1  KHAI LEQUANG (SBN 202922)
   klequang@orrick.com
2  MELANIE D. PHILLIPS (SBN 245584)
   mphillips@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street
4  Suite 3200
   Los Angeles, California 90017
5  Telephone: 213-629-2020
   Facsimile: 213-612-2499
6
   STEPHEN G. FORESTA (*pro hac vice* to be filed)
7  sforesta@orrick.com
   PHILIPP SMAYLOVSKY(*pro hac vice* to be filed)
8  psmaylovsky@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
9  51 West 52nd Street
   New York, New York 10019
10 Telephone: 212-506-5000
   Facsimile: 212-506-5151
11
   Attorneys for Plaintiff
12 U.S. BANK NATIONAL ASSOCIATION, AS
   SECURITIES INTERMEDIARY FOR LIMA
13 ACQUISITION LP

14

                UNITED STATES DISTRICT COURT
15
                CENTRAL DISTRICT OF CALIFORNIA
16
                      WESTERN DIVISION
17

18 U.S. BANK NATIONAL                    Case No.: CV12-03047 R (RZ)
   ASSOCIATION, a national association,
19 as securities intermediary for LIMA   **FIRST AMENDED COMPLAINT**
   ACQUISITION LP,                       **FOR:**
20
              Plaintiff,                 1. **BREACH OF CONTRACT;**
21                                        2. **BREACH OF THE**
           v.                               **COVENANT OF GOOD**
22                                          **FAITH AND FAIR DEALING;**
   PHL VARIABLE INSURANCE               3. **UNJUST ENRICHMENT**
23 COMPANY, a Connecticut corporation,  4. **VIOLATION OF THE**
                                            **CONNECTICUT UNFAIR**
24            Defendant.                    **TRADE PRACTICES ACT,**
                                            **CONN. GEN. STAT. §§ 42-**
25                                          **110a, et seq.; AND**
                                         5. **VIOLATION OF THE**
26                                          **CONNECTICUT UNFAIR**
                                            **INSURANCE PRACTICES**
27                                          **ACT, CONN. GEN. STAT. §§**
                                            **38a-815, et seq.**
28
                                         **JURY TRIAL DEMANDED**

1   Plaintiff U.S. Bank National Association, as securities intermediary for Lima

2   Acquisition LP ("Plaintiff"), hereby files this complaint against defendant PHL

3   Variable Insurance Company ("Phoenix" or "Defendant"), and alleges as follows:

4                            **NATURE OF THE ACTION**

5       1.      Plaintiff brings this action seeking compensatory and consequential

6   damages, punitive damages, equitable relief, and attorneys' fees based on Phoenix's

7   failure and refusal to pay the death benefit due under a $10 million dollar life

8   insurance policy insuring the life of Mr. John Doe (the "Doe Policy" or "Policy").[1]

9       2.      Phoenix issued the Doe Policy more than six years ago, and since

10  issuing the Policy, Phoenix has received $1,484,500 in premiums paid to keep the

11  Policy in force.  Mr. Doe passed away on January 7, 2012.  Shortly thereafter,

12  Plaintiff, as the current owner of the Policy, timely submitted a proof of claim to

13  Phoenix seeking payment of the death benefit under the Policy.  Phoenix, however,

14  has failed and refused to pay the death benefit, stating that it will not pay until

15  Plaintiff provides Phoenix with a document that Plaintiff does not have and that has

16  no bearing on Phoenix's obligation to pay.   Payment of the death benefit is now

17  due and owing, and Phoenix's pretextual and unjustified excuses for its failure and

18  refusal to pay the death benefit is a blatant violation of its obligations under the

19  Policy, and constitutes willful, reckless, and/or wanton disregard of Plaintiff's

20  rights.

21      3.      Upon information and belief, Phoenix has deliberately failed and

22  refused to pay this claim, along with claims submitted on a number of other policies

23  owned by Plaintiff, in retaliation for Plaintiff filing a lawsuit against Phoenix,

24  alleging that Phoenix unlawfully raised the cost of insurance rates on many of

25  Plaintiff's and other policyholders' policies.  Plaintiff filed that lawsuit, *U.S. Bank*

26  *National Association v. PHL Variable Insurance Company*, Case No. 2:11-cv-

27  _____

28  [1] For privacy reasons, Plaintiff has substituted "John Doe" for the name of the actual insured.

1   09517-OD (RZx) (the "COI Action"), in the Central District of California on

2   November 16, 2011.

3       4.    Before Plaintiff filed the COI Action, Phoenix promptly paid the death

4   benefit on a claim under one of Plaintiff's other policies, but since Plaintiff filed the

5   COI Action, Phoenix has not paid any of Plaintiff's death benefit claims. Plaintiff

6   has thus been forced to file two other lawsuits in addition to this one seeking

7   payment under other policies whose death benefits Phoenix has failed to pay. In

8   other words, while the rest of the life insurance industry, on average, denies less

9   than 1% of all death benefit claims, Phoenix has failed to pay 100% of Plaintiff's

10   death benefit claims submitted since the COI Action was filed.

11       5.    By improperly refusing to pay the death benefit on the Doe Policy,

12   Phoenix has forced Plaintiff to incur the substantial expense and delay of litigation

13   in order to obtain the benefits of the Policy, even after Phoenix has collected

14   premiums on it for over six years. Phoenix's misconduct in refusing to pay the

15   death benefit after collecting premiums for years constitutes not only express

16   breaches of the Policy, but also bad faith. Phoenix's misconduct is also part of an

17   ongoing pattern of unfair claims handling in violation of Connecticut's Unfair

18   Trade Practices Act and the Unfair Insurance Practices Act. Phoenix, a Connecticut

19   insurer, is unquestionably subject to the provisions of those statutes.

20                         **PARTIES**

21       6.    Plaintiff U.S. Bank National Association is a national banking

22   association with its principal place of business in Ohio, and is the securities

23   intermediary for Lima Acquisition LP.

24       7.    Upon information and belief, defendant Phoenix is a Connecticut

25   corporation with its principal place of business and nerve center in Hartford,

26   Connecticut, and Phoenix is authorized to do business in the State of California and

27   regularly conducts its business in the State of California, including within this

28   judicial district.

## JURISDICTION AND VENUE

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2) because Defendant resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including issuance of the Doe Policy in California to a trust that resided within this judicial district.

## FACTUAL ALLEGATIONS

10.     In 2006, Phoenix issued the Doe Policy, Policy No. 97516307, with a face value of $10,000,000 and an Issue Date and Policy Date of November 4, 2005. A copy of the Doe Policy is attached hereto as Exhibit 1.[2] The original owner of the Policy was the John D. Doe Irrevocable Insurance Trust[3] (the "Doe Trust" or "Trust"), which was also the original beneficiary of the Policy. The original beneficiary of the Doe Trust was Mr. Doe's wife, Jane Doe. The original trustee of the Trust was Wells Fargo Bank, N.A. The issue state of the Policy is California.

11.     California Insurance Code section 10113.5 states that "[a]n individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue." The Policy also states: "We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement)." Policy, p. 3 (Exhibit 1).

12.     The Doe Policy was acquired by Plaintiff after the expiration of the

---

[2] Some of the policy information in the exhibits hereto has been redacted for privacy reasons.

[3] As noted above, "John Doe" has been substituted for the true name of the insured, including within the name of the Trust. For the same privacy reasons, "Jane Doe" has been substituted for the true name of the insured's spouse.

1    contestability period, and Plaintiff thereafter continued to make all premium

2    payments on the Policy.

3         13.    From the time the Doe Policy was issued effective November 4, 2005

4    and until the Policy matured, all of the premiums that were due under the Doe

5    Policy were paid. Indeed, throughout the contestability period, and after, Phoenix

6    continued to accept premiums on the Policy, including over $700,000 in premiums

7    that were paid after the Policy became incontestable. In total, Phoenix received

8    $1,484,500 in premiums on the Policy.

9         14.    Mr. Doe died on January 7, 2012, while the Policy was in force. Upon

10   information and belief, Phoenix became aware of Mr. Doe's death shortly

11   thereafter.

12        15.    On January 30, 2012, Plaintiff submitted a proof of claim to Phoenix

13   requesting payment of the death benefit under the Doe Policy.

14        16.    On January 31, 2012, Phoenix sent a letter to Plaintiff stating that

15   Phoenix had on file a "Release of Assignment" and an "Assignment and

16   Assumption Agreement" from nearly two years earlier—before Plaintiff became the

17   owner of the Policy. The letter enclosed a single page of the "Assignment and

18   Assumption Agreement" from Phoenix's files and requested that Plaintiff provide

19   to Phoenix a Schedule 2.1(a)(3) to a "Purchase Agreement" that was referred to on

20   the page that Phoenix provided. A copy of Phoenix's correspondence dated

21   January 31, 2012 is attached hereto as Exhibit 2.

22        17.    Plaintiff was not a party to the Release of Assignment, the Assignment

23   and Assumption Agreement, or the Purchase Agreement that Phoenix referred to.

24   Upon information and belief, these documents concerned a collateral assignment on

25   the Policy that was released (per the referenced Release of Assignment) in

26   connection with the sale of a security agreement that covered the Doe Policy (per

27   the referenced Purchase Agreement). That sale took place *before* Plaintiff became

28   the owner of the Policy. Plaintiff therefore did not have, and does not have, a copy

- 4 -

FIRST AMENDED COMPLAINT

1  of the schedule that Phoenix demanded. Phoenix, however, clearly knew about the

2  collateral assignment, the release of the collateral assignment, and the sale of the

3  security agreement covering the Policy because Phoenix *recorded* the collateral

4  assignment and the release of the collateral assignment in connection with the sale,

5  and Phoenix had a copy of the "Assignment and Assumption Agreement."

6        18.    On February 8, 2012, Plaintiff responded to Phoenix's January 31

7  inquiry in a letter indicating that Phoenix had already recorded the release of the

8  collateral assignment and had acknowledged that it had done so. Having known

9  about the Release of Assignment, the Assignment and Assumption Agreement, and

10  the Purchase Agreement nearly two years ago, Phoenix had no basis for now asking

11  for a copy of a schedule referred to in those documents or refusing to pay the death

12  benefit to Plaintiff, a subsequent owner of the Policy. A copy of Plaintiff's

13  correspondence dated February 8, 2012 is attached hereto as Exhibit 3.

14        19.    In response to Plaintiff's letter, Phoenix advised Torrey Pines Services

15  LLC ("Torrey Pines"), the company that serviced the Doe Policy on behalf of

16  Plaintiff, that Phoenix would not pay the claim unless and until Plaintiff provided

17  Phoenix with a copy of the requested schedule. During that call, Phoenix admitted

18  it had already released the collateral assignment of the Policy (which, again, had

19  nothing to do with Plaintiff's subsequent acquisition of the Policy), and Phoenix

20  acknowledged that it was now, two years later and after receiving a death benefit

21  claim, trying to investigate whether it had released the assignment in error. Phoenix

22  also advised Torrey Pines that it would be sending a letter confirming this.

23        20.    Phoenix never sent a confirming letter. Therefore, on February 24,

24  2012, Plaintiff sent Phoenix a letter confirming the conversation between Phoenix

25  and Torrey Pines and further advising Phoenix that Plaintiff did not have a copy of

26  the schedule that Phoenix sought or the ability to obtain it. Plaintiff also advised

27  Phoenix that Phoenix had no legal basis for requiring Plaintiff to prove to Phoenix

28  that *Phoenix* had not made a mistake in releasing the collateral assignment that

- 5 -

1    took place before Plaintiff ever owned the Policy.  A copy of Plaintiff's

2    correspondence dated February 24, 2012 is attached hereto as <u>Exhibit 4</u>.

3          21.    Phoenix still refused to pay the claim.

4          22.    The Policy states: "Upon receipt by Us of Due Proof of Death that the

5    Insured died while this policy is In Force, We will pay the death proceeds of this

6    policy." Policy, p. 13 (Exhibit 1).  Because Plaintiff provided Phoenix with proof

7    of John Doe's death while the Policy was in force, Phoenix had no legal basis for

8    conditioning the payment of the death benefit upon Plaintiff obtaining documents

9    from a third party in order to prove *to Phoenix* that *Phoenix* had not made a

10   mistake in recording a release of a collateral assignment *two years earlier* and

11   before Plaintiff was the owner of the Policy.

12         23.    Nevertheless, in light of Phoenix's continued refusal to pay the claim,

13   Plaintiff contacted one of the parties to the Assignment and Assumption Agreement

14   that Phoenix provided to Plaintiff and requested a copy of the schedule that Phoenix

15   sought.  That party advised Plaintiff that it would not provide a copy of the

16   schedule, which it said was confidential, but it agreed to provide a certificate that

17   verified the Doe Policy was one of the assets that was listed on the schedule.

18   Plaintiff could only assume that this is what Phoenix sought to confirm by

19   requesting a copy of the schedule.  Thus, on March 21, 2012, Plaintiff provided

20   Phoenix with a copy of the certificate and made a final demand that Phoenix pay

21   the claim.  A copy of Plaintiff's correspondence dated March 21, 2012 is attached

22   hereto as <u>Exhibit 5</u>.

23         24.    In fact, just two weeks before Phoenix released the collateral

24   assignment, on August 3, 2010, Phoenix sent a notice advising it had recorded a

25   Change of Owner and Beneficiary under the Policy.  Phoenix did not raise any

26   questions or issues about the Policy, including any questions or issues about the

27   change of owner or beneficiary.  Also, on November 4, 2010, Phoenix provided a

28   Verification of Coverage for the Policy, and again did not raise any questions about

FIRST AMENDED COMPLAINT

1   the Policy or indicate there was any issue with it.

2       25.   California Code of Regulations, Title 10, section 2695.7(b) states:

3   "Upon receiving proof of claim, every insurer . . . shall immediately, but in no

4   event more than forty (40) calendar days later, accept or deny the claim, in whole or

5   in part. . . ."  Subsection (1) further states:

6               Where an insurer denies or rejects a first party claim, in
                whole or in part, it shall do so in writing and shall
7               provide the claimant a statement listing all bases for such
                rejection or denial and the factual and legal bases for
8               each reason given for such rejection or denial which is
                then within the insurer's knowledge.  Where an insurer's
9               denial of a first party claim, in whole or in part, is based
                on a specific statute, applicable law or policy provision,
10              condition or exclusion, the written denial shall include
                reference thereto and provide an explanation of the
11              application of the statute, applicable law or provision,
                conditions or exclusion to the claim. . . .
12

13      26.   It has been more than 40 calendar days since Plaintiff filed the proof of

14  claim on January 30, 2012, and Plaintiff has not received any notice that complies

15  with section 2695.7(b).

16      27.   As of the date hereof, Phoenix still has failed and refused to pay the

17  death benefit under the Doe Policy.

18                          **FIRST CAUSE OF ACTION**

19                       **For Breach of Contract (Express)**

20      28.   Plaintiff realleges the allegations contained in paragraphs 1 through

21  27.

22      29.   The Doe Policy is a binding and enforceable contract.

23      30.   Defendant breached the Policy by failing and refusing to pay the death

24  benefit due under the Policy.

25      31.   Plaintiff has performed all of its obligations under the Policy.

26      32.   As a direct and proximate cause of Defendant's material breaches of

27  the Policy, Plaintiff has been damaged as alleged herein in an amount to be proven

28  at trial.

## SECOND CAUSE OF ACTION

### For Breach of Contract (Bad Faith)

33.     Plaintiff realleges the allegations contained in paragraphs 1 through 27.

34.     The Doe Policy is a binding and enforceable contract.

35.     The Doe Policy includes an implied covenant that Defendant will act in good faith and deal fairly with Plaintiff.

36.     Defendant breached the implied covenant of good faith and fair dealing by, among other things, failing and refusing to pay the death benefit due under the Doe Policy, failing and refusing to provide any legal or contractual basis for its failure and refusal to pay the death benefit, making unreasonable demands for irrelevant documents to delay payment of the death benefit or as a pretext for refusing to pay the death benefit, and deliberately refusing and delaying the payment of the death benefit in retaliation for Plaintiff filing the COI Action.

37.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

38.     Furthermore, because Defendant acted with a conscious disregard of Plaintiff's rights, and its actions constitute oppression, fraud, or malice under Civil Code section 3294, Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION

### For Unjust Enrichment

39.     Plaintiff realleges the allegations contained in paragraphs 1 through 27.

40.     The premiums under the Doe Policy were fully paid to Defendant, by Plaintiff and prior owners of the Policy, through the maturation of the Policy.

41.     Defendant has retained these premium payments and has refused to pay the benefit due under the Policy.

- 8 -

FIRST AMENDED COMPLAINT

42.   Defendant's retention of the premiums and refusal to pay the benefit under the Policy has unjustly enriched Defendant at Plaintiff's expense.

43.   Accordingly, Plaintiff is entitled to an order requiring Defendant to pay the benefit due under the Policy.

## FOURTH CAUSE OF ACTION

### For Violation of the Connecticut Unfair Trade Practices Act

### Conn. Gen. Stat. §§ 42-110a, *et seq.*

44.   Plaintiff realleges the allegations contained in paragraphs 1 through 27.

45.   The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

46.   Defendant, a Connecticut corporation with its principal place of business in Connecticut, has engaged in "unfair" conduct, as alleged herein, of a "trade" or "commerce" as defined in Conn. Gen. Stat. § 42-110a.

47.   Among other violations of the Unfair Trade Practices Act, Defendant, as part of its general claims handling practices, has: (i) made misrepresentations pertinent to the facts relating to coverage under the Policy and other policies, including assertions that it had the right to condition payment of death benefits upon submission of documents confirming release of a collateral assignment that Defendant had already acknowledged had been released years before; (ii) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iv) refused to pay unquestionably valid claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (v) failed to affirm or deny coverage of claims within a reasonable time; and (vi) failed to promptly provide a reasonable explanation of the basis for denial

1  of a claim.

2    48.    Defendant's conduct violates (among other applicable provisions of

3  Connecticut law), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat.

4  § 42-110b(a), and the Connecticut Unfair Insurance Practices Act, including Conn.

5  Gen. Stat. §§ 38a-816(6)(a)-(f), and (n).

6    49.    Because Defendant acted with a willful, reckless and/or wanton

7  indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to

8  Conn. Gen. Stat. § 42-110g(a).

9    50.    Plaintiff is also entitled to recover its costs and reasonable attorneys'

10  fees incurred in prosecuting this action pursuant to Conn. Gen. Sta. § 42-110g(d).

11    51.    In compliance with Connecticut General Statutes § 42-110g(c), a copy

12  of this Complaint has been mailed to the Attorney General of the State of

13  Connecticut and the Connecticut Commissioner of Consumer Protection on this

14  date.

15                    **FIFTH CAUSE OF ACTION**

16      **For Violation of the Connecticut Unfair Insurance Practices Act**

17          **Conn. Gen. Stat. §§ 38a-815, *et seq.***

18    52.    Plaintiff realleges the allegations contained in paragraphs 1 through

19  27.

20    53.    The Connecticut Unfair Insurance Practices Act prohibits any "unfair

21  or deceptive act or practice in the business of insurance" by any Connecticut

22  insurer, including acts defined by statute as unfair claims handling.

23    54.    Defendant, a Connecticut corporation with its principal place of

24  business in Connecticut, engaged in "unfair" practices in the business of insurance,

25  as alleged herein.

26    55.    Among other violations of the Unfair Insurance Practices Act,

27  Defendant, as part of its general claims handling practices, has: (i) made

28  misrepresentations pertinent to the facts relating to coverage under the Policy and

- 10 -

other policies, including assertions that it had the right to condition payment of

death benefits upon submission of documents confirming release of a collateral

assignment that Defendant had already acknowledged had been released years

before; (ii) failed to act with reasonable promptness upon communications

regarding the Policy and other policies; (iii) failed to adopt and implement

reasonable standards for the prompt investigation of claims brought under the

Policy and other policies; (iv) refused to pay unquestionably valid claims without

conducting a reasonable investigation and despite available information

establishing the validity of such claims; (v) failed to affirm or deny coverage of

claims within a reasonable time; and (vi) failed to promptly provide a reasonable

explanation of the basis for denial of a claim.

56.    Defendant's conduct violates (among other applicable provisions of

Connecticut law) the Connecticut Unfair Insurance Practices Act, including Conn.

Gen. Stat. §§ 38a-816(6)(a)-(f), and (n).

57.    Because Defendant acted with a willful, reckless and/or wanton

indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to

Conn . Gen. Sta. §§ 42-110g(a).

58.    Plaintiff is also entitled to recover its costs and reasonable attorneys'

fees incurred in prosecuting this action pursuant to Conn. Gen. Sta. § 42-110g(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

## On the First Cause of Action

1.    For damages in an amount to be determined at trial;

2.    For an award of pre-judgment and post-judgment interest;

3.    For the costs of the suit herein incurred, including reasonable

attorneys' fees to the extent permitted by law; and

4.    For such other and further relief as the Court may deem proper.

## On the Second Cause of Action

- 11 -

1    1.    For damages in an amount to be determined at trial;

2    2.    For an award of pre-judgment and post-judgment interest;

3    3.    For the costs of the suit herein incurred, including reasonable

4    attorneys' fees to the extent permitted by law;

5    4.    For punitive damages; and

6    5.    For such other and further relief as the Court may deem proper.

7                    **On the Third Cause of Action**

8    1.    For an order requiring Defendant to pay the benefit due under the

9    Policy;

10   2.    For the costs of the suit herein incurred, including reasonable

11   attorneys' fees to the extent permitted by law; and

12   3.    For such other and further relief as the Court may deem proper.

13                    **On the Fourth Cause of Action**

14   1.    For damages in an amount to be determined at trial, but not less than

15   the benefits due on the Doe Policy;

16   2.    For an award of consequential damages and lost profits, in an amount

17   to be determined at trial;

18   3.    For an award of pre-judgment and post-judgment interest;

19   4.    For the costs of the suit herein incurred, including reasonable

20   attorneys' fees to the extent permitted by law;

21   5.    For punitive damages; and

22   6.    For such other and further relief as the Court may deem proper.

23                    **On the Fifth Cause of Action**

24   1.    For damages in an amount to be determined at trial, but not less than

25   the benefits due on the Doe Policy;

26   2.    For an award of consequential damages and lost profits, in an amount

27   to be determined at trial;

28   3.    For an award of pre-judgment and post-judgment interest;

FIRST AMENDED COMPLAINT

1        4.    For the costs of the suit herein incurred, including reasonable

2    attorneys' fees to the extent permitted by law;

3        5.    For punitive damages; and

4        6.    For such other and further relief as the Court may deem proper.

5    Dated:    May 24, 2012              Orrick, Herrington & Sutcliffe LLP

6

7                        By: _____

8                              KHAI LEQUANG

9                            Attorneys for Plaintiff
                           U.S. BANK NATIONAL

10                   ASSOCIATION, AS SECURITIES
                       INTERMEDIARY FOR LIMA

11                         ACQUISITION LP

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:        May 24, 2012                        Orrick, Herrington & Sutcliffe LLP

By:_____

KHAI LEQUANG
Attorneys for Plaintiff
U.S. BANK NATIONAL
ASSOCIATION, AS SECURITIES
INTERMEDIARY FOR LIMA
ACQUISITION LP

- 14 -

# Exhibit 1

**Document Cover sheet**

Original 





Exhibit 1 - 15

# PHL Variable Insurance Company

**Insured** ▮▮▮▮▮▮▮▮▮▮▮

**Age & Sex** 73    MALE

**Policy Number** 97516307

**Face Amount** $10,000,000.00

**Policy Date** NOVEMBER 4, 2005

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. For service or information on this policy, contract the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within 30 days after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> PHL Variable Insurance Company
> Variable and Universal Life Administration
> P.O. Box 8027
> Boston, MA 02266-8027
> Telephone (800) 541-0171

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy.

Signed for PHL Variable Insurance Company at its Home Office, One American Row, Hartford, Connecticut 06115.

Sincerely yours,

PHL Variable Insurance Company

*John H. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

## FLEXIBLE PREMIUM LIFE INSURANCE POLICY
**Death benefit payable if Insured dies while the Policy is In Force**
**Not Eligible for Annual Dividends**

U606 CA

U606CAF1

Exhibit 1 - 16

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

**POLICY NUMBER:**           97516307

**POLICY DATE:**             NOVEMBER   4, 2005

**FACE AMOUNT:**             $10,000,000.00

**DEATH BENEFIT OPTION:**    A

**OWNER:**                   OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

**BENEFICIARY:**             AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

### INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---------|-----------------|---------------------|
| ███████ | 73      MALE    | PREFERRED           |

### PREMIUMS

**ISSUE PREMIUM:**           $56,377.64

**SUBSEQUENT PLANNED QUARTERLY PREMIUM:**           $84,566.47

**TOTAL PREMIUM LIMIT:**     GREATER OF   $6,301,545.50   AND RESULT OF    $892,996.69 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER NOVEMBER 4, 2005

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

**PREMIUM DUE DATES:**       The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the FIFTH day of each QUARTER          thereafter until the Death of the Insured, but not beyond NOVEMBER   4, 2032

**POLICY VALUE BENCHMARK AMOUNT:**    $8,600,000.00       (See Part 5)

U606

U606ZZS1

Exhibit 1 - 17

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:                97516307

### POLICY CHARGES

SALES CHARGE:          10% of the first $540,000.00    of premium paid in the
                       first policy year. 5% of any premium paid in excess of
                       $540,000.00     in the first policy year.
                       5% of all premiums  paid in policy years 2+.

MONTHLY DEDUCTION:     See Part 5, "Monthly Deduction". Includes cost of insurance, any
                       rider charges, any flat extra mortality charges, and monthly
                       service and expense charges.

MONTHLY SERVICE CHARGE: $3.50      Guaranteed not to exceed $7.00.

MONTHLY EXPENSE CHARGE:   $50.00 deductible monthly during the first Policy Year.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:  $25.00 (in addition to a partial
                                             Surrender Charge).

SURRENDER CHARGE:      See table on next page.

We will not charge any Policy charges after the Policy Anniversary which follows the Insured's 100th
Birthday.

### OTHER RATES

GUARANTEED MINIMUM INTEREST RATE: 4%.

### LIMITATIONS

MINIMUM LOAN AMOUNT:   $100

PARTIAL WITHDRAWALS:   A Partial Withdrawal will not be permitted in an amount

- less than $500.00;

- which would reduce the Surrender Value to $0.00; or

- which would reduce the face amount below $250,000.

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     97516307

### TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5.  The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums.  In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|---|---|
| 1 | 57.2400 |
| 2 | 54.8479 |
| 3 | 52.5272 |
| 4 | 50.2784 |
| 5 | 48.0994 |
| 6 | 45.9838 |
| 7 | 43.9204 |
| 8 | 41.9035 |
| 9 | 39.9361 |
| 10 | 38.0261 |
| 11 | 36.1875 |
| 12 | 34.4363 |
| 13 | 32.7794 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

## SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:      97516307

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 3.95330 | 11 | 10.31580 | 21 | 22.63580 |
| 02 | 4.41000 | 12 | 11.34250 | 22 | 24.63750 |
| 03 | 4.90000 | 13 | 12.43330 | 23 | 27.49670 |
| 04 | 5.42170 | 14 | 13.56670 | 24 | 32.04580 |
| 05 | 5.97000 | 15 | 14.73250 | 25 | 40.01670 |
| 06 | 6.53920 | 16 | 15.90750 | 26 | 54.83170 |
| 07 | 7.14330 | 17 | 17.10750 | 27 | 83.33330 |
| 08 | 7.80580 | 18 | 18.34920 | | |
| 09 | 8.54330 | 19 | 19.65330 | | |
| 10 | 9.37670 | 20 | 21.06250 | | |

Basis of Calculations:   1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker *Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective* annual interest rate.

Monthly Factor used in determining Cost of Insurance:   1.0032737 (SEE PART 5)

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     97516307

### TABLE OF FACE AMOUNTS OF INSURANCE

ISSUE DATE                                          FACE AMOUNT
NOVEMBER  4, 2005                                   $10,000,000.00


### RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR69 – AGE 100+ | 11/04/2005 | NOT APPLICABLE | NONE | $0.00 |
| UR77 – EXCHANGE OF INSURED OPTION | 11/04/2005 – EXCHANGE OPTION RIDER | $0.00 | 11/04/2032 | $0 |
| UR73 – LIFEPLAN OPTIONS RIDER | 11/04/2005 | NOT APPLICABLE | NONE | $0.00 |

U606

# BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two *Death Benefit* Options to choose from, as described in Part 7. *Option A is the Face Amount. Option B is the Face Amount plus Policy Value.* Under either Option, the *Death Benefit* must be at least the Minimum *Death Benefit* as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the *Death Benefit* Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the *Surrender Value*, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and *Death Benefit* Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.

**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**

U606

Exhibit 1 - 22

# TABLE OF CONTENTS

SCHEDULE PAGE

BRIEF SUMMARY OF MAIN PROVISIONS

PART1: DEFINITIONS........................................ 1

PART2: GENERAL PROVISIONS......................2
    Effective Date of Insurance.......................2
    The Policy and Application.......................2
    Not Eligible for Annual Dividends.........2
    Revised Schedule Pages..........................2
    Age.........................................................3
    Misstatement of Age or Sex....................3
    Contestability........................................3
    Insurability Requirements After Issue....3
    Suicide Exclusion...................................4
    Termination............................................4
    Minimum Policy Values..........................4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY....................... 4
    Owner.....................................................4
    Rights of Owner.......................................4
    Collateral Assignment.............................5
    Beneficiary..............................................5
    How to Change the Beneficiary.............. 6

PART 4: PREMIUMS...................................... 6
    Payments................................................6
    Total Premium Limit................................6
    Grace Period and Lapse..........................7
    Reinstatement.........................................7

PART 5: POLICY VALUES............................. 8
    Basics of Calculations............................ 8
    Policy Value............................................ 8
    Interest Rate........................................... 9
    Benchmark Interest Bonus...................... 9
    Monthly Deduction.................................10
    Cost of Insurance...................................10
    Cost of Insurance Rates..........................10
    Surrender Value......................................11
    Partial Withdrawals................................11

PART 6: POLICY LOANS.......................12
    When Available...................................... 12
    Amount Available...................................12
    Loan Interest......................................... 12
    Debt......................................................13
    Repayment.............................................13

PART 7: INSURANCE COVERAGE
PROVISIONS................................................. 13
    Death Proceeds.................................... 13
    Interest on Insurance Proceeds..............14
    Death Benefit.........................................14
    Minimum Death Benefit......................... 14
    Death Benefit Following Insured's
       Age 100............................................ 14
    Change in Death Benefit Option........... 15
    Request for a Decrease in Face
       Amount.............................................15

PART 8: MISCELLANEOUS
PROVISIONS................................................. 15
    Annual Report........................................ 16
    Projection of Benefits and Values...... 16
    Notices by Us........................................ 16
    Deferment of Certain Payments............ 16
    Claims of Creditors................................ 16
    Corrections............................................ 16

PART 9: PAYMENT OPTIONS....................... 16
    Who May Elect Payments Options...... 16
    How to Elect a Payment Option........... 17
    What Payment Options Are Available 17
    Other Payment Options......................... 19
    Additional Interest................................. 19

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS..................................................... 19
    Adjusted Age......................................... 19
    Tables for Options 3, 4 and 5.............. 21
    Table for Option 7................................. 22

Exhibit 1 - 23

# PART 1: DEFINITIONS

| | |
|---|---|
| **Assigns** | Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3. |
| **Death Benefit Option** | The type of Death Benefit in effect as described in Part 7. |
| **Due Proof of Death** | A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us. |
| **In Force** | The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4. |
| **In Writing (Written Notice) (Written Request)** | Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office. |
| **Monthly Calculation Day** | The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day. |
| **Subsequent Planned Premium** | The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. |
| **Policy Anniversary** | The anniversary of the Policy Date. |
| **Policy Date** | The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured. |
| **Policy Debt** | Unpaid policy loans with accrued interest. |
| **Policy Month** | The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day. |
| **Policy Value** | The Policy Value as defined in Part 5. |
| **Policy Year** | The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary. |
| **Surrender Value** | The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt. |
| **We (Our, Us)** | PHL Variable Insurance Company. |
| **You (Your)** | The owner of this policy at the time an owner's right is exercised. |

## PART 2:   GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**The Policy and Application**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements to it, and the application for it (and any supplemental applications) constitute the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, in the absence of fraud, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1.   it is contained in the application or in a supplemental application; and

2.   a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, including modifying the policy, waiving any of its conditions, or making an agreement for the Company, to be in effect, must be In Writing and signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us at Our Main Administrative Office in Hartford, Connecticut. Any benefits payable under this policy are payable at Our Main Administrative Office.

**Not eligible for Annual Dividends**

This policy is non-participating and therefore is not eligible for annual dividends. This means that You are not entitled to participate in company profits.

**Revised Schedule Pages**

The   Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

Exhibit 1 - 25

**Age**

Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date.

**Misstatement of Age or Sex**

If the age or sex of the Insured is misstated, the Policy Value and any Death Benefits payable shall be adjusted on the basis of the difference between the monthly deductions made and the monthly deductions which should have been made, accumulated at the interest rates that were credited to the Policy Value.

In the event of death, the recalculation, in and of itself, will not result in termination of the policy prior to the date of death. We will not pay less on the date of death on the policy after recalculation than the Surrender Value determined based upon the misstated age.

**Contestability**

We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement).

While insurance is contestable, We may rescind the insurance or deny a claim on the basis of:

1. a misstatement in the application or supplemental application for this policy or any face amount increase; or

2. a misstatement in the reinstatement application if there has been a reinstatement of this policy.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by Us for the contested face amount or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1. evidence of the Insured's insurability must be given that is satisfactory to Us; and

2. under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

U606

-3-

Exhibit 1 - 26

**Suicide Exclusion**

If the Insured, whether sane of insane, dies by suicide within two years from the Policy Date, (or within two years from any reinstatement of the policy) and while the policy is in Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals.

**Termination**

If not previously terminated, this policy will terminate automatically on the earliest. of:

1.  the date the Insured dies; or

2.  the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

**Minimum Policy Value**

All of the values under this policy are equal to or more than the minimum required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered.

## PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

**Owner**

The Insured is the owner of this policy, unless otherwise provided in the application or be later transfer of ownership.

**Rights of Owner**

While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may:

1.  Transfer ownership to a new owner.

2.  Name or change a contingent owner to succeed to the rights of the owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed in Writing.

3.  Receive any amounts payable under this policy during the Insured's lifetime.

4.  Change the beneficiary of the death benefit. See Part 3.

5.  Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6.  Obtain a partial withdrawal. See Part 5.

7.  Surrender this policy for its cash Surrender Value. See Part 5.

8.  Obtain policy loans. See part 6.

9. Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

An ownership transfer designation or change of designation will be effective as of the date the notice was signed, subject to any action taken by Us before We record such notice. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**

By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**

Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:

a) Primary beneficiaries;

b) Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;

c) You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the insured.

**How to Change the Beneficiary**

You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office.

# PART 4: PREMIUMS

**Payments**

The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid.

Subject to the limitations stated below, You may pay additional premiums at any time prior to age 100 while this policy is In Force. All premiums are payable at Our Main Administrative Office or to an authorized agent of ours. You may request a receipt signed by one of Our executive officers.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi-annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent. We may limit the number and amount of premium payments in any Policy Year.

The minimum premium payment amount that We will accept is $25. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. To the extent of such evidence, the Contestability and Suicide Exclusion provisions will apply. The application for such evidence is attached to and will be made part of the policy.

**Total Premium Limit**

The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period And Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

a) change in Death Benefit Option;

b) a decrease of face amount;

c) a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any Policy Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. If such premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value, but not before 30 days have elapsed since *We mailed Our Written Notice to You and any Assigns. The date of lapse* will be the Monthly Calculation Day on which the deduction was to be made, and any insurance and rider benefits provided under this policy will terminate as of that date.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement until We receive at Our Main Administrative Office all of the following:

1. a Written Request for reinstatement;

2. evidence of insurability satisfactory to Us;

3. if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

U606

Exhibit 1 - 30

4. the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, minus the monthly deduction for the month then starting.

## PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**

Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**

Policy Value is to be calculated as follows:

1. In each Monthly Calculation Day following the Policy Date, the Policy Value will equal $(A + B + C - D - E)$;

2. on a day of the month other than a Monthly Calculation Day, it will equal $(A + C)$;

3. on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E; where:

    A= the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

    B= one month's interest on A, including any Benchmark Interest Bonus;

—9—

Exhibit 1 - 31

C= all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D= any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E= the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Changes in the rate will apply to all policies in the same investment class. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." The rate in effect on a given date for loaned amounts will be no less than the Loan Interest Rate in effect on that date less 2%. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Interest Bonus**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit an interest bonus on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Bonus Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This bonus will be equal to (A x B), where:

A= the Bonus Interest Rate; and

B= the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

$$(A + B + C); \text{ where:}$$

A= the cost of insurance (as defined in the Cost of Insurance provision below);

B= the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C= the Monthly Service Charge shown on the Schedule Pages, and if applicable, one–twelfth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

$$(A \times (B - C)) + D; \text{ where}$$

A= the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B–C) below;

B= the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C= the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one–twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D= the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

Exhibit 1 - 33

No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings, mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

U606                                    −11−

Exhibit 1 - 34

The partial surrender charge is equal to a pro-rata portion of the surrender charge that would apply to a full surrender. The partial surrender charge is determined by multiplying the full surrender charge by a fraction equal to the partial surrender amount payable divided by the result of subtracting the applicable surrender charge from the Policy Value.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

# PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the Policy Value minus any applicable surrender charge then in effect, this policy will lapse according to the terms of the Grace Period and Lapse provision.

A loan will not be permitted in an amount less than the Minimum Loan Amount shown on the Schedule Pages, except if the amount to be loaned equals the full loaned amount then remaining.

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

**Loan Interest**

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. Each year We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A. The Corporate Bond Yield Average – Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B. If that Monthly Average is no longer published, a substantially similar average, established by regulation issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**

As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**

The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25.

# PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**

Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a) the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c) any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy is In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insureds death occurs, as follows:

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0-40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76-90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the Insured's birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

Exhibit 1 - 37

**Change in Death Benefit Option**

The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following:

1. A change in Death Benefit Option will require that there be no immediate change in Our insurance risk. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require evidence of insurability for a change in Death Benefit Option. You are limited to one change in Death Benefit Option for each Policy Year.

2. The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change.

## PART 8: MISCELLANEOUS PROVISIONS

**Annual Report**

We will send You, without charge, a report for each Policy Year which includes:

1. the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2. any partial withdrawals, premiums paid, interest credited and charges made during the year;

3. any outstanding policy loans and new loans and loan repayments made during the year; and

J606

–15–

Exhibit 1 - 38

4.  any other information required by the insurance supervisory official of the state in which this policy was delivered.

You have the right to request an illustrative report at any other time. We reserve the right to charge up to $25.00 for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee of up to $25.00, a projection of illustrative future benefits and values under Your policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan. If payment is deferred 31 days or more on any surrender, interest will be paid at an effective annual rate of 4.00% on the amount deferred, from the date the request is received to the date of payment.

**Claims of Creditors**

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law.

**Corrections**

We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy.

## PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Exhibit 1 - 39

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be In Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amount provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1 – Payment in one sum

Option 2 – Left to earn interest

We pay interest on the amount left with Us under this Option as a principal sum.

We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

Equal installments are paid until the later of:

a) the death of the payee;

b) the end of the period certain.

Exhibit 1 - 40

The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows:

a) ten years;

b) twenty years;

c)   until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

If, for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

Option 5-   Life annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6-   Payments of a specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

U606

Exhibit 1 - 41

Option 7 – Joint survivorship annuity with a 10–year period certain

This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

a) the end of the 10–year period certain;
b) the death of the Insured;

c) the death of the other named annuitant.

The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**

We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

a) the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b) the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

# PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**

The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a) for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

Exhibit 1 - 42

a) for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

## Option 3 - Payments for a specified period

| Number of Years | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment $ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment $ | 17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment $ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Monthly Installment $ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

## *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Fe-Male | Male | Fe-Male | Male | Fe-Male | | Male | Fe-Male | Male | Fe-Male | Male | Fe-Male |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

## *Option 5 - Life annuity

| Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.17 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

Exhibit 1 - 44

**\* Option 7 - Joint survivorship annuity with 10-year period certain**

| Age of Other Annuit- ant F | Age of Insured Male | | Age of Other Annuit- ant F | Age of Insured Male | | Age of Other Annuit- ant M | Age of Insured Female | | Age of Other Annuit- ant M | Age of Insured Female | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | | 55 | 60 | | 55 | 60 | | 55 | 60 |
| 40 | $3.62 | $3.64 | 60 | $4.43 | $4.64 | 40 | $3.72 | $3.77 | 60 | $4.34 | $4.64 |
| 45 | 3.80 | 3.83 | 65 | 4.61 | 4.93 | 45 | 3.89 | 3.97 | 65 | 4.44 | 4.82 |
| 50 | 4.00 | 4.07 | 70 | 4.75 | 5.18 | 50 | 4.06 | 4.19 | 70 | 4.50 | 4.95 |
| 55 | 4.22 | 4.34 | 75 | 4.86 | 5.36 | 55 | 4.22 | 4.43 | 75 | 4.54 | 5.03 |

\* Minimum monthly income for each $1,000 applied

# AGE 100+ RIDER

This rider is part of the policy to which it is attached.  Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**Rider Date:**                      NOVEMBER 4, 2005

**Rider Charge Date:**          N/A

## DEFINITIONS

**Age 100 Anniversary**
The Policy Anniversary nearest the Insured's 100th birthday.

## GENERAL

**Death Proceeds**
While this rider is in effect, the "Death Proceeds" provision of the basic policy is amended by adding the following to the end of that provision:

On and after the Age 100 Anniversary, the death proceeds at the death of the Insured are equal to:

a)    the Death Benefit, as described below;  MINUS

b)    any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

c)    any debt then existing on this policy

**Death Benefit Following Insured's Age 100**
While this rider is in effect, the "Death Benefit Following Insured's Age 100" provision of the basic policy is replaced with the following:

On and after the Age 100 Anniversary, the death benefit will equal 1 or 2, whichever is greater:

1.    the face amount of the basic policy on the date of the insured's death, plus the Total Rider Insurance Amount under the Individual Term Rider as of the day before the Age 100 Anniversary provided the Individual Term Rider was in effect on that date; or

2.    the Policy Value on the date of the insured's death.

Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid.  Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Age 100 Anniversary. It may be subject to adverse tax consequences and a tax advisor should be consulted before You choose to continue the policy after the Age 100 Anniversary.**

UR69 CA

Exhibit 1 - 46

**Monthly Rider Charges**
There is no charge for this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1.  the date of full surrender or lapse of the basic policy;

2.  Our receipt of Your Written Request to cancel this rider, which shall be effective as of the next Monthly Calculation Day; or

3.  the date of the insured's death.

Upon termination of this rider the "Death Benefit Following Insured's Age 100" provision in the policy will become operative including any consequent reduction in death benefit to equal the Policy Value. No retroactive assessment will be made for monthly deductions waived under this rider.

PHL Variable Insurance Company

Chairman, President
and Chief Executive Officer

UR69 CA

Exhibit 1 - 47

# Life Plan Options Rider

This rider is part of the policy to which it is attached.  Except as stated in this rider, it is subject to all of the provisions contained in the policy.

## DEFINITIONS

Option Review Period
The 90-day period immediately preceding the 5th, 10th and 15th Policy Anniversaries.

Individual Term Life Rider
As used in this rider form "Individual Term Life Rider" refers to any of the following riders: Individual Term Rider, Individual Term Insurance Rider, Policy Term Rider, Policy Term Insurance Rider, Phoenix Individual Edge Term Rider, or the Variable Policy Term Rider.

## OPTION BENEFITS

Increased Coverage Determination without Medical Exam
Policies that include both this rider and the Individual Term Life Rider are eligible during each Option Review Period, while both such riders are in effect, for an increase in their term insurance rider amount up to a maximum lifetime increase of $1,000,000, with underwriting and our agreement to such increase determined without the inconvenience of an additional medical exam.  Our other ordinary underwriting rules will continue to apply and thus the increase in coverage is still subject to our normal underwriting approval.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- The insured must be attained age 65 or younger on the last day of the Option Review Period.
- The risk classification of the insured must be standard through Table D (200%) at original issue of the basic policy.
- The insured must be alive and meet our underwriting requirements at the time of your request for the increase in term rider face amount.
- The Individual Term Life Rider must either already be attached to the policy or then currently approved and available for sale in the state of applicable jurisdiction.
- There is a maximum lifetime increase of $1,000,000 per insured life.

Reduced Coverage without Surrender Charge
During each Option Review Period you may request a decrease in the face amount of the policy without our assessment of the partial surrender charge that, under the terms of your basic policy, would otherwise apply.  In such case the surrender charge remaining under the policy will continue to be calculated as if such decrease in face amount had not been made.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- Total option reductions of the basic policy face amount may not exceed the lesser of 50% of the initial basic policy face amount or $5,000,000 in combined aggregate of all option reductions for all Our policies on the same insured.

Exchange for Annuity without Surrender Charge

During each Option Review Period beginning with the 90-day period preceding the 10th policy anniversary, you may request that the policy be surrendered as part of an exchange request to an eligible annuity offered by us. In such an exchange, we would not assess the surrender charge that would otherwise apply. In such case, the new annuity will reflect the usual surrender charges that would ordinarily apply for new business.

Other conditions that apply to this option are as follows:
• The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.


**TERMINATION OF THIS RIDER**

This rider will terminate on the first of any of the following events to occur:

1. exercise of the Exchange for Annuity without Surrender Charge Option;

2. the 15th policy anniversary;

3. termination of the basic policy.


PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer


UR73

2

Exhibit 1 - 49

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

### The Exchange Option
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

### How to Exercise This Option
To exercise this option, You must file an application with Us at Our Main Administrative Office. It must be signed by You. We must also receive:

1. Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2. Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for. Selection of risks includes health and non-health factors.

3. The release of any lien against or assignment of your policy. You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4. The surrender and release of the exchange policy.

5. Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy. Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1. Our receipt of the application;

2. Payment of the Exchange Adjustments, if any; and

3. Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

### The New Policy
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

UR77                                         - 1 -                          RUR77ZZ1   Exhibit 1 - 50

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below.  The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy.  All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1.   Termination of the exchange policy;

2.   Lapse or Exchange of the exchange policy;

3.   Our receipt at Our Home Office of a Written Request to cancel this rider; and

4.   Death of the insured.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

# PHOENIX

Boston, MA 02266-8027
Underwriting Service Center

Company is defined as indicated below:

☐ Phoenix Life and Annuity Company
☒ PHL Variable Insurance Company

| Agency: | E0366 | Insured(s): | |
|---------|-------|-------------|---|
| Policy Number: | 97516307 | | |

## DECLARATION:

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a Health Statement Form for that insured. **PLEASE NOTE: Home Office approval of the Health Statement Form is necessary before the policy is in effect.**

**AMENDMENTS:** The application for Policy No. 97516307 is amended as follows:

**The premiums are payable Quarterly.**
**The application Part 2 is hereby amended to reflect the company name as PHL Variable Insurance Company.**
**Trust was established in CA on 01/18/2006 Tax ID #206801257**
**The application Part 1 is hereby amended to reflect the company name as PHL Variable Insurance Company.**

**ENDORSEMENTS:**

**Delivery expiry is 4/1/2006 on policy 97516307.**

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If a Health Statement Form is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | _____ | Insured(s) | _____ | ☐ |
| Signed at | _____ | | _____ | ☐ |
| Witness | _____ | | _____ | ☐ |
| Owner | _____ | | _____ | ☐ |
| Owner | (if other than Insured) | | _____ | ☐ |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

**AGENT:** ORIGINAL to Underwriting and Issue, YELLOW copy to Agent, PINK copy to remain with policy.

HD11

HHR11ZZ1  10-99

Exhibit 1 - 52

# PHOENIX

P.O. Box 8027
Boston, MA 02266-8027

Underwriting Service Center

. Company is defined as indicated below:

☐ Phoenix Life and Annuity Company
☒ PHL Variable Insurance Company

| Agency: | E0366 | Insured(s): | |
|---|---|---|---|
| Policy Number: | 97516307 | | |

## DECLARATION:

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a Health Statement Form for that insured. PLEASE NOTE: Home Office approval of the Health Statement Form is necessary before the policy is in effect.

**AMENDMENTS:** The application for Policy No. 97516307 is amended as follows:

The premiums are payable Quarterly.
The application Part 2 is hereby amended to reflect the company name as PHL Variable Insurance Company.
Trust was established in CA on 01/18/2006 Tax ID #206801257
The application Part 1 is hereby amended to reflect the company name as PHL Variable Insurance Company.

**ENDORSEMENTS:**

Delivery expiry is 4/1/2006 on policy 97516307.

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If a Health Statement Form is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | _____ | Insured(s) | _____ | ☐ |
| Signed at | _____ | | _____ | ☐ |
| Witness | _____ | | _____ | ☐ |
| Owner | _____ | | _____ | ☐ |
| Owner | (If other than Insured) | | _____ | ☐ |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

**AGENT:** ORIGINAL to Underwriting and Issue. YELLOW copy to Agent, PINK copy to remain with policy.

Exhibit 1 - 53

# ◈ PHOENIX

P.O. Box 8027
Boston, MA 02266-8027
Underwriting Service Center

Company is defined as indicated below:

☐ Phoenix Life and Annuity Company
☒ PHL Variable Insurance Company

| Agency: E0366 | Insured(s): ████████ |
|---|---|
| Policy Number: 97516307 | |

## DECLARATION:

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a Health Statement Form for that insured. **PLEASE NOTE: Home Office approval of the Health Statement Form is necessary before the policy is in effect.**

**AMENDMENTS:**   The application for Policy No. 97516307 is amended as follows:

**The premiums are payable Quarterly.**
**The application Part 2 is hereby amended to reflect the company name as PHL Variable Insurance Company.**
**Trust was established in CA on 01/18/2006 Tax ID #206801257**
**The application Part 1 is hereby amended to reflect the company name as PHL Variable Insurance Company.**

**ENDORSEMENTS:**

**Delivery expiry is 4/1/2006 on policy 97516307.**

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If a Health Statement Form is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | _____ | Insured(s) | _____ | ☐ |
| Signed at | _____ | | _____ | ☐ |
| Witness | _____ | | _____ | ☐ |
| Owner | _____ | | _____ | ☐ |
| Owner | (If other than Insured) | | _____ | ☐ |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

**AGENT:** ORIGINAL to Underwriting and Issue, YELLOW copy to Agent, PINK copy to remain with policy.

Exhibit 1 - 54

**⬥PHOENIX** PO Box 8027
Boston MA 02166-8027

**Application for Life Insurance**
**Part I**

Company is defined as indicated below: (check one)

☒ Phoenix Life Insurance Company      ☐ PHL Variable Insurance Company      ☐ Phoenix Life and Annuity Company

**Section I - Proposed Insured**

[REDACTED]

**Section II - Ownership**

☒ A. Insured
☐ B. Successive Owners
☐ B1. Owners Jointly
☐ C. Corporation, its successors or assigns (include state of incorporation)

☐ D. Partnership (include Name of all Partners - if partnership is limited, indicate which partners are general partners)
☐ E. Sole Proprietorship (include Name of Sole Proprietor)
☒ F. Trust (include Name and Date of Trust, Name of Trustee(s) and Grantor)

(Complete section below if B, C, D, E or F are checked)

If Owner is other than Proposed Insured, Premium Notice will be sent to:

Owner's Name _____ [REDACTED]

Mailing Address
Owner's Email Address
Social Security
Contingent Owner

Name _____ Date of Birth _____
Relationship _____

Ultimate Owner: Check one. If none checked, insured will be ultimate owner.
☐ Insured      ☐ Executor or administrator of the survivor of the primary and contingent owners

**Section III - Beneficiary Designation**

| [REDACTED] | Relationship to Proposed Insured | Date of Birth (if Available) | Social Security No. (if known) |
|---|---|---|---|
| [REDACTED] | | | |
| First Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (if Available) | Social Security No. (if known) |
| Second Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (if Available) | Social Security No. (if known) |

If Trust is primary beneficiary: (check one)
☐ Trust under insured's will      [REDACTED]
☒ Inter vivos - Name of Trustee _____
Date of Trust __12-13-2000__

To qualify for payment, beneficiary must be living: (Check A or B, otherwise A will apply)
☐ A. at the Proposed Insured's death.      ☐ B. on the 30th day after the date of the Proposed Insured's death.

OL273                                    1 of 8          v092113083882956                    4-02

**BISYS Insurance Services, Inc.**

Exhibit 1 - 55

10/31/2005 10:26 FAX 954 796 9818      BISYS                                    ☒002

**Section IV - Coverage Applied For**

Plan of Insurance | Basic Policy Amount
Phoenix Accumulator UL II | $ 10,000,000

**Section V - VARIABLE/UNIVERSAL PLANS of Insurance - Riders and Features**

First Year Anticipated, BILLED Premium (Excluding 1035 Exchange, Lump Sum Funds, etc.) | Subsequent Planned Annual Premium
779,300.00 | 779,300.00

☐ Disability Waiver of a Specified Amount
   Amount $ _____
☐ Accidental Death Benefit Rider
☐ Death Benefit Protection Rider
   ☐ Age 70   ☐ Age 80   ☐ Age 100
☐ Purchase Protector _____ units
☐ Child's Term Rider
☐ Family Term Rider
☐ Living Benefit Rider
☐ Guaranteed Death Benefit Rider
☐ Guaranteed Extension Rider
☐ Cash Value Accumulation Rider
☐ Age 100 + Rider
☐ Individual Term Rider $ _____

Death Benefit Option (check one) If none checked, Option 1 will apply.
   ☒ Option 1 - Level Face Amount
   ☐ Option 2 - Increasing Face Amount
Face Amount Increase Options:
   ☐ _____ % percentage Increase
   ☐ $ _____ Fixed Dollar Increase
   ☐ Increase Equal to Premiums Paid
Policy Option: (check one) If none checked, Option A will apply.
   ☐ Policy Option A
   ☐ Policy Option B
   ☐ Policy Option C
☐ Other _____
☐ Other _____
☐ Other _____
☐ Other _____

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market enhancement until the end of the Right to Cancel Period, as stated in the policy, indicate: ☐ Yes   ☐ No

**Telephone/Electronic Authorization**

I will receive this privilege automatically. By checking "Yes", I am authorizing and directing the Company to act on telephone or electronic instructions from my licensed agent who can furnish proper identification. The Company will use reasonable procedures to confirm that these instructions are authorized and genuine. As long as these procedures are followed, the Company and its affiliates and their directors, trustees, officers, employees, representatives and/or agents, will be held harmless for any claim, liability, loss or cost.
☐ Yes   ☐ No

**Electronic Delivery Authorization**

By checking "Yes," I am authorizing the Company to provide my statements, prospectuses and other information electronically if available. I understand that I must have Internet access to use this service and there may be access fees charged by the Internet service provider. ☐ Yes   ☐ No

**Section VI - Suitability**

Do you understand that if you have purchased a Variable Life Policy and the Death Benefit may be varied in or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying enhancements? ☐ Yes   ☐ No

If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives? ☐ Yes   ☐ No

If I have purchased a Variable Life Policy, I confirm that I have received the prospectus for that policy and its underlying funds.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

**Section VII - Complete if Temporary Insurance is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement may not be issued, and no coverage will take effect.

Yes  No
☐    ☐    1. Within the past two years have you been treated for heart disease, stroke, or cancer or had such treatment recommended?
☐    ☐    2. Within the past 60 days have you been scheduled or advised to have any diagnostic test (excluding HIV) tests or surgery not yet performed?

$ _____ has been paid by _____ to the Licensed Agent/Registered Representative indicated in this application, for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the Temporary Insurance Receipt bearing the same number as this application.

OL2773                          1 of 6              v09211306388958              4-02

Exhibit 1 - 56

**Section VIII - TERM/WHOLE LIFE PLANS of Insurance - Riders and Features**

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Purchase Protector _____ units
☐ Family Protection _____
☐ Children's Protection _____ units
☐ Living Benefit Rider _____
☐ Other _____

Cost of Living is automatic (No COL for Term products) unless this box is checked ☐ I do not desire Cost of Living

Additional Death Benefit Riders:
Primary Insurance Term Rider (PITR)  $ _____
Other Rider Name _____   Amount $ _____

☐ Paid-Up Additions Purchase Options Rider (PAPOR) (check one)
☐ PAPOR A-Flexible   ☐ PAPOR B-Flexible with Optionterm
Number of years payable _____
Intended premium payments for the first 7 years:
Year 1 _____     Year 5 _____
Year 2 _____     Year 6 _____
Year 3 _____     Year 7 _____
Year 4 _____     Maximum Amount $ _____

**Dividend Option:**
☐ Optionterm
   Optionterm Death Benefit $ _____
   Premium Paying Coverage ☐ Yes   ☐ No or
   % of Increase _____
☐ Accumulate at Interest (ACCUM)
☐ Paid-up Additional Insurance (PUI)
☐ One Year Term with Balance to:
   ☐ Cash   ☐ PUA   ☐ ACCUM   ☐ RP
☐ Reduce Premium (RP)
☐ Cash
☐ Other _____
☐ Other _____

Automatic Premium Loan, if applicable
☐ Yes   ☐ No

Policy Loan Interest Rate, if applicable  if none checked, "Variable" will apply.)
☐ Variable   ☐ Fixed

**Section IX - Mode of Premium Payment - (Please note, there is a higher cost associated with the purchase of a Whole Life or Term policy, if the mode of payment is other than on an annual pay basis. Please consult with your Licensed Agent/Registered Representative.)**

☒ Annual                    ☐ Quarterly                           [ ] Semi-Annual
☐ Monthly (Variable Life insurance only)   ☐ PCS (Phoenix Check-O-Matic Service)
                            Minimum Monthly Check for Each Service - $25.00

Multiple Billing Option - Give # or Details _____
☐ List Bill   ☐ Employee Insurance Counseling Service (EICS)   ☐ Salary Allotment   ☐ Pension   ☐ Money Purchase Pension
☐ Other _____

If electing PCS, complete the following:
Existing Policy Number or PCS File Number _____
Authorization Agreement for Preauthorized Payments
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the depository named below.
Information for New Account
Attach a void check to furnish encoding details.
If the depositor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

Signature of depositor (if different from owner) _____
Send premium notices to: (In addition to owner)
☐ Insured at:   ☐ Home Address   ☐ Business Address
☐ Other (Name, Relationship to Owner and Address) _____

OL3770                              1 of 6      v09211306386956                    4-02

Exhibit 1 - 57

## Section X - Existing Life Insurance

Describe all additional coverage in force. Include individual and group.  If no coverage inforce, check here ☐

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| Transamerica | 10-10-2002 | Trendsetter Super 10 | $ 1,000,000 | ☐ | ☒ |
| Valley Forge / CNA | 11-1-1999 | Last Survivor Joint First Prem Adjustable | $ 1,000,000 | ☒ | ☐ |
| | | | $ | ☐ | ☐ |

Total Life Insurance in force (if none, indicate) $ 2,000,000   Total Accidental Death Benefit in force (if none, ind min) $

| Yes | No | | |
|---|---|---|---|
| ☒ | ☐ | 1. | Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicants or the insureds or the owner(s) or the annuitant? |
| ☐ | ☒ | 2. | With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy? |
| ☐ | ☒ | 3. | Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) to pay any initial or subsequent premium(s) for this policy? |

For all "Yes" answers above, please provide the following information

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| See Section X - Existing Life | | | $ | ☐ | ☐ |
| Insurance | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

## Section XI - Income

| Earned Income | Independent Income | Net Worth |
|---|---|---|
| a. 400,000.00/yr | b. 100,000.00/yr | c. 7,300,000.00 |

## Section XII - Additional Information

1. Have you used tobacco or nicotine products in any form in the last 10 years? If "Yes," please circle the product(s) used: cigarettes, cigars, pipes, snuff, smokeless or chewing tobacco, nicotine patch or gum. If "Yes," check one: ☐ Use currently   ☐ Date quit

2. Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes," give date, company and reason).

3. Are you negotiating for other insurance? (If "Yes," name companies and total amount to be placed in force.)

4. Do you intend to live or travel outside the United States or Canada? (If "Yes," state where and / or how long).

5. Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes," complete Aviation Questionnaire).

6. Have you participated in the past 3 years or plan to engage in any extreme sport activities such as motorized vehicle, or parachute jumping, or underwater diving, or any other extreme avocation? (If "Yes," complete Avocation Questionnaire).

7. Have you in the past three years been the driver of a motor vehicle involved in an accident, or charged with a moving violation of any motor vehicle law, or had your driver's license suspended or revoked?

8. Have you ever been convicted of a felony or do you have charges pending?

Give full details for all "Yes" answers above. If necessary, use an additional piece of paper and please sign it.

| Question # | Details |
|---|---|
| 3 | Midland National Life   2,500,000 |
| | Transamerica          2,500,000 |
| | SunLife              10,000,000 |
| | Total to be placed will be  25,000,000  (in addition to the |
| | 2,000,000 already in force) |

OL2773                                           4 of 8      v09211306388958              443

Exhibit 1 - 58

10/31/2005 10:27 FAX 954 796 9818       BISYS                                    @009

---

**Section XIII - Medical History (Not necessary to complete if medical or paramedical exam has been ordered)**

| Height | | | Weight | | | Has your weight changed by 10 pounds or more in the past 2 years? If "yes", how much _____ pounds  ☐ Gain  ☐ Loss |

| Family History: | Age if Alive | Age if Death | If alive, indicate health problems or if deceased, indicate cause of death | Family History: | Age if Alive | Age if Death | If alive, indicate health problems or if deceased, indicate cause of death |
|---|---|---|---|---|---|---|---|
| Father  ☐ Alive | | | | Mother  ☐ Alive | | | |
| ☐ Deceased | | | | ☐ Deceased | | | |

| Personal Physician: Please provide the name and address of your personal physician or health care provider, date of most recent visit, reason for visit, and results of treatment (if any): | Has anyone in your immediate family developed any hereditary condition, cancer, or heart disease before age 60? ☐ Yes (please provide details below)  ☐ No |

| Have you ever had, or been told by a physician or other health care provider that you have: | Please provide details of "YES" answers (include question number, diagnosis, date of occurrence, hospital or treating physician's name and address, and current status). Use CL1 80 if additional space is necessary to record all data. |
|---|---|
| 1. High blood pressure or hypertension? ☐ Yes ☐ No | |
| 2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath? ☐ Yes ☐ No | |
| 3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease? ☐ Yes ☐ No | |
| 4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins? ☐ Yes ☐ No | |
| 5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease? ☐ Yes ☐ No | |
| 6. Neurologic disease, seizures, fainting, fits, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, paralysis, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system? ☐ Yes ☐ No | |
| 7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness? ☐ Yes ☐ No | |
| 8. Arthritis, lupus, or any musculoskeletal or skin disorder? ☐ Yes ☐ No | |
| 9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system? ☐ Yes ☐ No | |
| 10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine? ☐ Yes ☐ No | |
| 11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands? ☐ Yes ☐ No | |
| 12. Acquired Immune Deficiency Syndrome (AIDS) or any other immunologic disorder? ☐ Yes ☐ No | |
| 13. Anemia, bleeding or clotting disorder, or any other disorder of the blood or bone marrow? ☐ Yes ☐ No | |
| 14. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease? ☐ Yes ☐ No | |
| 15. Are you taking any kind of medicine, therapy, or treatment regularly or at frequent intervals? ☐ Yes ☐ No | |
| 16. Have you ever been treated for alcoholism or been advised to limit or stop your use of alcohol? ☐ Yes ☐ No | |
| 17. Have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions? ☐ Yes ☐ No | |
| 18. Have you ever been a patient in any hospital, treatment center, or similar facility within the last 10 years? ☐ Yes ☐ No | |
| 19. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding HIV or AIDS tests), or other tests within the last 5 years? ☐ Yes ☐ No | |
| 20. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years? ☐ Yes ☐ No | |

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

CL3773                                    6 of 8              v09211306388956                          4-03

Exhibit 1 - 59

### Authorization To Obtain Information

I authorize any physician, health care provider, hospital, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or my health, to provide any such information to Phoenix Life Insurance Company and its affiliated insurers (Phoenix) or its reinsurers. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

If insurance on any minor child is applied for, this authorization extends to records and knowledge of that child and that child's health. To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records and knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the MIB to provide any information to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about how adverse Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report.

This authorization shall continue to be valid for thirty months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix prior to the time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

[ ] I do [ ] I do not (check one) require that I be interviewed in connection with any investigative consumer report if any be prepared.

I have reviewed this application, and the statements made herein are those of the proposed insured and all its statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that i) no statement made to, or information acquired by any Licensed Agent/Registered Representative who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and ii) the Licensed Agent/Registered Representative has no authority to make, modify, alter or discharge any contract hereby applied for.

I understand and agree that the insurance applied for shall not take effect unless and until each of the following i) is accurate; the policy has been issued by the Company; the premium required for issuance of this policy has been paid in full during the life time of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates, and then has been no change in the health of any proposed insured that would change the answers to any of the questions in the application.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform the Company as soon as possible.

Under penalty of perjury, I confirm that (i) the Social Security or Tax Identification Number shown above is correct, and (ii) that I am not subject to back-up withholding. (Strike this out and initial if not true).

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud, as determined by a court of competent jurisdiction.



Exhibit 1 - 60

**◆ PHOENIX**    ☒ Phoenix Life Insurance Company     100 Bright Meadow Boulevard     **Application Part II**
                 ☐ PHL Variable Insurance Company      PO Box 1900
Company is defined as indicated                        Enfield CT 06083-1900
                                                       Underwriting and Issue

2. To your knowledge, have any of your parents, brothers or     In any hospital, sanatorium, or similar institution?
   sisters had diabetes?                                    8. Have you had, or been advised to have, any surgical
3. A. Have you ever been treated for alcoholism or any drug habit?  operations, X-rays, electrocardiograms, blood studies,
   B. Have you ever used narcotics, barbiturates, amphetamines,     or other tests within the last 5 years?
      hallucinogens or any prescription drug except in accordance  C. Has a physician ever advised you to diet?
      with a physician's instructions?                      D. Is there any kind of medicine which you take regularly
4. Have you sought treatment or consulted a physician for any  or at frequent intervals?
   reason in the last 5 years, including routine examinations or
   check-ups? (Give full details.)                          A. Have you ever been declined, postponed, rated, or ridered
5. To the best of your knowledge have you ever had, or been     for insurance?
   by any physician or other practitioner that you had:    B. Are you negotiating for other insurance? (If "yes" name
   A. High blood pressure?                                     companies and amounts.)
   B. Pain, pressure, or discomfort in the chest, palpitation,
      swelling of the ankles, or undue shortness of breath?  DETAILS of all questions answered "yes." Include Dates, Names,
   C. Heart disease, heart murmur, angina pectoris, or coronary  and Addresses of all doctors consulted, Duration, Treatment, and
      disease?                                              Results. Please indicate question # you are responding to:
   D. Rheumatic fever, chorea, rheumatism, or arthritis?    Question #
   E. Pneumonia, pleurisy, asthma, tuberculosis, chronic
      cough, or any other disease of the lungs?
   F. Epilepsy, fainting spells, concussion, skull fracture, severe
      headaches, dizziness, mental disorder or nervous
      breakdown?
   G. Indigestion, stomach or duodenal ulcer, colitis, or other
      disease of the intestines or rectum, gall bladder disorder,
      jaundice, hepatitis, or liver disorder?
   H. Kidney disease, nephritis, kidney stone, bladder trouble,
      or albumin, sugar, pus, or blood in the urine?
   I. Disease of the reproductive organs, prostate trouble,
      abnormal menstruation, complicated pregnancies or
      disease of the breasts?
   J. Diabetes, venereal disease, gout, thyroid disease, enlarged
      glands, tumor, polyp, cancer or skin disease?
   K. Anemia, bleeding or clotting disorder, or any other disease
      of the blood or bone marrow? (except HIV status)
   L. Acquired Immune deficiency syndrome (AIDS), AIDS-
      related complex (ARC), or any other immunological
      disease or disorder? (except HIV status)
   M. Paralysis, deformity, or any injury or disorder of the
      muscles, bones, joints, spine or back?
   N. Other than above, any physical or mental disorder,
      operation, or injury within the past 5 years?

Exhibit 1 - 61

 **PHOENIX**

100 Bright Meadow Blvd
PO Box 1900
Enfield CT 06083-1900
Underwriting and Issue

**Application Part II Addendum**

Company is defined as indicated: ☐ Phoenix Life Insurance Company   ☐ Phoenix Life and Annuity Company   ☐ PHL Variable Insurance Company



**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
Death Benefit payable if Insured dies While the Policy is In Force
Not eligible for annual dividends

Exhibit 1 - 63

Exhibit 2



PHOENIX

# Fax Cover Sheet

Phoenix Life Insurance Company
PHL Variable Insurance Company
Members of The Phoenix Companies

**Date/Time:**     1/31/2012 5:36:06 PM

**Number of pages**
**including cover sheet:**     **6**

**TO:** *Jacob Hoffman:*

Company:

Fax Number: 9,18587775700

**FROM:**

Customer Care Center

Phone Number:

Fax Number:

**COMMENTS:**

Policy- 97516307
Insured- ████████████

**Confidentiality Note:**
The documents accompanying this fax cover sheet contain information that is confidential or privileged from Phoenix Life Insurance Company. The information is intended to be for the sole use of the individual or entity named on this cover sheet. If you are not the intended recipient, please note that any disclosure, copying, distribution or use of the contents of this telecopied information is strictly prohibited. If you have received this fax cover sheet in error, please contact us immediately. Thank you.

Exhibit 2 - 64

 PHOENIX

PO Box 8027
Boston MA 02266-8027

Phone 800.628.1936
Internet www.PhoenixWM.com

Phoenix Life Insurance Company
PHL Variable Insurance Company
Phoenix Life and Annuity Company
*Members of the Phoenix Company Inc.*

January 31, 2012

JACOB HOFFMAN
TORREY PINES SERVICES LLC
4365 EXECUTIVE DR STE 710
SAN DIEGO CA 92121

RE:  Contract / Policy:   97516307
     Deceased:            ███████████████
     Claim No:            120119GG0128

Dear Mr. Hoffman:

We have on file a Release of Assignment from JP Morgan Chase Bank NA dated 5/20/10.

Along with the Release an Assignment and Assumption Agreement was submitted. We have provided you with a copy of page 1 of the agreement.

Please refer to the middle of the page under 1. Assignment and Acceptance of Assets. It states the following: "Subject to and upon the terms and conditions of the Purchase Agreement, Assignors hereby sell, assign, transfer, convey and deliver, or cause to be assigned, transferred, conveyed and delivered, to Assignee all right, title and interest of each Assignor in, to and under the Contracts that are Purchased Corporate Trust Assets(including the Corporate Trust Agreements and other Corporate Trust Contracts listed as of the date hereof set forth opposite the Assignor's name on Schedule 2.1(a)(3) to the Purchase Agreement……"

We are requesting Schedule 2.1(a)(3) which should provide the list of contracts included in this agreement.

We are ready to assist you with these important financial matters.  Our Claims Examiners are available at 1-800-814-3692 to answer your questions Monday through Friday from 8:30 a.m. to 5:00 p.m. Eastern time.  As always, we appreciate the opportunity to serve your insurance needs.

Sincerely,

*Susan M. Yurek*

Life Claim Examiner
Benefits

Exhibit 2 - 65

## Payment Options Summary

### Please contact our Benefits Department for more details regarding any of these Options.

**Cash Settlement**
**A SINGLE CHECK:** You have the choice to receive your benefit by means of a single check

**PHOENIX CONCIERGE ACCOUNT:** If you do not request a single check, the proceeds from your policy or contract will be transferred to a retained asset account, The Phoenix Concierge Account ("Account"). This interest-bearing account both protects the proceeds or distributions you receive from Phoenix while you take time to carefully consider your next steps while also giving you immediate access to all or some of your funds simply by writing a check/draft. Your Phoenix Concierge Account provides you with:

➤ **A COMPETITIVE INTEREST RATE:** The Account will be credited interest on a daily basis at the current rate stated on the preceding page. The current interest rate can be changed at any time and is based on our analysis of the interest rate for comparable short-term demand investments. There is no guaranteed minimum interest rate. The current rate will be reflected on the monthly statements. We are required to comply with Internal Revenue Service requirements concerning this interest and the credited interest is taxable income to you. You may wish to consult your tax advisor.

➤ **SAFETY OF PRINCIPAL:** The Phoenix Concierge Account is part of our general account. It is not a checking or bank account and is not insured by the Federal Deposit Insurance Corporation (FDIC), National Credit Union Share Insurance Fund (NCUSIF), or any other state or federal agency which insures deposits. No additional amounts aside from the proceeds or distributions you receive may be deposited into the PCA. As part of our general account, it is subject to the claims of our creditors. We may receive a financial benefit from earnings on amounts left in the PCA. The guarantee of principal is based on the claims-paying ability of the company and principal is covered by the state guarantee association. You may contact the National Organization of Life and Health Insurance Guaranty Associations (www.nolhga.com) to learn more about this coverage.

➤ **FREE DRAFT/CHECK-WRITING PRIVILEGES:** There are no administration fees or charges for checks. Service fees will be charged for the following activities:

| Activity | Fee |
|---|---|
| UPS Delivery | $15.00 |
| Stop Payments | $12.00 |
| Returned Checks | $15.00 |
| Electronic Fund Transfers | $65.00 |
| Check Copies | $2.50 each |
| Duplicate Statements | $2.50 each. |

➤ **SERVICE:** You will receive a monthly statement by mail, which will include details about all transactions as well as current interest rate information. You may close your account at any time and receive the entire balance in one transaction without fees or penalties either by writing a single check/draft for the entire balance or by calling a toll free number and requesting that the account be liquidated. The account will automatically close when the balance falls below $1,000, and a check for the remaining balance plus any accrued interest will be mailed to you in a check.

**Interest Options**
Interest settlement options allow funds to be held on deposit with interest paid or left to accumulate at either a Non-Guaranteed or Guaranteed rate.

**INTEREST INCOME (*Non-guaranteed Interest Rate*):** This option is designed to earn interest on your proceeds while you take time to make a more permanent decision. You may leave part or all of your proceeds on

Exhibit 2 - 66

deposit with us, and we will pay you interest at our current Non-Guaranteed rate. The interest payment due to you is available in cash or may be allowed to accumulate to your balance. As you need funds, you may withdraw them from your balance without penalty. You may also elect our Enhanced Interest, Installment, or Annuity options at any time.

**ENHANCED INTEREST INCOME (*Guaranteed Interest Rate*):** We provide another interest option that guarantees an interest rate for a selected period of time. The interest rate is quoted weekly and varies with the length of the period you select. The interest payment owed to you is available in cash or may be allowed to accumulate to your balance. There is a penalty if you decide to withdraw funds early or to transfer to another option. At the end of the selected period, the option will be renewed for another identical period at the current rate unless you select otherwise.

Installment Income Options
**INSTALLMENTS FOR A SPECIFIED PERIOD:** Under this plan, the proceeds of the policy plus guaranteed interest are paid in a specified number of equal installments. Payments will be continued whether you live or die during the specified period.

**ENHANCED INSTALLMENTS FOR A SPECIFIED PERIOD:** Under this plan, a competitive guaranteed rate of interest is used to determine the equal installments provided by the proceeds for a specified period. Interest rates are quoted weekly and vary with the number of years selected. A range of time periods is available. Payment will continue whether you live or die during the specified period. Installments can be made monthly, quarterly, semi-annually or annually.

**INSTALLMENTS FOR A SPECIFIED AMOUNT:** You specify how much income you wish. Usually the payments are monthly, but they may be paid quarterly, semi-annually or annually. The payment is made from the principal and interest until the fund is exhausted. Interest rates are quoted weekly and may vary depending on a range of factors.

Life Annuity Options
An annuity option is a contract under which your benefit is converted into a non-forfeitable investment. You cede control of the money to the insurance company in return for payment guarantees. No withdrawals or lump-sum payments will be allowed. Payments and payment guarantees are based on the claims-paying ability of the issuing insurance company. The income provided by the proceeds will be determined based on our then-current rates for settlement options.

**LIFE ANNUITY WITH GUARANTEED PAYMENTS:** This option provides payment for your lifetime, with a guarantee of a set amount of total payments received. Either with the addition of a Specified Period of ten or twenty years, or the guarantee of principle through an Installment Refund, your beneficiary would receive the remaining payments should you die before the guaranteed payments are received.

**LIFE ANNUITY:** This option provides payment for your lifetime; payments continue as long as you live and cease when you die. Of the two life options, this plan generally allows for larger payments because there is no guarantee for a set amount of payments.

**Under all of these Settlement Options, please note that payment of principal and/or interest is based on the claims-paying ability for the issuing insurance company. Amounts held by insurance companies are not guaranteed by the Federal Deposit Insurance Corporation (FDIC), but are guaranteed by the State Guaranty Associations, as described by the National Organization of Life and Health Insurance Guaranty Associations (www.nolhga.com). Certain Payment Options may not be offered by your policy/contract. Please contact our Benefits Department for specific details.**
**FOR FURTHER INFORMATION ABOUT SETTLEMENT OPTIONS IN GENERAL, INCLUDING THE RETAINED ASSET ACCOUNT, PLEASE CONTACT YOUR STATE DEPARTMENT OF INSURANCE.**

Exhibit 2 - 67

## Retained Asset Account Disclosure
## Phoenix Concierge Account

**A SINGLE CHECK:** You have the choice to receive your benefit by means of a single check

**PHOENIX CONCIERGE ACCOUNT:** If you do not request a single check, the proceeds from your policy or contract will be transferred to a retained asset account, The Phoenix Concierge Account ("Account").

This interest-bearing account both protects the proceeds or distributions you receive from Phoenix while you take time to carefully consider your next steps while also giving you immediate access to all or some of your funds simply by writing a check/draft. Your Phoenix Concierge Account provides:

➢ **A COMPETITIVE INTEREST RATE:** The Account will be credited interest on a daily basis at the rate which is indicated on the correspondence sent with the death benefit claim. The actual current interest rate can be changed at any time and is based on our analysis of the interest rate for comparable short-term demand investments. There is no guaranteed minimum interest rate. Once the funds are in the Account, the current rate will be printed on each monthly Account statement. We are required to comply with Internal Revenue Service requirements concerning tax reporting of the interest credited to the Account. You may wish to consult your tax advisor.

➢ **FREE DRAFT/CHECK-WRITING PRIVILEGES:** There are no administration fees or charges for checks/drafts. The minimum amount of any draft/check is $250.00 and there are no limits concerning the number of checks/drafts that can be written in any month. No additional deposits may be made to the Account. Service fees will be charged for the following activities:

| Activity | Current Fee (subject to change) |
|---|---|
| UPS Delivery | $15.00 |
| Stop Payments | $12.00 |
| Returned Checks | $15.00 |
| Electronic Fund Transfers | $65.00 |
| Check Copies | $2.50 each |
| Duplicate Statements | $2.50 each |

➢ **SERVICE:** You will receive a monthly statement by mail, which will include details about all transactions as well as current interest rate information. You may close your account at any time and receive the entire balance in one transaction without fees or penalties either by writing a single check/draft for the entire balance or by calling a toll free number and requesting that the account be liquidated.

Exhibit 2 - 68

➢ **CLOSURE OF ACCOUNT/ESCHEAT:** The Account will remain open until the earlier of:

    1. Check/Draft written for the entire Account balance;

    2. Account balance falls below $1,000. Should it fall below this level, Your Account will be closed and a check for the balance will be sent to You;

    3. Your request to close the Account;

    4. No activity on Account for a period of no less than 24 months without Accountholder affirmative request to keep Account open. In the event that the Account has no activity for a period of no less than 24 months and there has not been a request that the Account remain open, We are required to comply with applicable State escheat laws concerning dormant or inactive accounts.

➢ **GENERAL PROVISIONS:**

    ○ You may receive additional information about the Account by calling 1-888-799-9905.

    ○ You should carefully review the attached Contract for details concerning primary and contingent Account Beneficiaries and other administrative details regarding Account information.

    ○ Once the Original Settlement Amount is transferred to the Account, other settlement options which were available at the Settlement Date may no longer continue to be available. The exact availability will depend on the specific alternative settlement option. Our Customer Care Department has further availability information.

➢ **SAFETY OF PRINCIPAL:** The Phoenix Concierge Account is part of our general account. It is not a checking or bank account and is not insured by the Federal Deposit Insurance Corporation (FDIC), National Credit Union Share Insurance Fund (NCUSIF), or any other state or federal agency which insures deposits. As part of our general account, it is subject to the claims of our creditors. We may receive a financial benefit from earnings on amounts left in the PCA. The guarantee of principal and/or interest is based on the claims-paying ability of the company and is covered by the State Guarantee Association. You may contact the National Organization of Life and Health Insurance Guaranty Associations (www.nolhga.com) to learn more about this coverage. For further information about settlement options in general, including the retained asset account, please contact your state department of insurance.

Exhibit 2 - 69

Exhibit 3

 All of **us** serving you

February 8, 2012

Susan M. Yurib
Life Claim Examiner
Phoenix Life Insurance Company
PI Box 8027
Boston, MA 02266-8027

Dear Ms. Yurib:

We have received your letter to Jacob Hoffman at Torrey Pines Services dated January 31, 2012 regarding the life insurance policy insuring the deceased ███████ (Policy No. 97516307). In particular, you request information on a Release of Assignment from JP Morgan Chase Bank NA dated May 20, 2010.

Please note that we received a letter from you dated August 19, 2010 confirming to us that you recorded the release of the collateral assignment along with a copy of the Release of the Assignment dated August 15, 2010. We have enclosed copies of these documents for your review.

We trust this information is sufficient for you to conclude your inquiry and process the claim that we have submitted to you.

Sincerely,

Russell Mosley

US Bank National Association

Enclosure

 **PHOENIX**

PO Box 8027
Boston MA 02266-8027

Phone 800.628.1936
Internet www.PhoenixWM.com

Phoenix Life Insurance Company
PHL Variable Insurance Company
Phoenix Life and Annuity Company
*Members of the Phoenix Company Inc.*

August 19, 2010

US BANK AS SECURITIES
INTERMEDIARY
PO BOX 65690
SAINT PAUL MN 55165-0690

RE:   Contract / Policy:   97516307
      Annuitant/Insured:   ███████████

Dear Policy Owner:

As you requested, we have recorded a release of collateral assignment.

We are enclosing a copy of the recorded change for your records.  We recommend that this document be filed with your policy for future reference.

If you have any questions, please call us at 1-800-628-1936.  Our customer service representatives are available to assist you Monday through Friday from 8:30a.m. to 5:00p.m. Eastern time.  As always, we appreciate the opportunity to serve your insurance needs.

Sincerely,

Policy Title Division

Exhibit 3 - 71

0492060 · 00008 38

## ◈PHOENIX·

Release of Assignment

For value received, all right, title and interest of the undersigned assignee(s) in and to Phoenix Life Insurance Company

Policy No. 97516307 ____ on the life of ███████████

is hereby relinquished and released this 20 day of May _____ 20 10 .

CORPORATE SEAL

*RAISED SEAL*

JP Morgan Chase Bank, N.A.
_____
Name of Bank or Corporation
By: The Bank of New York Trust Company, N.A., as attorney-in-fact:
R. Tamas
Vice President

Witness: _____
Ross Finke

By _____
Signature and Title

Witness: _____

_____
Individual Assignee

Corporate releases should be signed by duly authorized officer and seal of corporation affixed.

Phoenix Life Insurance Company

Received at the Home Office of the Company on 9/15/10   Recorded by _____
Authorized Signature

520E

8-03

Exhibit 3 - 72

# Exhibit 4



All of **us** serving you

EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107

February 24, 2012

<u>By Overnight Delivery and Facsimile</u>

Susan M. Yurib
Life Claim Examiner
Phoenix Life Insurance Company
30 Dan Road
Canton, MA 02021

Dear Ms. Yurib:

On February 8, 2012, we sent you a letter responding to your letter dated January 31, 2012 regarding the claim we submitted on the life insurance policy insuring the deceased ███████ (Policy No. 97516307) (the "Policy"). Your letter requested information on a Release of Assignment from JP Morgan Chase Bank NA dated May 20, 2010. In our previous letter we provided you with proof that the Assignment was previously released by your company on August 15, 2010.

We now understand that you subsequently spoke to Mr. Jacob Hoffman at Torrey Pines Services and informed him that our previous letter was insufficient because you were already aware that you had released the assignment on the Policy but that you now want to investigate to determine whether or not you made an error in doing so. We are puzzled by your request and question whether you are handling our claim in good faith. The Assignment in question was released prior to our ownership of the Policy. Therefore, we do not have the schedule to the agreement that you relied upon in releasing the Assignment and do not have the ability to obtain it. Moreover, we do not believe it is appropriate for you to require us to prove to you that you did not make a mistake when you released an Assignment on the Policy nearly two years ago.

We trust this letter will be sufficient for you to conclude your inquiry and process the claim that we have submitted to you.

Sincerely,

Russell Mosley

US Bank National Association

Exhibit 4 - 74

# Exhibit 5



All of **us** serving you®

EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55101

March 21, 2012

Susan M. Yurib
Life Claim Examiner
Phoenix Life Insurance Company
30 Dan Road
Canton, MA 02021

      Re:    Policy/Contract No.: 97516307
            Insured: ▮▮▮▮▮▮▮▮
            Claim No.:  120119GG0128

Dear Ms. Yurib:

      We understand that Phoenix still refuses to pay the proceeds under the above-referenced policy unless we provide it with a copy of a schedule to a Purchase Agreement that is referenced in Phoenix's records for this policy.  As I explained to you in my letter dated February 24, 2012, we do not have a copy of that schedule because the schedule pertained to an assignment of the Ertley policy that took place before we purchased it.  Moreover, as I pointed out to you in my letter dated February 8, 2012, Phoenix recorded the release of that assignment nearly a year and a half ago, on August 15, 2010.  There is simply no basis for Phoenix to condition its payment of this claim on us providing documents that are not in our possession, and if anything should be in Phoenix's files.

      Nevertheless, we have undertaken to obtain a copy of that schedule from the relevant parties.  Although we could not obtain a copy of the schedule itself, because it is confidential, one of the parties to the Purchase Agreement has provided us with an Officer's Certificate certifying that the Ertley policy was one of the assets acquired under the Purchase Agreement referenced in your letter dated January 31, 2012.  For your records, a copy of the Officer's Certificate is enclosed.

      Accordingly, please pay this claim immediately, or we will take appropriate legal action.

Sincerely,

Russell Mosley

US Bank National Association

usbank.com

Exhibit 5 - 75