1   KHAI LEQUANG (SBN 202922)
    klequang@orrick.com
2   MELANIE D. PHILLIPS (SBN 245584)
    mphillips@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    777 South Figueroa Street
4   Suite 3200
    Los Angeles, California  90017
5   Telephone:  213-629-2020
    Facsimile:   213-612-2499
6
    STEPHEN G. FORESTA (admitted *pro hac vice*)
7   sforesta@orrick.com
    PHILIPP SMAYLOVSKY(admitted *pro hac vice*)
8   psmaylovsky@orrick.com
    ORRICK, HERRINGTON & SUTCLIFFE LLP
9   51 West 52nd Street
    New York, New York 10019
10  Telephone:  212-506-5000
    Facsimile:    212-506-5151
11
    Attorneys for Plaintiff
12  U.S. BANK NATIONAL ASSOCIATION, AS
    SECURITIES INTERMEDIARY FOR LIMA
13  ACQUISITION LP

14              UNITED STATES DISTRICT COURT

15             CENTRAL DISTRICT OF CALIFORNIA

16                   WESTERN DIVISION

17

18  U.S. BANK NATIONAL                Case No. CV12-03047 RGK (MRW)
    ASSOCIATION, a national association,
19  as securities intermediary for LIMA   **SECOND AMENDED**
    ACQUISITION LP,                   **COMPLAINT FOR:**
20
                Plaintiff,            **1.  BREACH OF CONTRACT;**
21                                    **2.  BREACH OF THE**
         v.                          **     COVENANT OF GOOD**
22                                    **     FAITH AND FAIR DEALING;**
    PHL VARIABLE INSURANCE            **     AND**
23  COMPANY, a Connecticut corporation,  **3.  VIOLATION OF THE**
                                      **     CONNECTICUT UNFAIR**
24              Defendant.            **     TRADE PRACTICES ACT**

25                                    **JURY TRIAL DEMANDED**

26

27

28

Plaintiff U.S. Bank National Association, as securities intermediary for Lima Acquisition LP ("Plaintiff"), hereby files this Second Amended Complaint against defendant PHL Variable Insurance Company ("Phoenix" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this action seeking compensatory and consequential damages, punitive damages, equitable relief, and attorneys' fees based on Phoenix's failure and refusal to timely pay the death benefit due under a $10 million life insurance policy insuring the life of John Doe (the "Doe Policy" or "Policy")[1] and, more broadly, to hold Phoenix accountable for its pattern of bad faith and unfair claims handling.

2.    In this particular case, Phoenix issued the Doe Policy more than six years ago, and since issuing the Policy, Phoenix received $1,484,500 in premiums paid to keep the Policy in force.  Mr. Doe passed away on January 7, 2012, and shortly thereafter, Plaintiff, the owner of the Policy, timely submitted a proof of claim to Phoenix seeking payment of the death benefits.

3.    Phoenix failed and refused to timely pay the death benefit, stating that it would not pay until Plaintiff provided Phoenix with a schedule to an agreement that Plaintiff does not have and that has no bearing on Phoenix's obligation to pay.

4.    Phoenix used this excuse to delay paying the death benefits to Plaintiff for months in blatant violation of its contractual and legal obligations, and Phoenix did so willfully, recklessly, and/or with wanton disregard of Plaintiff's rights.

5.    Upon information and belief, Phoenix has deliberately delayed payment on certain of Plaintiff's claims, and denied other claims outright, in retaliation for Plaintiff filing a lawsuit against Phoenix alleging that Phoenix unlawfully raised the cost of insurance rates on many of Plaintiff's and other

---

[1] For privacy reasons, Plaintiff has substituted "John Doe" for the name of the actual insured.

1   policyholders' policies.  Plaintiff filed that lawsuit, *U.S. Bank National Association*
2   *v. PHL Variable Insurance Company*, Case No. 2:11-CV-09517-OD (RZx) (the
3   "COI Action"), in the Central District of California on November 16, 2011.

4         6.    Before Plaintiff filed the COI Action, Phoenix promptly paid the death
5   benefit on one of Plaintiff's other policies.  Since Plaintiff filed the COI Action,
6   Phoenix has resisted paying every single one of Plaintiff's death benefit claims.

7         7.    Plaintiff thus was forced to file this and two other lawsuits, *U.S. Bank*
8   *N.A. v. PHL Variable Ins. Co.*, No. CV12-03046 RGK (MRW) (C.D. Cal.) (the
9   "Doe II Action") and *U.S. Bank N.A. v. PHL Variable Ins. Co.*, No. 0:12-cv-00877-
10  JRT-TNL (D. Minn.) (the "Doe III Action"), seeking payment of death benefits that
11  Phoenix unlawfully refused to pay.  True and correct copies of the operative
12  complaints in these actions are attached hereto as <u>Exhibit 1</u> and <u>Exhibit 2</u>,
13  respectively, and are incorporated herein by reference.  In both of these other cases,
14  as in this one, Phoenix lacked any legitimate reason for delaying or denying
15  payment of Plaintiff's claims, and has engaged in the same and similar unfair
16  claims handling practices.

17        8.    Phoenix's improper and illegal claims handling practices, however,
18  have not been limited to death benefit claims submitted by Plaintiff, but, rather, are
19  part of Phoenix's general business practice and an overall pattern of misconduct.

20        9.    For example, since Plaintiff commenced this action, Phoenix's unfair
21  claims handling practices have become the subject of several new lawsuits filed by
22  other policy owners.  These lawsuits include *Wilmington Savings Fund Soc., FSB v.*
23  *PHL Variable Ins. Co., Phoenix Life Ins. Co., and the Phoenix Companies, Inc.*,
24  No. CV12-04926SVW(AJNx) (C.D. Cal.) (the "RICO Action"); *Karen Benjamin,*
25  *as Trustee of the Jackson Family 2007 Irrevocable Trust v. PHL Variable Ins. Co.*,
26  No. CV12-4556SVW(SHX) (C.D. Cal.) (the "Jackson Action"); *PHL Variable Life*
27  *Ins. Co. v. ESF QIF Trust*, No. 1:12-cv-319-UNA (D. Del.) (the "Griggs Action");
28  and *PHL Variable Life Ins. Co. v. Bank of Utah*, No. 0:12-cv-01256-ADM-JJK (D.

SECOND AMENDED COMPLAINT
CV12-03047-RGK (MRW)

Minn.) (the "Close Action").  True and correct copies of the relevant complaints or counterclaims in these actions are attached hereto as <u>Exhibit 3</u>, <u>Exhibit 4</u>, <u>Exhibit 5</u>, and <u>Exhibit 6</u>, respectively, and are incorporated herein by reference.

10.    Notably, the plaintiffs in the RICO Action have alleged that Phoenix has "implemented *a wide scale effort* to avoid paying claims on many billions of dollars" in policies.  This "wide scale effort" to avoid paying claims has also garnered attention from *The Wall Street Journal*, which reported earlier this year that Phoenix has denied "tens of millions of dollars" in claims each year and that Phoenix's claims denial rates are well above the industry average.

11.    In fact, according to Phoenix's regulatory filings, Phoenix denied or resisted paying 12.37%, 16.20%, and 20.87% of total death benefit claims in 2009, 2010, and 2011, respectively.  Excerpts of Phoenix's 2009, 2010, and 2011 regulatory filings are attached hereto as <u>Exhibit 7</u> (pages 24.GT and 36), <u>Exhibit 8</u> (pages 24.GT and 36), and <u>Exhibit 9</u> (pages 24.GT and 36).  The industry average for denial of death benefits per year is *less than one percent*.  Excerpts of the Statistical Compilation of Annual Statement Information for Life/Health Insurance Companies in 2011 by the National Association of Insurance Commissioners reflecting the industry average of claims resistance are attached hereto as <u>Exhibit 10</u>.

12.    Phoenix's massive denial rate, which has steadily increased since 2009, is no coincidence.  In 2008, when the national financial crisis hit, Phoenix incurred *over a billion dollars in losses* on its investment portfolio, which consisted in large part of high-risk subprime and Alt-A residential mortgage-backed securities.  Thus, in its 2008 annual report filed with the Securities and Exchange Commission, Phoenix was forced to disclose:

> The value of our investment portfolio has declined which has resulted in, and may continue to result in, higher realized and/or unrealized losses.  For example, *in 2008 the value of our general account investments decreased by $1.3 billion*, before offsets, due to net unrealized losses on investments.  A widening of credit

spreads, such as the market has experienced recently, increases the net unrealized loss position of our investment portfolio and may ultimately result in increased realized losses. The value of our investment portfolio can also be affected by illiquidity and by changes in assumptions or inputs we use in estimating fair value. Further, *certain types of securities in our investment portfolio, such as asset-backed securities supported by residential and commercial mortgages, have been disproportionately affected.* Continued adverse capital market conditions could result in further realized and/or unrealized losses. (Emphasis added.)

13.     Within a matter of months, the stock price of Phoenix's ultimate parent company, The Phoenix Companies, Inc. (NYSE:PNX), plunged from $13.98 per share to $0.29 per share, as PNX lost nearly *a billion and a half dollars* in shareholder equity, suffered several credit rating agency downgrades that crippled Phoenix's ability to sell new life insurance, and lost two of its main distributors who stopped selling Phoenix policies due to concerns about Phoenix's reputation and ability to pay future claims.

14.     Since then, Phoenix has been trying to make up for the lost revenues caused by the company's inability to sell new life insurance as a result of its rating downgrades and the loss of key distributors. One way Phoenix has been trying to make up for this lost revenue has been to deny or delay the payment of death benefit claims. By improperly refusing to pay, or delaying the payment of, death benefit claims, Phoenix is able to earn a yield on the death benefits during the period of its refusal and delay. Additionally, by forcing Plaintiff and other policyholders to incur the substantial costs and delays of litigation in order to obtain the benefits of their policies, Phoenix hopes that some of these claimants will settle their claims with Phoenix for less than the full amount they are entitled to.

15.     Phoenix's misconduct in delaying or refusing to pay the death benefit after collecting premiums for years constitutes not only an express breach of the Policy, but also bad faith. Moreover, as detailed herein, Phoenix's wrongdoing is part of an ongoing pattern of unfair claims handling in violation of the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act.

1  Phoenix, a Connecticut insurance company, is unquestionably subject to the
2  provisions of those statutes.

3  ## PARTIES

4      16.    Plaintiff U.S. Bank National Association is a national banking
5  association with its principal place of business in Ohio, and is the securities
6  intermediary for Lima Acquisition LP.

7      17.    Upon information and belief, defendant Phoenix is a Connecticut
8  corporation with its principal place of business and nerve center in Hartford,
9  Connecticut, and Phoenix is authorized to do business in the State of California and
10 regularly conducts its business in the State of California, including within this
11 judicial district.

12 ## JURISDICTION AND VENUE

13     18.    The Court has jurisdiction over this action pursuant to 28 U.S.C.
14 § 1332(a)(2) because the parties are citizens of different states, and the amount in
15 controversy exceeds $75,000, exclusive of interest and costs.

16     19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and
17 (a)(2) because Defendant resides in this judicial district, and a substantial part of the
18 events giving rise to the claims occurred in this judicial district, including issuance
19 of the Doe Policy in California to a trust that resided within this judicial district.

20 ## FACTUAL ALLEGATIONS

21 **A.     The Doe I Policy**

22     20.    In 2006, Phoenix issued the Policy, with Policy Number 97516307, a
23 face value of $10,000,000, and an Issue Date and Policy Date of November 4, 2005.
24 A copy of the Doe Policy is attached hereto as Exhibit 11.[2]  The original owner of
25 the Policy was the John D. Doe Irrevocable Insurance Trust (the "Doe Trust" or
26 "Trust"), which was also the original beneficiary of the Policy.  The original

27 _____
28 [2] Some of the policy information in the exhibits hereto has been redacted for privacy reasons.

SECOND AMENDED COMPLAINT
CV12-03047-RGK (MRW)

beneficiary of the Doe Trust was Mr. Doe's wife, Jane Doe. The original trustee of the Trust was Wells Fargo Bank, N.A. The issue state of the Policy is California.

21. California Insurance Code section 10113.5 states that "[a]n individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue." The Policy also states: "We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement)." Exhibit 11 (Policy, p. 3).

22. The Doe Policy was acquired by Plaintiff after the expiration of the contestability period, and Plaintiff thereafter continued to make all premium payments on the Policy.

23. From the time the Doe Policy was issued effective November 4, 2005 until the Policy matured, all of the premiums that were due under the Doe Policy were paid. In total, Phoenix received $1,484,500 in premiums on the Policy.

24. Mr. Doe died on January 7, 2012, while the Policy was in force. Upon information and belief, Phoenix became aware of Mr. Doe's death shortly thereafter.

25. On January 30, 2012, Plaintiff submitted a proof of claim to Phoenix requesting payment of the death benefit under the Doe Policy.

26. On January 31, 2012, in response to the claim submitted by Plaintiff, Phoenix sent a letter enclosing a "Release of Assignment" and a single page of an "Assignment and Assumption Agreement," dating from nearly two years earlier, *before* Plaintiff became the owner of the Policy. In this letter, Phoenix requested that Plaintiff provide a schedule to a "Purchase Agreement" that was referenced on this single page that Phoenix provided. Exhibit 12.

27.     Plaintiff, however, was not a signatory on any of these documents, which apparently concerned the release of the prior collateral assignment on the Policy and a transaction between JP Morgan and Bank of New York.

28.     Plaintiff wrote to Phoenix on February 8, 2012 explaining that Phoenix had, according to its own records, already recorded the release of the collateral assignment and acknowledged the release in a letter to Plaintiff dated August 19, 2010, almost two years earlier.  Exhibit 13.

29.     Phoenix even admitted in a subsequent call that it had already released the collateral assignment, but Phoenix claimed it was "investigating" whether it had released the assignment in error and advised Plaintiff that it would send a letter explaining its position.

30.     Phoenix never sent the letter it promised.

31.     Plaintiff then followed up with yet another letter on February 24, 2012, confirming its prior conversation with Phoenix and informing Phoenix that it did not have a copy of the schedule that Phoenix sought, nor did Plaintiff have the ability to obtain it.  Plaintiff also advised Phoenix that Phoenix had no right to make Plaintiff prove to Phoenix that Phoenix did not make an error when it recorded the release of the collateral assignment before Plaintiff ever owned the Policy.  Exhibit 14.

32.     Phoenix still refused to pay the claim.

33.     In light of Phoenix's continued refusal to pay the claim, Plaintiff undertook its own inquiry.  Plaintiff contacted Bank of New York, but Bank of New York advised Plaintiff that it could not provide a copy of the document Phoenix sought because it was confidential.  Bank of New York, however, did provide a certificate confirming that it claimed no interest in the Policy.  Plaintiff provided a copy of that certificate to Phoenix on March 21, 2012 and made a final demand for payment.

34.     Phoenix still failed and refused to pay the claim, even after the statutorily prescribed 40-day period to pay the claim.  Plaintiff therefore filed this action.

35.     While Phoenix feigned concern about whether the collateral assignment of the Policy had actually been released, Phoenix admits that it made no effort to contact JP Morgan and Bank of New York, either before being sued or even immediately after.  Instead, when Phoenix was served with Plaintiff's original complaint in this action, Phoenix asked Plaintiff for an extension to respond (which Plaintiff granted), waited until the extension had expired, and then filed a cross-claim for interpleader against JP Morgan and Bank of New York.  Then, to further delay obtaining a response from JP Morgan and Bank of New York (as Phoenix knew they would disclaim any interest in the Policy), Phoenix waited a month to actually *serve* the interpleader on these entities.

36.     Despite having filed an interpleader, Phoenix never actually deposited the death benefits owed under the Policy with the Court's registry, retaining the use of those funds for itself.

37.     Phoenix intentionally dragged its feet trying to get a response from JP Morgan and Bank of New York because Phoenix knew that they would disclaim any interest in the Policies.  However, despite having already provided Phoenix with the certificate from Bank of New York, Plaintiff went even further and obtained a letter from JP Morgan confirming what Bank of New York had already said – that JP Morgan had sold its interest in the Policy to Bank of New York and that Bank of New York had released the liens years ago.  Bank of New York and JP Morgan thus confirmed that neither intended to make any claim to the death benefits under the Policy.  *See* Exhibit 15.  Of course, Phoenix knew this all along, as it was consistent with the documents in Phoenix's possession.  But it was not until Plaintiff finally able to obtain this information on its own, and provided it to Phoenix, that Phoenix finally paid Plaintiff the $10 million it owed.

38.    Thus, Phoenix strategically delayed paying Plaintiff's claim on the Policy and engaged in other unfair claims handling practices prohibited by the Connecticut Unfair Insurance Practices Act.  Phoenix, among other things: (i) failed to act with reasonable promptness upon communications regarding the Policy; (ii) refused to pay an unquestionably valid claim without conducting a reasonable investigation and despite available information establishing the validity of such claims; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims; (iv) failed to affirm or deny coverage of a claim within the period prescribed by statute; and (v) failed to promptly provide a reasonable explanation of the basis for denial of the claim.

**B.    The Doe II Policies**

39.    This is not the only case where Phoenix refused to pay a claim for the death benefits pretending to be concerned about the prior liens of JP Morgan and Bank of New York.  Phoenix did the same thing with the Doe II Policies that are the subject of the Doe II Action.  The only difference is, in that case, Phoenix ignored Plaintiff until Plaintiff sued Phoenix, at which point it finally disclosed its frivolous concerns about the prior liens.

40.    The insured under the Doe II Policies, Jane Doe, died on January 28, 2012.  Upon information and belief, Phoenix became aware of Ms. Doe's death shortly thereafter.

41.    On February 23, 2012, Plaintiff submitted proofs of claims to Phoenix requesting payment of the death benefits under the Doe II Policies.

42.    The Policies state: "Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy." Exhibit 1 (Policies, p. 13 of Exhibits 1 and 2 thereto).  Because Plaintiff had provided Phoenix with proof of Jane Doe's death while the Policies were in force, Phoenix had no legitimate basis, and it provided no legitimate basis, for failing and refusing to pay the death benefits under the Policies.

43.   California Code of Regulations, Title 10, section 2695.7(b) also states: "Upon receiving proof of claim, every insurer . . . shall immediately, but in no event more than forty (40) calendar days later, accept or deny the claim, in whole or in part. . . ."  Subsection (1) further states:

> Where an insurer denies or rejects a first party claim, in whole or in part, it shall do so in writing and shall provide the claimant a statement listing all bases for such rejection or denial and the factual and legal bases for each reason given for such rejection or denial which is then within the insurer's knowledge.  Where an insurer's denial of a first party claim, in whole or in part, is based on a specific statute, applicable law or policy provision, condition or exclusion, the written denial shall include reference thereto and provide an explanation of the application of the statute, applicable law or provision, conditions or exclusion to the claim. . . .

44.   Phoenix, however, did not respond to Plaintiff's proofs of claims. Thus, Phoenix failed to comply with its obligation to provide Plaintiff with timely notice in accordance with section 2695.7(b) and failed even to contact Plaintiff concerning the Doe II Policies until Plaintiff commenced this action.

45.   Even after Plaintiff filed this action, Phoenix failed and refused to pay the claims submitted on the Doe II Policies.  Instead, Phoenix informed Plaintiff that Phoenix was concerned that two prior collateral assignees of the Policies, JP Morgan and Bank of New York, might make a claim to the death benefits, even though Phoenix knew these collateral assignments were released in 2010.

46.   Moreover, while Phoenix feigned concern about whether these collateral assignments had actually been released, Phoenix admits that it made no effort to contact JP Morgan and Bank of New York, either before being sued or even immediately after.  Instead, when Phoenix was served with Plaintiff's original complaint in the Doe II Action, Phoenix asked Plaintiff for an extension to respond (which Plaintiff granted), waited until the extension had expired, and then filed a

cross-claim for interpleader against JP Morgan and Bank of New York. Then, to further delay obtaining a response from JP Morgan and Bank of New York (as Phoenix knew they would disclaim any interest in the Policies), Phoenix waited a month to actually *serve* the interpleader on these entities.

47.    Phoenix's sudden concern with these prior liens was clearly a pretext to delay paying the $20 million in death benefits that Phoenix owed to Plaintiff so that Phoenix could enjoy the use of those funds for as long as it could delay payment. And because Phoenix's interpleader was just a ruse, Phoenix never actually deposited the death benefits with the Court's registry.

48.    Only after filing the cross-claim for interpleader did Phoenix finally ask JP Morgan and Bank of New York whether they intended to make a claim to the death benefits under the Doe II Policies. It took Phoenix *over 100 days* to send a single letter to JP Morgan and Bank of New York asking them whether they intended to assert a claim on the Policies.

49.    Phoenix intentionally dragged its feet trying to get a response from JP Morgan and Bank of New York because Phoenix knew that they would disclaim any interest in the Policies. However, as in this case, Plaintiff was finally able to obtain written confirmation from JP Morgan and Bank of New York that they had released their liens years ago and did not intend to make any claim to the death benefits under the Policies. *See* Exhibit 16. Of course, Phoenix knew this all along. But it was not until Plaintiff was finally able to obtain this information on its own, and provided it to Phoenix, that Phoenix finally paid Plaintiff the $20 million it owed.

50.    Just as in this case, Phoenix's misconduct in the Doe II Action is not an isolated incident but instead is representative of Phoenix's general business practice and part an ongoing pattern of unfair claims handling in violation of the Connecticut Unfair Insurance Practices Act. Phoenix's misconduct in connection with other claims is described further below.

## C.     The Doe III Policy

51.     In another instance, Phoenix refused to pay Plaintiff's claim on a $3 million policy, forcing Plaintiff to sue Phoenix to obtain the death benefits.  In that case, Phoenix engaged in the same and similar unfair claims handling practices alleged here.

52.     For example, Phoenix failed and refused to pay a valid claim by purporting to be concerned about whether the insured actually consented to the policy (the "Doe III Policy").  Just as Phoenix pretended to be concerned about liens that had previously been released in this case, Phoenix feigned concern about whether the insured consented to the insurance policy at issue in that case.  And just as Phoenix forced Plaintiff to prove to Phoenix that the prior liens had been released in this case, Phoenix, in that case, has forced Plaintiff to prove to Phoenix that the insured consented to his policy, even though Phoenix's own records clearly evidence the insured's consent to the policy.  Among other things, the insured underwent medical examinations and signed the policy application and several other documents in connection with the issuance of the policy.  Nevertheless, Phoenix has asserted that the policy is void for lack of insurable interest because, according to Phoenix, the insured never consented to the policy.  Not only has Phoenix refused to pay the death benefits, Phoenix also has kept all the premiums that had been paid on the policy.

53.     Phoenix issued the Doe III Policy on June 23, 2008.

54.     Mr. Doe died on November 4, 2011, while the Policy was in force.

55.     The Doe III Policy states: "If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described below, upon receipt of due proof of death of the Insured no later than two months after receipt of such proof, subject to any applicable provisions of the policy."  Exhibit 2, (Exhibit 1 thereto, Policy, p. 9).

56.   Upon information and belief, Phoenix became aware of John Doe III's death shortly after his death on November 4, 2011.  On November 14, 2011, Phoenix sent a letter to John Doe III's widow requesting certain documents to process a claim for the death benefit.  The letter requested:  (a) a certified copy of the death certificate; (b) completion and return of an enclosed Beneficiary Statement; (c) completion of an enclosed Affidavit as to the Extent of Interest form; and (d) return of the policy.  Phoenix did not at this time express any concerns or issues about the Doe Policy.  Exhibit 2 (Exhibit 2 thereto).

57.   On November 16, 2011, Plaintiff filed the COI Action.

58.   On December 22, 2011, Plaintiff submitted a claim to Phoenix requesting payment of the death benefit owed under the Doe III Policy.  Plaintiff also provided Phoenix with all of the documents requested in Phoenix's November 14, 2011 letter, including a copy of John Doe III's death certificate, a completed Beneficiary Statement and completed Affidavit as to the Extent of Interest, and the original Doe III Policy.

59.   Phoenix responded to Plaintiff's claim by letter dated January 6, 2012. In that letter, Phoenix asserted that "issues" had been raised concerning John Doe III's consent to the Doe III Policy, the circumstances surrounding the Doe Policy's application, and the existence of an insurable interest at the time of issuance. Exhibit 2 (Exhibit 3 thereto).

60.   Phoenix did not specify what "issues" had been raised, or the basis for its belief that a valid insurable interest may not have existed at the time the Doe III Policy was issued.  Rather, Phoenix vaguely stated that it would be conducting an investigation into "the circumstances surrounding Mr. Doe's application for the Policy" *over three years earlier*.

61.   In an obvious attempt to engage in post-claim underwriting well after the expiration of the contestability period, Phoenix also demanded that Plaintiff produce a host of documents in connection with its investigation, most of which

1   had nothing to do with Mr. Doe's consent to the Policy or the existence of an

2   insurable interest at the time the Policy was issued, and many of which Phoenix

3   likely had in its possession.

4          62.    Plaintiff responded to Phoenix's demands in a letter dated January 20,

5   2012.  Plaintiff advised that it had already provided Phoenix with a copy of John

6   Doe III's death certificate, a completed Beneficiary Statement, a completed

7   Affidavit as to the Extent of Interest, and the original Doe III Policy, which was all

8   that was required for Phoenix to process the claim.  Plaintiff then made a second

9   request that Phoenix pay the claim.  Plaintiff also explained that, as Phoenix already

10  knew, the Doe III Policy was originally issued to a trust that was the original owner

11  and beneficiary of the Doe III Policy.  The original beneficiary of the trust was Jane

12  Doe III, John Doe III's wife.  Under Minnesota law, Jane Doe III indisputably had

13  an insurable interest in her husband's life.

14         63.    Notwithstanding its clear obligation to pay the death benefit, on

15  January 27, 2012, Phoenix responded to Plaintiff's January 20, 2012 letter by once

16  again refusing to pay the death benefit, insisting that Jane Doe III had "raised issues

17  concerning Mr. Doe's lack of consent to the insurance and the circumstances

18  surrounding the application or the Policy and the establishment of the Trust."

19  Exhibit 2 (Exhibit 5 thereto).

20         64.    Phoenix's purported concern about whether John Doe III "consented"

21  to the insurance was clearly pretextual given that John Doe III signed the Policy

22  application, the Policy, and the Policy Delivery Receipt, among many other

23  documents he signed and submitted to Phoenix when he procured the Doe III

24  Policy.  He also was required to undergo medical exams for underwriting purposes.

25         65.    Nevertheless, on February 16, 2012, in response to Phoenix's alleged

26  concerns about whether Mr. Doe consented to the insurance, Plaintiff provided

27  Phoenix with a copy of an Acknowledgment and Consent by Insured, Insured's

28  Spouse and Beneficiary (the "Consent"), which was executed before an official

1  public notary by John and Jane Doe III after the Doe III Policy was issued.  In the

2  Consent, Mr. and Mrs. Doe represented and warranted, among many other things,

3  that the transfer of the Doe III Policy was made on their "own initiative, (b)

4  voluntarily, (c) willingly, (d) without any undue influence or financial duress, . . .

5  (h) after considering the advantages and disadvantages of a sale of the Policy and

6  the other alternatives available, including retaining or otherwise selling the Policy,

7  or borrowing against the cash value of, or surrendering the Policy . . . ." <u>Exhibit 2</u>

8  (Exhibit 6 thereto, § 1.7).

9       66.    On March 1, 2012, more than two months after Plaintiff submitted a

10  claim under the policy and after the time during which Phoenix was required to pay

11  the death benefit under the express terms of the Policy, Phoenix acknowledged

12  receipt of the Consent but once again refused to pay the death benefit.  Phoenix

13  claimed it was still evaluating "the circumstances surrounding the issuance of the

14  Policy."  Phoenix also continued to demand that Plaintiff produce all of the

15  numerous categories of documents that it originally demanded in its

16  correspondence dated January 6, 2012, including, among other things, documents

17  "reflecting the income and net worth of Mr. Doe at the time the policy was applied

18  for" and documents "reflecting any estate plan developed for Mr. Doe." <u>Exhibit 2</u>

19  (Exhibit 7 thereto).

20       67.    Not only does Plaintiff not have many of the documents Phoenix

21  seeks, but such documents have nothing to do with Phoenix's purported concern

22  about John Doe III's consent to the insurance or whether the Doe III Policy was

23  issued to someone with an insurable interest.  Phoenix's requests were nothing

24  more than attempts either to delay payment of the claim or re-underwrite the Doe

25  III Policy after learning of John Doe III's untimely death.  Indeed, Phoenix never

26  disputed that the Doe III Policy was originally issued to a trust whose original

27  beneficiary was John Doe III's wife, who clearly had an insurable interest in Mr.

28  Doe's life.  Thus, on March 9, 2012, Plaintiff made a final demand that Phoenix

1   pay the death benefit under the Doe III Policy.  Exhibit 2 (Exhibit 8 thereto).

2   Phoenix never responded to the demand.

3       68.   Minnesota Statutes section 72A.201, subdivision 4(11) requires an

4   insurer to advise the insured in writing of the acceptance or denial of a claim

5   "within 60 business days after receipt of a properly executed proof of loss."

6   Subdivision 4(11) further provides that "[n]o insurer shall deny a claim on the

7   grounds of a specific policy provision, condition, or exclusion unless reference to

8   the provision, condition, or exclusion is included in the denial."  After more than 60

9   business days since Plaintiff filed the proof of loss on December 22, 2011, Plaintiff

10  had not received any notice from Phoenix that complied with section 72A.201.

11      69.   Phoenix still has failed and refused to pay the death benefit under the

12  Doe III Policy.

13      70.   Thus, as with the Doe II Policies, Phoenix strategically delayed

14  payment of Plaintiff's claim on the Doe III Policy and engaged in other unfair

15  claims handling practices prohibited by the Connecticut Unfair Insurance Practices

16  Act. Phoenix, among other things: (i) failed to act with reasonable promptness upon

17  communications regarding the Doe III Policy; (ii) refused to pay an unquestionably

18  valid claim without conducting a reasonable investigation and despite available

19  information establishing the validity of such claim; (iii) failed to adopt and

20  implement reasonable standards for the prompt investigation of claims; (iv) failed

21  to affirm or deny coverage of a claim within the period prescribed by statute; and

22  (v) failed to promptly provide a reasonable explanation of the basis for denial of the

23  claim.

24      71.   Phoenix's unlawful tactics have caused an eight-month (and counting)

25  delay in the payment on Plaintiff's claim under the Doe III Policy, during which

26  time Phoenix has essentially converted $3 million that rightfully belongs to

27  Plaintiff.

28

SECOND AMENDED COMPLAINT
CV12-03047-RGK (MRW)

## D.     The Jackson Policy

72.    In yet another example of Phoenix's unfair claims handling practices, Phoenix refused to pay a policyholder the death benefit under a $1.8 million policy (the "Jackson Policy") on the ground that the policyholder refused to provide Phoenix with answers to a post-claim questionnaire (the "Post-Claim Questionnaire") seeking private information about the policyholder that had nothing to do with payment of the claim.

73.    Phoenix issued the Jackson Policy in 2007.

74.    Mr. Jackson died on December 14, 2011, while the policy was in force.

75.    On January 23, 2012, the policy owner, the Jackson Family 2007 Irrevocable Trust (the "Jackson Trust"), submitted a proof of claim to Phoenix requesting payment of the death benefit. Despite having been provided all of the documents needed to process the claim, Phoenix ignored the claim for weeks.

76.    Having heard nothing from Phoenix for over five weeks, the Jackson Trust sent a follow-up letter demanding immediate payment of the death benefit. The next day, Phoenix advised the Jackson Trust that Phoenix would not pay the claim unless it completed and submitted the Post-Claim Questionnaire.

77.    According to Phoenix, the Post-Claim Questionnaire was necessary to establish the owner's insurable interest in the insured. However, under California law, an insurable interest is required to exist at the time the policy is issued – not at the time the claim is made. Insurance Code section 10110.1(f) specifically states: "An insurable interest shall be required to exist at the time the contract of life or disability insurance becomes effective, but *need not exist at the time the loss occurs.*" (Emphasis added.)

78.    Moreover, the Post-Claim Questionnaire asked numerous questions that have nothing to do with whether an insurable interest existed at the time the policy took effect. For example, Question 3 of the Post-Claim Questionnaire

sought information about the Trust's **current beneficiaries**; Question 4 asked for the identities of all persons or entities that would receive disbursements from the Trust; Questions 7 and 8 asked about the existence and exercise of any power of appointment by the trust beneficiary; and Question 14 asked whether there were any existing loans relating to payment of policy premiums. None of these questions are relevant to whether an insurable interest existed at the time the Jackson Policy became effective or whether Phoenix must pay the death benefit.

79.    The Jackson Trust objected to completing the Post-Claim Questionnaire because, among other things, Phoenix had no right to condition payment of the death benefit upon receiving this information, and the information requested by Phoenix was private and confidential.

80.    On April 2, 2012, Phoenix sent Plaintiff another letter reiterating that it would not pay the death benefit until the Jackson Trust provided the information requested in the Post-Claim Questionnaire. In response to this letter, Plaintiff sent Phoenix a letter on April 12, 2012 insisting that Phoenix had no right to condition payment of the death benefit on receipt of the information sought in the Post-Claim Questionnaire. Nevertheless, the trustee of the Jackson Trust provided a sworn affidavit to Phoenix confirming the existence of a valid insurable interest at the time the Jackson Policy was issued. On May 17, 2012, Phoenix responded by again insisting that it would not pay the death benefit unless Plaintiff completed and submitted the Post-Claim Questionnaire.

81.    The Jackson Policy states: "If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described above, **upon receipt of due proof of death of the Insured**, subject to any applicable provisions of the policy." Exhibit 4 (Exhibit 1 thereto, Policy, p. 10) (emphasis added). Thus, by its own terms, the Policy does not condition the payment of the death benefit upon the submission of the Post-Claim Questionnaire or anything other than proof of death of the insured.

82.    Because Plaintiff provided Phoenix with proof of Mr. Jackson's death while the policy was in force, Phoenix had no reasonable explanation for denying the claim.  Phoenix had no right to condition payment of the death benefit upon the Jackson Trust completing a document that was neither referenced in the Jackson Policy nor relevant to the question Phoenix purportedly sought to answer.

83.    As in this case, Phoenix failed to provide any notice that complied with California Code of Regulations, Title 10, section 2695.7(b) within 40 days of receipt of the claim.

84.    And, as in this case, Phoenix engaged in unfair claims handling practices prohibited by the Connecticut Unfair Insurance Practices Act.  Phoenix, among other things: (i) failed to act with reasonable promptness upon communications regarding the Jackson Policy; (ii) refused to pay an unquestionably valid claim without conducting a reasonable investigation and despite available information establishing the validity of such claim; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims; (iv) failed to affirm or deny coverage of a claim within the period prescribed by statute; and (v) failed to promptly provide a reasonable explanation of the basis for denial of the claim.

E.    **The Close Policy**

85.    Another example of Phoenix's unfair claims handling practices is described in the counterclaim in the Close Action, which involved a claim on a $5 million policy (the "Close Policy").  Phoenix issued the Close Policy in Minnesota on September 11, 2007.

86.    Mr. Close, the insured, died on November 18, 2011, and the policyholder submitted a proof of claim on January 4, 2012.  The policyholder then called Phoenix frequently concerning the claim and was repeatedly assured by Phoenix that the claim would be processed within the two-month period specified in the policy.  However, this turned out to be false.  Phoenix failed to promptly

1    reach a decision on the policyholder's claim.  The policyholder inquired about the

2    reason and was told that Phoenix's processing of the claim was delayed because of

3    the "size" of the claim.  Needless to say, there was no provision in the policy that

4    allowed Phoenix to delay payment of a claim based on the size of the claim, nor

5    does the law permit Phoenix to delay payment of a claim based on the size of the

6    policy.

7         87.    Phoenix then further delayed payment of the claim based on what was

8    an obvious pretext.  Phoenix said it was still investigating the claim because it

9    appeared that Mr. Close (who was 75 years old at the time the policy was issued)

10   may have misrepresented in the policy application that he was "retired."  However,

11   whether or not Mr. Close was retired when he applied for the policy was irrelevant.

12   The policy was well beyond the period during which Phoenix could deny the claim

13   based on a misrepresentation in the policy application.  Moreover, Mr. Close's

14   retired status was obviously not material to Phoenix's underwriting decision.

15        88.    In any event, after Phoenix failed to affirm or deny coverage within the

16   time period specifically required under the policy, the policyholder inquired about

17   the delay, and Phoenix advised the policyholder that Phoenix was still investigating

18   the claim.

19        89.    Over *five months* after the insured's death, and over four months after

20   the policyholder submitted a claim for the death benefit, Phoenix finally denied the

21   claim and initiated the Close Action seeking to rescind the Close Policy, claiming

22   that the Policy was void due to lack of insurable interest at origination.

23        90.    The Close Policy, however, was procured by a trust (the "Close

24   Trust") formed by Mr. Close.  The sole beneficiary of the trust was Mr. Close's

25   wife, Mrs. Close.  After the Close Policy was issued, it was held in trust, for Mrs.

26   Close's exclusive benefit, for over two years.  Mr. Close, the Close Trust, and Mrs.

27   Close, all had an insurable interest in Mr. Close's life.  Thus, Phoenix's assertion

28   that the Close Policy is void for lack of insurable interest is clearly false.

91.     As in this case, Phoenix engaged in unfair claims handling practices prohibited by the Connecticut Unfair Insurance Practices Act. Phoenix, among other things: (i) failed to act with reasonable promptness upon communications regarding the Close Policy; (ii) refused to pay an unquestionably valid claim without conducting a reasonable investigation and despite available information establishing the validity of such claim; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims; (iv) failed to affirm or deny coverage of a claim within the period prescribed by statute; and (v) failed to promptly provide a reasonable explanation of the basis for denial of the claim.

**F.    The Griggs Policy**

92.     The policyholder's counterclaim in the Griggs Action also describes the same and similar unfair claims handling practices by Phoenix. There, Phoenix denied a claim on a $10 million policy issued on the life of Roberta Griggs (the "Griggs Policy"). Although the specifics of Phoenix's claims handling practices are not outlined in detail, the counterclaim alleges conduct that violates the Connecticut Unfair Insurance Practices Act. Specifically, the plaintiff in the Griggs Action has alleged that Phoenix (i) refused to pay unquestionably valid claims without conducting a reasonable investigation and (ii) failed to provide a reasonable explanation for its failure and refusal to pay the claim.

93.     As described in detail above, Phoenix's unfair claims handling practices have not been confined merely to Plaintiff, but are part of an ongoing pattern of misconduct that constitutes a general business practice. Moreover, the conduct described above only relates to instances where policyholders have initiated litigation against Phoenix. Upon information and belief, Phoenix's general business practices have victimized other policyholders who, for any number of reasons, have not yet pursued litigation against Phoenix.

94.     Phoenix has reaped a significant windfall from its repeated violations of the Connecticut Unfair Insurance Practices Act because even if Phoenix

1   ultimately pays all of the claims on the policies described above after a delay of six

2   months on average, the delay in making such payments will have afforded Phoenix

3   the use and enjoyment of nearly $50,000,000 for six months.  Assuming Phoenix

4   were able to earn a modest 5% annual rate of return on that amount (although

5   Phoenix's actual rate of return is probably higher), Phoenix would net

6   approximately $500,000 dollars in interest, on just these policies, after paying its

7   policyholders interest at the rate of 3% rate, which is the minimum rate provided

8   under Phoenix's policies.  This is a significant amount of revenue for a company

9   that made only $1.5 million in premiums from new sales of life insurance in the

10  past year, as reflected in Phoenix's regulatory filings.  *See* <u>Exhibit 9</u> (page 9, line

11  9.4).

12        95.    This amount also does not include Phoenix's delays in paying claims

13  by other policyholders.  Upon information and belief, the actual incidence of

14  Phoenix's unfair claims handling is likely much higher than what Plaintiff is aware

15  of based on publicly available information.

16                          **FIRST CAUSE OF ACTION**

17                       **For Breach of Contract (Express)**

18        96.    Plaintiff realleges the allegations contained in paragraphs 1 through

19  95.

20        97.    The Doe Policy is a binding and enforceable contract.

21        98.    Defendant breached the Policy by failing and refusing to pay the death

22  benefit due under the Policy.

23        99.    Plaintiff has performed all of its obligations under the Policy.

24        100.   As a direct and proximate cause of Defendant's material breaches of

25  the Policy, Plaintiff has been damaged as alleged herein in an amount to be proven

26  at trial.

27

28

## SECOND CAUSE OF ACTION

### For Breach of Contract (Bad Faith)

101.   Plaintiff realleges the allegations contained in paragraphs 1 through 95.

102.   The Doe Policy is a binding and enforceable contract.

103.   The Doe Policy includes an implied covenant that Defendant will act in good faith and deal fairly with Plaintiff.

104.   Defendant breached the implied covenant of good faith and fair dealing by, among other things, failing and refusing to pay the death benefit due under the Doe Policy, failing and refusing to provide a valid legal or contractual basis for its failure and refusal to pay the death benefit, and deliberately refusing and delaying the payment of the death benefit in retaliation for Plaintiff filing the COI Action.

105.   As a direct and proximate cause of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

106.   Furthermore, because Defendant acted with a conscious disregard of Plaintiff's rights, and its actions constitute oppression, fraud, or malice under Civil Code section 3294, Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION

### For Violation of the Connecticut Unfair Trade Practices Act,

### Conn. Gen. Stat. §§ 42-110a, *et seq.*

107.   Plaintiff realleges the allegations contained in paragraphs 1 through 95.

108.   The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

109.   Defendant, a Connecticut corporation with its principal place of business in Connecticut, has engaged in "unfair" conduct, as alleged herein, of a "trade" or "commerce" as defined in Conn. Gen. Stat. §42-110a.

110.   Among other violations of the Unfair Trade Practices Act, Defendant, as part of its general claims handling practices, has:  (i) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (ii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iii) refused to pay unquestionably valid claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (iv) failed to affirm or deny coverage of claims within a reasonable time; and (v) failed to promptly provide a reasonable explanation of the basis for denial of a claim.

111.   Defendant's conduct violates (among other applicable provisions of Connecticut law), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a), and the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(6)(b)-(f), and (n).

112.   Because Defendant acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

113.   Plaintiff is also entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Stat. § 42-110g(d).

114.   In compliance with Conn. Gen. Stat. § 42-110g(c), a copy of this Complaint has been mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

### **On the First Cause of Action**

1.   For damages in an amount to be determined at trial;

SECOND AMENDED COMPLAINT
CV12-03047-RGK (MRW)

2.      For an award of pre-judgment and post-judgment interest;

3.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.      For such other and further relief as the Court may deem proper.

**On the Second Cause of Action**

1.      For damages in an amount to be determined at trial;

2.      For an award of pre-judgment and post-judgment interest;

3.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

4.      For punitive damages; and

5.      For such other and further relief as the Court may deem proper.

**On the Third Cause of Action**

1.      For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2.      For an award of consequential damages and lost profits, in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

5.      For punitive damages; and

6.      For such other and further relief as the Court may deem proper.

1  Dated:        August 20, 2012              Orrick, Herrington & Sutcliffe LLP

2

3                                            By: _____ for

4                                               KHAI LEQUANG
                                               Attorneys for Plaintiff
5                                              U.S. BANK NATIONAL
                                               ASSOCIATION, AS SECURITIES
6                                              INTERMEDIARY FOR LIMA
                                               ACQUISITION LP
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT
CV12-03047-RGK (MRW)

1

## DEMAND FOR JURY TRIAL

2

Plaintiff hereby demands a jury trial on all issues so triable.

3

4    Dated:        August 20, 2012                    Orrick, Herrington & Sutcliffe LLP

5

6                                                     By: _____
                                                          KHAI LEQUANG
7                                                         Attorneys for Plaintiff
                                                         U.S. BANK NATIONAL
8                                                    ASSOCIATION, AS SECURITIES
                                                      INTERMEDIARY FOR LIMA
9                                                       ACQUISITION LP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 27 -