KHAI LEQUANG (SBN 202922)
klequang@orrick.com
MELANIE D. PHILLIPS (SBN 245584)
mphillips@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California 90017
Telephone: +1-213-629-2020
Facsimile: +1-213-612-2499

STEPHEN G. FORESTA (*pro hac vice* to be filed)
sforesta@orrick.com
PHILIPP SMAYLOVSKY(*pro hac vice* to be filed)
psmaylovsky@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, New York 10019
Telephone: 212-506-5000
Facsimile: 212-506-5151

Attorneys for Plaintiff
U.S. BANK NATIONAL ASSOCIATION, AS
SECURITIES INTERMEDIARY FOR LIMA
ACQUISITION LP

FILED
2012 AUG 20 PM 4:16
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:_____

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, a national association, as securities intermediary for LIMA ACQUISITION LP, <br><br> Plaintiff, <br><br> v. <br><br> PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation, <br><br> Defendant. | Case No. CV-12-03047-RGK (MRWx) <br><br> **EXHIBITS 1-3 IN SUPPORT OF SECOND AMENDED COMPLAINT FOR:** <br><br> 1. **BREACH OF CONTRACT;** <br> 2. **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; AND** <br> 3. **VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT** <br><br> **JURY TRIAL DEMANDED** <br><br> **VOL. I OF III** |

Exhibit 1

1  KHAI LEQUANG (SBN 202922)
   klequang@orrick.com
2  MELANIE D. PHILLIPS (SBN 245584)
   mphillips@orrick.com
3  ORRICK, HERRINGTON & SUTCLIFFE LLP
   777 South Figueroa Street
4  Suite 3200
   Los Angeles, California 90017
5  Telephone: 213-629-2020
   Facsimile: 213-612-2499
6
7  STEPHEN G. FORESTA (*pro hac vice* to be filed)
   sforesta@orrick.com
   PHILIPP SMAYLOVSKY(*pro hac vice* to be filed)
8  psmaylovsky@orrick.com
   ORRICK, HERRINGTON & SUTCLIFFE LLP
9  51 West 52nd Street
   New York, New York 10019
10 Telephone: 212-506-5000
   Facsimile: 212-506-5151
11
   Attorneys for Plaintiff
12 U.S. BANK NATIONAL ASSOCIATION, AS
   SECURITIES INTERMEDIARY FOR LIMA
13 ACQUISITION LP

14            UNITED STATES DISTRICT COURT

15            CENTRAL DISTRICT OF CALIFORNIA

16                   WESTERN DIVISION

17

18

19 U.S. BANK NATIONAL                Case No. CV12-03046 RGK (MRW)
   ASSOCIATION, a national association,
20 as securities intermediary for LIMA   **FIRST AMENDED COMPLAINT**
   ACQUISITION LP,                    **FOR:**

21            Plaintiff,             **1. BREACH OF CONTRACT;**
                                      **2. BREACH OF THE**
22      v.                              **COVENANT OF GOOD**
                                         **FAITH AND FAIR DEALING;**
23 PHL VARIABLE INSURANCE               **AND**
   COMPANY, a Connecticut corporation, **3. UNJUST ENRICHMENT**
24                                      **4. VIOLATION OF THE**
            Defendant.                   **CONNECTICUT UNFAIR**
25                                       **TRADE PRACTICES ACT**
                                      **5. VIOLATION OF THE**
26                                       **CONNECTICUT UNFAIR**
                                         **INSURANCE PRACTICES**
27                                       **ACT**

28                                   **JURY TRIAL DEMANDED**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CV12-03046-RGK(MRW)
First Amended complaint

EXHIBIT 1 - PAGE 29

1        Plaintiff U.S. Bank National Association, as securities intermediary for Lima

2  Acquisition LP ("Plaintiff"), hereby files this complaint against defendant PHL

3  Variable Insurance Company ("Phoenix" or "Defendant"), and alleges as follows:

4                  **NATURE OF THE ACTION**

5       1.     Plaintiff brings this action seeking compensatory and consequential

6  damages, punitive damages, equitable relief, and attorneys' fees based on Phoenix's

7  failure and refusal to pay the death benefit due under two $10 million dollar life

8  insurance policies insuring the life of Ms. Jane Doe (the "Doe Policies" or

9  "Policies").[1]

10      2.     Phoenix issued the Doe Policies more than six years ago, and since

11  issuing the Policies, Phoenix has received over $2,515,400 in premiums paid to

12  keep the Policies in force.  Ms. Doe passed away on January 28, 2012.  Shortly

13  thereafter, Plaintiff, as the current owner of the Policies, timely submitted a proof of

14  claim to Phoenix seeking payment of the death benefits under the Policies.

15  Phoenix, however, has failed and refused to pay the death benefits and has failed to

16  provide any justification (much less a valid one) for its failure and refusal to pay.

17  Payment of the death benefits is now due and owing.   Phoenix's pretextual and

18  unjustified excuses for its failure and refusal to pay the death benefit is a blatant

19  violation of its obligations under the Policy, and constitutes willful, reckless, and/or

20  wanton disregard of Plaintiff's rights.

21      3.     Upon information and belief, Phoenix has deliberately failed and

22  refused to pay this claim, along with claims submitted on a number of other policies

23  owned by Plaintiff, in retaliation for Plaintiff filing a lawsuit against Phoenix,

24  alleging that Phoenix unlawfully raised the cost of insurance rates on many of

25  Plaintiff's and other policyholders' policies.  Plaintiff filed that lawsuit, *U.S. Bank*

26  *National Association v. PHL Variable Insurance Company*, Case No. 2:11-cv-

27

28  [1] For privacy reasons, Plaintiff has substituted "Jane Doe" for the name of the actual insured.

1  09517-OD (RZx) (the "COI Action"), in the Central District of California on

2  November 16, 2011.

3      4.    Before Plaintiff filed the COI Action, Phoenix promptly paid the death

4  benefit on a claim under one of Plaintiff's other policies, but since Plaintiff filed the

5  COI Action, Phoenix has not paid any of Plaintiff's death benefit claims.  Plaintiff

6  has thus been forced to file two other lawsuits in addition to this one seeking

7  payment under other policies whose death benefits Phoenix has failed to pay.  In

8  other words, while the rest of the life insurance industry, on average, denies less

9  than 1% of all death benefit claims, Phoenix has failed to pay 100% of Plaintiff's

10  death benefit claims submitted since the COI Action was filed.

11      5.    By improperly refusing to pay the death benefits on the Doe Policies,

12  Phoenix has forced Plaintiff to incur the substantial expense and delay of litigation

13  in order to obtain the benefits of the Policies, even after Phoenix has collected

14  premiums on them for over six years.  Phoenix's misconduct in refusing to pay the

15  death benefits after collecting premiums for years constitutes not only express

16  breaches of the Policies, but also bad faith.  Phoenix's misconduct is also part of an

17  ongoing pattern of unfair claims handling in violation of Connecticut's Unfair

18  Trade Practices Act and the Unfair Insurance Practices Act.  Phoenix, a Connecticut

19  insurer, is unquestionably subject to the provisions of those statutes.

20  **PARTIES**

21      6.    Plaintiff U.S. Bank National Association is a national banking

22  association with its principal place of business in Ohio, and is the securities

23  intermediary for Lima Acquisition LP.

24      7.    Upon information and belief, defendant Phoenix is a Connecticut

25  corporation with its principal place of business and nerve center in Hartford,

26  Connecticut, and Phoenix is authorized to do business in the State of California and

27  regularly conducts its business in the State of California, including within this

28  judicial district.

CV12-03046-RGK(MRW)
FIRST AMENDED COMPLAINT

EXHIBIT 1 - PAGE 31

**JURISDICTION AND VENUE**

8.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2) because Defendant resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including issuance of the Doe Policies in California to a trust that resided within this judicial district.

**FACTUAL ALLEGATIONS**

10.     In 2006, Phoenix issued Policy No. 97514670 (the "Doe Policy 1") and Policy No. 97514671 (the "Doe Policy 2"), each with a face value of $10,000,000 and each with an Issue Date and Policy Date of December 28, 2005. Copies of the Doe Policies are attached hereto as <u>Exhibit 1</u> and <u>Exhibit 2</u>.[2]  The original owner of the Doe Policies was the Jane Doe Life Insurance Trust #2006[3] (the "Doe Trust" or "Trust"), which was also the original beneficiary of the Policies.  The original beneficiary of the Doe Trust was the Doe Family Irrevocable Trust (the "Doe Family Trust").  The original trustee of the Doe Trust was Wells Fargo Bank, N.A.  The issue state of the Policies is California.

11.     California Insurance Code section 10113.5 states that "[a]n individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue."  The Policies also state:  "We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement)."  Policies, p. 3 (Exhibit

---

[2] Some of the policy information in the exhibits hereto has been redacted for privacy reasons.

[3] As noted above, the true name of the insured has been substituted with "Jane Doe," including within the name of the Trust.

1 | 1 and Exhibit 2).

2 |     12.    The Doe Policies were acquired by Plaintiff after the expiration of the

3 | contestability period, and Plaintiff thereafter continued to make all premium

4 | payments on the Policies.

5 |     13.    From the time the Doe Policies were issued effective December 28,

6 | 2005 and until the Policies matured, all of the premiums that were due under the

7 | Doe Policies were paid.  Indeed, throughout the contestability period, and after,

8 | Phoenix continued to accept premiums on the Policies, including over $1.6 million

9 | in premiums that were paid after the Policies became incontestable.  In total,

10 | Phoenix received $2,515,400 in premiums on the Policies.

11 |     14.    Additionally, on August 3, 2010, well after the contestability period,

12 | when Phoenix advised Plaintiff that it had recorded changes of the owners and

13 | beneficiaries under the Policies, Phoenix did not raise any questions or concerns

14 | about the Policies.  Also, on November 4, 2010, Phoenix provided Verifications of

15 | Coverage for the Policies, and again did not raise any questions about the Policies

16 | or indicate there were any issues with them.

17 |     15.    Ms. Doe died on January 28, 2012, while both the Policies were in

18 | force.  Upon information and belief, Phoenix became aware of Ms. Doe's death

19 | shortly thereafter.

20 |     16.    On February 23, 2012, Plaintiff submitted a proof of claim to Phoenix

21 | requesting payment of the death benefit under the Doe Policies.

22 |     17.    The Policies state: "Upon receipt by Us of Due Proof of Death that the

23 | Insured died while this policy is In Force, We will pay the death proceeds of this

24 | policy." Policies, p. 13 (Exhibit 1 and Exhibit 2).  Because Plaintiff had provided

25 | Phoenix with proof of Jane Doe's death while the Policies were in force, Phoenix

26 | has no basis, and it has provided no basis, for failing and refusing to pay the death

27 | benefits under the Policies.

28 |     18.    California Code of Regulations, Title 10, section 2695.7(b) also states:

CV12-03046-RGK(MRW)
First Amended Complaint

EXHIBIT 1 - PAGE 33

1  "Upon receiving proof of claim, every insurer . . . shall immediately, but in no

2  event more than forty (40) calendar days later, accept or deny the claim, in whole or

3  in part. . . ."  Subsection (1) further states:

> Where an insurer denies or rejects a first party claim, in whole or in part, it shall do so in writing and shall provide the claimant a statement listing all bases for such rejection or denial and the factual and legal bases for each reason given for such rejection or denial which is then within the insurer's knowledge.  Where an insurer's denial of a first party claim, in whole or in part, is based on a specific statute, applicable law or policy provision, condition or exclusion, the written denial shall include reference thereto and provide an explanation of the application of the statute, applicable law or provision, conditions or exclusion to the claim. . . .

11  19.   It has been more than 40 calendar days since Plaintiff filed the proof of

12  claim on February 23, 2012, and Plaintiff has not received any notice that complies

13  with section 2695.7(b).

14  20.   As of the date hereof, Phoenix still has failed and refused to pay the

15  death benefits under the Doe Policies.

## FIRST CAUSE OF ACTION

### For Breach of Contract (Express)

21.   Plaintiff realleges the allegations contained in paragraphs 1 through 20.

22.   The Doe Policies are binding and enforceable contracts.

23.   Defendant breached the Policies by failing and refusing to pay the death benefits due under the Policies.

24.   Plaintiff has performed all of its obligations under the Policies.

25.   As a direct and proximate cause of Defendant's material breaches of the Policies, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### For Breach of Contract (Bad Faith)

CV12-03046-RGK(MRW)
FIRST AMENDED COMPLAINT

EXHIBIT 1 - PAGE 34

26.     Plaintiff realleges the allegations contained in paragraphs 1 through 20.

27.     The Doe Policies are binding and enforceable contracts.

28.     The Doe Policies include an implied covenant that Defendant will act in good faith and deal fairly with Plaintiff.

29.     Defendant breached the implied covenant of good faith and fair dealing by, among other things, failing and refusing to pay the death benefits due under the Doe Policies, failing and refusing to provide any legal or contractual basis for its failure and refusal to pay the death benefits, and deliberately refusing and delaying the payment of the death benefits in retaliation for Plaintiff filing the COI Action.

30.     As a direct and proximate cause of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

31.     Furthermore, because Defendant acted with a conscious disregard of Plaintiff's rights, and its actions constitute oppression, fraud, or malice under Civil Code section 3294, Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION

### For Unjust Enrichment

32.     Plaintiff realleges the allegations contained in paragraphs 1 through 20.

33.     The premiums under the Doe Policies were fully paid to Defendant, by Plaintiff and prior owners of the Policies, through the maturation of the Policies.

34.     Defendant has retained these premium payments and has refused to pay the benefits due under the Policies.

35.     Defendant's retention of the premiums and refusal to pay the benefits under the Policies has unjustly enriched Defendant at Plaintiff's expense.

36.     Accordingly, Plaintiff is entitled to an order requiring Defendant to

CV12-03046-RGK(MRW)
FIRST AMENDED COMPLAINT

EXHIBIT 1 - PAGE 35

1  pay the benefits due under the Policies.

2  ## FOURTH CAUSE OF ACTION

3  ### For Violation of the Connecticut Unfair Trade Practices Act

4  ### Conn. Gen. Stat. §§ 42-110a, *et seq.*

5      37.    Plaintiff realleges the allegations contained in paragraphs 1 through

6  20.

7      38.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-

8  110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or

9  commerce."

10      39.    Defendant, a Connecticut corporation with its principal place of

11  business in Connecticut, has engaged in "unfair" conduct, as alleged herein, of a

12  "trade" or "commerce" as defined in Conn. Gen. Stat. §42-110a.

13      40.    Among other violations of the Unfair Trade Practices Act, Defendant,

14  as part of its general claims handling practices, has:  (i) failed to act with reasonable

15  promptness upon communications regarding the Policy and other policies; (ii)

16  failed to adopt and implement reasonable standards for the prompt investigation of

17  claims brought under the Policy and other policies; (iii) refused to pay

18  unquestionably valid claims without conducting a reasonable investigation and

19  despite available information establishing the validity of such claims; (iv) failed to

20  affirm or deny coverage of claims within a reasonable time; and (v) failed to

21  promptly provide a reasonable explanation of the basis for denial of a claim.

22      41.    Defendant's conduct violates (among other applicable provisions of

23  Connecticut law), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §

24  42-110b(a), and the Connecticut Unfair Insurance Practices Act, including Conn.

25  Gen. Stat. §§ 38a-816(6)(b)-(f), and (n).

26      42.    Because Defendant acted with a willful, reckless and/or wanton

27  indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to

28  Conn. Gen. Stat. § 42-110g(a).

43.     Plaintiff is also entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn . Gen. Sta. 42-110g(d).

44.     In compliance with Connecticut General Statutes § 42-110g(c), a copy of this Complaint has been mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

## FIFTH CAUSE OF ACTION

### For Violation of the Connecticut Unfair Insurance Practices Act
### Conn. Gen. Stat. §§ 38a-815, *et seq.*

45.     Plaintiff realleges the allegations contained in paragraphs 1 through 20.

46.     The Connecticut Unfair Insurance Practices Act prohibits any "unfair or deceptive act or practice in the business of insurance" by any Connecticut insurer, including acts defined by statute as unfair claims handling.

47.     Defendant, a Connecticut corporation with its principal place of business in Connecticut, engaged in "unfair" practices in the business of insurance, as alleged herein.

48.     Among other violations of the Unfair Insurance Practices Act, Defendant, as part of its general claims handling practices, has:  (i) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (ii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iii) refused to pay unquestionably valid claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (iv) failed to affirm or deny coverage of claims within a reasonable time; and (v) failed to promptly provide a reasonable explanation of the basis for denial of a claim.

49.     Defendant's conduct violates (among other applicable provisions of Connecticut law) the Connecticut Unfair Insurance Practices Act, including Conn.

1    Gen. Stat. §§ 38a-816(6)(b)-(f), and (n).

2         50.    Because Defendant acted with a willful, reckless and/or wanton

3    indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to

4    Conn. Gen. Stat. § 42-110g(a).

5         51.    Plaintiff is also entitled to recover its costs and reasonable attorneys'

6    fees incurred in prosecuting this action pursuant to Conn . Gen. Sta. 42-110g(d).

7                          **PRAYER FOR RELIEF**

8         WHEREFORE, Plaintiff prays for judgment as follows:

9                     **On the First Cause of Action**

10        1.    For damages in an amount to be determined at trial;

11        2.    For an award of pre-judgment and post-judgment interest;

12        3.    For the costs of the suit herein incurred, including reasonable

13   attorneys' fees to the extent permitted by law; and

14        4.    For such other and further relief as the Court may deem proper.

15                    **On the Second Cause of Action**

16        1.    For damages in an amount to be determined at trial;

17        2.    For an award of pre-judgment and post-judgment interest;

18        3.    For the costs of the suit herein incurred, including reasonable

19   attorneys' fees to the extent permitted by law;

20        4.    For punitive damages; and

21        5.    For such other and further relief as the Court may deem proper.

22                    **On the Third Cause of Action**

23        1.    For an order requiring Defendant to pay the benefits due under the

24   Policies;

25        2.    For the costs of the suit herein incurred, including reasonable

26   attorneys' fees to the extent permitted by law; and

27        3.    For such other and further relief as the Court may deem proper.

28                    **On the Fourth Cause of Action**

CV12-03046-RGK(MRW)
FIRST AMENDED COMPLAINT

EXHIBIT 1 - PAGE 38

1.   For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2.   For an award of consequential damages and lost profits, in an amount to be determined at trial;

3.   For an award of pre-judgment and post-judgment interest;

4.   For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

5.   For punitive damages; and

6.   For such other and further relief as the Court may deem proper.

## On the Fifth Cause of Action

1.   For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2.   For an award of consequential damages and lost profits, in an amount to be determined at trial;

3.   For an award of pre-judgment and post-judgment interest;

4.   For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law;

5.   For punitive damages;

6.   For such other and further relief as the Court may deem proper.

Dated:       May 24, 2012                    Orrick, Herrington & Sutcliffe LLP

By: _____ for

KHAI LEQUANG
Attorneys for Plaintiff
U.S. BANK NATIONAL
ASSOCIATION, AS SECURITIES
INTERMEDIARY FOR LIMA
ACQUISITION LP

- 10 -

CV12-03046-RGK(MRW)
FIRST AMENDED COMPLAINT

EXHIBIT 1 - PAGE 39

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a jury trial on all issues so triable.

3

4

Dated:          May 24, 2012

Orrick, Herrington & Sutcliffe LLP

5

6

By: _____

7

KHAI LEQUANG
Attorneys for Plaintiff

8

U.S. BANK NATIONAL
ASSOCIATION, AS SECURITIES
INTERMEDIARY FOR LIMA
ACQUISITION LP

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CV12-03046-RGK(MRW)
First Amended Complaint

EXHIBIT 1 - PAGE 40

# Exhibit 1

EXHIBIT 1 - PAGE 41

**Document Cover sheet**

Original 



Exhibit 1 - 12

EXHIBIT 1 - PAGE 42

## PHL Variable Insurance Company

| | |
|---|---|
| **Insured** | ████████████████ |
| **Age & Sex** | 74 FEMALE |
| **Policy Number** | 97514670 |
| **Face Amount** | $10,000,000.00 |
| **Policy Date** | DECEMBER 28, 2005 |

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. For service or information on this policy, contract the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within 30 days after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> PHL Variable Insurance Company
> Variable and Universal Life Administration
> P.O. Box 8027
> Boston, MA 02266-8027
> Telephone (800) 541-0171

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy.

Signed for PHL Variable Insurance Company at its Home Office, One American Row, Hartford, Connecticut 06115.

Sincerely yours,

PHL Variable Insurance Company

*John M. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
**Death benefit payable if Insured dies while the Policy is In Force**
**Not Eligible for Annual Dividends**

U606 CA

Exhibit 1 - 13

U606CAF1

EXHIBIT 1 - PAGE 43

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

**POLICY NUMBER:** 97514670

**POLICY DATE:** DECEMBER 28, 2005

**FACE AMOUNT:** $10,000,000.00

**DEATH BENEFIT OPTION:** A

**OWNER:** OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

**BENEFICIARY:** AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

## INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---------|-----------------|---------------------|
| ███████ | 74    FEMALE | NON-SMOKER |

## PREMIUMS

**ISSUE PREMIUM:** $192,647.00

**SUBSEQUENT PLANNED ANNUAL PREMIUM:**          $0.00

**TOTAL PREMIUM LIMIT:** GREATER OF   $5,843,937.56   AND RESULT OF   $765,094.43 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER DECEMBER 28, 2005

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

**PREMIUM DUE DATES:** The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the THIRTIETH day of each DECEMBER thereafter until the Death of the Insured, but not beyond DECEMBER 28, 2031.

**POLICY VALUE BENCHMARK AMOUNT:** $8,800,000.00          (See Part 5)

U606

PAGE 3 OF 14

U606ZZS1

EXHIBIT 1 - PAGE 44

Exhibit 1 - 14

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:            97514670

### POLICY CHARGES

SALES CHARGE:             10% of the first $450,000.00   of premium paid in the
                          first policy year. 5% of any premium paid in excess of
                          $450,000.00     in the first policy year.
                          5% of all premiums  paid in policy years 2+.

MONTHLY DEDUCTION:        See Part 5, "Monthly Deduction". Includes cost of insurance, any
                          rider charges, any flat extra mortality charges, and monthly
                          service and expense charges.

MONTHLY SERVICE CHARGE:   $3.50    Guaranteed not to exceed $7.00.

MONTHLY EXPENSE CHARGE:   $50.00 deductible monthly during the first Policy Year.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:  $25.00 (in addition to a partial
                                             Surrender Charge).

SURRENDER CHARGE:         See table on next page.

We will not charge any Policy charges after the Policy Anniversary which follows the Insured's 100th
Birthday.

### OTHER RATES

GUARANTEED MINIMUM INTEREST RATE:  4%.

### LIMITATIONS

MINIMUM LOAN AMOUNT:      $100

PARTIAL WITHDRAWALS:      A Partial Withdrawal will not be permitted in an amount

- less than $500.00;

- which would reduce the Surrender Value to $0.00; or

- which would reduce the face amount below $250,000.

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:    97514670

### TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5.  The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums.  In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|:---:|:---:|
| 1 | 57.6900 |
| 2 | 55.2198 |
| 3 | 52.7915 |
| 4 | 50.4081 |
| 5 | 48.0667 |
| 6 | 45.7623 |
| 7 | 43.4941 |
| 8 | 41.2687 |
| 9 | 39.0973 |
| 10 | 36.9954 |
| 11 | 34.9795 |
| 12 | 33.0540 |
| 13 | 31.2199 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

Exhibit 1 - 16

EXHIBIT 1 - PAGE 46

## SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:      97514670

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 2.75170 | 10 | 7.64670 | 19 | 19.05000 |
| 02 | 3.11000 | 11 | 8.58580 | 20 | 20.95000 |
| 03 | 3.50330 | 12 | 9.61500 | 21 | 23.27580 |
| 04 | 3.92580 | 13 | 10.71500 | 22 | 26.44330 |
| 05 | 4.37750 | 14 | 11.89250 | 23 | 31.31170 |
| 06 | 4.87080 | 15 | 13.13420 | 24 | 39.58080 |
| 07 | 5.42670 | 16 | 14.45920 | 25 | 54.65420 |
| 08 | 6.06330 | 17 | 15.86580 | 26 | 83.33330 |
| 09 | 6.79920 | 18 | 17.38170 | | |

Basis of Calculations:   1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective annual interest rate.

Monthly Factor used in determining Cost of Insurance:   1.0032737 (SEE PART 5)

U606

EXHIBIT 1 - PAGE 47

U606
5566Z909N
PAGE 5 OF 5

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     975146Z0

### TABLE OF FACE AMOUNTS OF INSURANCE

| ISSUE DATE | FACE AMOUNT |
|---|---|
| DECEMBER 28, 2005 | $10,000,000.00 |

### RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR11 LIVING BENEFIT RIDER | 12/28/2005 | | NONE | NONE |
| UR69 - AGE 100+ | 12/28/2005 | NOT APPLICABLE | NONE | $0.00 |
| UR77 - EXCHANGE OF INSURED OPTION | 12/28/2005 | $0.00 | 12/28/2031 | $0 |
| UR73 - LIFEPLAN OPTIONS RIDER | 12/28/2005 | NOT APPLICABLE | NONE | $0.00 |
| - EXCHANGE OPTION RIDER | | | | |

Exhibit 1 - 18

EXHIBIT 1 - PAGE 48

# BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two Death Benefit Options to choose from, as described in Part 7. Option A is the Face Amount. Option B is the Face Amount plus Policy Value. Under either Option, the Death Benefit must be at least the Minimum Death Benefit as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the Death Benefit Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the Surrender Value, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and Death Benefit Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.

**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**

U606

Exhibit 1 - 19

EXHIBIT 1 - PAGE 49

# TABLE OF CONTENTS

SCHEDULE PAGE

BRIEF SUMMARY OF MAIN PROVISIONS

PART1: DEFINITIONS..................................... 1

PART2: GENERAL PROVISIONS................... 2
    Effective Date of Insurance........................ 2
    The Policy and Application........................ 2
    Not Eligible for Annual Dividends........... 2
    Revised Schedule Pages............................ 2
    Age............................................................... 3
    Misstatement of Age or Sex...................... 3
    Contestability.............................................. 3
    Insurability Requirements After Issue..... 3
    Suicide Exclusion....................................... 4
    Termination.................................................. 4
    Minimum Policy Values.............................. 4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY...................... 4
    Owner........................................................... 4
    Rights of Owner.......................................... 4
    Collateral Assignment............................... 5
    Beneficiary................................................... 5
    How to Change the Beneficiary................ 6

PART 4: PREMIUMS...................................... 6
    Payments..................................................... 6
    Total Premium Limit................................... 6
    Grace Period and Lapse............................ 7
    Reinstatement............................................. 7

PART 5: POLICY VALUES............................. 8
    Basics of Calculations............................... 8
    Policy Value................................................. 8
    Interest Rate................................................ 9
    Benchmark Interest Bonus........................ 9
    Monthly Deduction................................... 10
    Cost of Insurance.................................... 10
    Cost of Insurance Rates.......................... 10
    Surrender Value....................................... 11
    Partial Withdrawals.................................. 11

PART 6: POLICY LOANS............................. 12
    WhenAvailable......................................... 12
    Amount Available...................................... 12
    Loan Interest............................................ 12
    Debt........................................................... 13
    Repayment............................................... 13

PART 7: INSURANCE COVERAGE
PROVISIONS............................................... 13
    Death Proceeds....................................... 13
    Interest on Insurance Proceeds.............. 14
    Death Benefit............................................ 14
    Minimum Death Benefit............................ 14
    Death Benefit Following Insured's
        Age 100............................................... 14
    Change in Death Benefit Option............. 15
    Request for a Decrease in Face
        Amount............................................... 15

PART 8: MISCELLANEOUS
PROVISIONS............................................... 15
    Annual Report.......................................... 16
    Projection of Benefits and Values........... 16
    Notices by Us........................................... 16
    Deferment of Certain Payments............. 16
    Claims of Creditors.................................. 16
    Corrections............................................... 16

PART 9: PAYMENT OPTIONS..................... 16
    Who May Elect Payments Options......... 16
    How to Elect a Payment Option............. 17
    What Payment Options Are Available 17
    Other Payment Options........................... 19
    Additional Interest.................................... 19

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS.................................................... 19
    Adjusted Age............................................ 19
    Tables for Options 3, 4 and 5................. 21
    Table for Option 7.................................... 22

# PART 1: DEFINITIONS

| | |
|---|---|
| **Assigns** | Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3. |
| **Death Benefit Option** | The type of Death Benefit in effect as described in Part 7. |
| **Due Proof of Death** | A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us. |
| **In Force** | The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4. |
| **In Writing (Written Notice) (Written Request)** | Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office. |
| **Monthly Calculation Day** | The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day. |
| **Subsequent Planned Premium** | The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. |
| **Policy Anniversary** | The anniversary of the Policy Date. |
| **Policy Date** | The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured. |
| **Policy Debt** | Unpaid policy loans with accrued interest. |
| **Policy Month** | The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day. |
| **Policy Value** | The Policy Value as defined in Part 5. |
| **Policy Year** | The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary. |
| **Surrender Value** | The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt. |
| **We (Our, Us)** | PHL Variable Insurance Company. |
| **You (Your)** | The owner of this policy at the time an owner's right is exercised. |

U606

—1—

U606ZZP1

Exhibit 1 - 21

EXHIBIT 1 - PAGE 51

## PART 2:  GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**The Policy and Application**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements to it, and the application for it (and any supplemental applications) constitute the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, in the absence of fraud, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1. it is contained in the application or in a supplemental application; and

2. a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, including modifying the policy, waiving any of its conditions, or making an agreement for the Company, to be in effect, must be In Writing and signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us at Our Main Administrative Office in Hartford, Connecticut. Any benefits payable under this policy are payable at Our Main Administrative Office.

**Not eligible for Annual Dividends**

This policy is non-participating and therefore is not eligible for annual dividends. This means that You are not entitled to participate in company profits.

**Revised Schedule Pages**

The  Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

EXHIBIT 1 - PAGE 52

**Age**

Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date.

**Misstatement of Age or Sex**

If the age or sex of the Insured is misstated, the Policy Value and any Death Benefits payable shall be adjusted on the basis of the difference between the monthly deductions made and the monthly deductions which should have been made, accumulated at the interest rates that were credited to the Policy Value.

In the event of death, the recalculation, in and of itself, will not result in termination of the policy prior to the date of death. We will not pay less on the date of death on the policy after recalculation than the Surrender Value determined based upon the misstated age.

**Contestability**

We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement).

While insurance is contestable, We may rescind the insurance or deny a claim on the basis of:

1.  a misstatement in the application or supplemental application for this policy or any face amount increase; or

2.  a misstatement in the reinstatement application if there has been a reinstatement of this policy.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by Us for the contested face amount or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1.  evidence of the Insured's insurability must be given that is satisfactory to Us; and

2.  under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

U606                                  -3-                         Exhibit 1 - 23

EXHIBIT 1 - PAGE 53

**Suicide Exclusion**

If the Insured, whether sane of insane, dies by suicide within two years from the Policy Date, (or within two years from any reinstatement of the policy) and while the policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals.

**Termination**

If not previously terminated, this policy will terminate automatically on the earliest of:

1.  the date the Insured dies; or

2.  the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

**Minimum Policy Value**

All of the values under this policy are equal to or more than the minimum required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered.

## PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

**Owner**

The Insured is the owner of this policy, unless otherwise provided in the application or be later transfer of ownership.

**Rights of Owner**

While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may:

1.  Transfer ownership to a new owner.

2.  Name or change a contingent owner to succeed to the rights of the owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed In Writing.

3.  Receive any amounts payable under this policy during the Insured's lifetime.

4.  Change the beneficiary of the death benefit. See Part 3.

5.  Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6.  Obtain a partial withdrawal. See Part 5.

7.  Surrender this policy for its cash Surrender Value. See Part 5.

8.  Obtain policy loans. See part 6.

9.  Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

An ownership transfer designation or change of designation will be effective as of the date the notice was signed, subject to any action taken by Us before We record such notice. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**

By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**

Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:

a)  Primary beneficiaries;

b)  Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;

c)  You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the insured.

**How to Change the Beneficiary**

You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office.

## PART 4: PREMIUMS

**Payments**

The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid.

Subject to the limitations stated below, You may pay additional premiums at any time prior to age 100 while this policy is In Force. All premiums are payable at Our Main Administrative Office or to an authorized agent of ours. You may request a receipt signed by one of Our executive officers.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi–annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent. We may limit the number and amount of premium payments in any Policy Year.

The minimum premium payment amount that We will accept is $25. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. To the extent of such evidence, the Contestability and Suicide Exclusion provisions will apply. The application for such evidence is attached to and will be made part of the policy.

**Total Premium Limit**

The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period And Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

a) change in Death Benefit Option;

EXHIBIT 1 - PAGE 56

b) a decrease of face amount;

c) a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any Policy Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. If such premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value, but not before 30 days have elapsed since We mailed Our Written Notice to You and any Assigns. The date of lapse will be the Monthly Calculation Day on which the deduction was to be made, and any insurance and rider benefits provided under this policy will terminate as of that date.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement until We receive at Our Main Administrative Office all of the following:

1. a Written Request for reinstatement;

2. evidence of insurability satisfactory to Us;

3. if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

EXHIBIT 1 - PAGE 57

4.  the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, minus the monthly deduction for the month then starting.

# PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**    Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**    Policy Value is to be calculated as follows:

1.  In each Monthly Calculation Day following the Policy Date, the Policy Value will equal $(A + B + C - D - E)$;

2.  on a day of the month other than a Monthly Calculation Day, it will equal $(A + C)$;

3.  on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E; where:

   A=    the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

   B=    one month's interest on A, including any Benchmark Interest Bonus;

Exhibit 1 - 28

U606                              –8–

EXHIBIT 1 - PAGE 58

C= all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D= any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E= the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Changes in the rate will apply to all policies in the same investment class. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." The rate in effect on a given date for loaned amounts will be no less than the Loan Interest Rate in effect on that date less 2%. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Interest Bonus**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit an interest bonus on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Bonus Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This bonus will be equal to (A x B), where:

A= the Bonus Interest Rate; and

B= the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

EXHIBIT 1 - PAGE 59

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

(A + B + C); where:

A= the cost of insurance (as defined in the Cost of Insurance provision below);

B= the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C= the Monthly Service Charge shown on the Schedule Pages, and if applicable, one-twelfth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

(A x (B – C)) + D; where

A= the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B–C) below;

B= the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C= the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one-twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D= the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

Exhibit 1 - 30

EXHIBIT 1 - PAGE 60

No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings, mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

–11–

Exhibit 1 - 3

EXHIBIT 1 - PAGE 61

The partial surrender charge is equal to a pro-rata portion of the surrender charge that would apply to a full surrender. The partial surrender charge is determined by multiplying the full surrender charge by a fraction equal to the partial surrender amount payable divided by the result of subtracting the applicable surrender charge from the Policy Value.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

# PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the Policy Value minus any applicable surrender charge then in effect, this policy will lapse according to the terms of the Grace Period and Lapse provision.

A loan will not be permitted in an amount less than the Minimum Loan Amount shown on the Schedule Pages, except if the amount to be loaned equals the full loaned amount then remaining.

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

**Loan Interest**

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. Each year We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

EXHIBIT 1 - PAGE 62

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A.  The Corporate Bond Yield Average — Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B.  If that Monthly Average is no longer published, a substantially similar average, established by regulation issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**
As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**
The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25.

## PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**
Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a)  the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b)  any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c)  any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

U606                          –13–                    Exhibit 1 - 33
                                                     U606ZZP0

EXHIBIT 1 - PAGE 63

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy is In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insureds death occurs, as follows:

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0-40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76-90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the Insured's birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

EXHIBIT 1 - PAGE 64

| | |
|---|---|
| **Change in Death Benefit Option** | The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following: |

1.  A change in Death Benefit Option will require that there be no *immediate change in Our insurance risk*. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require *evidence of insurability for a change in Death Benefit Option*. You are limited to one change in Death Benefit Option for each Policy Year.

2.  The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

| | |
|---|---|
| **Request for a Decrease in Face Amount** | You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change. |

## PART 8: MISCELLANEOUS PROVISIONS

| | |
|---|---|
| **Annual Report** | We will send You, without charge, a report for each Policy Year which includes: |

1.  the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2.  any partial withdrawals, premiums paid, interest credited and charges made during the year;

3.  any outstanding policy loans and new loans and loan repayments made during the year; and

U606

Exhibit 1 - 35

EXHIBIT 1 - PAGE 65

4. any other information required by the insurance supervisory official of the state in which this policy was delivered.

You have the right to request an illustrative report at any other time. We reserve the right to charge up to $25.00 for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee of up to $25.00, a projection of illustrative future benefits and values under Your policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan. If payment is deferred 31 days or more on any surrender, interest will be paid at an effective annual rate of 4.00% on the amount deferred, from the date the request is received to the date of payment.

**Claims of Creditors**

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law.

**Corrections**

We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy.

# PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Exhibit 1 - 36

EXHIBIT 1 - PAGE 66

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be In Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amount provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1 – Payment in one sum

Option 2 – Left to earn interest

We pay interest on the amount left with Us under this Option as a principal sum.

We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

Equal installments are paid until the later of:

a) the death of the payee;

b) the end of the period certain.

The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows:

a) ten years;

b) twenty years;

c) until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

If, for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

Option 5- Life annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6- Payments of a specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

EXHIBIT 1 - PAGE 68

Option 7 – Joint survivorship annuity with a 10-year period certain

This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

a) the end of the 10-year period certain;

b) the death of the Insured;

c) the death of the other named annuitant.

The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**

We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**

In addition to:

a) the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b) the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

# PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**

The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a) for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

a) for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

### Option 3 - Payments for a specified period

| Number of Years | | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|
| Annual Installment | $ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment | $ | 17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years | | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| Annual Installment | $ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Monthly Installment | $ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

### *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Fe-Male | Male | Fe-Male | Male | Fe-Male | | Male | Fe-Male | Male | Fe-Male | Male | Fe-Male |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

### *Option 5 - Life annuity

| Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.17 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

**\* Option 7 - Joint survivorship annuity with 10-year period certain**

| Age of Other Annuit- ant F | Age of Insured Male 55 | 60 | Age of Other Annuit- ant F | Age of Insured Male 55 | 60 | Age of Other Annuit- ant M | Age of Insured Female 55 | 60 | Age of Other Annuit- ant M | Age of Insured Female 55 | 60 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | $3.62 | $3.64 | 60 | $4.43 | $4.64 | 40 | $3.72 | $3.77 | 60 | $4.34 | $4.64 |
| 45 | 3.80 | 3.83 | 65 | 4.61 | 4.93 | 45 | 3.89 | 3.97 | 65 | 4.44 | 4.82 |
| 50 | 4.00 | 4.07 | 70 | 4.75 | 5.18 | 50 | 4.06 | 4.19 | 70 | 4.50 | 4.95 |
| 55 | 4.22 | 4.34 | 75 | 4.86 | 5.36 | 55 | 4.22 | 4.43 | 75 | 4.54 | 5.03 |

\* Minimum monthly income for each $1,000 applied

# AGE 100+ RIDER

This rider is part of the policy to which it is attached.  Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**Rider Date:**                    DECEMBER 28, 2005

**Rider Charge Date:**          N/A

## DEFINITIONS

**Age 100 Anniversary**
The Policy Anniversary nearest the Insured's 100th birthday.

## GENERAL

**Death Proceeds**
While this rider is in effect, the "Death Proceeds" provision of the basic policy is amended by adding the following to the end of that provision:

On and after the Age 100 Anniversary, the death proceeds at the death of the Insured are equal to:

a)   the Death Benefit, as described below;  MINUS

b)   any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

c)   any debt then existing on this policy

**Death Benefit Following Insured's Age 100**
While this rider is in effect, the "Death Benefit Following Insured's Age 100" provision of the basic policy is replaced with the following:

On and after the Age 100 Anniversary, the death benefit will equal 1 or 2, whichever is greater:

1.   the face amount of the basic policy on the date of the insured's death, plus the Total Rider Insurance Amount under the Individual Term Rider as of the day before the Age 100 Anniversary provided the Individual Term Rider was in effect on that date; or

2.   the Policy Value on the date of the insured's death.

Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid.  Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Age 100 Anniversary. It may be subject to adverse tax consequences and a tax advisor should be consulted before You choose to continue the policy after the Age 100 Anniversary.**

UR69 CA

Exhibit 1 - 43

EXHIBIT 1 - PAGE 73

**Monthly Rider Charges**

There is no charge for this rider.

**Termination of This Rider**

This rider will terminate on the first of any of the following events to occur:

1. the date of full surrender or lapse of the basic policy;

2. Our receipt of Your Written Request to cancel this rider, which shall be effective as of the next Monthly Calculation Day; or

3. the date of the insured's death.

Upon termination of this rider the "Death Benefit Following Insured's Age 100" provision in the policy will become operative including any consequent reduction in death benefit to equal the Policy Value. No retroactive assessment will be made for monthly deductions waived under this rider.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

UR69 CA

- 2 -

Exhibit 1 - 44

EXHIBIT 1 - PAGE 74

# ACCELERATED BENEFIT RIDER

This Rider is part of the Policy to which it is attached, effective as of the Rider Date, if it is listed on the Policy's Schedule Page or in an Endorsement after that page. You should therefore review the Policy's Schedule Page for applicability. Except as stated in this Rider, it is subject to all of the provisions contained in the Policy.

**THE BENEFIT PAID UNDER THIS RIDER MAY BE TAXABLE. YOU SHOULD CONSULT YOUR PERSONAL TAX ADVISOR REGARDING POSSIBLE TAX CONSEQUENCES.**

| | |
|---|---|
| **Rider Date** | SAME AS POLICY DATE |
| **Maximum Administrative Charge** | $300.00 |
| **Maximum Proportion Allowable** | 75% |
| **Maximum Accelerated Benefit** | $250,000 |
| **Minimum Remaining Face Amount** | $10,000 |

**Definitions**

**Insured** is the person covered under the basic Policy.

**You (Your)** is the owner of the Policy to which this Rider is attached.

**We (Our, Us)** refers to PHL Variable Insurance Company.

**Eligible Amount** is the amount of insurance under the Policy that is eligible for accelerated payment. It is equal to the death benefit of the basic Policy at the time of claim plus any term insurance amounts In Force provided by Rider on the life of the Insured, which provides coverage renewable to the Insured's attained age 95 or beyond, but exclusive of any other supplemental Rider death benefits.

**Proportion** is the percentage of the Eligible Amount that will be accelerated under this Rider. The Proportion is chosen by You at the time of election of an accelerated benefit, subject to the following limitations. The Proportion elected:

1. can be no more than the Maximum Proportion Allowable as specified in this Rider;

2. cannot result in a remaining death benefit below the minimum as specified in this Rider; and

3. cannot result in a Requested Benefit that exceeds the Maximum Accelerated Benefit as specified in this Rider.

Exhibit 1 - 45

EXHIBIT 1 - PAGE 75

This Rider terminates upon payment of the accelerated benefit.

**Maximum Accelerated Benefit** is the amount shown on the first page of this Rider. This Maximum Accelerated Benefit applies, in aggregate, to all policies issued on the Insured by Us.

**Requested Benefit** is the Proportion multiplied by the Eligible Amount.

**Terminal Illness** is an illness or condition that is expected to result in the Insured's death within six months based on evidence satisfactory to Us as defined under the Proof of Terminal Illness section below.

| | |
|---|---|
| **Rider Description** | This Rider allows You to elect an accelerated benefit upon terminal illness of the Insured. The election must be made by a Written Request signed by You. We must also receive proof satisfactory to Us of the Insured's terminal illness as described in the Proof of Terminal Illness section below. The amount of the accelerated benefit will be adjusted as described under the Payment Made to You section below. The resulting payment will be made in a lump sum. Policy Values, cash Surrender Values, loan values and the death benefit as specified in the Policy to which this Rider is attached will be reduced if You receive an accelerated benefit. There is no premium charge for this Rider. |
| **Payment Made To You** | The amount of the payment made to You will be determined by discounting the Requested Benefit at Our then current discounting rate for a period of twelve (12) months, to reflect the early payment of insurance proceeds under the Policy. |

Our discounting rate will be subject to the higher of:

1. 5%; or
2. the Published Monthly Average for the calendar month ending two months before the Policy Anniversary on or immediately preceding the date that We receive Your Written Request for payment under this Rider.

The Published Monthly Average will be:

a. The Corporate Bond Yield Average -- Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or
b. If that Monthly Average is no longer published, a substantially similar average, established by regulation for policy loan rates issued by the Insurance Department of the state where the Rider was delivered will be applicable.

If the discounting rate computed for a Policy Year is no more than 1/2% higher than the rate in effect for the previous Policy Year, then We will maintain such prior year's rate.

If the discounting rate computed for a Policy Year is no more than 1/2% lower than the rate in effect for the previous Policy Year, then We may, at Our discretion, maintain such prior year's rate.

If the cash Surrender Value multiplied by the Proportion exceeds the discounted value, then the discounted Requested Benefit will be increased to equal such greater amount.

Exhibit 1 - 46

EXHIBIT 1 - PAGE 76

The discounted Requested Benefit is reduced by the Proportion of any Policy debt, including any unpaid loan interest, and the Proportion of any other amounts due Us from You. This result is then reduced by Our then current Administrative Charge for benefits under this type of Rider, not to exceed the maximum as specified in this Rider. The amount that remains is the payment that will be made to You.

In the event that the Insured dies after the Written Request but before We make the payment, and We receive Written Notice at Our Main Administrative Office during this period of this event, the request will be considered void, and no payment will be made under this Rider.

**Effect On Contract**

The following values will be reduced by the Proportion at the time the payment is made to You:

1. the future planned premium payable on the basic Policy;

2. the face amount of the Policy at the time of claim;

3. the cash value (Policy Value);

4. any remaining Surrender Charge;

5. the cash Surrender Value; and

6. any Policy debt including any unpaid loan interest.

If this Rider is attached to a variable life insurance policy that permits fund investment in various subaccounts of Our Variable Universal Life Separate Account, the reduction in Policy Value will be achieved through a proportionate reduction in this Policy's share in the value of each subaccount based on the allocation You request at the time of Your accelerated benefit request. If no allocation request is made, the assignment to each subaccount will be made in the same manner as provided for monthly deductions.

Future values under the Policy will be determined in a manner consistent with that under the original Policy, as adjusted to reflect the above reductions. We will mail to You a new policy Schedule Page reflecting any payment made under this Rider.

**Proof of Terminal Illness**

A licensed physician, who is not Yourself or a member of Your family, must provide Us with evidence satisfactory to Us of the Insured's terminal illness. We reserve the right to obtain a second medical opinion from a physician of Our choosing at Our expense.

**Conditions**

Payment under this Rider is subject to the following conditions:

1. The Policy must not have lapsed.

2. We will require the consent of any assignees and irrevocable beneficiaries to any request for payment under this Rider.

3. No payments will be made under this Rider to satisfy the claims, demands, or obligations of any creditor, trustee in bankruptcy or governmental agency, or arising under any court order directed against You, to the extent that We have written notice thereof.

UR11

3

Exhibit 1 - 47

EXHIBIT 1 - PAGE 77

**Rider Termination**

This Rider will terminate on the earliest of:

1. Lapse or surrender of this Policy to which it is attached.

2. Our receipt of Your written request to terminate this Rider; or

3. Payment of any benefit under this Rider.


PHL Variable Insurance Company

*John H. Beers*

Secretary

UR11

4

Exhibit 1 - 48

EXHIBIT 1 - PAGE 78

# Life Plan Options Rider

This rider is part of the policy to which it is attached.  Except as stated in this rider, it is subject to all of the provisions contained in the policy.

## DEFINITIONS

Option Review Period
The 90-day period immediately preceding the 5th, 10th and 15th Policy Anniversaries.

Individual Term Life Rider
As used in this rider form "Individual Term Life Rider" refers to any of the following riders: Individual Term Rider, Individual Term Insurance Rider, Policy Term Rider, Policy Term Insurance Rider, Phoenix Individual Edge Term Rider, or the Variable Policy Term Rider.

## OPTION BENEFITS

Increased Coverage Determination without Medical Exam
Policies that include both this rider and the Individual Term Life Rider are eligible during each Option Review Period, while both such riders are in effect, for an increase in their term insurance rider amount up to a maximum lifetime increase of $1,000,000, with underwriting and our agreement to such increase determined without the inconvenience of an additional medical exam.  Our other ordinary underwriting rules will continue to apply and thus the increase in coverage is still subject to our normal underwriting approval.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- The insured must be attained age 65 or younger on the last day of the Option Review Period.
- The risk classification of the insured must be standard through Table D (200%) at original issue of the basic policy.
- The insured must be alive and meet our underwriting requirements at the time of your request for the increase in term rider face amount.
- The Individual Term Life Rider must either already be attached to the policy or then currently approved and available for sale in the state of applicable jurisdiction.
- There is a maximum lifetime increase of $1,000,000 per insured life.

Reduced Coverage without Surrender Charge
During each Option Review Period you may request a decrease in the face amount of the policy without our assessment of the partial surrender charge that, under the terms of your basic policy, would otherwise apply.  In such case the surrender charge remaining under the policy will continue to be calculated as if such decrease in face amount had not been made.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- Total option reductions of the basic policy face amount may not exceed the lesser of 50% of the initial basic policy face amount or $5,000,000 in combined aggregate of all option reductions for all Our policies on the same insured.

UR73

Exhibit 1 - 49

EXHIBIT 1 - PAGE 79

Exchange for Annuity without Surrender Charge

During each Option Review Period beginning with the 90-day period preceding the 10th policy anniversary, you may request that the policy be surrendered as part of an exchange request to an eligible annuity offered by us. In such an exchange, we would not assess the surrender charge that would otherwise apply. In such case, the new annuity will reflect the usual surrender charges that would ordinarily apply for new business.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.


## TERMINATION OF THIS RIDER

This rider will terminate on the first of any of the following events to occur:

1. exercise of the Exchange for Annuity without Surrender Charge Option;

2. the 15th policy anniversary;

3. termination of the basic policy.


PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**The Exchange Option**
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

**How to Exercise This Option**
To exercise this option, You must file an application with Us at Our Main Administrative Office.  It must be signed by You. We must also receive:

1.   Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2.   Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for.  Selection of risks includes health and non-health factors.

3.   The release of any lien against or assignment of your policy.  You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4.   The surrender and release of the exchange policy.

5.   Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy.  Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1.   Our receipt of the application;

2.   Payment of the Exchange Adjustments, if any; and

3.   Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

**The New Policy**
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

EXHIBIT 1 - PAGE 81

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below. The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy. All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1. Termination of the exchange policy;

2. Lapse or Exchange of the exchange policy;

3. Our receipt at Our Home Office of a Written Request to cancel this rider; and

4. Death of the insured.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

UR77                                            - 2 -                                    Exhibit 1 - 52
RGK7/222

EXHIBIT 1 - PAGE 82

**PHOENIX**

P.O. Box 8027
Boston, MA 02266-8027

Underwriting Service Center

**Policy Acceptance Form**

Company is defined as indicated below:

☐ Phoenix Life and Annuity Company
☒ PHL Variable Insurance Company

| Agency: | E7500 | Insured(s): |
|---|---|---|

| Policy Number: | 97514670 | |
|---|---|---|

**DECLARATION:**

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a Health Statement Form for that insured. **PLEASE NOTE: Home Office approval of the Health Statement Form is necessary before the policy is in effect.**

**AMENDMENTS:** The application for Policy No. 97514670 is amended as follows:

There is no coverage under application #v08311050379328 dated 09/28/2005.
The application Part 1 is hereby amended to reflect the company name as PHL Variable Insurance Company.

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If a Health Statement Form is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | _____ | Insured(s) | _____ | ☐ |
|---|---|---|---|---|
| Signed at | _____ | | _____ | ☐ |
| Witness | _____ | | _____ | ☐ |
| Owner | _____ | | _____ | ☐ |
| Owner | (If other than Insured) | | _____ | ☐ |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

**AGENT:** ORIGINAL to Underwriting and Issue, YELLOW copy to Agent, PINK copy to remain with policy Exhibit 1 - 53

HHR11771      10-99

EXHIBIT 1 - PAGE 83

**PHOENIX** PO Box 9027
Boston MA 02266-9027

Application for Life Insurance
Part 1

Company is defined as indicated below: (check one)
☑ Phoenix Life Insurance Company   ☐ PHL Variable Insurance Company   ☐ Phoenix Life and Annuity Company

**Section I - Proposed Insured**

[redacted]

| Business Address (Include Street, Apt, Number, City, State, and ZIP Code) | | Bus. Phone No. (Include Ext.)<br>( ) |
|---|---|---|

Email Address

**Section II - Ownership**

☐ A.  Insured
☐ B.  Successive Owners
☐ B1. Owners Jointly
☐ C.  Corporation, its successors or assigns (include state of incorporation)

☐ D. Partnership (include Name of all Partners - if partnership is limited, indicate which partners are general partners)
☐ E. Sole Proprietorship (include Name of Sole Proprietor)
☑ F. Trust (include Name and Date of Trust, Name of Trustee(s) and Grantor)

(Complete section below if B, C, D, E or F are checked)
If Owner is other than Proposed Insured, Premium Notice will be sent to:

Owner's Name

Mailing Address
Owner's Email Address
Social Security or Tax I.D. No.
Contingent Owner

Name _____   Date of Birth _____
Relationship _____
**Ultimate Owner:** Check one. If none checked, insured will be ultimate owner.
☐ Insured   ☐ Executor or administrator of the survivor of the primary and contingent owners

**Section III - Beneficiary Designation**

| Primary Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| ☐ If this box is checked, then all the Contingent Beneficiaries listed shall receive an equal interest. | | | |
| First Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
| Second Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |

If Trust is primary beneficiary: (check one)
☐ Trust under Insured's will
☑ Inter vivos - Name of Trustee [redacted]
Date of Trust _____
To qualify for payment, beneficiary must be living: (Check A or B, otherwise A will apply)
☑ A. at the Proposed Insured's death.   ☐ B. on the 30th day after the date of the Proposed Insured's death.

OL2773                        1 of 6            v01131030432851                   4-02

Exhibit 1 - 54

EXHIBIT 1 - PAGE 84

**Section IV - Coverage Applied For**

Plan of Insurance: PHOENIX ACCUMULATOR UL II

Basic Policy Amount: $ 10,000,000

**Section V - VARIABLE/UNIVERSAL PLANS of Insurance - Riders and Features**

First Year Anticipated, BILLED Premium (Excluding 1035 Exchange, Lump Sum Funds, etc.): $ 950,000

Subsequent Planned Annual Premium: $ -0- YR. 2   $385,469/YR. THEREAFTER

Death Benefit Option: (check one) If none checked, Option 1 will apply.
- [X] Option 1 - Level Face Amount
- [ ] Option 2 - Increasing Face Amount

Face Amount Increase Options:
- [ ] _____% percentage increase
- [ ] $_____ Fixed Dollar increase
- [ ] Increase Equal to Premiums Paid

Policy Options: (check one) If none checked, Option A will apply.
- [ ] Policy Option A
- [ ] Policy Option B
- [ ] Policy Option C

- [ ] Disability Waiver of a Specified Amount
  Amount $_____
- [ ] Accidental Death Benefit Rider
- [ ] Death Benefit Protection Rider
  - [ ] Age 70   [ ] Age 80   [ ] Age 100
- [ ] Purchase Protector _____ units
- [ ] Child's Term Rider
- [ ] Family Term Rider
- [X] Living Benefit Rider
- [ ] Guaranteed Death Benefit Rider
- [ ] Guaranteed Extension Rider
- [ ] Cash Value Accumulation Rider
- [X] Age 100 + Rider
- [ ] Individual Term Rider $ _____

- [ ] Other _____
- [ ] Other _____
- [ ] Other _____
- [ ] Other _____

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market subaccount until the end of the Right to Cancel Period, as stated in the policy, indicate: [ ] Yes  [ ] No

**Telephone/Electronic Authorization**

I will receive this privilege automatically. By checking "Yes", I am authorizing and directing the Company to act on telephone or electronic instructions from my licensed agent who can furnish proper identification. The Company will use reasonable procedures to confirm that these instructions are authorized and genuine. As long as these procedures are followed, the Company and its affiliates and their directors, trustees, officers, employees, representatives and/or agents, will be held harmless for any claim, liability, loss or cost.
[ ] Yes  [ ] No

**Electronic Delivery Authorization**

By checking "Yes", I am authorizing the Company to provide my statements, prospectuses and other information electronically if available. I understand that I must have internet access to use this service and there may be access fees charged by the internet service provider. [ ] Yes  [ ] No

**Section VI - Suitability**

Do you understand that if you have purchased a Variable Life Policy and the Death Benefit may be variable or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying subaccounts? [ ] Yes  [ ] No

If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives? [ ] Yes  [ ] No

If I have purchased a Variable Life Policy, I confirm that I have received the prospectus for that policy and its underlying funds.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

**Section VII - Complete if Temporary Insurance is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement may not be issued, and no coverage will take effect.

| Yes | No | |
|---|---|---|
| [ ] | [ ] | 1. Within the past two years have you been treated for heart disease, stroke, or cancer or had such treatment recommended? |
| [ ] | [ ] | 2. Within the past 60 days have you been scheduled or advised to have any diagnostic test (excluding HIV) tests or surgery not yet performed? |

$_____ has been paid by _____ to the Licensed Agent/Registered Representative indicated in this application, for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the Temporary Insurance Receipt bearing the same number as this application.

01277a                    2 of 6              v01131030432851                    4-02

Exhibit 1 - 55

EXHIBIT 1 - PAGE 85

NO. 946   P. 3     PHOENIX LIFE     MAR. 13, 2008  9:19AM

**Section VIII - TERM/WHOLE LIFE PLANS of Insurance - Riders and Features**

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Purchase Protector _____ units
☐ Family Protection
☐ Children's Protection _____ units
☐ Living Benefits Rider
☐ Other _____
Cost of Living is automatic (No COL for Term products) unless this box is checked ☐ I do not desire Cost of Living

Additional Death Benefit Riders:
Primary Insurance Term Rider (PITR) $ _____
Other Rider Name _____ Amount $ _____

☐ Paid-Up Additions Purchase Options Rider (PAPOR) (check one)
☐ PAPOR A-Flexible   ☐ PAPOR B-Flexible with Optionterm
Number of years payable _____
Intended premium payments for the first 7 years:
Year 1 _____   Year 5 _____
Year 2 _____   Year 6 _____
Year 3 _____   Year 7 _____
Year 4 _____   Maximum Amount $ _____

**Dividend Options:**
☐ Optionterm
☐ Optionterm Death Benefit $ _____
Premium Paying Coverage ☐ Yes  ☐ No or
_____ % of Increase
☐ Accumulate at Interest (ACCUM)
☐ Paid-up Additional Insurance (PUA)
☐ One Year Term with Balance to:
☐ Cash   ☐ PUA   ☐ ACCUM   ☐ RP
☐ Reduce Premium (RP)
☐ Cash
☐ Other _____
☐ Other _____

Automatic Premium Loan, if applicable
☐ Yes   ☐ No

Policy Loan Interest Rate, if applicable (If none checked, "Variable" will apply.)
☐ Variable   ☐ Fixed

**Section IX - Mode of Premium Payment -** (Please note, there is a higher cost associated with the purchase of a Whole Life or Term policy, if the mode of payment is other than on an annual pay basis. Please consult with your Licensed Agent/Registered Representative.)

☑ Annual                                  ☐ Quarterly                        ☐ Semi-Annual
☐ Monthly (Variable Life Insurance only)  ☐ PCS (Phoenix Check-O-Matic Service)
                                          Minimum Monthly Check for Each Service - $25.00

**Multiple Billing Option - Give # or Details**
☐ List Bill   ☐ Employee Insurance Counseling Service (EICS)   ☐ Salary Allotment   ☐ Pension   ☐ Money Purchase Pension
☐ Other _____

If electing PCS, complete the following:
Existing Policy Number or PCS File Number _____
**Authorization Agreement for Preauthorized Payments**
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the depository named below.
**Information for New Account**
Attach a void check to furnish encoding details.
If the depositor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

Attach Void Check Here

Signature of depositor (if different from owner) _____

Send premium notices to: (in addition to owner)
☐ Insured at   ☐ Home Address   ☐ Business Address
☒ Other (Name, Relationship to Owner and Address)

OL2773

Exhibit 1 - 56

**Section X - Existing Life Insurance**

Describe all additional coverage in force. Include individual and group.  If no coverage in force, check here ☐.

| Company | Issue Date | Plan | Amount | Personal / Business |
|---|---|---|---|---|
| AMERICAN NAT'L INS. CO. | 1980's | UNIV. LIFE | $ 550,000 | ☑ ☐ |
| | | | $ | ☐ ☐ |
| | | | $ | ☐ ☐ |

Total Life Insurance in force (if none, indicate) $ 550,000    Total Accidental Death Benefit in force (if none, indicate) $ NONE

| Yes | No | | |
|---|---|---|---|
| ☑ | ☐ | 1. | Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicants or the insureds or the owner(s) or the annuitant? |
| ☐ | ☑ | 2. | With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy? |
| ☐ | ☑ | 3. | Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) to pay any initial or subsequent premium(s) for this policy? |

For all "Yes" answers above, please provide the following information

| Company | Issue Date | Plan | Amount | Personal / Business |
|---|---|---|---|---|
| SAME AS ABOVE | | | $ | ☐ ☐ |
| | | | $ | ☐ ☐ |
| | | | $ | ☐ ☐ |

**Section XI - Income**

a. Earned Income $20,000/YEAR   b. Unearned Income $130,000/YEAR   c. Net Worth SEE INFO IN FILE

**Section XII - Additional Information**

1. Have you used tobacco or nicotine products in any form in the last 10 years? If "Yes," please circle the product(s) used: cigarettes, cigars, pipes, snuff, smokeless or chewing tobacco, nicotine patch or gum.
   If "Yes," check one: ☐ Use currently   ☐ Date quit _____

2. Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes," give date, company and reason).

3. Are you negotiating for other insurance? (If "Yes," name companies and total amount to be placed in force.)

4. Do you intend to live or travel outside the United States or Canada? (If "Yes," state where and for how long).

5. Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes," complete Aviation Questionnaire).

6. Have you participated in the past 3 years or plan to engage in any extreme sport activities such as motorized vehicle, or parachute jumping, or underwater diving, or any other extreme avocation? (If "Yes," complete Avocation Questionnaire).

7. Have you in the past three years been the driver of a motor vehicle involved in an accident, or charged with a moving violation of any motor vehicle law, or had your driver's license suspended or revoked?

8. Have you ever been convicted of a felony or do you have charges pending?

Give full details for all "Yes" answers above. If necessary, use an additional piece of paper and please sign it.

| Question # | Details |
|---|---|
| | |
| | |
| | |
| | |
| | |



**Section XIII - Medical History (Not necessary to complete if medical or paramedical exam has been entered)**

Have you ever had, or been told by a physician or other health care provider you that have:

1. High blood pressure or hypertension?
2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath?
3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease?
4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins?
5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease?
6. Neurologic disease, seizures, fainting, falls, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system?
7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness?
8. Arthritis, lupus, or any musculoskeletal or skin disorder?
9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system?
10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine?
11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands?
12. Acquired Immune Deficiency Syndrome (AIDS) or any other immunologic disorder?
13. Anemia, bleeding or clotting disorder, or any other disorder of the blood or bone marrow?
14. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease?

15. Are you taking any kind of medicine, therapy, or treatment regularly or at frequent intervals?
16. Have you ever been treated for alcoholism or been advised to limit or stop your use of alcohol?
17. Have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions?
18. Have you ever been a patient in any hospital, treatment center, or similar facility within the last 10 years?
19. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding HIV or AIDS tests) or other tests within the last 5 years?
20. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years?

Please provide details of "YES" answers: include question number, diagnosis, date of occurrence, hospital or treating physician's name and address, and current status. Use OL1590 if additional space is necessary to record all details.

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

OL2773                                      6 of 8        v01131030432851                    4-02

Exhibit 1 - 58

JAN. 19. 2006  9:15AM      PHOENIX LIFE        NO. 946    P. 6

EXHIBIT 1 - PAGE 88

### Authorization To Obtain Information

I authorize any physician, health care provider, hospital, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or my health, to provide any such information to Phoenix Life Insurance Company and its affiliated insurers (Phoenix) or its reinsurers. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

If insurance on any minor child is applied for, this authorization extends to records and knowledge of that child and that child's health. To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records or knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the like insurance to provide to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about Investigative Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report.

This authorization shall continue to be valid for thirty months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix prior to the time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

☐ I do ☐ I do not (check one) require that I be interviewed in connection with any investigative consumer report that may be prepared.

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or said in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that I) no statement made in, or information acquired by any Licensed Agent/Registered Representative who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and II) the Licensed Agent/Registered Representative has no authority to make, modify, alter or discharge any contract thereby applied for.

I understand and agree that the insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the date of each date; and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform the Company as soon as possible.

Under penalty of perjury, I confirm that (a) the Social Security or Tax Identification Number shown above is correct, and (b) that I am not subject to back-up withholding. (Strike this out and initial if not true).

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud as determined by a court of competent jurisdiction.

If I have applied for the Living Benefit Rider, I confirm that I have received a copy of the disclosure form, Summary of Coverage for Accelerated Benefit Rider.



The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for.

Will the proposed insured replace (in whole or in part) any existing life insurance or annuity contract in force with the policy applied for? ☐ Yes ☑ No

Will the proposed insured utilize values from another insurance policy (through loans, surrenders or otherwise) or annuity to pay for the initial or subsequent premium(s) for the policy applied for? ☐ Yes ☑ No

Are there any life insurance policies or annuity contracts owned by or on the life of the applicant or the insured or the owner(s) or the annuitant? ☑ Yes ☐ No

09/28/2005 11:46 8052731* EPCH LAB PAGE 01

Sep 26 05 01:49p    Lynda Lyles         808 858-6738    p.2

**PHOENIX**

Exhibit 1 - 60

EXHIBIT 1 - PAGE 90

# Exhibit 2

EXHIBIT 1 - PAGE 91

**Document Cover sheet**

Original 





Exhibit 2 - 61

EXHIBIT 1 - PAGE 92

## PHL Variable Insurance Company

| | |
|---|---|
| **Insured** | ███████████████ |
| **Age & Sex** | 74 FEMALE |
| **Policy Number** | 97514671 |
| **Face Amount** | $10,000,000.00 |
| **Policy Date** | DECEMBER 28, 2005 |

Dear Policyowner:

We agree to pay the benefits of this policy in accordance with its provisions. For service or information on this policy, contract the agent who sold the policy, any of Our agency offices, Our Home Office or Our Customer Service Center.

YOU HAVE A RIGHT TO RETURN THIS POLICY. If for any reason You are not satisfied with this policy, You may return it at any time within 30 days after You receive it to either the agent through whom it was purchased or to Us at Our Main Administrative Office at the following address:

> PHL Variable Insurance Company
> Variable and Universal Life Administration
> P.O. Box 8027
> Boston, MA 02266-8027
> Telephone (800) 541-0171

If returned, the policy will be considered void from the beginning and any premium paid will be refunded to You less any partial withdrawals or any loans taken under the policy.

Signed for PHL Variable Insurance Company at its Home Office, One American Row, Hartford, Connecticut 06115.

Sincerely yours,

PHL Variable Insurance Company

*John H. Beers*

Secretary

*Dona D. Young*

Chairman, President
and Chief Executive Officer

**FLEXIBLE PREMIUM LIFE INSURANCE POLICY**
**Death benefit payable if Insured dies while the Policy is In Force**
**Not Eligible for Annual Dividends**

U606 CA

Exhibit 2 - 62
U606CAF1

EXHIBIT 1 - PAGE 93

# SCHEDULE PAGE

The specifications shown below are those in effect initially. They may later be changed for reasons as stated in this policy. Coverage may end if premiums paid are not enough to continue coverage.

## BASIC INFORMATION

**POLICY NUMBER:**        97514671

**POLICY DATE:**        DECEMBER 28, 2005

**FACE AMOUNT:**        $10,000,000.00

**DEATH BENEFIT OPTION:**        A

**OWNER:**        OWNER AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

**BENEFICIARY:**        AS STATED ON THE APPLICATION UNLESS LATER CHANGED.

### INSURED

| INSURED | ISSUE AGE & SEX | RISK CLASSIFICATION |
|---|---|---|
| ██████████ | 74        FEMALE | NON-SMOKER |

### PREMIUMS

**ISSUE PREMIUM:**        $192,647.00

**SUBSEQUENT PLANNED ANNUAL PREMIUM:**        $0.00

**TOTAL PREMIUM LIMIT:**        GREATER OF   $5,843,937.56   AND RESULT OF   $765,094.43 MULTIPLIED BY THE NUMBER OF ELAPSED POLICY YEARS (OR FRACTION THEREOF) AFTER DECEMBER 28, 2005

The limit may decrease when monthly charges for any rider or any other monthly charges cease, and may be exceeded if additional premium is needed to prevent policy lapse.

**PREMIUM DUE DATES:**        The amount and time of premium payments following the Policy Date are flexible. Subsequent planned premiums are payable on the THIRTIETH day of each DECEMBER thereafter until the Death of the Insured, but not beyond DECEMBER 28, 2031.

**POLICY VALUE BENCHMARK AMOUNT:**        $8,800,000.00        (See Part 5)

Exhibit 2 - 63

EXHIBIT 1 - PAGE 94

# SCHEDULE PAGE
## CONTINUED

POLICY NUMBER:            97514671

## POLICY CHARGES

SALES CHARGE:            10% of the first $450,000.00    of premium paid in the
first policy year. 5% of any premium paid in excess of
$450,000.00      in the first policy year.
5% of all premiums   paid in policy years 2+.

MONTHLY DEDUCTION:       See Part 5, "Monthly Deduction". Includes cost of insurance, any
rider charges, any flat extra mortality charges, and monthly
service and expense charges.

MONTHLY SERVICE CHARGE:  $3.50     Guaranteed not to exceed $7.00.

MONTHLY EXPENSE CHARGE:   $50.00 deductible monthly during the first Policy Year.

PARTIAL WITHDRAWAL FEE FOR EACH WITHDRAWAL:  $25.00 (in addition to a partial
Surrender Charge).

SURRENDER CHARGE:        See table on next page.

We will not charge any Policy charges after the Policy Anniversary which follows the Insured's 100th
Birthday.

## OTHER RATES

GUARANTEED MINIMUM INTEREST RATE:  4%.

## LIMITATIONS

MINIMUM LOAN AMOUNT:      $100

PARTIAL WITHDRAWALS:      A Partial Withdrawal will not be permitted in an amount

- less than $500.00;

- which would reduce the Surrender Value to $0.00; or

- which would reduce the face amount below $250,000.

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     97514671

### TABLE OF SURRENDER CHARGES

For an explanation of this table, see section entitled "Surrender Value" in Part 5.  The charges shown in this table are stated as of the beginning of the Policy Year indicated. The charge will be level for the first 10 Policy Years and will be prorated on an annual basis beginning in Policy Year 11, unless limited by legal maximums.  In all Policy Years after the 20th policy year, the Surrender Charge is zero.

| POLICY YEAR | CHARGE PER $1,000 OF FACE AMOUNT |
|:---:|:---:|
| 1 | 57.6900 |
| 2 | 55.2198 |
| 3 | 52.7915 |
| 4 | 50.4081 |
| 5 | 48.0667 |
| 6 | 45.7623 |
| 7 | 43.4941 |
| 8 | 41.2687 |
| 9 | 39.0973 |
| 10 | 36.9954 |
| 11 | 34.9795 |
| 12 | 33.0540 |
| 13 | 31.2199 |
| 14 | 22.4250 |
| 15 | 10.7250 |
| 16 | 0.0000 |
| 17 | 0.0000 |
| 18 | 0.0000 |
| 19 | 0.0000 |
| 20 | 0.0000 |
| 20+ | 0.0000 |

Exhibit 2 - 65
PAGE 3 OF 5
U606ZZS3

EXHIBIT 1 - PAGE 96

## SCHEDULE PAGES (CONTINUED)

POLICY NUMBER:        97514671

### TABLE OF GUARANTEED MAXIMUM COST OF INSURANCE RATES
### PER $1000 OF NET AMOUNT AT RISK
### BASED ON 1980 CSO MORTALITY TABLE

| POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE | POLICY YEAR | MONTHLY RATE |
|---|---|---|---|---|---|
| 01 | 2.75170 | 10 | 7.64670 | 19 | 19.05000 |
| 02 | 3.11000 | 11 | 8.58580 | 20 | 20.95000 |
| 03 | 3.50330 | 12 | 9.61500 | 21 | 23.27580 |
| 04 | 3.92580 | 13 | 10.71500 | 22 | 26.44330 |
| 05 | 4.37750 | 14 | 11.89250 | 23 | 31.31170 |
| 06 | 4.87080 | 15 | 13.13420 | 24 | 39.58080 |
| 07 | 5.42670 | 16 | 14.45920 | 25 | 54.65420 |
| 08 | 6.06330 | 17 | 15.86580 | 26 | 83.33330 |
| 09 | 6.79920 | 18 | 17.38170 | | |

Basis of Calculations:   1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table for each insured's sex and risk class, age nearest birthday, and 4% effective annual interest rate.

Monthly Factor used in determining Cost of Insurance:   1.0032737 (SEE PART 5)

U606

EXHIBIT 1 - PAGE 97

# SCHEDULE PAGE
## (CONTINUED)

POLICY NUMBER:     97514671

## TABLE OF FACE AMOUNTS OF INSURANCE

ISSUE DATE                                    FACE AMOUNT
DECEMBER 28, 2005                             $10,000,000.00

## RIDERS AND RIDER BENEFITS

| RIDER DESCRIPTION | RIDER DATE OF ISSUE | AMOUNT | RIDER TERMINATION DATE | MONTHLY CHARGE |
|---|---|---|---|---|
| UR11    LIVING BENEFIT RIDER | 12/28/2005 | | | NONE |
| UR69 - AGE 100+ | 12/28/2005 | NOT APPLICABLE | NONE | $0.00 |
| UR77 - EXCHANGE OF INSURED OPTION | 12/28/2005 - EXCHANGE OPTION RIDER | $0.00 | 12/28/2031 | $0 |
| UR73 - LIFEPLAN OPTIONS RIDER | 12/28/2005 | NOT APPLICABLE | NONE | $0.00 |

# BRIEF SUMMARY OF MAIN PROVISIONS

This is only a summary to help You understand the basics of Your policy. The policy provisions spell out the full details of the rights and obligations of the parties to this policy. The policy provisions and not this brief summary are binding on Us. We will pay the benefits of this policy as set forth on the policy Schedule Pages.

There are two Death Benefit Options to choose from, as described in Part 7. Option A is the Face Amount. Option B is the Face Amount plus Policy Value. Under either Option, the Death Benefit must be at least the Minimum Death Benefit as described in Part 7.

The premiums You pay are added to the Policy Value after We deduct any applicable premium expense charges. We make a monthly deduction from the Policy Value to pay the cost of insurance, the cost of any additional benefit riders and certain monthly charges. We determine cost of insurance rates from time to time, with the guarantee that they will never be higher than the maximum provided on the Schedule Pages. The Policy Value is credited with interest at a current rate which We set from time to time but which will not be less per year than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

The Subsequent Planned Premium shown on the Schedule Pages is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy. However, You may generally pay premiums when and in the amount You choose provided sufficient premium is paid to maintain the policy In Force. The amount and timing of premium payments will affect the accumulation of Policy Value.

This policy gives You a number of other options. Under stated conditions, You may change the Death Benefit Option, withdraw part of the Surrender Value or surrender the policy for its full Surrender Value. The Surrender Value is based on the Policy Value, minus any applicable Surrender Charges, unpaid issue charges, loans and loan interest.

We pay the insurance proceeds, as described in Part 3, to the beneficiary when We receive due proof that the Insured's death has occurred while this policy is In Force.

We pay the Surrender Value, as described in Part 5, to You if the Insured is living on the surrender date and this policy is then In Force.

You may change the premiums and Death Benefit Option, subject to Our approval. Certain changes may require evidence of insurability.

See the policy provisions for details.

**READ YOUR POLICY CAREFULLY. IT IS A CONTRACT BETWEEN YOU AND US.**

U606

Exhibit 2 - 68

EXHIBIT 1 - PAGE 99

# TABLE OF CONTENTS

SCHEDULE PAGE

BRIEF SUMMARY OF MAIN PROVISIONS

PART1: DEFINITIONS...................................... 1

PART2: GENERAL PROVISIONS.................. 2
    Effective Date of Insurance................... 2
    The Policy and Application.................... 2
    Not Eligible for Annual Dividends........... 2
    Revised Schedule Pages...................... 2
    Age................................................ 3
    Misstatement of Age or Sex................. 3
    Contestability.................................... 3
    Insurability Requirements After Issue... 3
    Suicide Exclusion............................... 4
    Termination...................................... 4
    Minimum Policy Values......................... 4

PART 3: OWNER, COLLATERAL
ASSIGNMENT, BENEFICIARY................... 4
    Owner.............................................. 4
    Rights of Owner................................ 4
    Collateral Assignment........................ 5
    Beneficiary...................................... 5
    How to Change the Beneficiary............. 6

PART 4: PREMIUMS................................. 6
    Payments......................................... 6
    Total Premium Limit............................ 6
    Grace Period and Lapse...................... 7
    Reinstatement.................................. 7

PART 5: POLICY VALUES.......................... 8
    Basics of Calculations....................... 8
    Policy Value..................................... 8
    Interest Rate................................... 9
    Benchmark Interest Bonus.................. 9
    Monthly Deduction............................. 10
    Cost of Insurance............................. 10
    Cost of Insurance Rates..................... 10
    Surrender Value................................ 11
    Partial Withdrawals............................ 11

PART 6: POLICY LOANS............................ 12
    When Available.................................. 12
    Amount Available............................... 12
    Loan Interest................................... 12
    Debt.............................................. 13
    Repayment....................................... 13

PART 7: INSURANCE COVERAGE
PROVISIONS......................................... 13
    Death Proceeds................................ 13
    Interest on Insurance Proceeds........... 14
    Death Benefit.................................. 14
    Minimum Death Benefit....................... 14
    Death Benefit Following Insured's
        Age 100................................... 14
    Change in Death Benefit Option........... 15
    Request for a Decrease in Face
        Amount.................................... 15

PART 8: MISCELLANEOUS
PROVISIONS......................................... 15
    Annual Report.................................. 16
    Projection of Benefits and Values........ 16
    Notices by Us.................................. 16
    Deferment of Certain Payments........... 16
    Claims of Creditors........................... 16
    Corrections..................................... 16

PART 9: PAYMENT OPTIONS..................... 16
    Who May Elect Payments Options........ 16
    How to Elect a Payment Option........... 17
    What Payment Options Are Available 17
    Other Payment Options...................... 19
    Additional Interest............................ 19

PART 10: TABLE OF PAYMENT OPTION
AMOUNTS........................................... 19
    Adjusted Age................................... 19
    Tables for Options 3, 4 and 5............. 21
    Table for Option 7............................ 22

Exhibit 2 - 69

EXHIBIT 1 - PAGE 100

# PART 1: DEFINITIONS

**Assigns**
Any persons to whom You assign an interest in this policy if We have notice of the assignment in accordance with the provisions stated in Part 3.

**Death Benefit Option**
The type of Death Benefit in effect as described in Part 7.

**Due Proof of Death**
A certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to Us.

**In Force**
The policy has not terminated or otherwise lapsed in accordance with the Grace Period and Lapse Provision in Part 4.

**In Writing (Written Notice) (Written Request)**
Is a written form signed by You, satisfactory to Us and received at Our Home Office or Our Main Administrative Office.

**Monthly Calculation Day**
The first Monthly Calculation Day is the same day as the Policy Date. Subsequent Monthly Calculation Days are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be the Monthly Calculation Day.

**Subsequent Planned Premium**
The premium shown on the Schedule Page, which is the premium You selected in Your application and is the basis for the Policy Summary delivered with this policy.

**Policy Anniversary**
The anniversary of the Policy Date.

**Policy Date**
The Policy Date shown on the Schedule Pages from which Policy Years and Policy Anniversaries are measured.

**Policy Debt**
Unpaid policy loans with accrued interest.

**Policy Month**
The period from one Monthly Calculation Day up to but not including the next Monthly Calculation Day.

**Policy Value**
The Policy Value as defined in Part 5.

**Policy Year**
The first Policy Year is the one-year period from the Policy Date to, but not including, the first Policy Anniversary. Each succeeding Policy Year is the one-year period from the Policy Anniversary up to but not including the next Policy Anniversary.

**Surrender Value**
The Surrender Value as defined in Part 5. The Surrender Value is the Policy Value on the date of surrender less any applicable surrender charge, unpaid issue charge, and less any Policy Debt.

**We (Our, Us)**
PHL Variable Insurance Company.

**You (Your)**
The owner of this policy at the time an owner's right is exercised.

# PART 2:  GENERAL PROVISIONS

**Effective Date of Insurance**

This policy will be In Force from the Policy Date until terminated in accordance with its terms, provided the first Issue Premium shown on the Schedule Pages is paid on or before delivery of this policy while the Insured is alive.

**The Policy and Application**

This policy, including the Schedule Pages (and any supplements or changes thereto), any riders or endorsements to it, and the application for it (and any supplemental applications) constitute the entire contract between You and Us.

This policy is made in consideration of the application and the payment of premiums as provided in this policy. We rely on all statements made by or for the Insured in the written application. Each statement made in an application will, in the absence of fraud, be deemed a representation and not a warranty. No statement will be used to void this policy or in defense of a claim under this policy unless:

1. it is contained in the application or in a supplemental application; and

2. a copy of that application is attached to this policy when issued or made a part of this policy when changes become effective.

Any change in the provisions of the policy, including modifying the policy, waiving any of its conditions, or making an agreement for the Company, to be in effect, must be In Writing and signed by one of Our executive officers and countersigned by Our registrar or one of Our executive officers. This policy is issued by Us at Our Main Administrative Office in Hartford, Connecticut. Any benefits payable under this policy are payable at Our Main Administrative Office.

**Not eligible for Annual Dividends**

This policy is non-participating and therefore is not eligible for annual dividends. This means that You are not entitled to participate in company profits.

**Revised Schedule Pages**

The  Schedule Pages issued with the policy show the initial policy data in effect for this policy on the Policy Date. Some of this policy data may change by an action You request or take or by a change You make. Any of these changes will be reflected in Revised Schedule Pages which supplement or restate the Schedule Pages and show the effective date of the change. We will send You such Revised Schedule Pages along with a copy of any supplemental application, and they will become part of this policy as of their effective date.

EXHIBIT 1 - PAGE 102

**Age**

Issue Age means the Insured's age on the Policy Date as of the Insured's nearest birthday. The attained age of the Insured on any Policy Anniversary and for the entire Policy Year then starting is the Issue Age plus the number of Policy Years since the Policy Date.

**Misstatement of Age or Sex**

If the age or sex of the Insured is misstated, the Policy Value and any Death Benefits payable shall be adjusted on the basis of the difference between the monthly deductions made and the monthly deductions which should have been made, accumulated at the interest rates that were credited to the Policy Value.

In the event of death, the recalculation, in and of itself, will not result in termination of the policy prior to the date of death. We will not pay less on the date of death on the policy after recalculation than the Surrender Value determined based upon the misstated age.

**Contestability**

We cannot contest the validity of the original face amount of this policy after it has been in effect during the Insured's lifetime for two years from the Policy Date (or two years from any reinstatement).

While insurance is contestable, We may rescind the insurance or deny a claim on the basis of:

1. a misstatement in the application or supplemental application for this policy or any face amount increase; or

2. a misstatement in the reinstatement application if there has been a reinstatement of this policy.

If We contest the validity of all or a portion of the face amount provided under this policy, the amount We pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by Us for the contested face amount or the sum of any monthly deductions made under this policy for the contested face amount.

**Insurability Requirements After Issue**

To make some changes or elections under this policy after it is issued, the Insured must meet Our insurability requirements (medical and/or financial) as follows:

1. evidence of the Insured's insurability must be given that is satisfactory to Us; and

2. under Our underwriting standards, the Insured must be in a Risk Classification that is the same as, or better than, the Risk Classification for this policy at issue.

| | |
|---|---|
| **Suicide Exclusion** | If the Insured, whether sane of insane, dies by suicide within two years from the Policy Date, (or within two years from any reinstatement of the policy) and while the policy is In Force, Our liability shall be limited to an amount equal to the premiums paid on this policy less any debt owed Us and less any partial withdrawals. |
| **Termination** | If not previously terminated, this policy will terminate automatically on the earliest of: |

1. the date the Insured dies; or

2. the date the grace period expires without the payment of sufficient premium in accordance with the Grace Period and Lapse Provision in Part 4.

| | |
|---|---|
| **Minimum Policy Value** | All of the values under this policy are equal to or more than the minimum required on the Policy Date by the state in which this policy was delivered. The method of computation of the values under this policy has been filed as may be required with the Insurance Department of the state in which this policy was delivered. |

# PART 3: OWNER, COLLATERAL ASSIGNMENT, BENEFICIARY

| | |
|---|---|
| **Owner** | The Insured is the owner of this policy, unless otherwise provided in the application or be later transfer of ownership. |
| **Rights of Owner** | While the Insured is living, You may, as the owner, exercise all rights provided by this policy or allowed by Us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. By Written Notice You may: |

1. Transfer ownership to a new owner.

2. Name or change a contingent owner to succeed to the rights of the owner at the owner's death. If there is no contingent owner at the owner's death, ownership will pass to the Insured, except as You may have otherwise directed In Writing.

3. Receive any amounts payable under this policy during the Insured's lifetime.

4. Change the beneficiary of the death benefit. See Part 3.

5. Change the Subsequent Planned Premium payment amount and frequency. See Part 4.

6. Obtain a partial withdrawal. See Part 5.

7. Surrender this policy for its cash Surrender Value. See Part 5.

8. Obtain policy loans. See part 6.

EXHIBIT 1 - PAGE 104

9.  Request changes in the insurance amount. See Part 7.

10. Change the Death Benefit Option. See Part 7.

11. Select a payment option for any cash Surrender Value that becomes payable. See Part 10.

12. Assign, release or surrender any of Your interest in the policy.

Exercise of any of these rights will, to the extent thereof, assign, release or surrender the interest of the Insured and all other beneficiaries and owners under this policy.

An ownership transfer designation or change of designation will be effective as of the date the notice was signed, subject to any action taken by Us before We record such notice. A transfer of ownership (or absolute assignment) is not the same as a "collateral assignment" as described in the next paragraph, and the new owner is not an "assignee" as these terms are used in this policy.

**Collateral Assignment**

By Written Notice You may assign an interest in this policy as collateral to a collateral assignee. The collateral assignment or a certified copy of it must be filed with Us at Our Main Administrative Office. When filed, it will bind Us as of the date of the assignment, subject to any action taken by Us before such filing. We shall not be responsible for the validity of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. A collateral assignee cannot change the beneficiary, owner or contingent owner.

**Beneficiary**

Unless another payment option is elected as described in Part 10, any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:

a)  Primary beneficiaries;

b)  Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;

c)  You or Your executor or administrator, provided no primary or contingent beneficiary is living at the death of the insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the insured.

EXHIBIT 1 - PAGE 105

**How to Change the Beneficiary**

You may change the beneficiary by Written Notice filed with Us at Our Main Administrative Office. When We receive it, the change will relate back and take effect as of the date it was signed by You. However, the change will be subject to any payments made or actions taken by Us before We received the notice at Our Main Administrative Office.

## PART 4: PREMIUMS

**Payments**

The Issue Premium as shown on the Schedule Pages is payable on or before delivery of this policy. The Insured must be alive when that premium is paid.

Subject to the limitations stated below, You may pay additional premiums at any time prior to age 100 while this policy is In Force. All premiums are payable at Our Main Administrative Office or to an authorized agent of ours. You may request a receipt signed by one of Our executive officers.

On Written Request We will send Subsequent Planned Premium notices to You. These notices can be sent annually, semi-annually or quarterly. Premiums may also be paid at other intervals, or under automatic collection methods, subject to Our consent. We may limit the number and amount of premium payments in any Policy Year.

The minimum premium payment amount that We will accept is $25. Any premium payment that would increase the Death Benefit by more than it would increase the Policy Value, shall be subject to evidence of insurability satisfactory to Us. To the extent of such evidence, the Contestability and Suicide Exclusion provisions will apply. The application for such evidence is attached to and will be made part of the policy.

**Total Premium Limit**

The total premium limit is shown on the Schedule Pages and is applied to the sum of all premiums received by Us to date, excluding premiums applied to debt repayment, reduced by the sum of all partial withdrawals paid by Us to date. If the total premium limit is exceeded, We will refund the excess with interest at an annual rate of not less than 4%, not later than 60 days after the end of the Policy Year in which the limit was exceeded. The Policy Value will be adjusted to reflect such refund.

The total premium limit may be exceeded if additional premium is needed to prevent lapse under the Grace Period And Lapse provision, and such additional premium is permitted by federal tax laws or regulations such that this policy continues to meet the Definition of Life Insurance.

The total premium limit may change due to:

   a) change in Death Benefit Option;

-6-

Exhibit 2 - 75

EXHIBIT 1 - PAGE 106

b) a decrease of face amount;

c) a partial withdrawal;

d) addition, change or termination of a rider; or

e) a change in federal tax law or regulations.

If the total premium limit changes, We will send You Revised Schedule Pages reflecting the change. However, We reserve the right to require that the policy be returned to Us to endorse the change.

**Grace Period and Lapse**

During the first seven Policy Years, if on any Monthly Calculation Day the required monthly deduction exceeds the Policy Value less any Policy Debt, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

After the seventh Policy Year, if on any Monthly Calculation Day the required monthly deduction exceeds the Surrender Value, a grace period of 61 days will be allowed for the payment of an additional premium. Such additional premium must be sufficient to increase such value on that Monthly Calculation Day to cover three monthly deductions.

The policy will continue In Force during such grace period. We will mail to You and any Assigns at the post office addresses last known to Us a Written Notice as to the amount of premium required. If such premium amount is not postmarked as having been mailed to Us by the end of the grace period, the policy will lapse without value, but not before 30 days have elapsed since We mailed Our Written Notice to You and any Assigns. The date of lapse will be the Monthly Calculation Day on which the deduction was to be made, and any insurance and rider benefits provided under this policy will terminate as of that date.

**Reinstatement**

If this policy terminates, in accordance with the Grace Period and Lapse Provision, You may reinstate this policy back to an "In Force" status within five years after the expiration of the Grace Period. Reinstatement must become effective prior to age 100 and while the Insured is alive. We will not approve a request for a reinstatement until We receive at Our Main Administrative Office all of the following:

1.  a Written Request for reinstatement;

2.  evidence of insurability satisfactory to Us;

3.  if applicable, payment or reinstatement of any Policy Debt as of the date of lapse; and

U606

–7–

Exhibit 2 - 76

EXHIBIT 1 - PAGE 107

4. the payment of a reinstatement premium while the Insured is alive which equals an amount needed to provide for a positive Surrender Value as of the date of lapse, plus three monthly deductions. However, during the first seven Policy Years, the reinstatement premium will equal an amount needed to provide for a positive Policy Value (less any Policy Debt) as of the date of lapse, plus three monthly deductions.

Subject to the foregoing conditions, the effective date of a reinstatement will be the Monthly Calculation Day following the date We approve the request for reinstatement. If We approve it on a Monthly Calculation Day, the effective date will be that Monthly Calculation Day.

The Policy Value as of the effective date of a reinstatement shall equal the reinstatement premium received, plus any Policy Debt in effect as of the date of lapse, minus the monthly deduction for the month then starting.

# PART 5: POLICY VALUES

The premiums You pay, minus the premium expense charges shown on the Schedule Pages, are added to the policy's Policy Value. We make monthly deductions from the Policy Value to cover the cost of insurance, the cost of any additional benefit riders and the monthly charges shown on the Schedule Pages. We also deduct any partial withdrawals You make and charges for them, as well as any charges for face amount decreases. The Policy Value earns interest. Details are provided below. We will keep You informed of the current Policy Value by sending You an Annual Report as described in Part 8 of this policy.

**Basis of Calculations**

Minimum Surrender Values are determined from the Basis of Calculations shown on the Schedule Pages. The Guaranteed Maximum Insurance Rates shown on the Schedule Pages are also based on this Table.

**Policy Value**

Policy Value is to be calculated as follows:

1. In each Monthly Calculation Day following the Policy Date, the Policy Value will equal $(A + B + C - D - E)$;

2. on a day of the month other than a Monthly Calculation Day, it will equal $(A + C)$;

3. on the Policy Date, it will equal all premiums received, net of any premium expense charges, minus E; where:

    A= the Policy Value on the prior Monthly Calculation Day, after assessment of the monthly deduction on that day;

    B= one month's interest on A, including any Benchmark Interest Bonus;

Exhibit 2 - 77

EXHIBIT 1 - PAGE 108

C= all premiums received, net of any premium expense charges, since the prior Monthly Calculation Day, plus interest thereon to the end of the Policy Month, or any earlier date on which the Policy Value is being determined;

D= any partial withdrawal, and charge for it, being made as of that Monthly Calculation Day; and

E= the monthly deduction for the month then starting (no monthly deduction is made if the policy is surrendered for its full Surrender Value as of that Monthly Calculation Day).

**Interest Rate**

We will, from time to time, determine the interest rate used in the calculation of the Policy Value, based on Our anticipation of future investment earnings, mortality, persistency and expense/administrative costs. We will determine the interest rate at least once each year. We may, in Our sole discretion, change the interest rate. Changes made will be in accordance with procedures and standards on file with the Insurance Department of the state where this policy was delivered. Changes in the rate will apply to all policies in the same investment class. Any interest credited in excess of the Guaranteed Minimum Interest Rate is referred to as "excess interest." The effective annual interest rate will never be less than the Guaranteed Minimum Interest Rate shown on the Schedule Pages.

We may credit different interest rates on loaned and unloaned portions of the Policy Value. The rate in effect on a given date for unloaned amounts is referred to as the "current interest rate." The rate in effect on a given date for loaned amounts will be no less than the Loan Interest Rate in effect on that date less 2%. All interest rates are stated as effective annual rates. Interest will be compounded at least monthly to yield the effective annual rate.

**Benchmark Interest Bonus**

Beginning in the third Policy Year of this policy, in addition to interest being credited under the policy on each Monthly Calculation Day, We will also credit an interest bonus on each Monthly Calculation Day on amounts in excess of the Policy Value Benchmark Amount, shown on the Schedule Page. The Bonus Interest Rate will be equal to:

1. An annual effective rate of 1% if the Current Interest Rate is 5% or greater; or

2. An annual effective rate of .5% if the Current Interest Rate is at least 4.5% but less than 5%; or

3. An annual effective rate of 0% if the Current Interest Rate is less than 4.5%.

This bonus will be equal to (A x B), where:

A= the Bonus Interest Rate; and

B= the excess of the unloaned portion of the Policy Value over the Policy Value Benchmark Amount, shown on the Schedule Page.

EXHIBIT 1 - PAGE 109

**Monthly Deduction**

The monthly deduction is the amount deducted from the Policy Value on the Policy Date and on each Monthly Calculation Day to pay the cost of insurance, the cost for any additional benefit riders and monthly charges for the Policy Month starting on that day. The monthly deduction will be equal to:

$$(A + B + C); \text{ where:}$$

A= the cost of insurance (as defined in the Cost of Insurance provision below);

B= the monthly cost for any additional benefit riders as shown on the Schedule Pages;

C= the Monthly Service Charge shown on the Schedule Pages, and if applicable, one–twelth of the Issue Charge.

**Cost of Insurance**

The cost of insurance is the amount We charge each month for providing the insurance coverage. The cost of insurance is equal to:

$$(A \times (B - C)) + D; \text{ where}$$

A= the applicable cost of insurance rate for the Insured's risk class, based upon the Net Amount at Risk and Insured's risk class, including any applicable substandard mortality percentage extra. The Net Amount at Risk is equal to (B–C) below;

B= the Death Benefit at the beginning of the Policy Month, divided by the Monthly Factor shown on the Schedule Pages;

C= the Policy Value at the beginning of the Policy Month, after the Monthly Service Charge and, when applicable, one–twelfth of the Issue Charge, and prior to subtracting the Cost of Insurance for that month;

D= the Substandard (Temporary or Permanent) Extra Charge, if any, shown on the Schedule Pages.

In item B "Death Benefit" means the Death Benefit as defined in Part 7 but prior to subtracting the cost of insurance for that month from any Policy Value element.

**Cost of Insurance Rates**

The cost of insurance rate for each Policy Month is based on the Insured's age at issue, risk class and sex, and on policy duration. The rate used in computing the cost of insurance is obtained from the Table of Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages for the insured risk classification(s), or such lower rate as We may declare. At least 31 days before the start of the Policy Year, We will send You a notice of any change in rates.

EXHIBIT 1 - PAGE 110

No more frequent than once per year and no less frequent than once every five years, We will review the monthly Cost of Insurance Rates to determine if these rates should be changed. However, the rates will never exceed the Guaranteed Maximum Cost of Insurance Rates shown on the Schedule Pages. Our right to change rates also is subject to the following terms:

1. Any change in rates will be made on a uniform basis for all insureds in the same class. No change in rates will occur due to any change in the Insured's health or occupation.

2. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

3. Any change in rates will be based on a change in Our expectations of future investment earnings, mortality, persistency and expense/administrative costs.

4. Any change in rates will comply with any procedures and standards that may be on file with the insurance official of the jurisdiction where this policy is delivered.

The Monthly Service Charge, shown on the Schedule Pages, is subject to change based on Our expectations of future investment earnings, mortality, persistency and expense/administrative costs, subject to the maximum Monthly Service Charge stated on the Schedule Pages.

**Surrender Value**

You may surrender this policy for its Surrender Value at any time, by sending Us a Written Request along with this policy on or before such Monthly Calculation Day.

The Surrender Value on any date is the Policy Value on that date minus any applicable surrender charge as shown in the Table of Surrender Charges on the Schedule Pages, minus any Policy Debt, minus any unpaid issue charge. If the surrender is requested within 30 days after a Policy Anniversary, the Surrender Value shall not be less than the Surrender Value on the Policy Anniversary less any debt, partial withdrawals and charges made or incurred since the Policy Anniversary. The Surrender Value is never less than zero.

If this policy is terminated, the remaining schedule of Surrender Charges will be suspended. When this policy is reinstated, the remaining schedule of Surrender Charges also will be reinstated. The Surrender Charges are based on the period of time the policy is in effect. When reinstated, the schedule of Surrender Charges will start from the point where the schedule was suspended.

**Partial Withdrawals**

You may withdraw part of the Surrender Value as of any Monthly Calculation Day while the Insured is living, subject to the charges and limitations shown on the Schedule Pages. We must receive your Written Request for partial withdrawal on or before the Monthly Calculation Day on which the partial withdrawal is to be effective. The Policy Value will be reduced by the amount withdrawn, a partial surrender charge and a partial withdrawal fee.

EXHIBIT 1 - PAGE 111

The partial surrender charge is equal to a pro-rata portion of the surrender charge that would apply to a full surrender. The partial surrender charge is determined by multiplying the full surrender charge by a fraction equal to the partial surrender amount payable divided by the result of subtracting the applicable surrender charge from the Policy Value.

The partial withdrawal fee is shown on the Schedule Pages.

Under Death Benefit Option A (the Face Amount), the Face Amount is decreased by the same amount of reduction as the Policy Value.

Under Death Benefit Option B (the Face Amount plus the Policy Value), the Face Amount does not change.

A partial withdrawal will not be permitted which would reduce the Face Amount below Our then current Minimum Face Amount, or the Surrender Value to zero.

# PART 6: POLICY LOANS

**When Available**

You may obtain a loan from Us at any time, on assignment of the policy to Us as security, if it has a Surrender Value greater than zero.

**Amount Available**

The amount of any loan may not exceed the lesser of:

- the Surrender Value of this policy projected from the date of the loan to the next Policy Anniversary based upon guaranteed assumptions, minus loan interest charges through the next Policy Anniversary; and

- the current Surrender Value of this policy.

If on any Monthly Calculation Day the Policy Debt exceeds the Policy Value minus any applicable surrender charge then in effect, this policy will lapse according to the terms of the Grace Period and Lapse provision.

A loan will not be permitted in an amount less than the Minimum Loan Amount shown on the Schedule Pages, except if the amount to be loaned equals the full loaned amount then remaining.

We reserve the right to defer the granting of a loan, other than for the payment of any premium to Us, for six months after submission of a loan application.

Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

**Loan Interest**

Loans will bear interest at such rate or rates as established by Us for any period during which loans are outstanding. Each year We will set the rate that will apply during the next Policy Year. Such rate will be effective at the beginning of that year and will apply to both new and any outstanding loans under this policy.

EXHIBIT 1 - PAGE 112

We will notify You of the initial loan interest rate at the time a policy loan is made, or as soon as practical thereafter. If there are any outstanding loans, except for purposes of reinstatement, We will give You advance notice of any increase in the rate.

There is a maximum limit on the interest rate We can set. The maximum limit is the Published Monthly Average for the calendar month ending two months before the Policy Year begins or the Guaranteed Minimum Interest Rate used in computing the Policy Value plus 1%, whichever is higher.

The Published Monthly Average will be:

A.  The Corporate Bond Yield Average − Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

B.  If that Monthly Average is no longer published, a substantially similar average, established by regulation issued by the insurance supervisory official of the state where this policy was delivered.

If the maximum limit for a Policy Year is at least 1/2% higher than the rate in effect for the previous year, We may increase the rate to not more than that limit.

If the maximum limit for a Policy Year is at least 1/2% lower than the rate in effect for the previous Policy Year, We must decrease the rate to not more than that limit.

**Debt**

As used in this policy, "debt" or "Policy Debt" means all loans existing on this policy plus accrued interest. When this policy terminates, We will add to any existing debt interest accrued from the prior Policy Anniversary to the termination date.

**Repayment**

The whole or any part of a loan may be repaid at any time while this policy is in effect. Any moneys received will be applied directly to reduce the debt unless specified as a premium payment. We will not accept partial payments in amounts less than $25.

## PART 7: INSURANCE COVERAGE PROVISIONS

**Death Proceeds**

Upon receipt by Us of Due Proof of Death that the Insured died while this policy is In Force, We will pay the death proceeds of this policy. The death proceeds at the death of the Insured are equal to:

a)  the Death Benefit, as described below, in effect on the Insured's date of death; PLUS

b)  any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; PLUS

c)  any premiums received by Us after the Monthly Calculation Day just prior to the Date of Death and on or before the Date of Death; MINUS

EXHIBIT 1 - PAGE 113

d) Any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

e) Any debt then existing on this policy; MINUS

f) Any monthly deductions not already made up to and including the Policy Month of death.

**Interest on Insurance Proceeds**

We will pay interest on any death proceeds from the date of death to the date of payment. The amount of interest will be the same as would be paid were the death proceeds left for that period of time to earn interest under Payment Option 2. However, in no case will the amount of interest be less than the minimum required in Your state.

**Death Benefit**

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is chosen and is then in effect, but in no event while the policy is In Force will it be less than the Minimum Death Benefit described below.

Option A: The Face Amount on that date.

Option B: The Face Amount plus the Policy Value on that date.

**Minimum Death Benefit**

The Minimum Death Benefit will be equal to a percentage of the Policy Value as of the insured's attained age at the beginning of the Policy Year in which the insureds death occurs, as follows:

| ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE | ATTAINED AGE | % OF POLICY VALUE |
|---|---|---|---|---|---|
| 0-40 | 250% | 54 | 157% | 68 | 117% |
| 41 | 243% | 55 | 150% | 69 | 116% |
| 42 | 236% | 56 | 146% | 70 | 115% |
| 43 | 229% | 57 | 142% | 71 | 113% |
| 44 | 222% | 58 | 138% | 72 | 111% |
| 45 | 215% | 59 | 134% | 73 | 109% |
| 46 | 209% | 60 | 130% | 74 | 107% |
| 47 | 203% | 61 | 128% | 75 | 105% |
| 48 | 197% | 62 | 126% | 76-90 | 105% |
| 49 | 191% | 63 | 124% | 91 | 104% |
| 50 | 185% | 64 | 122% | 92 | 103% |
| 51 | 178% | 65 | 120% | 93 | 102% |
| 52 | 171% | 66 | 119% | 94 | 101% |
| 53 | 164% | 67 | 118% | 95 and over | 100% |

**Death Benefit Following Insured's Age 100**

After the Policy Anniversary which follows the insured's birthday, the Death Benefit will equal the Policy Value. Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid. Policy loans and partial withdrawals will continue to be made available after this anniversary.

EXHIBIT 1 - PAGE 114

**Change in Death Benefit Option**

The Face Amount and Death Benefit Option You have chosen initially are shown on the initial Schedule Pages. While this policy is In Force, You may request In Writing to change the Death Benefit Option. Any change will be subject to the following:

1. A change in Death Benefit Option will require that there be no immediate change in Our insurance risk. To assure this, when We approve a change from Option A to Option B, We will decrease the Face Amount by the Policy Value. Such a change from Option A to Option B may not be made if it would reduce the Face Amount below the Minimum Face Amount shown on the Schedule Pages. Similarly, when We approve a change from Option B to Option A, We will increase the Face Amount by the Policy Value. We will not require evidence of insurability for a change in Death Benefit Option. You are limited to one change in Death Benefit Option for each Policy Year.

2. The effective date of any change will be the Monthly Calculation Day next following Our approval of Your Written Request for change. This date will be shown on the Revised Schedule Pages that We will send You.

**Request for a Decrease in Face Amount**

You may request a decrease in face amount at any time after the first Policy Year. The decrease requested must at least equal $25,000 and the face amount remaining after the decrease must at least equal $250,000. All requests to decrease the face amount must be In Writing and will be effective on the first Monthly Calculation Day following the date We approve the request. We reserve the right to require that this policy first be returned to Us before the decrease is made. Upon a decrease in face amount, a partial surrender charge will be deducted from the Policy Value based on the amount of the decrease. The charge will equal the applicable surrender charge that would then apply to a full surrender multiplied by the result of dividing the decrease in face amount by the face amount of the policy before the decrease. We will send You a Revised Schedule Page reflecting the change.

# PART 8: MISCELLANEOUS PROVISIONS

**Annual Report**

We will send You, without charge, a report for each Policy Year which includes:

1. the current Policy Value, Death Benefit, Face Amount and Surrender Value;

2. any partial withdrawals, premiums paid, interest credited and charges made during the year;

3. any outstanding policy loans and new loans and loan repayments made during the year; and

EXHIBIT 1 - PAGE 115

4.  any other information required by the insurance supervisory official of the state in which this policy was delivered.

You have the right to request an illustrative report at any other time. We reserve the right to charge up to $25.00 for the report.

**Projection of Benefits and Values**

We will provide You, on Written Request and payment of Our service fee of up to $25.00, a projection of illustrative future benefits and values under Your policy. We may limit the number of such projections in any Policy Year.

**Notices By Us**

Whenever We are required to give notice to You, it shall be deemed given if We mail it to You and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record at Our Main Administrative Office.

**Deferment of Certain Payments**

We may defer, for not more than six months after We receive Written Request, the payment of the Surrender Value due to surrender or partial withdrawal or the making of any loan. If payment is deferred 31 days or more on any surrender, interest will be paid at an effective annual rate of 4.00% on the amount deferred, from the date the request is received to the date of payment.

**Claims of Creditors**

The proceeds and any income payments under this policy shall not be subject to the claims of creditors and shall be exempt from legal process, levy or attachment to the extent allowed by law.

**Corrections**

We reserve the right to correct any clerical errors in this policy, or in Our administration of the policy.

# PART 9: PAYMENT OPTIONS

**Who May Elect Payment Options**

The surrender or death proceeds of this policy will be paid in one sum unless otherwise provided. As an alternative to payment in one sum as provided under Option 1, the proceeds may be applied under one or more of the alternative income payment options described in this Part.

However, Our consent is required for the election of an income payment option by a fiduciary or any entity other than a natural person. Our consent is also required for elections by any Assigns or an owner other than the Insured if the owner has been changed.

Except for Option 7 which is not available for death proceeds, You may elect any payment option for payment of the death proceeds. You may also designate or change one or more beneficiaries who will be the payee or payees under that Option. You may only do this during the lifetime of the Insured. If no election is in effect when the death benefit becomes payable, the beneficiary may elect any payment option other than Option 7. The payment options are also available to the payee of any Surrender Value that becomes payable under this policy.

Exhibit 2 - 85

U606 CA

EXHIBIT 1 - PAGE 116

Unless We agree otherwise, all payments under any Option chosen will be made to the designated payee or to his or her executor or administrator. We may require proof of age of any payee or payees on whose life payments depend as well as proof of the continued survival of any such payee(s).

**How To Elect a Payment Option**

The election of an income payment option must be In Writing. You can elect that the payments be made on an annual, semi-annual, quarterly, or monthly basis provided that each installment will at least equal $25. We also require that at least $1,000 be applied under any option chosen.

**What Payment Options Are Available**

This section provides a brief description of the various payment options that are available. In Part 10 You will find tables illustrating the guaranteed installment amount provided by several of the Options described in this section. The amounts shown for Option 4, Option 5 and Option 7 are the minimum monthly payments for each $1,000 applied. The actual payments will be based on the monthly payment rates We are using when the first payment is due. They will not be less than shown in the tables.

Option 1 – Payment in one sum

Option 2 – Left to earn interest

> We pay interest on the amount left with Us under this Option as a principal sum.

> We guarantee that at least one of the versions of this Option will provide interest at a rate of at least 3% per year.

Option 3 – Payments for a specified period

> Equal income installments are paid for a specified period of years whether the payee lives or dies. The first payment will be on the date of settlement.

> The Option 3 Table shows the guaranteed amount of each installment for monthly and annual payment frequencies. The table assumes an interest rate of 3% per year on the unpaid balance. The actual interest rate is guaranteed not to be less than this minimum rate.

Option 4 – Life annuity with specified period certain

> Equal installments are paid until the later of:

> a) the death of the payee;

> b) the end of the period certain.

– 17 –

Exhibit 02 Zen 86

EXHIBIT 1 - PAGE 117

The first payment will be on the date of settlement. The period certain must be chosen at the time this Option is elected. The periods certain that may be chosen are as follows:

a) ten years;

b) twenty years;

c) until the installments paid refund the amount applied under this Option. If the payee is not living when the final payment falls due, that payment will be limited to the amount which needs to be added to the payments already made to equal the amount applied under this Option.

If, for the age of the payee, a period certain is chosen that is shorter than another period certain paying the same installment amount, We will deem the longer period certain as having been elected.

Any life annuity as may be provided under this Option is calculated using an interest assumption of 3 3/8%, except that any life annuity providing a period certain of twenty years or more is calculated using an interest rate of 3 1/4%.

Option 5- Life annuity

Equal installments are paid only during the lifetime of the payee. The first payment will be on the date of settlement.

Any life annuity as may be provided under this Option is calculated using an interest rate of 3 1/2%.

Option 6- Payments of a specified amount

Equal installments of a specified amount, out of the principal sum and interest on that sum, are paid until the principal sum remaining is less than the amount of the installment. When that happens, the principal sum remaining with accrued interest will be paid as a final payment. The first payment will be on the date of settlement. The payments will include interest on the principal sum remaining at a rate guaranteed to at least equal 3% per year. This interest will be credited at the end of each year. If the amount of interest credited at the end of a year exceeds the income payments made in the last 12 months, that excess will be paid in one sum on the date credited.

U606

-18-

Exhibit 2 - 87

EXHIBIT 1 - PAGE 118

Option 7 – Joint survivorship annuity with a 10–year period certain

This payment option is not available for death proceeds. This Option is only available if the policy is surrendered within 6 months of the Policy Anniversary nearest the Insured's 55th, 60th, or 65th birthday. The first payment will be on the date of settlement. Equal income installments are paid until the latest of:

a) the end of the 10–year period certain;
b) the death of the Insured;

c) the death of the other named annuitant.

The other annuitant must be named at the time this Option is elected and cannot later be changed. That annuitant must have an adjusted age as defined in Part 10 of at least 40.

Any joint survivorship annuity as may be provided under this Option is calculated using an interest rate of 3 3/8%.

**Other Payment Options**   We may offer other payment options or alternative versions of the options listed in the above section.

**Additional Interest**   In addition to:

a) the interest of 3% per year guaranteed on the principal sum remaining with Us under Option 2 or 6; and

b) the interest of 3% per year included in the installments payable under Option 3;

We will pay or credit at the end of each year such additional interest as We may declare.

# PART 10: TABLES OF PAYMENT OPTION AMOUNTS

The installment amounts shown in the tables that follow are shown for each $1,000 applied. Amounts for payment frequencies, periods or ages not shown will be furnished upon request. Under Options 4 and 5, the installment amount for younger ages than shown will be the same as for the first age shown and for older ages than shown, it will be the same amount as for the last age shown.

**Adjusted Age**   The term "age" as used in the tables refers to the adjusted age. Under Options 4 and 5, the adjusted age is defined as follows:

a) for Surrender Values, the age of the payee on the payee's nearest birthday to the Policy Anniversary nearest the date of surrender;

EXHIBIT 1 - PAGE 119

a) for death benefits, the age of the payee on the payee's birthday nearest the effective date of the payment option elected.

Under Option 7, the adjusted age is the age on the nearest birthday to the Policy Anniversary nearest the date of surrender. The table for Option 7 only shows the amounts for annuitants of the opposite sex. Rates for annuitants of the same sex will be furnished upon request.

Exhibit 2 - 89

EXHIBIT 1 - PAGE 120

### Option 3 - Payments for a specified period

| Number of Years | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment $ | 211.99 | 179.22 | 155.83 | 138.31 | 124.69 | 113.82 | 104.93 | 97.54 | 91.29 |
| Monthly Installment $ | 17.91 | 15.14 | 13.16 | 11.68 | 10.53 | 9.61 | 8.86 | 8.24 | 7.71 |

| Number of Years | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|
| Annual Installment $ | 85.95 | 81.33 | 77.29 | 73.74 | 70.59 | 67.78 | 65.26 | 55.76 | 49.53 |
| Monthly Installment $ | 7.26 | 6.87 | 6.53 | 6.23 | 5.96 | 5.73 | 5.51 | 4.71 | 4.18 |

### *Option 4 - Life annuity with specified period certain

| Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | | Age of Payee | Installment Refund | | 10 Years Certain | | 20 Years Certain | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Male | Female | Male | Female | Male | Female | | Male | Female | Male | Female | Male | Female |
| 10 | $3.08 | $3.03 | $3.08 | $2.99 | $3.00 | $2.94 | 50 | $4.36 | $4.12 | $4.50 | $4.10 | $4.28 | $3.99 |
| 15 | 3.14 | 3.09 | 3.15 | 3.04 | 3.07 | 3.00 | 55 | 4.76 | 4.47 | 4.95 | 4.47 | 4.61 | 4.31 |
| 20 | 3.22 | 3.16 | 3.24 | 3.11 | 3.15 | 3.07 | 60 | 5.28 | 4.93 | 5.54 | 4.96 | 4.97 | 4.67 |
| 25 | 3.33 | 3.24 | 3.34 | 3.20 | 3.25 | 3.15 | 65 | 5.97 | 5.54 | 6.30 | 5.63 | 5.29 | 5.06 |
| 30 | 3.45 | 3.35 | 3.47 | 3.30 | 3.38 | 3.25 | 70 | 6.91 | 6.39 | 7.24 | 6.50 | 5.43 | 5.31 |
| 35 | 3.61 | 3.48 | 3.64 | 3.43 | 3.55 | 3.38 | 75 | 8.21 | 7.57 | 8.26 | 7.56 | 5.44 | 5.40 |
| 40 | 3.80 | 3.64 | 3.86 | 3.60 | 3.74 | 3.54 | 80 | 10.04 | 9.26 | 9.12 | 8.60 | 5.46 | 5.46 |
| 45 | 4.05 | 3.85 | 4.14 | 3.82 | 3.99 | 3.74 | 85 | 12.61 | 11.68 | 9.60 | 9.31 | 5.46 | 5.46 |

### *Option 5 - Life annuity

| Age of Payee | Male | Female | Age of Payee | Male | Female |
|---|---|---|---|---|---|
| 10 | $3.17 | $3.12 | 50 | $4.62 | $4.28 |
| 15 | 3.24 | 3.18 | 55 | 5.12 | 4.68 |
| 20 | 3.32 | 3.25 | 60 | 5.79 | 5.24 |
| 25 | 3.42 | 3.34 | 65 | 6.75 | 6.04 |
| 30 | 3.56 | 3.44 | 70 | 8.15 | 7.22 |
| 35 | 3.73 | 3.58 | 75 | 10.26 | 9.03 |
| 40 | 3.95 | 3.75 | 80 | 13.54 | 11.88 |
| 45 | 4.24 | 3.98 | 85 | 18.72 | 16.54 |

EXHIBIT 1 - PAGE 121

\* **Option 7 - Joint survivorship annuity with 10-year period certain**

| Age of Other Annuit- ant F | Age of Insured Male | | Age of Other Annuit- ant F | Age of Insured Male | | Age of Other Annuit- ant M | Age of Insured Female | | Age of Other Annuit- ant M | Age of Insured Female | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | | 55 | 60 | | 55 | 60 | | 55 | 60 |
| 40 | $3.62 | $3.64 | 60 | $4.43 | $4.64 | 40 | $3.72 | $3.77 | 60 | $4.34 | $4.64 |
| 45 | 3.80 | 3.83 | 65 | 4.61 | 4.93 | 45 | 3.89 | 3.97 | 65 | 4.44 | 4.82 |
| 50 | 4.00 | 4.07 | 70 | 4.75 | 5.18 | 50 | 4.06 | 4.19 | 70 | 4.50 | 4.95 |
| 55 | 4.22 | 4.34 | 75 | 4.86 | 5.36 | 55 | 4.22 | 4.43 | 75 | 4.54 | 5.03 |

\* Minimum monthly income for each $1,000 applied

# AGE 100+ RIDER

This rider is part of the policy to which it is attached.  Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**Rider Date:**          DECEMBER 28, 2005

**Rider Charge Date:**          N/A

## DEFINITIONS

**Age 100 Anniversary**
The Policy Anniversary nearest the Insured's 100th birthday.

## GENERAL

**Death Proceeds**
While this rider is in effect, the "Death Proceeds" provision of the basic policy is amended by adding the following to the end of that provision:

On and after the Age 100 Anniversary, the death proceeds at the death of the Insured are equal to:

a)   the Death Benefit, as described below;  MINUS

b)   any partial withdrawals made after the Date of Death and prior to receipt of Written Notice of the insured's death; MINUS

c)   any debt then existing on this policy

**Death Benefit Following Insured's Age 100**
While this rider is in effect, the "Death Benefit Following Insured's Age 100" provision of the basic policy is replaced with the following:

On and after the Age 100 Anniversary, the death benefit will equal 1 or 2, whichever is greater:

1.   the face amount of the basic policy on the date of the insured's death, plus the Total Rider Insurance Amount under the Individual Term Rider as of the day before the Age 100 Anniversary provided the Individual Term Rider was in effect on that date; or

2.   the Policy Value on the date of the insured's death.

Monthly Service Charges and Cost of Insurance Charges will not be deducted after this anniversary, nor can any premiums be paid.  Policy loans and partial withdrawals will continue to be made available after this anniversary.

**Under federal tax law, this policy may not qualify as life insurance after the Age 100 Anniversary. It may be subject to adverse tax consequences and a tax advisor should be consulted before You choose to continue the policy after the Age 100 Anniversary.**

UR69 CA

Exhibit 2 - 92

EXHIBIT 1 - PAGE 123

**Monthly Rider Charges**
There is no charge for this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1. the date of full surrender or lapse of the basic policy;

2. Our receipt of Your Written Request to cancel this rider, which shall be effective as of the next
   Monthly Calculation Day; or

3. the date of the insured's death.

Upon termination of this rider the "Death Benefit Following Insured's Age 100" provision in the policy will
become operative including any consequent reduction in death benefit to equal the Policy Value. No
retroactive assessment will be made for monthly deductions waived under this rider.


PHL Variable Insurance Company


*Dona D. Young*

Chairman, President
and Chief Executive Officer


UR69 CA

- 2 -

Exhibit 2 - 93


EXHIBIT 1 - PAGE 124

# ACCELERATED BENEFIT RIDER

This Rider is part of the Policy to which it is attached, effective as of the Rider Date, if it is listed on the Policy's Schedule Page or in an Endorsement after that page. You should therefore review the Policy's Schedule Page for applicability. Except as stated in this Rider, it is subject to all of the provisions contained in the Policy.

**THE BENEFIT PAID UNDER THIS RIDER MAY BE TAXABLE. YOU SHOULD CONSULT YOUR PERSONAL TAX ADVISOR REGARDING POSSIBLE TAX CONSEQUENCES.**

| | |
|---|---|
| **Rider Date** | SAME AS POLICY DATE |
| **Maximum Administrative Charge** | $300.00 |
| **Maximum Proportion Allowable** | 75% |
| **Maximum Accelerated Benefit** | $250,000 |
| **Minimum Remaining Face Amount** | $10,000 |

**Definitions**

**Insured** is the person covered under the basic Policy.

**You (Your)** is the owner of the Policy to which this Rider is attached.

**We (Our, Us)** refers to PHL Variable Insurance Company.

**Eligible Amount** is the amount of insurance under the Policy that is eligible for accelerated payment. It is equal to the death benefit of the basic Policy at the time of claim plus any term insurance amounts In Force provided by Rider on the life of the Insured, which provides coverage renewable to the Insured's attained age 95 or beyond, but exclusive of any other supplemental Rider death benefits.

**Proportion** is the percentage of the Eligible Amount that will be accelerated under this Rider. The Proportion is chosen by You at the time of election of an accelerated benefit, subject to the following limitations. The Proportion elected:

1. can be no more than the Maximum Proportion Allowable as specified in this Rider;

2. cannot result in a remaining death benefit below the minimum as specified in this Rider; and

3. cannot result in a Requested Benefit that exceeds the Maximum Accelerated Benefit as specified in this Rider.

Exhibit 2 - 94

UR11                    1

EXHIBIT 1 - PAGE 125

This Rider terminates upon payment of the accelerated benefit.

**Maximum Accelerated Benefit** is the amount shown on the first page of this Rider. This Maximum Accelerated Benefit applies, in aggregate, to all policies issued on the Insured by Us.

**Requested Benefit** is the Proportion multiplied by the Eligible Amount.

**Terminal Illness** is an illness or condition that is expected to result in the Insured's death within six months based on evidence satisfactory to Us as defined under the Proof of Terminal Illness section below.

| | |
|---|---|
| **Rider Description** | This Rider allows You to elect an accelerated benefit upon terminal illness of the Insured. The election must be made by a Written Request signed by You. We must also receive proof satisfactory to Us of the Insured's terminal illness as described in the Proof of Terminal Illness section below. The amount of the accelerated benefit will be adjusted as described under the Payment Made to You section below. The resulting payment will be made in a lump sum. Policy Values, cash Surrender Values, loan values and the death benefit as specified in the Policy to which this Rider is attached will be reduced if You receive an accelerated benefit. There is no premium charge for this Rider. |
| **Payment Made To You** | The amount of the payment made to You will be determined by discounting the Requested Benefit at Our then current discounting rate for a period of twelve (12) months, to reflect the early payment of insurance proceeds under the Policy. |

Our discounting rate will be subject to the higher of:

1. 5%; or
2. the Published Monthly Average for the calendar month ending two months before the Policy Anniversary on or immediately preceding the date that We receive Your Written Request for payment under this Rider.

The Published Monthly Average will be:

a. The Corporate Bond Yield Average –– Monthly Average Corporates as published by Moody's Investors Service, Inc. or any successor to that Service; or

b. If that Monthly Average is no longer published, a substantially similar average, established by regulation for policy loan rates issued by the Insurance Department of the state where the Rider was delivered will be applicable.

If the discounting rate computed for a Policy Year is no more than 1/2% higher than the rate in effect for the previous Policy Year, then We will maintain such prior year's rate.

If the discounting rate computed for a Policy Year is no more than 1/2% lower than the rate in effect for the previous Policy Year, then We may, at Our discretion, maintain such prior year's rate.

If the cash Surrender Value multiplied by the Proportion exceeds the discounted value, then the discounted Requested Benefit will be increased to equal such greater amount.

UR11                    2                    Exhibit 2 - 95

EXHIBIT 1 - PAGE 126

The discounted Requested Benefit is reduced by the Proportion of any Policy debt, including any unpaid loan interest, and the Proportion of any other amounts due Us from You. This result is then reduced by Our then current Administrative Charge for benefits under this type of Rider, not to exceed the maximum as specified in this Rider. The amount that remains is the payment that will be made to You.

In the event that the Insured dies after the Written Request but before We make the payment, and We receive Written Notice at Our Main Administrative Office during this period of this event, the request will be considered void, and no payment will be made under this Rider.

**Effect On Contract**

The following values will be reduced by the Proportion at the time the payment is made to You:

1. the future planned premium payable on the basic Policy;

2. the face amount of the Policy at the time of claim;

3. the cash value (Policy Value);

4. any remaining Surrender Charge;

5. the cash Surrender Value; and

6. any Policy debt including any unpaid loan interest.

If this Rider is attached to a variable life insurance policy that permits fund investment in various subaccounts of Our Variable Universal Life Separate Account, the reduction in Policy Value will be achieved through a proportionate reduction in this Policy's share in the value of each subaccount based on the allocation You request at the time of Your accelerated benefit request. If no allocation request is made, the assignment to each subaccount will be made in the same manner as provided for monthly deductions.

Future values under the Policy will be determined in a manner consistent with that under the original Policy, as adjusted to reflect the above reductions. We will mail to You a new policy Schedule Page reflecting any payment made under this Rider.

**Proof of Terminal Illness**

A licensed physician, who is not Yourself or a member of Your family, must provide Us with evidence satisfactory to Us of the Insured's terminal illness. We reserve the right to obtain a second medical opinion from a physician of Our choosing at Our expense.

**Conditions**

Payment under this Rider is subject to the following conditions:

1. The Policy must not have lapsed.

2. We will require the consent of any assignees and irrevocable beneficiaries to any request for payment under this Rider.

3. No payments will be made under this Rider to satisfy the claims, demands, or obligations of any creditor, trustee in bankruptcy or governmental agency, or arising under any court order directed against You, to the extent that We have written notice thereof.

Exhibit 2 - 96

EXHIBIT 1 - PAGE 127

**Rider Termination**

This Rider will terminate on the earliest of:

1. Lapse or surrender of this Policy to which it is attached.

2. Our receipt of Your written request to terminate this Rider; or

3. Payment of any benefit under this Rider.


PHL Variable Insurance Company

*John M. Beers*

Secretary


Exhibit 2 - 97

UR11                              4

EXHIBIT 1 - PAGE 128

# Life Plan Options Rider

This rider is part of the policy to which it is attached.  Except as stated in this rider, it is subject to all of the provisions contained in the policy.

## DEFINITIONS

Option Review Period
The 90-day period immediately preceding the 5th, 10th and 15th Policy Anniversaries.

Individual Term Life Rider
As used in this rider form "Individual Term Life Rider" refers to any of the following riders: Individual Term Rider, Individual Term Insurance Rider, Policy Term Rider, Policy Term Insurance Rider, Phoenix Individual Edge Term Rider, or the Variable Policy Term Rider.

## OPTION BENEFITS

Increased Coverage Determination without Medical Exam
Policies that include both this rider and the Individual Term Life Rider are eligible during each Option Review Period, while both such riders are in effect, for an increase in their term insurance rider amount up to a maximum lifetime increase of $1,000,000, with underwriting and our agreement to such increase determined without the inconvenience of an additional medical exam.  Our other ordinary underwriting rules will continue to apply and thus the increase in coverage is still subject to our normal underwriting approval.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- The insured must be attained age 65 or younger on the last day of the Option Review Period.
- The risk classification of the insured must be standard through Table D (200%) at original issue of the basic policy.
- The insured must be alive and meet our underwriting requirements at the time of your request for the increase in term rider face amount.
- The Individual Term Life Rider must either already be attached to the policy or then currently approved and available for sale in the state of applicable jurisdiction.
- There is a maximum lifetime increase of $1,000,000 per insured life.

Reduced Coverage without Surrender Charge
During each Option Review Period you may request a decrease in the face amount of the policy without our assessment of the partial surrender charge that, under the terms of your basic policy, would otherwise apply.  In such case the surrender charge remaining under the policy will continue to be calculated as if such decrease in face amount had not been made.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- Total option reductions of the basic policy face amount may not exceed the lesser of 50% of the initial basic policy face amount or $5,000,000 in combined aggregate of all option reductions for all Our policies on the same insured.

UR73

1

Exhibit 2 - 98

EXHIBIT 1 - PAGE 129

<u>Exchange for Annuity without Surrender Charge</u>
During each Option Review Period beginning with the 90-day period preceding the 10th policy anniversary, you may request that the policy be surrendered as part of an exchange request to an eligible annuity offered by us. In such an exchange, we would not assess the surrender charge that would otherwise apply. In such case, the new annuity will reflect the usual surrender charges that would ordinarily apply for new business.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.

## TERMINATION OF THIS RIDER

This rider will terminate on the first of any of the following events to occur:

1. exercise of the Exchange for Annuity without Surrender Charge Option;

2. the 15th policy anniversary;

3. termination of the basic policy.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

# EXCHANGE OF INSURED OPTION RIDER

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

**The Exchange Option**
While this rider is in effect and subject to its terms, you have the option to exchange your policy ("the exchange policy") for a new policy on the life of a substitute insured.

**How to Exercise This Option**
To exercise this option, You must file an application with Us at Our Main Administrative Office. It must be signed by You. We must also receive:

1.  Evidence that You have a satisfactory insurable interest in the life of the substitute insured.

2.  Evidence that the substitute insured is insurable under our established practice in the selection of risks for the amount and plan applied for. Selection of risks includes health and non-health factors.

3.  The release of any lien against or assignment of your policy. You may instead submit written approval by the lienholder or assigns of the exchange policy in a form satisfactory to Us with such other documents as We may reasonably require.

4.  The surrender and release of the exchange policy.

5.  Payment of any amounts due to Us for the exchange as described in the Exchange Adjustments.

Unless otherwise provided in the application, the owner and the beneficiary of the new policy will be the same as under the exchange policy. Any subsequent changes will be governed by provisions of the new policy.

The Date of Exchange will be the policy anniversary following the later of:

1.  Our receipt of the application;

2.  Payment of the Exchange Adjustments, if any; and

3.  Our approval of the insurable interest.

The new policy will take effect on the Date of Exchange. When the new policy takes effect, the exchange policy will terminate.

**The New Policy**
The Policy Date of the new policy will be the Date of Exchange.

The issue age of the Insured under the new policy will be determined based upon the substitute insured's age on his or her birthday nearest the date of issue of the new policy.

The new policy on the life of the substitute insured will be written on any plan of universal life insurance issued with a level face amount issued by Us at the time of the exchange. The new policy will be subject to Our published issue rules (e.g., age and amount limits) for the plan chosen which are in effect at that time. The risk classification and any exclusions applicable to the new policy will be determined in accordance with Our rules and practices in effect on the date of exchange. The rates for the new policy will be based on Our published rates in effect on the Date of Exchange.

EXHIBIT 1 - PAGE 131

The face amount of the new policy will equal the basic face amount of the exchange policy without regard to any riders under the exchange policy, except as provided below. The Policy Value of the exchange policy on the Date of Exchange will be applied as premium to the new policy, but without any issue or sales charge applied under the new policy.

**Exchange Adjustments**
The owner must pay an amount equal to the excess, if any, of the surrender charge in effect on the exchange policy over the surrender charge for the new policy. All such surrender charges will be determined as of the Date of Exchange.

In some cases, the amount of Policy Value that may be applied to the new policy may exceed the premium limit for the new policy. In that event, We will return such excess Policy Value to You in cash.

**Monthly Rider Charges**
There are no Monthly Charges for coverage under this rider.

**Termination of This Rider**
This rider will terminate on the first of any of the following events to occur:

1. Termination of the exchange policy;

2. Lapse or Exchange of the exchange policy;

3. Our receipt at Our Home Office of a Written Request to cancel this rider; and

4. Death of the insured.

PHL Variable Insurance Company

*Dona D. Young*

Chairman, President
and Chief Executive Officer

**Policy Acceptance Form**

◈ **PHOENIX**

P.O. Box 8027
Boston, MA 02266-8027

Underwriting Service Center

Company is defined as indicated below:

☐ Phoenix Life and Annuity Company
☒ PHL Variable Insurance Company

| Agency: | E7500 | Insured(s): | |
|---|---|---|---|
| Policy Number: | 97514671 | | |

**DECLARATION:**

The insured(s) declares that the statements made in the application remain full, complete, and true as of this date; that since the date of the application, no insured has applied to any insurance company or society without receiving the exact policy applied for or had any symptoms, diseases or disorders for which advice has been sought.

All insured(s) must attest to the above declaration. If any insured cannot attest to the above statement, please so indicate by checking the box next to that insured's signature below and complete a Health Statement Form for that insured. **PLEASE NOTE: Home Office approval of the Health Statement Form is necessary before the policy is in effect.**

**AMENDMENTS:**   The application for Policy No. 97514671 is amended as follows:

**There is no coverage under application #v08311050379328 dated 09/28/2005. The application Part 1 is hereby amended to reflect the company name as PHL Variable Insurance Company.**

It is agreed that the above declaration and amendments are part of the application and shall be part of the policy.

**DELIVERY RECEIPT:** To be completed when policy is delivered. If a Health Statement Form is required, please consult with your agent before completing this section.

This certifies that as the policy owner, (check ONE only):

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information.

☐ I have received delivery of the insurance policy listed above, which includes a Statement of Policy Cost and Benefit Information, and authorize _____ to hold such policy on my behalf.

| Date | _____ | Insured(s) | _____ |
|---|---|---|---|
| Signed at | _____ | | _____ |
| Witness | _____ | | _____ |
| Owner | _____ | | _____ |
| Owner | *(If other than Insured)* | | _____ |

If owner is a firm or corporation, please give the name of the firm or corporation and the title of the officer signing for the firm or corporation.

**AGENT:** ORIGINAL to Underwriting and Issue, YELLOW copy to Agent, PINK copy to remain with firm. Exhibit 2 - 102

HHR11ZZ1    10-99

EXHIBIT 1 - PAGE 133

## PHOENIX® PO Box 8027 Boston MA 02266-8027

**Application for Life Insurance**
**Part I**

Company is defined as indicated below: (check one)
☒ Phoenix Life Insurance Company   ☐ PHL Variable Insurance Company   ☐ Phoenix Life and Annuity Company

**Section I - Proposed Insured**

[redacted]

Email Address _____

**Section II - Ownership**

☐ A.  Insured
☐ B.  Successive Owners
☐ B1. Owners Jointly
☐ C.  Corporation, its successors or assigns (include state of incorporation)

☐ D. Partnership (include Name of all Partners - if partnership is limited, indicate which partners are general partners)
☐ E. Sole Proprietorship (include Name of Sole Proprietor)
☒ F. Trust (include Name and Date of Trust, Name of Trustee(s) and Grantor)

(Complete section below if A, C, D, E or F are checked)
If Owner is other than Proposed Insured, Premium Notice will be sent to:

[redacted]

Contingent Owner:
Name _____   Date of Birth _____
Relationship _____

**Ultimate Owner:** Check one. If none checked, insured will be ultimate owner.
☐ Insured    ☐ Executor or administrator of the survivor of the primary and contingent owners

**Section III - Beneficiary Designation**

| Primary Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| [redacted] | | | |

If two or more are indicated, equal or the Contingent Beneficiaries listed shall receive an equal interest.

| First Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
|---|---|---|---|
| | | | |
| Second Contingent Beneficiary | Relationship to Proposed Insured | Date of Birth (If Available) | Social Security No. (If known) |
| | | | |

**If Trust is primary beneficiary: (check one)**
☐ Trust under insured's will

[redacted]

Proposed Insured's death.

OL2773                        1 of 8        V0113105843285Z                     H2

Exhibit 2 - 103

EXHIBIT 1 - PAGE 134

**Section IV - Coverage Applied For**

Plan of Insurance: *PHOENIX ACCUMULATOR UL II*

Basic Policy Amount: $ *10,000,000*

**Section V - VARIABLE/UNIVERSAL PLANS of Insurance - Riders and Features**

First Year Anticipated, BILLED Premium (excluding 1035 Exchange, Lump Sum Funds, etc.): $ *450,000*

Subsequent Planned Annual Premium: $ *-0- yr. 2   $885,468/yr. thereafter*

☐ Disability Waiver of a Specified Amount
Amount $ _____

☐ Accidental Death Benefit Rider

☐ Death Benefit Protection Rider

☐ Age 70   ☐ Age 80   ☐ Age 100

☐ Purchase Protector _____ units

☐ Child's Term Rider

☐ Family Term Rider

☑ Living Benefit Rider

☐ Guaranteed Death Benefit Rider

☐ Guaranteed Extension Rider

☐ Cash Value Accumulation Rider

☑ Age 100 + Rider

☐ Individual Term Rider $ _____

Death Benefit Option: (check one) If none checked, Option 1 will apply.
☑ Option 1 - Level Face Amount
☐ Option 2 - Increasing Face Amount

Face Amount Increase Options:
☐ _____ % percentage increase
☐ $ _____ Fixed Dollar Increase
☐ Increase Equal to Premiums Paid

Policy Options: (check one) If none checked, Option A will apply.
☐ Policy Option A
☐ Policy Option B
☐ Policy Option C
☐ Other _____
☐ Other _____
☐ Other _____
☐ Other _____

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market subaccount until the end of the Right to Cancel Period, as stated in the policy, indicate: ☐ Yes ☐ No

**Telephone/Electronic Authorization**

I will receive this privilege automatically. By checking "Yes", I am authorizing and directing the Company to act on telephone or electronic instructions from any licensed agent who can furnish proper identification. The Company will use reasonable procedures to confirm that these instructions are authorized and genuine. As long as these procedures are followed, the Company and its affiliates and their directors, trustees, officers, employees, representatives and/or agents, will be held harmless for any claim, liability, loss or cost.
☐ Yes ☐ No

**Electronic Delivery Authorization**

By checking "Yes," I am authorizing the Company to provide my statements, prospectuses and other information electronically if available. I understand that I must have internet access to use this service and there may be access fees charged by the internet service provider. ☐ Yes ☐ No

**Section VI - Suitability**

Do you understand that if you have purchased a Variable Life Policy and the Death Benefit may be variable or fixed under certain conditions and that the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying subaccounts? ☐ Yes ☐ No

If you are purchasing a Variable Life Policy, do you believe it is suitable to meet your financial objectives? ☐ Yes ☐ No

If I have purchased a Variable Life Policy, I confirm that I have received the prospectus for that policy and its underlying funds.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

**Section VII - Complete If Temporary Insurance is Requested**

If either of the following questions are answered "Yes" or left blank, no agent or broker is authorized to accept money and a Temporary Insurance Agreement may not be issued, and no coverage will take effect.

| Yes | No | |
|---|---|---|
| ☐ | ☐ | 1. Within the past two years have you been treated for heart disease, stroke, or cancer or had such treatment recommended? |
| ☐ | ☐ | 2. Within the past 60 days have you been scheduled or advised to have any diagnostic test (excluding HIV) tests or surgery not yet performed? |

$ _____ has been paid by _____ to the Licensed Agent/Registered Representative indicated in this application, for proposed insurance applied for in this application. This sum is to be applied in accordance with and subject to the terms of the Temporary Insurance Receipt bearing the same number as this application.

OL279                                    2 of 5                    v01131058432852                    +12

Exhibit 2 - 104

JAN. 19, 2007 9:20AM    PHOENIX LIFE

EXHIBIT 1 - PAGE 135

**Section VIII - TERM/WHOLE LIFE PLANS of Insurance - Riders and Features**

☐ Accidental Death Benefit
☐ Disability Waiver of Premium on Insured
☐ Purchase Protection _____ units
☐ Family Protection
☐ Children's Protection _____ units
☐ Living Benefit Rider
☐ Other _____
Cost of Living is automatic (No COL for Term products) unless this box is checked ☐ I do not desire Cost of Living

Additional Death Benefit Riders
Primary Insurance Term Rider (PITR) $ _____
Other Rider Name _____ Amount $ _____

☐ Paid-Up Additions Purchase Options Rider (PAPOR) (check one)
   ☐ PAPOR A-Flexible   ☐ PAPOR B-Flexible with Optionterm
   Number of years payable _____
Intended premium payments for the first 7 years:
Year 1 _____ Year 5 _____
Year 2 _____ Year 6 _____
Year 3 _____ Year 7 _____
Year 4 _____ Maximum Amount $ _____

**Dividend Option:**
☐ Optionterm
   Optionterm Death Benefit $ _____
   Premium Paying Coverage ☐ Yes   ☐ No or
   % of Increase _____
☐ Accumulate at Interest (ACCUM)
☐ Paid-up Additional Insurance (PUA)
☐ One Year Term with Balance to:
   ☐ Cash   ☐ PUA   ☐ ACCUM   ☐ RP
☐ Reduce Premium (RP)
☐ Cash
☐ Other _____
☐ Other _____

Automatic Premium Loan, if applicable
☐ Yes   ☐ No

Policy Loan Interest Rate, if applicable (if none checked, "Variable" will apply)
☐ Variable   ☐ Fixed

**Section IX - Mode of Premium Payment** - (Please note, there is a higher cost associated with the purchase of a Whole Life or Term policy, if the mode of payment is other than on an annual pay basis. Please consult with your Licensed Agent/Registered Representative.)

☐ Annual   ☐ Quarterly   ☐ Semi-Annual
☐ Monthly (Variable Life Insurance only)   ☐ PCS (Phoenix Check-O-Matic Service)
   Minimum Monthly Check for Each Service - $25.00

Multiple Billing Option - Give # or Details
☐ List Bill   ☐ Employee Insurance Counseling Service (EICS)   ☐ Salary Allotment   ☐ Pension   ☐ Money Purchase Pension
☐ Other _____

If electing PCS, complete the following:
Existing Policy Number or PCS File Number _____
**Authorization Agreement for Preauthorized Payments**
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the depository named below.
**Information for New Account**
Attach a void check to furnish encoding details.
If the depositor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

_Attach Void Check Here_

Signature of depositor (if different from owner) _____

Send premium notices to: (in addition to owner)
☐ Insured at:   ☐ Home Address   ☐ Business Address
☒ Other (Name, Relationship to Owner and Address) _____

OL0773

**Section X – Existing Life Insurance**

Describe all additional coverage in force. Include individual and group. If no coverage inforce, check here ☐.

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| AMERICAN NAT'L. INS. CO. | 1980's | UNIV. LIFE | $ 550,000 | ☑ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

Total Life Insurance in force (if none, indicate) $ 550,000   Total Accidental Death Benefit in force (if none, indicate) $ NONE

| Yes | No | | |
|---|---|---|---|
| ☑ | ☐ | 1. | Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicants or the insureds or the owner(s) or the annuitant? |
| ☐ | ☑ | 2. | With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy? |
| ☐ | ☑ | 3. | Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) to pay any initial or subsequent premium(s) for this policy? |

For all "Yes" answers above, please provide the following information

| Company | Issue Date | Plan | Amount | Personal / Business | |
|---|---|---|---|---|---|
| SAME AS ABOVE | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |
| | | | $ | ☐ | ☐ |

**Section XI – Income**

| Earned Income | Independent Income | Net Worth |
|---|---|---|
| a. $ 70,000/YEAR | b. $ 130,000/YEAR | c. SEE INFO IN FILE |

**Section XII – Additional Information**

1. Have you used tobacco or nicotine products in any form in the last 10 years? If "Yes," please circle the product(s) used: cigarettes, cigars, pipes, snuff, smokeless or chewing tobacco, nicotine patch or gum.
   If "Yes," check one: ☐ Use currently   ☐ Date quit _____

2. Have you ever applied for life, accident, or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from that applied for? (If "Yes," give date, company and reason).

3. Are you negotiating for other insurance? (If "Yes," name companies and total amount to be placed in force.)

4. Do you intend to live or travel outside the United States or Canada? (If "Yes," state where and for how long).

5. Have you flown during the past three years as a pilot, student pilot or crew member? (If "Yes," complete Aviation Questionnaire).

6. Have you participated in the past 3 years or plan to engage in any extreme sport activities such as motorized vehicle, or parachute jumping, or underwater diving, or any other extreme avocation? (If "Yes," complete Avocation Questionnaire).

7. Have you in the past three years been the driver of a motor vehicle involved in an accident, or charged with a moving violation of any motor vehicle law, or had your driver's license suspended or revoked?

8. Have you ever been convicted of a felony or do you have charges pending?

Give full details for all "Yes" answers above. If necessary, use an additional piece of paper and please sign it.

| Question # | Details |
|---|---|
| | |
| | |
| | |
| | |
| | |

OLS776   4 of 5   v01131058432852   4-02

Exhibit 2 - 106

EXHIBIT 1 - PAGE 137

**Section XIII – Medical History (Not necessary to complete if medical or paramedical exam has been ordered)**

| Height | Weight | Has your weight changed by 10 pounds or more in the past 2 years? |
|---|---|---|

Have you ever had, or been told by a physician or other health care provider that you have: | Please provide details of "YES" answers (include question number, diagnosis, date of occurrence, hospital or treating physician's name and address, and current status). Use OL1590 if additional space is necessary to record all details.

1. High blood pressure or hypertension?
2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath?
3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease?
4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins?
5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease?
6. Neurologic disease, seizures, fainting, falls, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, paralysis, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system?
7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness?
8. Arthritis, lupus, or any musculoskeletal or skin disorder?
9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system?
10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine?
11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands?
12. Acquired Immune Deficiency Syndrome (AIDS) or any other immunologic disorder?
13. Anemia, bleeding or clotting disorder, or any other disorder of the blood or bone marrow?
14. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease?

15. Are you taking any kind of medicine, therapy, or treatment regularly or at frequent intervals?
16. Have you ever been treated for alcoholism or been advised to limit or stop your use of alcohol?
17. Have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions?
18. Have you ever been a patient in any hospital, treatment center, or similar facility within the last 10 years?
19. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding HIV or AIDS tests), or other tests within the last 5 years?
20. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years?

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

OL2778    3 of 8    v01131058432852    4-08

Exhibit 2 - 107

EXHIBIT 1 - PAGE 138

**Authorization To Obtain Information**

I authorize any physician, health care provider, hospital, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or of my health, to provide any such information to Phoenix Life Insurance Company and its affiliated insurers (Phoenix) or its reinsurers. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

If insurance on any minor child is applied for, this authorization extends to records and knowledge of that child and that child's health. To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records or knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the MIB to provide any information to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about Investigative Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report.

This authorization shall continue to be valid for thirty months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix prior to the time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

☐ I do  ☐ I do not (check one) require that I be interviewed in connection with any investigative consumer report that may be prepared.

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that (i) no statement made to, or information acquired by any Licensed Agent/Registered Representative who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and (ii) the Licensed Agent/Registered Representative has no authority to make, modify, alter or discharge any contract thereby applied for.

I understand and agree that the insurance applied for shall not take effect unless and until each of the following has occurred: the policy has been issued by the Company; the premium required for issuance of the policy has been paid in full during the lifetime of the insured; all the representations made in the application remain true, complete and accurate as of the latest of such dates, and there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform the Company as soon as possible.

Under penalty of perjury, I confirm that (a) the Social Security or Tax Identification Number shown above is correct, and (b) that I am not subject to back-up withholding. (Strike this out and initial if not true).

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud as determined by a court of competent jurisdiction.

If I have applied for the Living Benefit Rider, I confirm that I have received a copy of the disclosure form, Summary of Coverage for Accelerated Benefit Rider.

████████████████████████████████████████

The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for.

Will the proposed insured replace (in whole or in part) any existing life insurance or annuity contract in force with the policy applied for?  ☐ Yes ☑ No

Will the proposed insured utilize values from another insurance policy (through loans, surrenders or otherwise) or annuity to pay for the initial or subsequent premium(s) for the policy applied for?  ☐ Yes ☑ No

Are there any life insurance policies or annuity contracts owned by or on the life of the applicants or the insureds or the owner(s) or their annuity?  ☑ Yes ☐ No

████████████████████████████████████████

Exhibit 2 - 108

EXHIBIT 1 - PAGE 139

09/28/2005  11:46    8062731     GPCH LAB                        PAGE  01

Sep 26_05 01:46p   Lynda Lyles              808 858-6738      P.2

**PHOENIX**

Exhibit 2 - 109

EXHIBIT 1 - PAGE 140

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

U.S. BANK NATIONAL
ASSOCIATION, a National Association,    CASE NO.: 12-CV-00877(JRT/TNL)
as Securities Intermediary for LIMA
ACQUISITION LP,

         Plaintiff,        **JURY TRIAL REQUESTED**

    v.

PHL VARIABLE INSURANCE
COMPANY, a Connecticut corporation,

         Defendant.

_____

## FIRST AMENDED COMPLAINT

Plaintiff U.S. Bank National Association, as securities intermediary for Lima

Acquisition LP ("Plaintiff"), hereby files this complaint against defendant PHL Variable

Insurance Company ("Phoenix" or "Defendant"), and alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this action seeking compensatory and consequential

damages, punitive damages, equitable relief, and attorneys' fees based on Phoenix's

unjustified refusal to pay the death benefit due under a $3 million dollar life insurance

policy insuring the life of Mr. John Doe (the "Doe Policy" or "Policy").[1]

2.    Phoenix issued the Doe Policy more than four years ago, and since issuing

the Policy, Phoenix has received $389,000 in premiums paid to keep the Doe Policy in

---

[1] For privacy reasons, Plaintiff has substituted "John Doe" for the name of the actual insured.

EXHIBIT 2 - PAGE 141

force.  Mr. Doe passed away on November 4, 2011.  Shortly thereafter, Plaintiff, as the current owner of the Policy, timely submitted a proof of loss to Phoenix seeking payment of the death benefit under the Policy.  Phoenix, however, has failed and refused to pay the death benefit, making various pretextual and unjustified excuses for its refusal in blatant violation of its obligations under the Policy, and with a willful, reckless, and/or wanton disregard of Plaintiff's rights.

3.      Upon information and belief, Phoenix has deliberately failed and refused to pay this claim, along with claims submitted on a number of other policies owned by Plaintiff, in retaliation for Plaintiff filing a lawsuit alleging that Phoenix unlawfully raised the cost of insurance rates on many of Plaintiff's and other policyholders' policies. Plaintiff filed that lawsuit, *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 2:11-cv-09517-OD (RZx) (the "COI Action"), in the Central District of California on November 16, 2011.

4.      Before Plaintiff filed the COI Action, Phoenix promptly paid the death benefit on a claim under one of Plaintiff's other policies, but since Plaintiff filed the COI Action, Phoenix has consistently failed to pay any of Plaintiff's death benefit claims. Plaintiff has thus been forced to file two other lawsuits, in addition to this one, seeking payment under other policies whose death benefits Phoenix has failed to pay.  In other words, while the rest of the life insurance industry, on average, denies less than 1% of all death benefit claims, Phoenix has failed to pay 100% of Plaintiff's death benefit claims submitted since the COI Action was filed.

EXHIBIT 2 - PAGE 142

5.     By improperly refusing to pay the death benefit under the Policy, Phoenix has forced Plaintiff to incur the substantial expense and delay of litigation in order to obtain the benefits of the Policy, even after Phoenix collected premiums on it for approximately four years.

6.     Phoenix's conduct is not only a breach of its express obligations under the terms of the Policy and other policies, it also constitutes a pattern of unfair claims handling in violation of Connecticut's Unfair Trade Practices Act and the Unfair Insurance Practices Act.  Phoenix, a Connecticut insurer, is unquestionably subject to the provisions of those statutes.

## PARTIES

7.     Plaintiff U.S. Bank National Association, is a national banking association with its principal place of business in Ohio, and is the securities intermediary for Lima Acquisition LP.

8.     Upon information and belief, Phoenix is a Connecticut insurance corporation with its principal place of business and nerve center in Hartford, Connecticut, and Phoenix is authorized to do business in the State of Minnesota and regularly conducts its business in the State of Minnesota.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

EXHIBIT 2 - PAGE 143

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2) because Defendant resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including issuance of the Policy in Minnesota to a Minnesota trust.

## FACTUAL ALLEGATIONS

11.     On or about June 2, 2008, John Doe established a Minnesota trust called the John Doe 2008A Irrevocable Trust (the "Doe Trust") pursuant to the John Doe 2008A Irrevocable Trust Agreement (the "Doe Trust Agreement").[2]   The original trustee of the Doe Trust was BNC National Bank ("BNC"), which held the Policy in Minnesota.   The original beneficiary of the Doe Trust was Jane Doe, Mr. Doe's wife.   The Trust Agreement contemplated that the Trust would take out a loan from PFG Private Financing, LLC ("PFG") and use the loan proceeds to finance the purchase of a life insurance policy on Mr. Doe's life.

12.     On or about June 4, 2008, Mr. Doe, along with BNC, in its capacity as trustee of the Doe Trust, submitted an application to Phoenix for a life insurance policy on Mr. Doe's life.   In the application, Mr. Doe specifically disclosed that he intended to finance the premiums for the policy through a loan from PFG.   Section XI, question 9 of the application asked,  "Will the owner, now or in the future pay premiums funded by an individual and/or entity other than the proposed insured?"   Mr. Doe checked the box marked "Yes" and wrote in, "Borrowed funds from PFG Private Funding."

---

[2] As noted above, "John Doe" has been substituted for the true name of the insured, including within the name of the Trust.  For the same privacy reasons, "Jane Doe" has been substituted for the true name of the insured's spouse.

EXHIBIT 2 - PAGE 144

13.     On or about June 13, 2008, as contemplated in the Doe Trust Agreement and related documents, Mr. Doe and BNC, in its capacity as trustee of the Trust, entered into a Term Financing Facility Agreement with PFG (the "Doe Financing Agreement"). Under the Doe Financing Agreement, PFG agreed to lend the Doe Trust a total of $257,200 to purchase the Doe Policy.  The parties to the Doe Financing Agreement executed several other documents in conjunction with the loan that PFG extended to the Doe Trust, including a Borrower Pledge and Security Agreement, whereby the Doe Trust pledged the Doe Policy as security for the Doe Trust's obligations to repay the loan to PFG.

14.     Mr. Doe agreed to personally guarantee the repayment of 25% of the Doe Trust's debt to PFG on terms set forth in a Limited Personal Guarantee executed in conjunction with the Doe Financing Agreement.

15.     BNC, in its capacity as trustee, collaterally assigned the Doe Policy to PFG, as security for the Trust's debt.

16.     PFG sent notice of the collateral assignment to Phoenix, which Phoenix received on or around June 16, 2008.  On the same day, Phoenix sent a letter to BNC, in its capacity as trustee, and Mr. Doe, acknowledging receipt of the collateral assignment and notifying BNC that it would record the collateral assignment when it issued the Doe Policy.

17.     PFG also filed a public UCC Financing Statement indicating that PFG was a secured creditor of BNC, as trustee for the Doe Trust, and that the Doe Policy served as collateral securing the Doe Trust's obligations to PFG.

EXHIBIT 2 - PAGE 145

18.     Phoenix issued the Doe Policy, Policy No. 97528505, with a face value of $3,000,000 and delivered it to the trustee of the Doe Trust and Mr. Doe on June 23, 2008. A copy of the Doe Policy is attached hereto as <u>Exhibit 1</u>.[3]  The Policy was issued with an Issue Date and Policy Date of January 21, 2008.  The Doe Trust was listed as the sole owner and beneficiary of the Policy.

19.     Upon information and belief, the terms of the PFG premium finance loan, including the provisions of the Doe Financing Agreement (defined above) and related documents, were all disclosed to Phoenix before Phoenix issued the Doe Policy.

20.     Upon information and belief, the terms of the PFG premium finance loan, including the provisions of the Doe Financing Agreement and related documents, were all approved by Phoenix before Phoenix issued the Doe Policy.

21.     Minnesota Statutes section 61A.03 requires that every life insurance contract include a provision that the policy "is incontestable after it has been in force during the lifetime of the insured for two years from its date."  Section 21 of the Policy provides that the "policy shall be incontestable after it has been in force during the Insured's lifetime for two years from the Issue Date . . . ."

22.     On August 21, 2009, the Trust and PFG entered into a Delayed Transfer Agreement (the "Doe Transfer Agreement"), pursuant to which the Doe Trust agreed to transfer the Doe Policy to PFG in satisfaction of the full amount of the loan.  Mr. Doe, Mrs. Doe, and the Doe Trust all consented to the transfer of the Doe Policy in writing.

---

[3] Some of the policy information in the exhibits hereto have been redacted for privacy reasons.

EXHIBIT 2 - PAGE 146

23.     On or about October 1, 2009, the Doe Trust sent Phoenix a Designation of Owner and Designation of Beneficiary form indicating the change of ownership of the Doe Policy to PFG.  One week later, on October 8, 2009, Phoenix sent a letter to BNC, as trustee for the Doe Trust, stating that Phoenix had recorded the change of the owner and beneficiary under the Doe Policy.

24.     Plaintiff subsequently acquired the Doe Policy after the expiration of the contestability period, and Plaintiff thereafter continued to make all premium payments on the Doe Policy.

25.     From the time the Doe Policy was issued until the Policy matured, all of the premiums that were due under the Doe Policy were paid.  Indeed, throughout the contestability period and after, Phoenix continued to accept premiums on the Policy, including $194,000 in premiums that were paid after the policy became incontestable.  In total, Phoenix received $389,000 in premiums on the Policy.

26.     Additionally, on September 22, 2010, well after the contestability period, Phoenix provided a Verification of Coverage for the Policy, and did not raise any questions about the Policy, or indicate that there were any issues with it.

27.     Mr. Doe died on November 4, 2011, while the Policy was in force.  The Policy states:  "If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described below, upon receipt of due proof of death of the Insured no later than two months after receipt of such proof, subject to any applicable provisions of the policy."  Policy, p. 9 (Exhibit 1).

EXHIBIT 2 - PAGE 147

28.     Upon information and belief, Phoenix became aware of Mr. Doe's death shortly after his death on November 4, 2011.  On November 14, 2011, Phoenix sent a letter to Mr. Doe's widow requesting certain documents needed to process a claim for the death benefit.  The letter requested:  (a) a certified copy of the death certificate; (b) completion and return of an enclosed Beneficiary Statement; (c) completion of an enclosed Affidavit as to the Extent of Interest form; and (d) return of the policy.  Phoenix did not at this time express any concerns or issues about the Doe Policy.  A copy of Phoenix's correspondence dated November 14, 2011 is attached hereto as Exhibit 2.

29.     On November 16, 2011, Plaintiff filed the COI Action.

30.     On December 22, 2011, Plaintiff submitted a claim to Phoenix requesting payment of the death benefit owed under the Doe Policy.  Plaintiff also provided Phoenix with all of the documents requested in Phoenix's November 14, 2011 letter, including a copy of Mr. Doe's death certificate, a completed Beneficiary Statement and completed Affidavit as to the Extent of Interest, and the original Policy.

31.     Phoenix responded to Plaintiff's claim by letter dated January 6, 2012, in which it asserted that "issues" had been raised concerning Mr. Doe's consent to the Doe Policy, the circumstances surrounding the Doe Policy's application, and the existence of an insurable interest at the time of issuance.  A copy of Phoenix's correspondence dated January 6, 2012 is attached hereto as Exhibit 3.

32.     Phoenix did not specify what "issues" had been raised, or the basis for its belief that a valid insurable interest may not have existed at the time the Doe Policy was issued.  Rather, Phoenix vaguely stated that it would be conducting an investigation into

8

EXHIBIT 2 - PAGE 148

"the circumstances surrounding Mr. Doe's application for the Policy" over three years earlier.

33.    In an obvious attempt to engage in post-claim underwriting well after the expiration of the contestability period, Phoenix also demanded that Plaintiff produce a host of documents in connection with its investigation, most of which had nothing to do with Mr. Doe's consent to the Policy or the existence of an insurable interest at the time the Policy was issued, and many of which Phoenix likely had in its possession.

34.    Plaintiff responded to Phoenix's demands in a letter dated January 20, 2012.  Plaintiff advised that it had already provided Phoenix with a copy of Mr. Doe's death certificate, a completed Beneficiary Statement, a completed Affidavit as to the Extent of Interest, and the original Doe Policy, which was all that was required for Phoenix to process the claim.  Plaintiff then made a second request that Phoenix pay the claim.  Plaintiff also explained that, as Phoenix already knew, the Policy was originally issued to the Doe Trust as the original owner and beneficiary of the Policy.  The original beneficiary of the Doe Trust was Jane Doe, Mr. Doe's wife.  Under Minnesota law, Mrs. Doe indisputably had an insurable interest in Mr. Doe's life.  A copy of Plaintiff's correspondence dated January 20, 2012 is attached hereto as Exhibit 4.

35.    Notwithstanding its clear obligation to pay the death benefit, on January 27, 2012, Phoenix responded to Plaintiff's January 20, 2012 letter by once again refusing to pay the death benefit, insisting that Mrs. Doe had "raised issues concerning Mr. Doe's lack of consent to the insurance and the circumstances surrounding the application or the Policy and the establishment of the Trust."  A copy of Phoenix's correspondence dated

EXHIBIT 2 - PAGE 149

January 27, 2012 is attached hereto as <u>Exhibit 5</u>.

36.     Phoenix's purported concern about whether Mr. Doe "consented" to the insurance was clearly disingenuous given that Mr. Doe signed the Policy application, the Policy, and the Policy Delivery Receipt, among many other documents he signed and submitted to Phoenix when he obtained the Policy.

37.     Nevertheless, on February 16, 2012, in response to Phoenix's alleged concerns about whether Mr. Doe consented to the insurance, Plaintiff provided Phoenix with a copy of an Acknowledgment and Consent by Insured, Insured's Spouse and Beneficiary (the "Consent"), which was executed by Mr. and Mrs. Doe and notarized on August 21, 2009 in conjunction with Mr. and Mrs. Doe's execution of the Delayed Transfer Agreement.   In the Consent, Mr. and Mrs. Doe represented and warranted, among many other things, that the transfer of the Doe Policy was made on their "own initiative, (b) voluntarily, (c) willingly, (d) without any undue influence or financial duress, . . . (h) after considering the advantages and disadvantages of a sale of the Policy and the other alternatives available, including retaining or otherwise selling the Policy, or borrowing against the cash value of, or surrendering the Policy . . . ."  Consent § 1.7.  A copy of Plaintiff's correspondence dated February 16, 2012 is attached hereto as <u>Exhibit 6</u>.

38.     On March 1, 2012, more than two months after Plaintiff submitted a claim under the policy and after the time during which Phoenix was required to pay the death benefit under the express terms of the Policy, Phoenix acknowledged receipt of the Consent but once again refused to pay the death benefit.  Phoenix claimed it was still

EXHIBIT 2 - PAGE 150

evaluating "the circumstances surrounding the issuance of the Policy."  Phoenix also continued to demand that Plaintiff produce all of the numerous categories of documents that it originally demanded in its correspondence dated January 6, 2012, including, among other things, documents "reflecting the income and net worth of Mr. Doe at the time the policy was applied for" and documents "reflecting any estate plan developed for Mr. Doe."  A copy of Phoenix's correspondence dated March 1, 2012 is attached hereto as Exhibit 7.

39.    Not only does Plaintiff not have many of these documents, but such documents have nothing to do with Phoenix's purported concern about Mr. Doe's consent to the insurance or whether the policy was issued to someone with an insurable interest.  Phoenix's requests were nothing more than an attempt to re-underwrite the Policy after learning of Mr. Doe's death. Indeed, Phoenix never disputed that the Policy was originally issued to the Doe Trust and that the original beneficiary of the Doe Trust was Mr. Doe's wife, who clearly had an insurable interest in Mr. Doe's life.  Thus, on March 9, 2012, Plaintiff made a final demand that Phoenix pay the death benefit under the Policy.  A copy of Plaintiff's correspondence dated March 9, 2012 is attached hereto as Exhibit 8.

40.    Minnesota Statutes section 72A.201, subdivision 4(11) requires an insurer to advise the insured in writing of the acceptance or denial of a claim "within 60 business days after receipt of a properly executed proof of loss."  Subdivision 4(11) further provides that "[n]o insurer shall deny a claim on the grounds of a specific policy provision, condition, or exclusion unless reference to the provision, condition, or

EXHIBIT 2 - PAGE 151

exclusion is included in the denial." It has been more than 60 business days since Plaintiff filed the proof of loss on December 22, 2011, and Plaintiff has not received any notice that complies with section 72A.201.

41.     As of the date hereof, Phoenix still has failed and refused to pay the death benefit under the Doe Policy.

## FIRST CAUSE OF ACTION

### For Breach of Contract

42.     Plaintiff realleges the allegations contained in paragraphs 1 through 41.

43.     The Doe Policy is a binding and enforceable contract of insurance issued by Defendant.

44.     Plaintiff is the current owner and beneficiary of the Doe Policy.

45.     Plaintiff has performed all of its obligations under the Doe Policy.

46.     Defendant breached the Doe Policy by failing and refusing to pay the death benefit due under the Policy.

47.     As a direct and proximate cause of Defendant's material breaches of the Policy, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### For Unjust Enrichment

48.     Plaintiff realleges the allegations contained in paragraphs 1 through 47.

49.     The premiums due under the Policy were fully paid to Defendant, by Plaintiff and prior owners of the Policy, through the maturation of the Policy.

50.     Defendant has retained these premium payments and has refused to pay the

EXHIBIT 2 - PAGE 152

benefit due under the Policy.

51.     Defendant's retention of the premiums and refusal to pay the benefit under the Policy has unjustly enriched Defendant at Plaintiff's expense.

52.     As a direct and proximate cause of Defendant's conduct, Plaintiff seeks an order requiring Defendant to pay the death benefit due under the Policy.

## THIRD CAUSE OF ACTION

### For Violation of the Connecticut Unfair Trade Practices Act

### Conn. Gen. Stat. §§ 42-110a, *et seq.*

53.     Plaintiff realleges the allegations contained in paragraphs 1 through 52.

54.     The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

55.     Defendant, a Connecticut corporation with its principal place of business in Connecticut, has engaged in "unfair" conduct, as alleged herein, of a "trade" or "commerce" as defined in Conn. Gen. Stat. §42-110a.

56.     Among other violations of the Unfair Trade Practices Act, Defendant, as part of its general claims handling practices, has: (i) made misrepresentations regarding the facts relating to coverage under the Policy and other policies, including claiming that there were "issues" regarding the consent to the insurance and the existence of an insurable interest, where it knew there were no such issues; (ii) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iv) refused to pay unquestionably valid

EXHIBIT 2 - PAGE 153

claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (v) failed to affirm or deny coverage of claims within a reasonable time; and (vi) failed to promptly provide a reasonable explanation of the basis for denial of a claim.

57.     Defendant's conduct violates (among other applicable provisions of Connecticut law), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a), and the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(6)(a)-(e), and (n).

58.     As a direct and proximate cause of Defendant's unfair and deceptive acts and practices, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

59.     Because Defendant acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

60.     Plaintiff is also entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Sta. 42-110g(d).

61.     In compliance with Connecticut General Statutes § 42-110g(c), a copy of this Complaint has been mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

14

EXHIBIT 2 - PAGE 154

## **FOURTH CAUSE OF ACTION**

## **For Violation of the Connecticut Unfair Insurance Practices Act**

## **Conn. Gen. Stat. §§ 38a-815, *et seq*.**

62.     Plaintiff realleges the allegations contained in paragraphs 1 through 61.

63.     The Connecticut Unfair Insurance Practices Act prohibits any "unfair or deceptive act or practice in the business of insurance" by any Connecticut insurer, including acts defined by statute as unfair claims handling.

64.     Defendant, a Connecticut corporation with its principal place of business in Connecticut, engaged in "unfair" practices in the business of insurance, as alleged herein.

65.     Among other violations of the Unfair Insurance Practices Act, Defendant, as part of its general claims handling practices, has:   (i) made misrepresentations regarding the facts  relating to coverage under the Policy and other policies, including claiming that there were "issues" regarding the consent to the insurance and the existence of an insurable interest, where it knew there were no such issues; (ii) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iv) refused to pay unquestionably valid claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (v) failed to affirm or deny coverage of claims within a reasonable time; and (vi) failed to promptly provide a reasonable explanation of the basis for denial of a claim.

66.     Defendant's conduct violates (among other applicable provisions of

15

EXHIBIT 2 - PAGE 155

Connecticut law) the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(6)(a)-(e), and (n).

67.     As a direct and proximate cause of Defendant's unfair and deceptive acts and practices, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

68.     Because Defendant acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

69.     Plaintiff is also entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Sta. 42-110g(d).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

### On the First Cause of Action

1.     For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2.     For an award of pre-judgment and post-judgment interest;

3.     For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4.     For such other and further relief as the Court may deem proper.

### On the Second Cause of Action

1.     For an order requiring Defendant to pay the benefits due under the Policy;

2.     For the costs of the suit herein incurred, including reasonable attorneys'

16

EXHIBIT 2 - PAGE 156

fees to the extent permitted by law; and

3.      For such other and further relief as the Court may deem proper.

## On the Third Cause of Action

1.      For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2.      For an award of consequential damages and lost profits, in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees;

5.      For punitive damages; and

6.      For such other and further relief as the Court may deem proper.

## On the Fourth Cause of Action

1.      For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2.      For an award of consequential damages and lost profits, in an amount to be determined at trial;

3.      For an award of pre-judgment and post-judgment interest;

4.      For the costs of the suit herein incurred, including reasonable attorneys' fees;

5.      For punitive damages; and

6.      For such other and further relief as the Court may deem proper.

EXHIBIT 2 - PAGE 157

DATE:  May 24, 2012

s/ Kadee J. Anderson
THOMAS F. NELSON (#154040)
STEVEN P. ZABEL (#235866)
KADEE J. ANDERSON (#389902)
Leonard, Street and Deinard
  Professional Association
150 South Fifth Street, Suite 2300
Minneapolis, MN  55402
Telephone: (612) 335-1500


*Of Counsel:*

STEPHEN G. FORESTA
PHILIPP SMAYLOVSKY
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:  (212) 506-3742
Facsimile:  (212) 506-5151

KHAI LEQUANG
MELANIE D. PHILLIPS
Orrick, Herrington & Sutcliffe LLP
777 South Figueroa Street
Suite 3200
Los Angeles, California  90017
Telephone:   213-629-2020
Facsimile:    213-612-2499


Attorneys for Plaintiff U.S. Bank National
Association, as Securities Intermediary for
Lima Acquisition LP

EXHIBIT 2 - PAGE 158

| | |
|---|---|
| **Insured** | |
| **Policy Number** | 97528505 |
| **Plan** | Phoenix Accumulator UL |



PHOENIX

BNC National Bank • Wealth Management Services
Premium Financed Irrevocable Life Insurance Trusts
Document Tracking
D16572



SCANNED
APR - 6 2012
U.S. DISTRICT COURT MPLS

EXHIBIT 1



# PHOENIX   PHL VARIABLE INSURANCE COMPANY
### A Stock Company

| | | | |
|---|---|---|---|
| **Insured** | ▓▓▓▓▓▓▓ | **Total Face Amount at Issue** | $3,000,000 |
| **Policy Number** | 97528505 | **Policy Date** | January 21, 2008 |
| **Death Benefit** | Option A | **Issue Date** | January 21, 2008 |
| **Plan** | Phoenix Accumulator UL | | |

The PHL Variable Insurance Company ("the Company") agrees, subject to the conditions and provisions of this policy, to pay the Death Benefit to the Beneficiary in a lump sum upon the death of the Insured if such death occurs while the policy is in force, and to provide the other benefits, rights, and privileges of the policy. If the Company makes other plans of payment available other than a lump sum, then a Beneficiary may request written election of any such other plans in lieu of a lump sum. The Death Benefit will be payable on receipt at the Main Administrative Office of the Company of due proof of the Insured's death.

We are issuing the policy in consideration of the application and our receipt of the Minimum Initial Premium at our Main Administrative Office. The provisions of this and the following pages and any attachments make up your contract.

**RIGHT TO CANCEL:** You may cancel this policy by delivering or mailing a written notice or sending a telegram to:

> **Main Administrative Office**
>
> PHL Variable Insurance Company
> Variable and Universal Life Administration
> P.O. Box 8027
> Boston, MA 02266-8027
> Telephone (800) 541-0171

and by returning the policy or contract before midnight of the tenth day after the date you receive the policy. Notice given by mail and return of the policy or contract by mail are effective on being postmarked, properly addressed, and postage prepaid. The Insurer must return all payments made for this policy within 10 days after it receives notice of cancellation and the returned policy.

Signed for PHL Variable Insurance Company at One American Row, Hartford, Connecticut 06103-2899.

*Philip K Polk*

President

*John M. Beers*

Secretary

## READ YOUR POLICY CAREFULLY
**It is a legal contract between the Owner and PHL Variable Insurance Company**

Universal Life Insurance Policy
Flexible Premiums
Death Benefit payable at death of Insured
Nonparticipating – not eligible for dividends
Benefits, premiums, and the Risk Classification are shown in Section 1

05PAUL

U001MNF1

EXHIBIT 2 - PAGE 160

## TABLE OF CONTENTS

**Section      Provision**

1.   Schedule Pages
2.   Table of Rates
3.   Definitions
4.   Qualification as Life Insurance
5.   Total Face Amount
6.   Death Proceeds
7.   Guaranteed Death Benefit
8.   Death Benefit On or After Age 100 Anniversary
9.   Policy Value
10.  Premiums
11.  Grace Period
12.  Policy Termination
13.  Reinstatement
14.  Loans and Overloan Protection
15.  Surrenders and Withdrawals
16.  Basis of Computations
17.  Owner(s) and Beneficiary(ies)
18.  Assignment
19.  Misstatements
20.  Suicide Exclusion
21.  Incontestability
22.  The Entire Contract
23.  Annual Statement
24.  Claims of Creditors
25.  Right to Defer Payment of Benefits

U001ZZT1

EXHIBIT 2 - PAGE 161

## SECTION 1: SCHEDULE PAGES

POLICY NUMBER:    97528505

| | |
|---|---|
| **Insured** | ▇▇▇▇▇▇▇ |
| **Age at Policy Date** | ▇▇ |
| **Sex** | Male |
| **Risk Classification** | Non-Smoker |
| **Additional Ratings** | Not Applicable |
| | |
| **Owner, Beneficiary** | As designated in the application or subsequently changed |
| **Policy Date** | January 21, 2008 |
| **Issue Date** | January 21, 2008 |
| **Death Benefit Option at Issue** | Option A |
| **Life Insurance Qualification Test** | Guideline Premium Test |
| **Total Face Amount** | |

|  |  |  |
|---|---|---|
| Basic Face Amount at Issue | $3,000,000 |
| Supplemental Face Amount at Issue | $0 |
| Total Face Amount at Issue | $3,000,000 |

### Premiums at Issue

| | |
|---|---|
| **Premium Mode** | Annual |
| **Minimum Initial Premium** | $20,355.00 |
| **Planned Premium** | $194,500.00 |
| **Monthly Guarantee Premium** | $10,177.50 |

### Other Benefits and Specifications
#### (See Rider Information for further details regarding riders)

| | |
|---|---|
| **Preferred Loan Amount at Issue** | $0 |
| **Interest Bonus Start Date** | January 21, 2015 |
| **Guaranteed Death Benefit Period** | 5 Policy Years |
| **Withdrawal Charge Period** | Policy Years 1-10 |
| | |
| **Rider 1** | Life Plan Options Rider |
| **Rider 2** | Living Benefit Rider |

**Notice:** The actual premiums paid will affect the Policy Value, the duration of insurance coverage, and the amount of Death Benefit as described in Section 6. **Even if the Planned Premiums shown above are paid as scheduled, they may not be sufficient to continue the policy in force until the death of the Insured.** Unless the Total Cumulative Premium Test is satisfied during the Guaranteed Death Benefit Period, the policy will continue in force until the death of the Insured only if on each Monthly Calculation Date the Net Policy Value, less Policy Debt, during the first 9 Policy Years is at least equal to all due and unpaid Monthly Deductions.  After the first 9 Policy Years, the Net Surrender Value on each Monthly Calculation Date must be at least equal to all due and unpaid Monthly Deductions.

U001ZZS1

EXHIBIT 2 - PAGE 162

## SECTION 1: SCHEDULE PAGES (continued)

POLICY NUMBER:   97528505

### Policy Charges

#### Deductions from Premium Payments

Sales Charge*   10% of first $192,270.00 of premium paid in the first Policy Year
7% of any premium paid in excess of $192,270.00 in the first Policy Year
5% of all premiums paid in Policy Years 2 and thereafter.

*No sales charge will apply to any loan carried over as part of the initial premium paid for this policy.

#### Monthly Deduction (the following charges are deducted monthly from the Policy Value on each Monthly Calculation Date)

Issue Charge   $50.00   deducted during the first Policy Year only

Service Charge   $3.50   guaranteed not to exceed $7.00.

Cost of Insurance Charge   Determined in accordance with Section 9.  Maximum monthly rates per $1,000 of Net Amount at Risk are shown in Section 2.

Rider Charges   As hereinafter described in this Section 1 under Rider Information

#### Other Deductions

Overloan Transaction Charge   3.5% of the Policy Value, deducted when the overloan protection feature is exercised, as described in Section 14.

Surrender Charge   The charges shown in this table are as of the beginning of each Policy Year. These Surrender Charges will reduce on a monthly basis to equal zero over time, as shown in this table.  The policy's Surrender Charge is equal to the sum of that shown for the Basic Face Amount and that shown for the Supplemental Face Amount.

### Table Of Surrender Charges

| Policy Year | Basic Face Amount | Supplemental Face Amount |
|---|---|---|
| 1 | $165,878 | $0 |
| 2 | $158,261 | $0 |
| 3 | $150,831 | $0 |
| 4 | $143,617 | $0 |
| 5 | $136,673 | $0 |
| 6 | $130,059 | $0 |
| 7 | $123,801 | $0 |
| 8 | $117,890 | $0 |
| 9 | $112,283 | $0 |
| 10 | $106,919 | $0 |
| 11 | $101,700 | $0 |
| 12 | $96,523 | $0 |
| 13 | $91,274 | $0 |
| 14 | $80,730 | $0 |
| 15 | $38,610 | $0 |
| 16 | $0 | $0 |
| 17 | $0 | $0 |
| 18 | $0 | $0 |
| 19 | $0 | $0 |
| 20 | $0 | $0 |
| 21+ | $0 | $0 |

U001ZZS2

EXHIBIT 2 - PAGE 163

## SECTION 1: SCHEDULE PAGES (continued)

POLICY NUMBER:   97528505

### Rider Information

| | Rider Description | Rider Issue Date | Benefit Amount | Rider Expiry Date | Rider Charge |
|---|---|---|---|---|---|
| UR11 | Living Benefit Rider | 01/21/2008 | | | None |
| UR73 | Life Plan Option Rider | 01/21/2008 | | | None |

* Rider Charges for subsequent Policy Months are in accordance with those guarantees specified in the rider.

EXHIBIT 2 - PAGE 164

## SECTION 1: SCHEDULE PAGES (continued)

POLICY NUMBER:    97528505

### Table of Values

**Refer to your policy provisions for details on the terms and values shown in this table.**

| | |
|---|---|
| Minimum Total Face Amount | $100,000 |
| Minimum Basic Face Amount | $100,000 |
| Policy Loan Interest Rate | 6% |
| Minimum Loan Amount | $500 |
| Minimum Withdrawal Amount | $500 |
| Guaranteed Minimum Interest Rate | 4% |
| Policy Value Benchmark Percentage | 40% |
| Guideline Single Premium | $2,229,080.62 |
| Guideline Level Premium | $387,697.44 |
| Maximum Annual Premium | $1,000,000 |
| Minimum Total Face Amount Decrease | $10,000 |

U001ZZS4

EXHIBIT 2 - PAGE 165

## SECTION 2: TABLE OF RATES

POLICY NUMBER:   97528505

### MINIMUM DEATH BENEFIT PERCENTAGES & MAXIMUM MONTHLY COST OF INSURANCE RATE TABLE

| Attained Age | Minimum Death Benefit Percentage | Maximum Monthly Rates per 1,000 of Net Amount at Risk | Attained Age | Minimum Death Benefit Percentage | Maximum Monthly Rates per 1,000 of Net Amount at Risk |
|---|---|---|---|---|---|
| 79 | 105% | 7.1433 | 90 | 105% | 18.3492 |
| 80 | 105% | 7.8058 | 91 | 104% | 19.6533 |
| 81 | 105% | 8.5433 | 92 | 103% | 21.0625 |
| 82 | 105% | 9.3767 | 93 | 102% | 22.6358 |
| 83 | 105% | 10.3158 | 94 | 101% | 24.6375 |
| 84 | 105% | 11.3425 | 95 | 100% | 27.4967 |
| 85 | 105% | 12.4333 | 96 | 100% | 32.0458 |
| 86 | 105% | 13.5667 | 97 | 100% | 40.0167 |
| 87 | 105% | 14.7325 | 98 | 100% | 54.8317 |
| 88 | 105% | 15.9075 | 99 | 100% | 83.3333 |
| 89 | 105% | 17.1075 | 100+ | 100% | 0.0000 |

**Basis of Calculations:** 1980 Commissioner's Standard Ordinary Mortality Smoker/Nonsmoker Distinct Table (Age Nearest Birthday) for the Insured's sex and Risk Classification, Age, and 4% effective annual interest rate. The Monthly Factor used in determining Cost of Insurance is 1.0032737.

If this policy is issued on a unisex basis, we will use the 1980 Commissioners' Standard Ordinary Mortality Smoker/Nonsmoker Distinct 80% Male Table (Age Nearest Birthday) for the Insured's Risk Classification, Age, and 4% effective annual interest rate. The Monthly Factor used in determining the Cost of Insurance is 1.0032737.

U001ZZS5

EXHIBIT 2 - PAGE 166

## SECTION 3: DEFINITIONS

The term **"Age"** means, on any given date, the age of the person in question at his or her birthday nearest that date.

The term **"Age 100 Anniversary"** means the Policy Anniversary nearest the Insured's 100th birthday.

The term **"Attained Age"** on any date means the Age plus the number of whole years that have elapsed since the Policy Date.

The term **"business day"** means any day that we are open for business.

The term **"due proof of death"** means, a certified death certificate, an order of a court of competent jurisdiction, or any other proof acceptable to us.

The term **"in force"** means the policy has not terminated or otherwise lapsed in accordance with the Grace Period provision.

The terms **"in writing," "written notice," and "written request"** mean a written form signed by you, satisfactory to us and received at our Home Office or Main Administrative Office or such other medium electronic or otherwise that we may from time to time make available.

The term **"Issue Date"** means the date from which the Suicide Exclusion and Incontestability provisions are applied.

The term **"Minimum Initial Premium"** means the minimum premium needed to put the policy in force and is shown in Section 1.

The terms **"Monthly Calculation Date"** or **"Monthly Calculation Day"** mean the date on which monthly deductions are assessed from the Policy Value.  The first Monthly Calculation Date is the Policy Date.  Subsequent Monthly Calculation Dates are the same days of each month thereafter or, if such day does not fall within a given month, the last day of that month will be used.

The term **"Net Policy Value"** equals the Policy Value less the Policy Debt.

The term **"Net Surrender Value"** equals the Surrender Value less the Policy Debt.

The term **"notice"** means that whenever we are required to give notice to you, it shall be deemed given if we mail it to you and, unless otherwise specified, to the assignee of record, if any, in a postage-paid envelope mailed by first class mail to the last known address of record from our Main Administrative Office. If we mutually agree notice may also be provided by an electronic medium.

The term **"Planned Premium"** means the premium that is selected in the application or as later changed by you for this policy that you intend to be pay on a regular modal basis

The term **"Policy Anniversary"** means the same day and month of each year as the Policy Date. If the day does not exist in a month, the last day of the month will be used.

The term **"Policy Date"**  means the date shown in Section 1.  Policy Charges are calculated from the Policy Date. Policy Years, Policy Months, and Policy Anniversaries are determined from the Policy Date.

The term **"Policy Debt"** means unpaid loans with accrued interest.

The term **"Policy Month"** means the period from one Monthly Calculation Date up to, but not including, the next Monthly Calculation Date.

The term **"Policy Value"** means the amount equal to the Net Premium credited less an amount not to exceed one month of Monthly Deductions from the Policy Value on the later of the Issue Date or the receipt of the first payment at our Main Administrative Office as shown in Section 1. Thereafter the Policy Value is determined by accumulating with interest the Policy Value for the prior day increased by Net Premiums credited and decreased by withdrawals and, on the Monthly Calculation Date, the Monthly Deductions from Policy Value shown in Section 1.

The term **"Policy Year"** means, with respect to the first Policy Year, the one-year period beginning on the Policy Date up to, but not including, the first Policy Anniversary.  Each subsequent Policy Year is the one-year period beginning on a Policy Anniversary up to, but not including, the next Policy Anniversary.

The term  **"Preferred Loan"** means any loan that is carried over as part of the initial premium paid for this policy from a previously issued policy plus any loan taken to pay loan interest on the Preferred Loan.

U001ZZR1

EXHIBIT 2 - PAGE 167

## SECTION 6: Death Proceeds

If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described below, upon receipt of due proof of death of the Insured no later than two months after receipt of such proof, subject to any applicable provisions of the policy. If the Insured dies on or after the date we receive a request from you to surrender the policy, no Death Proceeds will be paid. We will pay the amount payable under the Surrenders and Withdrawals provision instead. The Death Proceeds at the death of the Insured are equal to:

- (a) the Death Benefit, as described below, in effect on the Insured's date of death; plus
- (b) any insurance then in effect on the life of the Insured that is provided by any additional benefit riders; less
- (c) any Policy Debt then existing on this policy.

If the Insured dies during the Grace Period, the Death Proceeds payable described above will be modified as follows:

- (a) the Death Proceeds will be reduced by any outstanding Policy Charges due; and
- (b) the Policy Value used in the calculation of the Death Benefit will be the Policy Value as of the date of death of the Insured.

We will pay interest on any Death Proceeds paid in one sum in the event of the Insured's death from the date of death to the date of payment as required by applicable state law. If the state does not specify the interest rate, we will use the rate for Death Proceeds left on deposit with us.

### Death Benefit

The Death Benefit under this policy will be determined under either Option A or Option B, whichever is then in effect.

Option A: The Total Face Amount on the date of death of the Insured or, if greater, the Minimum Death Benefit as described below.

Option B: The Total Face Amount plus the Policy Value on the date of death of the Insured or, if greater, the Minimum Death Benefit as described below.

If withdrawals are made, the Death Benefit will be reduced by reducing the Total Face Amount if Option A is in effect, or the Policy Value if Option B is in effect.

### Minimum Death Benefit

The Minimum Death Benefit is equal to the Policy Value on the date of death multiplied by the applicable Minimum Death Benefit Percentage for the Attained Age of the Insured. The Minimum Death Benefit Percentages are shown in Section 2. To the extent that the Net Amount at Risk associated with the Minimum Death Benefit that results from this calculation exceeds our guidelines and limitations that may be in effect, we reserve the right to:

- (a) distribute to you a portion of the Policy Value such that the Net Amount at Risk associated with the resulting Minimum Death Benefit does not exceed our guidelines and limitations in effect; or
- (b) if we should decide to accept the additional death benefit, require evidence of insurability satisfactory to us.

### Change in Death Benefit Option

While this policy is in force and prior to the Age 100 Anniversary, you may request in writing to change the Death Benefit Option, subject to the Minimum Basic Face Amount shown in Section 1. If, however, you have exercised the Overloan Protection feature as described in Section 14, the death benefit will be changed to Death Benefit Option A if it is not already in effect. No further changes to death benefit options will be allowed. Any change in Death Benefit Options will be effective on the next Monthly Calculation Date. Any change will be subject to the following:

- Change from Option A to Option B: the Total Face Amount will be reduced by the Policy Value.
- Change from Option B to Option A: the Total Face Amount will be increased by the Policy Value.

Any reduction in the Total Face Amount will be implemented by first reducing any Supplemental Face Amount, with no change to the surrender charge schedule of the policy.

If the Supplemental Face Amount is greater than 0, any increase in the Total Face Amount will be implemented by increasing the Supplemental Face Amount. If the Supplemental Face Amount is equal to 0, any increase in Total Face Amount will be implemented by increasing the Basic Face Amount.

U001MNP3

EXHIBIT 2 - PAGE 168

| SECTION 9: Policy Value |
| --- |

## Net Premiums Added

When we receive your premium payments at our Main Administrative Office, we deduct a Sales Charge which will not exceed the amount shown in Section 1 and add the balance remaining (the Net Premium) to your Policy Value. We will do this before we take any other deductions due on that business day. However, we will add any Net Premiums received before the Policy Date to your Policy Value as of the Policy Date. While a loan exists, we will treat the amounts you pay as premiums unless you request in writing that they be treated as loan repayments. If you instruct us to do so, we will first deduct from such payments the amount of accrued interest on loans and then deduct the amount specified as a loan repayment before applying any balance remaining as a premium payment.

## Monthly Deductions

A deduction is due and will be taken from the Policy Value as of the Policy Date and as of each applicable Monthly Calculation Date. Monthly Deductions are calculated from the Policy Date. If, at your request, we set the Policy Date to a date which precedes the date on which we receive the initial premium, Monthly Deductions due for the period prior to receipt of the initial premium will be taken on the later of the date we receive the initial premium and the date our underwriters approve issuance of this policy.

Monthly Deductions are due until the Age 100 Anniversary, at which time we will cease to take any further Monthly Deductions as described in Section 8.

The Monthly Deduction for any Policy Month that will be deducted from your Policy Value consists of charges (a) through (e) listed below, each of which will be deducted in the order as listed, where:

    (a)    is the Issue Charge;

    (b)    is the Service Charge;

    (c)    is the sum of the charges for riders which are part of the policy, if any,;

    (d)    is the sum of all charges for any applicable Additional Ratings shown in Section 1; and

    (e)    is the Cost of Insurance Charge, as described below.

## Cost of Insurance Charge

The rates for the Cost of Insurance Charge as of the Policy Date are based on the sex, if applicable, Age, Risk Classification, Basic Face Amount, Supplemental Face Amount, Net Amount at Risk, and duration that the coverage has been in force for the Insured.

The Cost of Insurance Charge for a specific Policy Month is the charge for the Net Amount at Risk. The charge for the Net Amount at Risk is an amount equal to the per dollar cost of insurance rate for that month multiplied by the Net Amount at Risk, and such rates will be based on our expectations of future mortality, persistency, investment earnings, expense experience, capital and reserve requirements, and tax assumptions. The Maximum Monthly Rates at any Age are shown in Section 2 as a rate per $1,000 of Net Amount at Risk. To get the maximum rate per dollar, the rate shown must be divided by 1,000. Each Cost of Insurance Charge is deducted in advance of the applicable insurance coverage for which we are at risk.

The Cost of Insurance calculation will reflect any adjustment for the Minimum Death Benefit.

We review our Cost of Insurance rates periodically, and may re-determine Cost of Insurance rates at such time on a basis that does not discriminate unfairly within any class of insureds. Any change in rates will be determined prospectively. We will not distribute past gains or recoup prior losses, if any, by changing the rates.

## Net Amount at Risk

The Net Amount at Risk is the amount determined by subtracting (a) from the greater of (b) or (c) where:

    (a)    is the Policy Value at the end of the immediately preceding business day less all charges due on the Monthly Calculation Date;

    (b)    (i) is the Total Face Amount divided by the applicable Monthly Factor shown in the footnote in Section 2 for Death Benefit Option A; or (ii) is the Total Face Amount divided by the applicable Monthly Factor shown in the footnote in Section 2 plus the Policy Value for Death Benefit Option B; and

    (c)    is the amount defined in (a) multiplied by the applicable Minimum Death Benefit Percentage shown in Section 2.

U001ZZP5

EXHIBIT 2 - PAGE 169

Subject to these limitations, you may pay additional premiums at any time prior to the Age 100 Anniversary and while this policy is in force. Unless we agree otherwise, maximum premium payments are subject to the Maximum Annual Premium shown in Section 1. If, however, you have exercised Overloan Protection, no further premiums may be paid once Overloan Protection goes into effect. All premiums are payable at our Main Administrative Office or to an authorized agent. You may request a receipt signed by one of our executive officers.

If any premium payment results in an increase in the Death Benefit by more than it would increase the Policy Value, then we will either refund the premium or require evidence of insurability satisfactory to us. To the extent of such evidence, the Incontestability and Suicide Exclusion provisions will apply. We may limit the number and amount of premium payments in any Policy Year. The minimum premium payment that we will accept is $25.

---
### SECTION 11: Grace Period
---

**During the first 5 Policy Years -** If the Total Cumulative Premium Test is satisfied, as described in Section 7, then the Basic Face Amount, any Supplemental Face Amount, and any rider benefits will remain in effect during the Guaranteed Death Benefit Period. If, however, the Total Cumulative Premium Test is not satisfied, then this policy and any riders will go into default if, on any Monthly Calculation Date, the required Monthly Deductions exceed the Net Policy Value. A grace period of 61 days from the date the policy goes into default will be allowed for additional premiums. Such additional premium payments must be sufficient to increase the Net Policy Value on that Monthly Calculation Date to cover three Monthly Deductions or, if less, the amount necessary to pass the Total Cumulative Premium Test for the next three Policy Months.

**During Policy Years 6 through 9 -** This policy and any riders will go into default if, on any Monthly Calculation Date, the required Monthly Deductions exceed the Net Policy Value. A grace period of 61 days from the date the policy goes into default will be allowed for the payment of additional premiums. Such additional premium payments must be sufficient to increase the Net Policy Value on that Monthly Calculation Date to cover three Monthly Deductions.

**After the 9th Policy Year -** This policy and any riders will go into default if, on any Monthly Calculation Date, the required Monthly Deductions exceed the Net Surrender Value. A grace period of 61 days from the date the policy goes into default will be allowed for the payment of additional premiums. Such additional premium payments must be sufficient to increase the Net Surrender Value on that Monthly Calculation Date to cover three Monthly Deductions.

At least 30 days prior to termination of coverage, we will send notice to your last known address, specifying the amount you must pay to bring the policy out of default. If we have notice of a policy assignment on file at our Main Administrative Office, we will also mail a copy of the notice of the amount due to the assignee on record. When payment is received, any Policy Charges which are past due and unpaid will be immediately deducted from the Policy Value. If the necessary additional premium payments have not been received by the end of the grace period, the policy will terminate. Upon termination of the policy, the remaining Net Surrender Value, if any, will be paid to the Owner. If the Insured dies while the policy is in default, then we will deduct from the proceeds all Monthly Deductions due and unpaid as of the date of the Insured's death. Unless a rider provides otherwise, no riders will be in effect after the policy terminates.

---
### SECTION 12: Policy Termination
---

This policy will terminate automatically on the earliest of:
  (1)  the date the Insured dies;
  (2)  the date the grace period expires without the payment of sufficient premium as provided in Section 11; or
  (3)  the date the policy is surrendered for its Net Surrender Value.

U001ZZP7

EXHIBIT 2 - PAGE 170

**Loan Interest Charged**
Loan interest will accrue on a daily basis from the date of the loan, and is payable in arrears.

Loans will bear interest at a rate not to exceed the Policy Loan Interest Rate shown in Section 1. Loan interest will be payable on each Policy Anniversary and on the date the loan is settled. In the event that you do not pay the loan interest charged in a Policy Year, such amount will be added to the Policy Debt on the Policy Anniversary. The portion of the loan interest attributable to the Preferred Loan Amount will be reflected as an increase to the Preferred Loan Amount on the Policy Anniversary.

**Loan Repayment**
You may repay the Policy Debt in whole or in part at any time prior to the death of the Insured and while the policy is in force. Subject to any rider, endorsement, or other provisions, while a loan exists, we will treat any amounts you pay as premiums, unless you request in writing that they be treated as loan repayments.

**Overloan Protection**
You have the option of exercising Overloan Protection, in writing, when the following conditions exist on the Monthly Calculation Date:
1. the Policy Debt exceeds the specified Total Face Amount;
2. the Policy Debt is equal to 96% of the Policy Value;
3. the Insured is at least 65 years of Age;
4. this policy has been in force for at least 15 Policy Years; and
5. the Guideline Premium Life Insurance Qualification Test is in effect.

If the loan balance is in excess of 96% of the Policy Value, the portion of the loan balance that exceeds 96% of the Policy Value must be repaid at the time that such Overloan Protection is exercised. Overloan Protection will be effective on the Monthly Calculation Date following your written request. Once in effect, Overloan Protection will keep your policy in force and the following changes will automatically take effect.

1. Any riders then in effect will terminate.
2. The Death Benefit Option will be permanently set to Death Benefit Option A.
3. The Total Face Amount then in effect will be reduced to 101% of the Policy Value.
4. The death benefit will equal the greater of (a) and (b), where:
   (a) = the new Total Face Amount, and
   (b) = the applicable Minimum Death Benefit Percentage shown in Section 2, multiplied by the greater of (i) and (ii), where:
      (i) = the Policy Value, and
      (ii) = the Policy Debt.
5. No further premium payments will be accepted.
6. No further withdrawals will be allowed.
7. No further monthly deductions will be assessed.
8. No additional loans or loan repayments will be allowed.

Any loan balance will reduce the death benefit payable. Loan interest will continue to accrue on this policy.

Once you have exercised Overloan Protection, a one-time Overloan Transaction Charge, as shown in Section 1, will be assessed. There is no additional charge for this benefit or for any of the automatic changes that occur pursuant to your election of this benefit.

U001ZZP9

EXHIBIT 2 - PAGE 171

While the Insured is living, the owner may exercise all rights provided by this policy or allowed by us. Consent of any beneficiary not irrevocably named or any contingent owner is not required. If there is no surviving Beneficiary upon the death of the Insured, you will be the Beneficiary, but if you were the Insured, your estate will be the Beneficiary.

Any death proceeds that become payable will be paid in equal shares to such beneficiaries living at the death of the Insured as stated in the application or as later changed. Payments will be made successively in the following order:

(a) Primary beneficiaries;
(b) Contingent beneficiaries, if any, provided no primary beneficiary is living at the death of the Insured;
(c) you or your executor or administrator, provided no primary or contingent beneficiary is living at the death of your insured, or in the absence of a beneficiary designation.

Unless otherwise stated, the relationship of a beneficiary is the relationship to the Insured. You may change the beneficiary by written notice filed with us at our Main Administrative Office. When we receive it, the change will take effect as of the date it was signed by you. However, the change will be subject to any payments made or actions taken by us before we received the notice at our Main Administrative Office.

---

### SECTION 18: Assignment

Except as otherwise provided in this policy, you may, by written notice, assign any interest in this policy without the consent of any person other than an irrevocable Beneficiary. The assignment or a certified copy of it must be filed with us at our Main Administrative Office. When filed, it will bind us as of the date of the assignment, subject to any action taken by us before such filing. We shall not be responsible for the validity or sufficiency of any assignment. The interest of the assignee shall be prior to the interest of any beneficiary not irrevocably named or any contingent owner. An assignee cannot change the beneficiary, owner, or contingent owner.

---

### SECTION 19: Misstatements

If the age or sex of the Insured has been misstated, we will adjust the Basic Face Amount, any Supplemental Face Amount, and every other benefit to that which would have been purchased at the correct age or sex by the most recent Cost of Insurance charge deducted under Section 9.

---

### SECTION 20: Suicide Exclusion

If the Insured, whether sane or insane, dies by suicide within two years from the Issue Date, (or within two years from any reinstatement of the policy) and while the policy is in force, our liability shall be limited to an amount equal to the premiums paid on this policy less any Policy Debt owed us and less any withdrawals.

---

### SECTION 21: Incontestability

This policy shall be incontestable after it has been in force during the Insured's lifetime for two years from the Issue Date, except for fraud, or any provision for reinstatement or policy change requiring evidence of insurability. In the case of reinstatement or any policy change requiring evidence of insurability, the incontestable period shall be two years from the effective date of such reinstatement or policy change. Any premium payment which we accept subject to insurability, and any increase in the Death Benefit resulting from such payment, shall be considered a policy change for purposes of this Section.

While insurance is contestable, we may either rescind the insurance or deny a claim on the basis of:

1. a material misrepresentation in the application or supplemental application for this policy or any face amount increase; or
2. a material misrepresentation in the reinstatement application if there has been a reinstatement of this policy.

U001MNPB

EXHIBIT 2 - PAGE 172

# ACCELERATED BENEFIT RIDER

This Rider is part of the Policy to which it is attached, effective as of the Rider Date, if it is listed on the Policy's Schedule Page or in an Endorsement after that page. You should therefore review the Policy's Schedule Page for applicability. Except as stated in this Rider, it is subject to all of the provisions contained in the Policy.

**This Rider pays accelerated death benefits at your option under conditions specified in this Rider. This Rider is not a long-term care rider meeting the requirements of section 62A.46 to 62A.56 or chapter 62S, Minnesota Insurance Law.**

| | |
|---|---|
| **Rider Date** | SAME AS POLICY DATE |
| **Maximum Administrative Charge** | $300.00 |
| **Maximum Proportion Allowable** | 75% |
| **Maximum Accelerated Benefit** | $250,000 |
| **Minimum Remaining Face Amount** | $10,000 |

**Definitions**

**Insured** is the person covered under the basic Policy.

**You (Your)** is the owner of the Policy to which this Rider is attached.

**We (Our, Us)** refers to PHL Variable Insurance Company.

**Eligible Amount** is the amount of insurance under the Policy that is eligible for accelerated payment. It is equal to the death benefit of the basic Policy at the time of claim plus any term insurance amounts In Force provided by Rider on the life of the Insured, which provides coverage renewable to the Insured's attained age 95 or beyond, but exclusive of any other supplemental Rider death benefits.

**Proportion** is the percentage of the Eligible Amount that will be accelerated under this Rider. The Proportion is chosen by You at the time of election of an accelerated benefit, subject to the following limitations. The Proportion elected:

1. can be no more than the Maximum Proportion Allowable as specified in this Rider;

2. cannot result in a remaining death benefit below the minimum as specified in this Rider; and

3. cannot result in a Requested Benefit that exceeds the Maximum Accelerated Benefit as specified in this Rider.

EXHIBIT 2 - PAGE 173

The discounted Requested Benefit is reduced by the Proportion of any Policy debt, including any unpaid loan interest, and the Proportion of any other amounts due Us from You. This result is then reduced by Our then current Administrative Charge for benefits under this type of Rider, not to exceed the maximum as specified in this Rider. The amount that remains is the payment that will be made to You.

In the event that the Insured dies after the Written Request but before We make the payment, and We receive Written Notice at Our Main Administrative Office during this period of this event, the request will be considered void, and no payment will be made under this Rider.

**Effect On Contract**

The following values will be reduced by the Proportion at the time the payment is made to You:

1. the future planned premium payable on the basic Policy;

2. the face amount of the Policy at the time of claim;

3. the cash value (Policy Value);

4. any remaining Surrender Charge;

5. the cash Surrender Value; and

6. any Policy debt including any unpaid loan interest.

If this Rider is attached to a variable life insurance policy that permits fund investment in various subaccounts of Our Variable Universal Life Separate Account, the reduction in Policy Value will be achieved through a proportionate reduction in this Policy's share in the value of each subaccount based on the allocation You request at the time of Your accelerated benefit request. If no allocation request is made, the assignment to each subaccount will be made in the same manner as provided for monthly deductions.

Future values under the Policy will be determined in a manner consistent with that under the original Policy, as adjusted to reflect the above reductions. We will mail to You a new policy Schedule Page reflecting any payment made under this Rider.

**Proof of Terminal Illness**

A licensed physician, who is not Yourself or a member of Your family, must provide Us with evidence satisfactory to Us of the Insured's terminal illness. We reserve the right to obtain a second medical opinion from a physician of Our choosing at Our expense.

**Conditions**

Payment under this Rider is subject to the following conditions:

1. The Policy must not have lapsed.

2. We will require the consent of any assignees and irrevocable beneficiaries to any request for payment under this Rider.

3. No payments will be made under this Rider to satisfy the claims, demands, or obligations of any creditor, trustee in bankruptcy or governmental agency, or arising under any court order directed against You, to the extent that We have written notice thereof.

UR11  MN

3

EXHIBIT 2 - PAGE 174

# Life Plan Options Rider

This rider is part of the policy to which it is attached. Except as stated in this rider, it is subject to all of the provisions contained in the policy.

## DEFINITIONS

Option Review Period
The 90-day period immediately preceding the 5th, 10th and 15th Policy Anniversaries.

Individual Term Life Rider
As used in this rider form "Individual Term Life Rider" refers to any of the following riders: Individual Term Rider, Individual Term Insurance Rider, Policy Term Rider, Policy Term Insurance Rider, Phoenix Individual Edge Term Rider, or the Variable Policy Term Rider.

## OPTION BENEFITS

Increased Coverage Determination without Medical Exam
Policies that include both this rider and the Individual Term Life Rider are eligible during each Option Review Period, while both such riders are in effect, for an increase in their term insurance rider amount up to a maximum lifetime increase of $1,000,000, with underwriting and our agreement to such increase determined without the inconvenience of an additional medical exam. Our other ordinary underwriting rules will continue to apply and thus the increase in coverage is still subject to our normal underwriting approval.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- The insured must be attained age 65 or younger on the last day of the Option Review Period.
- The risk classification of the insured must be standard through Table D (200%) at original issue of the basic policy.
- The insured must be alive and meet our underwriting requirements at the time of your request for the increase in term rider face amount.
- The Individual Term Life Rider must either already be attached to the policy or then currently approved and available for sale in the state of applicable jurisdiction.
- There is a maximum lifetime increase of $1,000,000 per insured life.

Reduced Coverage without Surrender Charge
During each Option Review Period you may request a decrease in the face amount of the policy without our assessment of the partial surrender charge that, under the terms of your basic policy, would otherwise apply. In such case the surrender charge remaining under the policy will continue to be calculated as if such decrease in face amount had not been made.

Other conditions that apply to this option are as follows:
- The basic policy face amount must be at least $1,000,000 at original issue of the basic policy.
- Total option reductions of the basic policy face amount may not exceed the lesser of 50% of the initial basic policy face amount or $5,000,000 in combined aggregate of all option reductions for all Our policies on the same insured.

UR73

EXHIBIT 2 - PAGE 175

**PHOENIX** | PHL Variable Insurance Company ("Phoenix" or "Company")<br>PO Box 8027<br>Boston MA 02266-9237<br>Underwriting Service Center | For Overnight Delivery:<br>PHL Variable Insurance Company<br>30 Dan Road, Suite 8227<br>Canton MA 02021-2809 | **Application for Life Insurance**<br>**Part I**

## Section I – Proposed Insured Information

| Name (First, Middle, Last) | | Sex ☒ M ☐ F | Date of Birth (mm/dd/yyyy) |
|---|---|---|---|

| Birth State | Birth Country<br>USA | U.S. Citizen<br>☒ Y ☐ N | Earned Income<br>$ | Net Worth<br>$ 8500,000 | Other Income<br>$ 225,000 |
|---|---|---|---|---|---|

| Social Security Number | Driver's License Number | State | Marital Status<br>☐ Single  ☒ Married  ☐ Widowed  ☐ Divorced |
|---|---|---|---|

| Residence Street Address (include Apt #) | City | State | ZIP Code | Home Telephone # |
|---|---|---|---|---|

Email Address

| Current Employer<br>RETIRED | Years of Service | Current Occupation |
|---|---|---|

| Employer Street Address | City | State | ZIP Code | Employer's Telephone #<br>(    ) |
|---|---|---|---|---|

Have you used tobacco or nicotine products in any form in the last 10 years? ☐ Yes ☒ No
a.  If "Yes", check the product(s) used: ☐ Cigarettes ☐ Cigars, Pipes, Snuff, Smokeless or Chewing Tobacco, ☐ Nicotine Patch, Gum or Lozenge
b.  If "Yes", check where appropriate: ☐ Use Currently ☐ Date Quit (mm/yyyy) _____

## Section II – Ownership (indicate the Owner of the policy.)

☐ **A. Insured**  (if Insured is Owner, go to Section III)

☐ **B. Partnership** - list all partners. If there is a general partner, complete Partnership Authorization form.
  Name(s) of All Partner(s) (First, Middle, Last)

| Employer's Street Address | City | State | ZIP Code |
|---|---|---|---|

☒ **C. Trust** (if Owner is a Trust, complete Certification of Trust Agreement)

☐ **D. Other**

| Owner's Name (First, Middle, Last)<br>Irrevocable Trust | Social Security Number/Tax ID | Date of Birth (mm/dd/yyyy) | Relationship to Proposed Insured<br>Trust |
|---|---|---|---|

| Owner's Street Address (include Apt #) | City<br>Minneapolis | State<br>MN | ZIP Code<br>55402 | Home Telephone # |
|---|---|---|---|---|

Email Address

## Section III – Beneficiary Designation

Unless otherwise specified, payments will be shared equally by all primary beneficiaries who survive the Proposed Insured or if none, by all contingent beneficiaries who survive the Proposed Insured. Only the Owner has the right to change the beneficiary(ies) unless otherwise stated.

| Primary Beneficiary(ies)<br>Name(s) (First, Middle, Last) | Date of Birth<br>(mm/dd/yyyy) | Social Security # or Tax ID#<br>(if available) | Relationship to<br>Proposed Insured | % Share |
|---|---|---|---|---|
| Same as Owner | 6-2-08 | | Trust | 100 |

| Contingent Beneficiary(ies)<br>Name(s) (First, Middle, Last) | Date of Birth<br>(mm/dd/yyyy) | Social Security # or Tax ID#<br>(if available) | Relationship to<br>Proposed Insured | % Share |
|---|---|---|---|---|
| | | | | |

CL42309MN.1        1 of 5

BNC National Bank • Wealth Management Services
Premium Financed Irrevocable Life Insurance Trusts
Document Tracking
D15606

EXHIBIT 2 - PAGE 176

## Section IV – Coverage Applied For

**Plan of Insurance (in features below)**

☐ Phoenix Benefit Choice VUL

☑ Phoenix Accumulator UL

☐ Phoenix Universal Life with Guarantee

☐ Other _____

**Face Amount**

$ ___3,000,000___

First Year anticipated, BILLED Premium (excluding 1035 Exchange, Lump Sum Funds, etc.)

$ ___136,000___

Subsequent Planned Premium

$ ___821,500___ per year

Life Insurance Qualification Test: (check one)  If none checked, Guideline Premium will apply.

☑ Guideline Premium Test

☐ Cash Value Accumulation Test (Must always be elected with Phoenix Universal Life with Guarantee) .

## Riders

☐ Life Plan Options Rider
☐ Alternate Surrender Value Rider
☐ Child Term Rider
☐ Family Term Rider
☐ Living Benefit Rider
☐ Guaranteed Extension Rider

☐ Disability Benefit Rider (Disability Waiver of a Specified Amount)

$ _____

☐ Other _____

☐ Other _____

## Features

☐ Increasing Term Protection Rider (Individual Increasing Term Rider)
    (available only with Death Benefit Option A)
    **Annual Rider Increase Options**
      ☐ Percentage Increase _____ %
      ☐ Fixed Dollar Increase $ _____
      ☐ Increase Equal to Premiums Paid
☐ Level Term Protection (Individual Level Term Rider)
    Supplemental Face Amount $ _____

**Death Benefit Option:** (check one)  if none checked, Option A will apply.

☑ Option A: Level

    ☐ Option B: Increasing

☐ Other _____

☐ Other _____

☐ Other _____

## Section V – Special Request

<br><br><br>

**Temporary Money Market Allocation**

If the state of issue does not require refund of premium during the Right To Cancel Period, but you prefer to temporarily allocate your premiums to the Money Market subaccount until the end of the Right to Cancel Period, as stated in the policy, indicate: ☐ Yes ☑ No

**Telephone/Electronic Authorization**

By checking the "Yes" box below, the Owner authorizes and directs the Company to act upon telephone or electronic instructions from me and/or my licensed representative who can furnish proper identification. The Company will use reasonable procedures to confirm that these instructions are authorized and genuine. As long as these procedures are followed, the Company and its affiliate and their directors, trustees, officers, employees, and licensed representatives will be held harmless for any claims, liability, loss or cost. ☐ Yes ☑ No

## Section VI – Suitability

This section applies ONLY to variable life insurance products:

Do you understand that the Death Benefit may be variable or fixed under certain conditions and the Death Benefit and Cash Values under any Variable Policy may increase or decrease in amount or duration based on the investment experience of the underlying investment options? ☐ Yes ☐ No

My signature in the Signature section of this application acknowledges that (a) I understand that a variable life insurance policy is not an appropriate investment vehicle for a short term trading strategy or short term savings and (b) I confirm that I have received the prospectus for the variable life policy I am purchasing.

Illustrations of benefits including death benefits, policy values and cash surrender values are available on request.

EXHIBIT 2 - PAGE 177

## Section VII - Mode of Premium Payment

☑ Annual ☐ Semi-Annual ☐ Quarterly ☐ Phoenix Check-O-Matic Service (PCS) Minimum Monthly Payment - $25.00
Multiple Billing Option - Give # or Details
☐ List-Bill ☐ Employee Insurance Counseling Service (EICS) ☐ Salary Allotment ☐ Pension ☐ Money Purchase Pension
☐ Other _____

If electing PCS, complete the following:
Existing Policy Number or PCS File Number _____

**Authorization Agreement for Preauthorized Payments**
I (we) hereby authorize the Company (Note: Company is defined as indicated on page 1 of application) to initiate debit entries to my (our) checking account and the financial institution as shown on the attached voided check below.

**Information for New Account**
Attach a void check to furnish encoding details.
If the payor's name is not imprinted on the check, fill it in here exactly as it appears in the bank records.

Attach Void
Check Here

Signature of depositor (if different from owner) _____

Send additional premium notices to:

Name (First, Middle, Last) _____

Street Address _____

City _____ State _____ ZIP Code _____ Relationship to Owner _____

## Section VIII – Existing Life Insurance

☑ Yes ☐ No  1. Are there any life insurance policies or annuity contracts, owned by, or on the life of, the applicant(s) or the insured(s) or the owner(s) or the annuitant?
☐ Yes ☑ No  2. With this policy, do you plan to replace (in whole or in part) now or in the future any existing life insurance or annuity contract in force with this policy?
☐ Yes ☑ No  3. Do you plan to utilize values from any existing life insurance policy or annuity contract (through loans, surrenders or otherwise) pay any initial or subsequent premium(s) for this policy?
For all "Yes" answers above, please provide the following information. If no coverage in force, check here ☐

| Company | Issue Date (mm/yyyy) | Plan | Amount | Pers/Bus | Replacing Y   N |
|---------|----------------------|------|--------|----------|-----------------|
| Phoenix | Unknown | | $ 250,000 | ☑ ☐ | ☐ ☑ |
| G.I. | Unknown | | $ 10,000 | ☑ ☐ | ☐ ☑ |
| | | | $ | ☐ ☐ | ☐ ☐ |
| | | Total Life Insurance in force | $ 200,000 | | |

The above applicant does not have to disclose an HIV (AIDS Virus) test which was administered: (1) to a criminal offender or crime victim as a result of a crime that was reported to the police; (2) to a patient who received the services of emergency medical services personnel at a hospital or medical care facility; (3) to emergency medical personnel who were tested as a result of performing emergency medical services. Refer to the Medical Authorization (on the back of this application) for a definition of "Emergency Medical Personnel."

## Section IX – Medical Transfer Statement *(Complete when submitting medical examinations of another insurance company.)*

I request that Phoenix review and consider the exam conducted by the Life Insurance Company listed below in evaluating my application. I authorize Phoenix to receive and review such application, and authorize my producer, broker or other life insurance company to provide such application to Phoenix.

1. Name of the insurance company for which examination(s) was made  Phoenix Exam

2. Date of examination (mm/dd/yyyy)

3. To the best of your knowledge and belief, are the statements in the examination true, accurate and complete as of today? ☐ Yes ☐ No
If "No", please explain.

4. Have you consulted a medical doctor or other practitioner since the above examination? *(If "Yes", complete Section X)*  ☐ Yes ☐ No

EXHIBIT 2 - PAGE 178

## Section X - Medical History (Not necessary to complete if medical or paramedical exam has been ordered)

| Current Height | Current Weight | Has your weight changed by 10 pounds or more in the past 2 years? If "yes", how much _____ pounds ☐ Gain ☐ Loss |
|---|---|---|

| Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: | Family History: | Age if Alive | Age at Death | If alive, indicate health problems or if deceased, indicate cause of death: |
|---|---|---|---|---|---|---|---|
| Father ☐ Alive ☐ Deceased | | | | Mother ☐ Alive ☐ Deceased | | | |

| Personal Physician: Please provide the name and address of your personal physician or health care provider, date of most recent visit, reason for visit, and results of treatment (if any): | Has anyone in your immediate family developed any hereditary condition, cancer, or heart disease before age 60? ☐ Yes (please provide details below) ☐ No |
|---|---|

To the best of your knowledge and belief, have you ever been diagnosed or treated or told by a physician or other health care provider that you have:

Please provide details of "Yes" answers (include question number, diagnosis, date of occurrence, current status, hospital or treating physician's name and address). Use Application Part II Addendum if additional space is necessary to record all details.

1. High blood pressure or hypertension?   ☐ Yes ☐ No
2. Pain, pressure, or discomfort in the chest, angina pectoris, palpitations, swelling of the ankles, or undue shortness of breath?   ☐ Yes ☐ No
3. Heart disease, coronary artery disease, cardiomyopathy, heart failure, atrial fibrillation, heart rhythm abnormality, heart murmur, congenital heart disease or valvular heart disease?   ☐ Yes ☐ No
4. Peripheral vascular disease, claudication, narrowing or blockage of arteries or veins?   ☐ Yes ☐ No
5. Asthma, pulmonary fibrosis, chronic cough, emphysema, pneumonia, or any other lung disease?   ☐ Yes ☐ No
6. Neurologic disease, seizures, fainting, falls, concussion, stroke, transient ischemic attack (TIA), tremor, neuropathy, weakness, paralysis, Parkinson's disease, memory loss, dementia, or any other disease of the brain or nervous system?   ☐ Yes ☐ No
7. Depression, bipolar disorder, schizophrenia, anxiety, or other psychiatric illness?   ☐ Yes ☐ No
8. Arthritis, lupus, or any musculoskeletal or skin disorder?   ☐ Yes ☐ No
9. Ulcers, abdominal pain, colitis, Crohn's disease, gall bladder disease, liver disease, hepatitis, jaundice, pancreatitis, or any other disease of the gastrointestinal system?   ☐ Yes ☐ No
10. Diabetes, kidney disease, kidney stones, bladder disorder, prostate disorder, protein or blood in the urine?   ☐ Yes ☐ No
11. Endocrine disorder, including disorder of the thyroid, parathyroid, adrenal, or pituitary glands?   ☐ Yes ☐ No
12. Anemia, bleeding or clotting disorder, or any other disorder of the blood (excluding Human Immunodeficiency Virus) or bone marrow?   ☐ Yes ☐ No
13. Cancer of any type, tumor (benign or malignant), leukemia, lymphoma, or Hodgkin's disease?   ☐ Yes ☐ No

14. Within the past 5 years, have you taken any kind of medicine, therapy, or treatment regularly or at frequent intervals?   ☐ Yes ☐ No
15. Within the past 5 years, have you medically been treated for alcoholism or been medically advised to limit or stop your use of alcohol?   ☐ Yes ☐ No
16. Within the past 5 years, have you ever used narcotics, barbiturates, amphetamines, hallucinogens, or any prescription drug except in accordance with a physician's instructions?   ☐ Yes ☐ No
17. Within the past 5 years, have you ever been a patient in any hospital, treatment center, or similar facility?   ☐ Yes ☐ No
18. Have you had, or been advised to have, any surgery, X-rays, electrocardiograms, blood studies (excluding Human Immunodeficiency Virus or Acquired Immune Deficiency Syndrome tests), or other tests within the last 5 years?   ☐ Yes ☐ No
19. Other than above, have you had any other physical or psychological disorder or been treated by a physician or other health care provider for any reason within the past 5 years?   ☐ Yes ☐ No

Phoenix reserves the right to require additional medical information, medical examination or testing to complete the underwriting process.

EXHIBIT 2 - PAGE 179

**Section XI – Additional Information** (Give full details for all "Yes" answers below. If necessary, use an additional piece of paper and please sign it.)

| ☐ Yes ☐ No | 1. | Have you ever applied for life, accident, disability or health insurance and been declined, postponed, or been offered a policy differing in plan, amount or premium rate from the applied for? (If "Yes" give date, company and reason.) |
| | | Date (mm/dd/yyyy): ___  Company: ___  Reason: ___ |

| ☐ Yes ☐ No | 2. | Do you intend to travel or reside outside of the United States or Canada? (If "Yes" state where, how long and purpose.) |
| | | Location City, Country: ___  Purpose: ___  How Long: (Specify weeks, months, years) ___ |

| ☐ Yes ☐ No | 3. | Are you negotiating for other insurance? (If "Yes" name companies and total amount to be placed in force.) |
| | | Company(ies): ___  Total Amount to be placed in force: ___ |

| ☐ Yes ☐ No | 4. | Have you flown during the past 3 years as a pilot, student pilot or crew member or do you plan to do so? (If "Yes" complete Aviation Questionnaire.) |

| ☐ Yes ☐ No | 5. | Have you participated in the past 3 years or plan to engage in ATV (all-terrain vehicle), organized motorized vehicle racing, stunt driving, motorcycle, motorboat, horse, or truck racing, rodeo, jet ski, scuba/skin diving, spelunking (cave exploration), hele-skiing, hang gliding, cliff diving, bungee jumping, snowmobile, bobsled, skeleton, luge, skydiving/sport parachuting, ultralight flying, ballooning, mountain climbing, big game hunting, boxing, martial arts? (If "Yes" complete Avocation Questionnaire.) |

| ☐ Yes ☐ No | 6. | Have you ever been convicted of a felony? (If "Yes" give details.) |
| | | Details: |

| ☐ Yes ☐ No | 7. | Have you ever been convicted of driving under the influence of alcohol or drugs, or had your driver's license revoked, or had 2 moving violations in the past 3 years? (If "Yes" give details.) |
| | | Details: |

**The following questions must be completed if the proposed insured is age 65 or older, and the face amount of the policy is $2,000,000 or more.**

| ☐ Yes ☐ No | 8. | Will any of the first year or subsequent premiums for the policy be borrowed by the proposed owner or proposed insured or by any other individual, trust, partnership, corporation or similar or related entity? |
| | | If "Yes" provide the name of the Premium Financing Program __PFG Private Funding__ |
| | | If "No" identify the source of funding for the premiums. (check all that apply). |
| | | ☐ Current Income  ☐ Cash and Equivalents  ☐ Marketable Securities  ☐ Non-Readily Marketable Securities: |
| | | ☐ Retirement Accounts  ☐ Other Assets (explain): |

| ☐ Yes ☐ No | 9. | Will the owner, now or in the future pay premiums funded by an individual and/or entity other than the proposed insured? (If "Yes" give details.) |
| | | Details: __Borrowed Funds from PFG Private Funding__ |

| ☐ Yes ☐ No | 10. | Is the policy being purchased in connection with any formal or informal program under which the proposed owner or proposed insured have been advised of the opportunity to transfer the policy to a third party within five years of its issuance? (If "Yes" give details.) |
| | | Details: |

| ☐ Yes ☐ No | 11. | Does the proposed insured or proposed owner have any understanding or agreement providing for a party other than the owner, to obtain any legal or equitable right, title or interest in the policy or entity owning the policy? (If "Yes" give details.) |
| | | Details: |

| ☐ Yes ☐ No | 12. | Has any entity, including, for example, any life expectancy valuation company or premium financing company, conducted (or made plans to conduct in the future) a life expectancy evaluation of the insured within the past two years? If yes, identify the entity or entities (including a contact name and telephone number) that provided the life expectancy valuations. |

| ☐ Yes ☐ No | 13. | Has either the proposed insured or the proposed owner, in the past five years, sold a policy to a life settlement, viatical, or other secondary market provider? (If yes, give details.) |
| | | Details: |

| | 14. | State in detail what bona fide need the proposed owner or proposed insured has for this insurance. (Attach additional statements or documentation if necessary.) __Estate Liquidity__ |

| ☐ Yes ☐ No | 15. | Has the proposed insured or proposed owner, or any individual, trust, partnership, corporation or similar or related entity received cash or other financial inducements in connection with this application or the purchase of this insurance? (If "Yes" give details.) |
| | | Details: |

EXHIBIT 2 - PAGE 180

## Section XI - Authorization To Obtain Information

I authorize any licensed physician, health care practitioner, hospital, medical laboratory, clinic or other medically-related facility, insurance company or the Medical Information Bureau (MIB), having any records or knowledge of me or my health, to provide any such information to PHL Variable Insurance Company (Phoenix), or its reinsurers. The information requested may include information regarding diagnosis and treatment of physical or mental condition, including consultations occurring after the date this authorization is signed. I authorize any of the above sources to release to Phoenix or its reinsurers any of my information relating to alcohol use, drug use and mental health care.

Medical information will be used only for the purpose of risk evaluation and determining eligibility for benefits under any policies issued. Phoenix may disclose information it has obtained to others as permitted or required by law, including the MIB, our reinsurers and other persons or entities performing business or legal services in connection with this application, any contract issued pursuant to it or in connection with the determination of eligibility for benefits under an existing policy. Information that is not personally identifiable may be used for insurance statistical studies.

To facilitate rapid submission of information, I authorize all of the above sources, except MIB, to give such records or knowledge to any agency employed by Phoenix to collect and transmit such information.

I authorize consumer reporting agencies, insurance companies, motor vehicle departments, my attorneys, accountants and business associates and the MIB to provide any information to Phoenix or its reinsurers that may affect my insurability. This may include information about my occupation, participation in hazardous activities, motor vehicle record, foreign travel, finances, and other insurance coverage in place.

I acknowledge that I have received a copy of the Notice of Information Practices, including information about Investigative Consumer Reports and the Medical Information Bureau. I authorize the preparation of an investigative consumer report. I understand that upon written request, I am entitled to receive a copy of the investigative consumer report.

This authorization shall continue to be valid for 26 months from the date it is signed unless otherwise required by law. A photocopy of this signed authorization shall be as valid as the original. This authorization may be revoked by writing to Phoenix at any time the insurance coverage has been placed in force. I understand my authorized representative or I may receive a copy of this authorization on request.

☐ I do  ☐ I do not (check one) require that I be interviewed in connection with any investigative consumer report that may be prepared.

This authorization excludes the release of information about HIV (AIDS Virus) tests which was administered (1) to a criminal offender or crime victim as a result of a crime that was reported to the police; (2) to a patient who received the services of emergency medical services personnel at a hospital or care facility; (3) to emergency medical personnel who were tested as a result of performing emergency medical services. The term "emergency medical personnel" includes individuals employed to provide pre-hospital emergency services; licensed police officers, firefighters, paramedics, emergency medical technicians, licensed nurses, rescue squad personnel, or other individuals who serve as volunteers of ambulance service who provide emergency medical services; crime lab personnel, correctional guards, including securing guards at the Minnesota security hospital who experience a significant exposure to an inmate who is transported to a facility for emergency medical care; and other persons who render emergency care or assistance at the scene of an emergency; or while an injured person is being transported to receive medical care and who would qualify for immunity under the good samaritan law.

## Section XII - Signature

I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

I understand that 1) no statement made to, or information acquired by any Licensed Producer who takes this application, shall bind the Company unless stated in Part I and/or Part II of this application, and 2) the Licensed Producer has no authority to make, modify, alter or discharge any contract thereby applied for.

I understand and agree that the insurance applied for shall not take effect unless and until each of the following has occurred: 1) the policy has been issued by the Phoenix; 2) the premium required for issuance of the policy has been paid in full during the lifetime of the insured; 3) all the representations made in the application remain true, complete and accurate as of the date the policy is delivered; 4) the insured is alive when the policy is delivered; and 5) as of the date of delivery of the policy, there has been no change in the health of any proposed insured that would change the answers to any of the questions in the application.

I understand that if there is any change in my health or physical condition, or if I visit a physician or am hospitalized, subsequent to the date I complete the application or provide any information to be contained in the application, I will inform Phoenix as soon as possible.

Under penalty of perjury, I confirm that 1) the Social Security or Tax Identification Number shown is correct, and 2) that I am not subject to back-up withholding. If I have applied for the Living Benefit Rider, I confirm that I have received a copy of the disclosure form, Summary of Coverage for Accelerated Benefit Rider.

| Proposed Insured's Signature | State Signed In | Witness Signature(Must be signed in presence of Proposed Insured) | Date (mm/dd/yyyy) |
|---|---|---|---|
| | | | 10-5-2008 |
| Owner's Signature (if other than Proposed Insured) | State Signed In  MN | Witness Signature (must be signed in presence of Owner)  *Nancy Klein* | Date (mm/dd/yyyy)  06-04-2008 |
| Parent's Signature (for minor insured)  SEE OWNERS STATEMENT ATTACHED TO APPLICATION | State Signed In | Witness Signature (Must be signed in presence of Owner) | Date (mm/dd/yyyy) |

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement may be guilty of insurance fraud as determined by a court of competent jurisdiction.

The Producer hereby confirms he/she has truly and accurately recorded on the application the information supplied by the Proposed Insured; and that he/she is qualified and authorized to discuss the contract herein applied for.

| Licensed Producer's Name (Print First, Middle, Last)  ELIC BERNSTEIN | Licensed Producer's Email Address | |
|---|---|---|
| Licensed Producer's Signature | Date (mm/dd/yyyy)  10-5-09 | Licensed Producer's I.D. #  31-7991 | Licensed Producer's Telephone # |

OL42SOAMN.1

3 of 5

9-07

'EXHIBIT 2 - PAGE 181



PO Box 8027
Boston MA 02266-8027

Phone 800.628.1936
Internet  www.PhoenixWM.com

Phoenix Life Insurance Company
PHL Variable Insurance Company
Phoenix Life and Annuity Company
*Members of the Phoenix Company Inc.*

November 14, 2011



RE:  Contract / Policy:   97528505
     Deceased:
     Claim No:            111109CD1144

Dear ▓▓▓

We are sorry to learn of the passing of ▓▓▓ and wish to express our sympathies.

Our records indicate that proceeds are payable to the US Bank NA as Securities Intermediary. Please note, there is an outstanding Collateral Assignment to US Bank Trust NA as Security Trustee dated 7/29/11.

We need your help in completing the claim process by providing the following:

❑ a certified copy of the death certificate (showing cause & manner of death)
❑ completion and return of the enclosed Beneficiary Statement by an Officer of US Bank NA as Securities Intermediary clearly indicating his/her title
❑ completion of the enclosed Affidavit as to the Extent of Interest form, signed by an Officer of US Bank Trust NA as Security Trustee , Assignee, clearly indicating his /her title and the beneficiary
❑ return of the policy/contract.

We are ready to assist you with these important financial matters.  Our Claims Examiners are available at 1-800-814-3692 to answer your questions Monday through Friday from 8:30 a.m. to 5:00 p.m. Eastern time.  As always, we appreciate the opportunity to serve your insurance needs.

Sincerely,

Life Claim Examiner
Benefits

**EXHIBIT  2**

EXHIBIT 2 - PAGE 183



# PHOENIX

Neal R Regels, FLMI, ACS, AIAA, AIRC, ARA, PLHC
Director
Claims, Title, Disbursements
PO Box 22012
Albany NY 12201-2012
518-479-8882
518-479-8412 fax
neal.regels@ophoenixwm.com

January 6, 2012

US Bank NA as Securities Intermediary
BP-MN-WS3D
60 Livingston Avenue
St Paul MN 55107

Re:   Policy/Contract No: 97528505
      Insured: ▇▇▇▇▇
      Claim No.: 11109CD1144

Dear US Bank NA as Securities Intermediary:

We are sorry to learn of the death of ▇▇▇▇▇ and wish to express our sincere sympathy to his family and associates. Our records indicate that the beneficiary is the US Bank NA as Securities Intermediary.

On December 23, 2011, we received:

- An original, certified Death Certificate showing cause and manner of death;
- A completed Beneficiary Statement, signed by Russel D. Mosely, Vice President;
- A Collateral Assignee's Affidavit, signed by Russell D. Mosely, Vice President, as both affiant and beneficiary;
- The returned policy.

Issues have been raised regarding ▇▇▇▇▇ consent to the insurance being taken out on his life and whether a valid insurable interest existed at the time the policy was issued. As a result, Phoenix will be conducting an investigation concerning the circumstances surrounding the application for the policy. As part of this process, we will require the following:

- Documentation reflecting the reasons ▇▇▇▇▇ applied for the Policy. This would include, but not be limited to the following:
  - Any documents reflecting ▇▇▇▇▇ intent in applying for the Policy;
  - Any documents reflecting the use of the Policy for "estate planning" purposes;
  - Documents reflecting any estate plan developed for ▇▇▇▇▇;
  - Any documents reflecting any payment, promise or other inducement for ▇▇▇▇▇ to apply for and/or obtain the Policy;
  - Documents reflecting any formal or informal program or arrangement under which ▇▇▇▇▇ was made aware of any opportunity to transfer the policy in a life settlement or other similar transaction within five years of its issuance;
  - Any documents reflecting an intent that any party, other than the ▇▇▇▇▇ 2008 Irrevocable Trust (the ▇▇ Trust"), would obtain any right, title or interest in the Policy;

P.O. Box 8027                  800 628 1936 Phone
Boston, MA 02266-8027          www.phoenixwm.com



EXHIBIT 3

EXHIBIT 2 - PAGE 184

- Documentation reflecting the chain of ownership for the Policy or the beneficial interest in the Lins Trust. This would include, but not be limited to the following:
  - The trust agreement for the ███ Trust, including any amendments, supplements, or addenda thereto;
  - Any documents reflecting the sale of or the proposed or potential sale of the beneficial interest in the ███ Trust;
  - Documents reflecting US Bank NA as Securities Intermediary's acquisition of the Policy, including any purchase agreements or beneficial interest transfer agreements;

- Documentation reflecting the source of funds for premiums paid on the Policy. This would include, but not be limited to the following:
  - Documents reflecting the source of funds used to pay premiums on the Policy for the first two years after the Policy was issued;
  - Documents reflecting the source of funds contributed to the ███ Trust;
  - Documents reflecting any loans or other financing arrangement provided to Mr. ███ or the ███ Trust in connection with payment of premiums on the Policy;

- Documentation reflecting the income and net worth of Mr. ███ at the time the policy was applied for.

This list of required documentation is not exhaustive and we reserve the right to request further and additional documentation as our investigation proceeds. To the extent you have any of the above documentation in your possession or control, we are requesting that you provide copies to the undersigned as soon as possible. Please contact me if you have any questions or if you feel you have information which could assist us in making our inquiry.

Sincerely,

*Neal Regels*

Neal Regels

EXHIBIT 2 - PAGE 185

# US bank

All of **us** serving you

EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107

January 20, 2012

Neal R. Regels
Director
Claims, Title, Disbursements
Phoenix Life Insurance Company
PO Box 22012
Albany, New York  12201-2012

Re:   Policy/Contract No.: 97528505
      Insured: ▮▮▮▮▮▮▮
      Claim No.:  11109CD1144

Dear Mr. Regels:

We have received and reviewed your letter dated January 6, 2012 regarding the above-referenced life insurance claim filed in connection with the death of Mr. ▮▮▮▮▮▮▮. In your letter you write that "[i]ssues have been raised regarding ▮▮▮▮▮ consent to the insurance being taken out on his life and whether a valid insurable interest existed at the time the policy was issued," and you request that we provide certain documentation to assist Phoenix in what you refer to as "an investigation concerning the circumstances surrounding the application for the policy."

The time for Phoenix to underwrite ▮▮▮▮▮▮ life insurance policy passed long ago, given that Phoenix issued this policy in June 2008. As you are undoubtedly aware, the policy referenced above was issued to the ▮▮▮▮▮▮▮ 2008A Irrevocable Trust, a Minnesota trust established by ▮▮▮▮▮▮, who was the original Trustee, with his wife, ▮▮▮▮▮▮, named as the trust beneficiary. Clearly, ▮▮▮▮▮▮ (as the insured), the trust (as the purchaser of the policy) and ▮▮▮▮▮▮ (as the ultimate beneficiary of the policy) all possessed an insurable interest in the life of ▮▮▮▮▮.

In accordance with the terms of the ▮▮▮ policy, we have already provided Phoenix with all of the information necessary to pay the death benefit to us as the current owner and beneficiary of the ▮▮▮ policy. Specifically, we previously forwarded to Phoenix a copy of Mr. ▮▮▮▮ death certificate, a completed Beneficiary Statement and completed Affidavit as to the Extent of Interest, and we returned the original policy, all as requested in a letter from Phoenix dated November 14, 2011. We expect that you will pay the death benefit owed under the ▮▮▮ policy forthwith, as you are required to do under the terms of the policy.

Sincerely,

Russell D. Mosley
Vice President

EXHIBIT 4

EXHIBIT 2 - PAGE 186



PHOENIX

Neal R Regels, FLMI, ACS, AIAA, AIRC, ARA, FLHC
Director
Claims, Title, Disbursements
PO Box 22012
Albany NY 12201-2012
518-479-8882
518-479-8412 fax
neal.regels@ophoenixwm.com

January 27, 2012

Mr. Russell D. Mosley
Vice President
US Bank, NA as Securities Intermediary
EP-MN-WS3D
60 Livingston Ave.
St. Paul, MN 55107

> Re:  Policy/Contract No. 97528505
>       Insured: ▉▉▉▉▉▉▉
>       Claim No. 11109CD1144

Dear Mr. Mosley:

I write in response to your January 20, 2012 letter. In your letter, you assert that ▉▉▉▉▉ was the original trustee of the ▉▉▉▉▉▉ 2008A Irrevocable Trust (the "Trust") and that ▉▉▉▉▉ was the beneficiary of the Trust. Our file reflects that BNC National Bank was the original trustee of the Trust. Moreover, it is ▉▉▉▉▉ who has raised issues concerning ▉▉▉▉ lack of consent to the insurance and the circumstances surrounding the application for the Policy and the establishment of the Trust. Phoenix takes these allegations very seriously and will complete its investigation prior to reaching a claims decision.

Your letter mistakenly asserts that Phoenix is attempting to re-underwrite the Policy which is not the case. My January 6, 2012 letter clearly explained that the purpose of this investigation was to evaluate the circumstances surrounding the application for the policy, in light of the issues raised by ▉▉▉▉▉ concerning ▉▉▉▉ lack of consent to the coverage and the potential lack of insurable interest. The documents requested in my letter reflect the limited scope of this investigation.

Your refusal to cooperate with our investigation will unnecessarily delay and impede our ability to reach a claims decision. As such, I encourage you to reconsider your position and to provide us with the requested documentation and information.

Sincerely,

Neal R. Regels

P.O. Box 8027          800 628 1936 *Phone*
Boston, MA 02266-8027   www.phoenixwm.com

EXHIBIT __5__

EXHIBIT 2 - PAGE 187



All of **us** serving you

February 16, 2012

Neal R. Regels
Director
Claims, Title, Disbursements
Phoenix Life Insurance Company
PO Box 22012
Albany, New York 12201-2012

Re:   Policy/Contract No.: 97528505
      Insured: ▇▇▇▇▇▇
      Claim No.: 11109CD1144

Dear Mr. Regels:

We have received your letter dated January 27, 2012 regarding the claim submitted for the above-referenced life insurance policy (the "Policy") in connection with the death of Mr. ▇▇▇▇▇▇. In your letter you write that "▇▇▇▇▇▇ has raised issues concerning ▇▇▇▇▇▇ lack of consent to the insurance and the circumstances surrounding the application for the Policy and the establishment of the Trust".

In order to resolve these allegations and assist you in expeditiously completing your investigation, we have enclosed an agreement entitled Acknowledgment and Consent by Insured, Insured's Spouse and Beneficiary dated August 21, 2009 (the "Consent"). The Consent was signed by both ▇▇▇▇▇▇ (who signed as the spouse of the insured and as the beneficiary of the Policy). The Consent includes a description of the circumstances surrounding the initial issuance of the Policy and representations and warranties from both ▇▇▇▇▇▇ ▇▇▇▇ regarding their participation in the application process for the Policy.

We trust that this information will allow you to conclude your review. We have previously provided you with all of the documentation required by the terms of the Policy. We expect that you will pay the death benefit owed under the Policy forthwith, as required by the clear terms of the Policy.

Sincerely,

Russell Mosley

US Bank National Association

Enclosure

EXHIBIT __6__

EXHIBIT 2 - PAGE 188

## ACKNOWLEDGMENT AND CONSENT
### BY INSURED, INSURED'S SPOUSE AND BENEFICIARY

This **ACKNOWLEDGMENT AND CONSENT** (the "Acknowledgment") is executed as of _____, 2009, by _____ (the "Insured"), a resident of the State of New York and the natural person whose life is insured by the Policy (as defined below), the undersigned spouse of the insured, if any, and _____ (the "Beneficiary" and, together with the Insured, the "Signatories"), a resident of the State of New York and the person who is the sole beneficiary of the Transferor (as defined below). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Transfer Agreement (as defined below).

### W I T N E S S E T H:

WHEREAS, the Insured formed the _____ 2008A **Irrevocable Trust** (the "Transferor") pursuant to that certain trust agreement of the Transferor by and between the Insured and BNC National Bank, as trustee (the "Trustee"), dated as of **June 2, 2008** (as amended, modified and supplemented and in effect from time to time, the "Trust Agreement"). The Transferor, by and through the Trustee in the State of Minnesota, executed an application for the purchase of a policy insuring the Insured's life and, in the State of Minnesota, delivered such application to an appointed, licensed insurance agent of **Phoenix Life Insurance Company** (the "Insurer"), which agent was licensed to conduct business in the State of Minnesota. The Insurer issued that certain universal life insurance policy, identified by policy number **97528505** (the "Policy"), issued on **January 21, 2008**, which was delivered to the Trustee on behalf of the Transferor in the State of Minnesota.;

WHEREAS, the Transferor is the sole owner and sole beneficiary of the Policy, which has a face amount of death benefit of **$3,000,000.00**;

WHEREAS, the Trust Agreement permits the transfer of the Policy;

WHEREAS, pursuant to the Delayed Transfer Agreement (the "Transfer Agreement"), dated as of _____, 2009, by and among PFG Loans Funding LLC, a limited liability company organized under the laws of the State of Minnesota (the "Transferee"), the Transferor elected to transfer to Transferee, and Transferee agreed to accept from the Transferor, all of the rights, title and interest in and to the Policy, in satisfaction of the full amount of debt outstanding (the "Loan Satisfaction") subject to the condition that the Loan not have been repaid and certain other conditions precedent and subsequent stated in the Transfer Agreement, pursuant to that certain Term Financing Facility Agreement dated and executed as of **June 13, 2008**, to which each of the Insured, the Trustee and the Transferor are party (the "Loan Agreement");

WHEREAS, each signatory agrees that the Loan Satisfaction is, in its judgment based on its individual circumstances, fair, reasonable and adequate consideration to the Transferor for the Transfer of the Policy to the Transferee. The Signatories are aware that the Loan Satisfaction may be different than the current fair market value of the Policy; and

WHEREAS, in order to induce the Transferee to enter into the Transfer Agreement and, if it is transferred thereunder, to accept the Policy from the Transferor under the Transfer Agreement, each of the Signatories has agreed to execute this Acknowledgment and, if the Insured is married, the Insured's Spouse has agreed to execute the Acknowledgment.

EXHIBIT 2 - PAGE 189

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants, warranties, representations and conditions contained in this Acknowledgment, it is hereby agreed as follows:

ARTICLE 1.   REPRESENTATIONS, WARRANTIES AND ACKNOWLEDGEMENTS OF THE SIGNATORIES AND OF INSURED

1.1.   Transaction Documents. The Signatories have received copies of, read, understand, approve and consent to the Transfer Agreement in the form attached hereto as Exhibit A and each of the other Transaction Documents listed on Exhibit B thereto (the "Transaction Documents") and hereby acknowledge and consent to the transactions contemplated by each such agreement.

1.2.   Execution, Delivery and Enforceability of this Acknowledgment and other Transaction Documents. Each of the Signatories represents and warrants that this Acknowledgment and any other Transaction Document to which such Signatory is a party have been or will be duly executed and delivered by the Insured, and (assuming due authorization, execution and delivery by the parties thereto other than such Signatory) this Acknowledgment and any other Transaction Document to which such Signatory is a party constitute or will constitute upon execution and delivery legal, valid and binding obligations of the Insured, enforceable against the Insured in accordance with their terms, subject, as to enforceability, to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law).

1.3.   Non-Reliance – Transfer of Policy. Each Signatory represents and warrants that in connection with the transfer of the Policy by the Transferor to Transferee, such Signatory has not relied on any financial projection or illustration, or any representation, warranty, covenant or agreement other than those contained in this Acknowledgment, nor has any of the Signatories relied upon any statement, information or advice provided by Transferee, its affiliates or their respective officers, trustees, employees, advisors, agents or representatives (collectively, "Representatives"). Each Signatory acknowledges that none of the Transferee, its affiliates, or any of their respective Representatives is acting on behalf of the Insured in connection with the transfer of the Policy to Transferee.

1.4.   Accuracy of Information. The Insured represents and warrants that all the answers provided by the Insured to the questions contained in, and all of the information requested in, the application by the Transferor for the purchase of the Policy were true, correct and complete in all respects and did not state any misleading or incorrect fact, answer or other requested information or fail to state any fact, answer or other requested information requested in or in connection with the application or necessary to make any answer or response to any requested information not misleading or incorrect, including without limitation, the answer provided to any question regarding (a) the intent of the applicant for the Policy, the Transferor, or the Insured to sell the Policy after its issuance, (b) whether any life insurance policy that insures or previously insured the life of the Insured has been sold or applied for or (c) whether any premiums to be paid for the Policy will be financed or the Policy will be the subject of a loan free and clear of all liens, pledges, claims, security interests and encumbrances (collectively, "Encumbrances"). Each Signatory represents and warrants that all information provided or furnished by or on behalf of such Signatory or the Transferor to Transferee in connection with this Acknowledgment and the transactions contemplated hereby is true, complete and accurate in all respects and does not contain any misstatement of fact or omit to state any fact required to be furnished hereunder or necessary to make the statements contained herein or therein not misleading. The Insured is aware that a person that knowingly presents false information in an

EXHIBIT 2 - PAGE 190

application for a life insurance policy or a life settlement is guilty of insurance fraud and may be subject to fine or imprisonment, as applicable.

1.5.    No Violation, Rescission or Cancellation of Policy. Each Signatory represents and warrants that such Signatory has not received any notice from the Insurer of any violation of any term or condition of the Policy or the application for the Policy, including but not limited to, any notice of (a) the rescission or cancellation of the Policy, or (b) the lapse of the Policy.

1.6.    Reliance by Third Parties. Each Signatory acknowledges and agrees that the Trustee of the Transferor, the Transferee and any subsequent owner of the Policy will be acting in reliance upon the representations, warranties and covenants of the Insured set forth herein, and any such person or entity shall be intended third party beneficiaries with respect to such representations warranties and covenants set forth herein.

1.7.    Independent Decision. Each Signatory represents and warrants that to the best of such Signatory's knowledge, the Transferor made the decision to transfer the Policy to Transferee (a) on the Transferor's own initiative, (b) voluntarily, (c) willingly, (d) without any undue influence or duress, (e) on a fully informed basis after consulting with the Transferor's tax, estate planning, legal, financial or other advisors, without relying on any representations or advice from Transferee, its affiliates or their respective Representatives, (f) after having all of the Transferor's questions answered regarding such decision, (g) after having sufficient time to carefully complete the Transferor's analysis of such decision, (h) after considering the advantages and disadvantages of a sale of the Policy and the other alternatives available, including retaining or otherwise selling the Policy, or borrowing against the cash value of, or surrendering, the Policy, and (i) after considering that the Insured may be limited in taking out future life insurance policies while the Policy is still in effect. Each Signatory represents and warrants that such Signatory has consulted with its own tax, estate planning, legal, financial or other advisors, without relying on any representations or advice from Transferor, Transferee, its affiliates or their respective Representatives after having all of such Signatory's questions answered regarding such matters. Without limiting the generality of the foregoing, each Signatory has reviewed the Internal Revenue Service's Revenue Ruling 2009-13 and its potential impact on Signatory with such Signatory's tax advisor. Each Signatory acknowledges and agrees that such Signatory concurs with the decision of the Transferor to transfer the Policy to Transferee after taking into account clauses (a) through (i) of the preceding sentence.

1.8.    Adequacy of Consideration. Each Signatory hereby agrees that the agreement to enter into the Transfer Agreement and the Loan Satisfaction is, in its judgment based on its individual circumstances, fair, reasonable and adequate consideration to the Transferor for Transferor's agreement to enter into the Transfer Agreement and the Transfer of the Policy to the Transferee. Each Signatory certifies that such Signatory and the Transferor are aware that the Amount of the Loan Satisfaction may be more or less than the current fair market value of the Policy.

1.9.    The Insured. The Insured represents and warrants, that

a) The information concerning the Insured recorded on the Transaction Documents and other documents relating to the transactions contemplated herein, the Trust Agreement and the Policy (and other documents relating to the Trust and the Policy) is true, complete and accurate and the signatures affixed upon those documents are genuine and original, and neither any such information nor any such signatures have been altered, manipulated or tampered with in any fashion;

EXHIBIT 2 - PAGE 191

b) Prior to and as a condition to the issuance of the Policy, the Insured underwent a medical examination by a physician or other medical professional during which a blood sample of the Insured was taken;

c) The Insured does not have a catastrophic, chronic, life-threatening or terminal illness and does not have a life expectancy of twenty-four (24) months or less;

d) The Insured is of sound mind and under no constraint or undue influence;

e) The Insured is not insolvent and is not currently a petitioner in any bankruptcy proceeding;

f) The Insured hereby certifies that no formal or informal agreement, arrangement or understanding to sell or assign ownership of or any beneficial interest in the Policy was in effect at or prior to the date of issuance of the Policy and formation of the Transferor;

g) The Insured agrees that any or all beneficial interests in the Policy may be assigned, sold, or transferred by the Transferee or its assignees without any further consent;

h) The health and medical data, information and records provided by the Insured's physician(s) in connection with the issuance of the Policy and the transactions contemplated herein are true, complete and accurate, do not omit any information relevant to the transactions contemplated herein, and have not been altered, manipulated or tampered with in any fashion;

i) The Insured has complied with all obligations of furnishing the Insurer with such true, complete and accurate information as has been requested by the Insurer, including, without limitation, such information requested on the application for the Policy;

j) The Insured has not engaged in any conduct, omissions or acts, or made any representations or misrepresentations, which could directly or indirectly preclude Transferee's recovery of benefits pursuant to or under the Policy;

k) If the Insured is married, the Insured's undersigned Spouse consents to the transactions contemplated herein, and the Insured is not currently a party to any divorce or marital separation proceeding, party to any divorce settlement or decree, or contemplating divorce or separation from the Insured's Spouse, and has no knowledge that such spouse may be contemplating divorce or separation from such person;

l) The Insured has not (i) obtained any financing, investment or loan, other than the Loan Agreement, from any person or entity for the Transferor's purchase or maintenance of the Policy, including without limitation the payment of any premiums due thereon, or (ii) entered into any other contracts that relate to the Policy, any other assets of the Transferor or the proceeds therefrom, except for the transactions made in connection with the Loan Agreement and otherwise as has been disclosed as set forth in Exhibit B attached hereto (collectively, the "Disclosed Contracts"). The Insured further represents and warrants that, if any Disclosed Contracts exist, (i) the total outstanding balance, including all principal, interest and any fees or amounts due upon termination, early or otherwise, thereof does not exceed the gross purchase price paid by the Transferee to the Transferor, and (ii) after giving effect to the transactions contemplated herein, Transferee will have the right and ability to terminate all Disclosed Contracts, including without limitation the repayment of any debts outstanding that relate to, affect or for which an Encumbrance has been granted in the Transferor or the Policy.

EXHIBIT 2 - PAGE 192

1.10.   <u>Bring-Down</u>.  The representations and warranties of each Signatory set forth in this Acknowledgment are and will be true and complete on and as of the Closing Date (as defined in the Transfer Agreement), with the same force and effect as if made on and as of such date, and each Signatory hereby covenants and agrees to inform the Transferee of any event or development which shall invalidate, in any material respect, any of the representations and warranties contained herein.

ARTICLE 2.    CONSENT, WAIVER AND RELEASE

2.1.    Each Signatory, on behalf of himself or herself and his or her respective heirs and/or estates, hereby releases, forever waives, discharges and covenants not to sue, and agrees release from any liability whatsoever, the Transferee, the Trustee and each of their respective subsidiaries, related or affiliated entities, predecessors, successors and assigns, and present, former, and future officers, directors, trustees, employees, including, without limitation, agents, administrators, representatives, attorneys, insurers or fiduciaries, in both their individual and representative capacities (collectively, "Released Parties" ) from all actions, claims, demands, causes of action, obligations, damages, liabilities, expenses and controversies of any nature and description whatsoever (collectively, "Claims"), whether or not now known, suspected or claimed, which such Signatory or his or her heirs and/or estates has, had, or may have, against one or more of the Released Parties, which arise out of, relate to or are based on, in whole or in part, the Loan Agreement, the Transfer Agreement, this Agreement, the Policy, any Transaction Document or any matter whatsoever in any way relating thereto, including without limitation, Claims involving the negligence of any of the Released Parties.

2.2.    By signing this document, each Signatory represents, warrants and acknowledges (a) he has carefully read this Agreement in its entirety and fully understands all of its terms, including that it constitutes a complete release and waiver of liability, assumption of risk and indemnity with respect to the Loan Agreement, the Transfer Agreement, the Policy, any Transaction Document and any other matter whatsoever in any way relating thereto; (b) he has been advised, in writing, to review this Agreement, the Transfer Agreement, and Transaction Documents and all other documents relating hereto or thereto, with an attorney before signing it; (c) he has had a sufficient period of time within which to review this Agreement, the Transfer Agreement and Transaction Documents and all other documents relating hereto or thereto, and has consulted with his attorney regarding all aspects of such Agreements and documents, and is satisfied with the advice he has received from such attorney; (d) he understands that the transfer contemplated by the Transfer Agreement and the consents he is giving by signing this Agreement are irrevocable.

ARTICLE 3.    OTHER AGREEMENTS

3.1.    <u>Annuity Authorization</u>. The Insured hereby irrevocably consents to the purchase by the Transferee or its designee, in the event the Transferee or its designee in its sole discretion deems it advisable, of one or more life annuity contracts under which the Insured is to be the annuitant or measuring life in such amounts that the Transferee or its designee determines in is sole and absolute discretion to be advisable.

3.2.    <u>Insured's Health Status</u>. The Insured hereby acknowledges that the Transferor, the Insured or the individuals designated by the Insured for tracking the Insured's life may be contacted by Transferee, or any successor owner of the Policy, or authorized representatives for the purpose of determining the Insured's health status from time to time, but no more often than allowed by law. The Insured agrees that it will cooperate with the Transferee or its authorized representatives, in providing a listing of new or additional physicians providing medical services to the Insured, entering

EXHIBIT 2 - PAGE 193

into additional consents to provision of protected health information (including provider-specific forms of consent required by particular providers, even if identical in substance to consents previously provided), and other cooperation requested by Transferee all to the extent not inconsistent with applicable law.

3.3.     Third Party Wrongdoing.   Each Signatory, for itself and on behalf of its respective successors, assigns, hereby remises, releases and forever discharges each of the Transferee and its present and former officers, directors, stockholders, employees, agents, attorneys, successors, affiliates and assigns from any and all claims, rights, actions, causes of action, suits, liabilities, defenses, damages and costs that challenge or invalidate Transferee's right to, or the proceeds of the Policy, that may exist now or in the future, that relate to alleged wrongdoing of third parties, including those parties involved in the origination of the Policy or any financing to pay premiums thereon; provided that, this Section shall not impact or restrict the Insured's ability to take recourse against parties other than the Transferee through means that will not be detrimental to the Transferee's ownership and enjoyment of the Policy or rights to proceeds of the Transferor, including those proceeds resulting from the sale or maturity of the Policy. The Insured, for itself and on behalf of its respective successors, assigns, hereby remises, waives any and all claims, rights and benefits it may have under any law of any jurisdiction that would render ineffective a release made by a seller of claims that the seller does not know or suspect to exist in its favor at the time of executing the release and that, if known by it, would have materially affected its dealings with the applicable Transferee.

3.4.     GOVERNING LAW.   THIS ACKNOWLEDGMENT WILL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MINNESOTA (WITHOUT REFERENCE TO CONFLICTS OF LAWS PROVISIONS), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER WILL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

3.5.     Consent to Jurisdiction.   The Insured, on its own behalf and on behalf of its successors and permitted assigns, (i) hereby irrevocably and unconditionally submits to the non-exclusive jurisdiction of the federal and state courts located in the County of Hennepin in the State of Minnesota, for the purpose of any proceeding relating to or arising out of the transactions contemplated herein or any other Transaction Document to which the Insured is a party, and (ii) to the extent permitted by applicable law, hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of the above-named courts, that its property is exempt or immune from execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper, or that this Acknowledgment or any other Transaction Document to which the Insured is a party may not be enforced in or by such court. The Insured hereby agrees that service of process in any action, suit or proceeding with respect to any matter as to which the Insured submits to jurisdiction herein may be served by mailing a copy thereof by registered or certified mail, postage prepaid, return receipt requested, addressed to the Insured at its address provided for notices hereunder, such service to become effective seven (7) Business Days after such mailing.

3.6.     WAIVER OF JURY TRIAL.   THE INSURED HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS ACKNOWLEDGMENT. INSTEAD, ANY DISPUTE RESOLVED IN COURT WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

EXHIBIT 2 - PAGE 194

3.7.    Survival. The representations and warranties made by the Insured herein and the indemnity obligations of the Insured hereunder shall survive the Closing Date.

3.8.    Notices and Communications.   Any notice, payment, request, instruction or other communication or document required or which may be given hereunder shall be in writing and be delivered personally, be sent by facsimile transmission (in which event such notice shall also be mailed as provided herein), or be mailed by certified or registered mail, postage prepaid, and shall be deemed given when so delivered personally, or when receipt is acknowledged by telecopy equipment if sent by facsimile transmission or, if mailed, two days after the date of mailing, as follows:

> If to Transferee:      PFG Loans Funding LLC
> c/o Marshall & Ilsley Trust Co., as Administrative Agent
> 651 Nicollet Mall, Suite 301
> Minneapolis, MN 55402

If to the Insured: To the address shown on the signature page.

The parties may change the person and addresses to which the notices or other communications are to be sent by giving written notice of any such change in the manner provided herein for giving notice.

3.9.    Payment of Funds. If any of the Beneficiary, the Beneficiary's spouse or the Beneficiary's estate (the "Beneficiary Receiving Party"), the Insured, the Insured's spouse or the Insured's estate (the "Insured Receiving Party") receives any proceeds derived or to be derived from any life insurance policy previously or then held within the Transferor and associated with the Policy (other than the proceeds received pursuant to this Acknowledgment), the Beneficiary (in the case of any Beneficiary Receiving Party) or the Insured (in the case of any Insured Receiving Party) shall cause such Beneficiary Receiving Party or Insured Receiving Party (as the case may be) to (a) immediately notify the Transferee of such receipt, (b) immediately transfer, convey and pay over such proceeds to the Transferee or any subsequent owner of the Policy as directed by the Transferee, (c) prior to such transfer, hold such proceeds in a constructive trust for the benefit of the Transferee and (d) take any and all actions reasonably requested by the Transferee in order to change the payment instructions with respect to such policy such that proceeds therefrom are payable solely to the Transferee or any subsequent owner of the Policy as directed by the Transferee.  In the event funds are distributed to a Receiving Party and such Receiving Party fails to deliver such funds to Transferee, the Insured agrees to indemnify Transferee up to the amount of such funds.

3.10.    Further Assurances. After the transactions contemplated hereby have been consummated, each of the Signatories will use best efforts and cooperate with the Transferee or its representatives, successors or designees in all reasonable respects, including without limitation in connection with Section 3.2 hereof and to obtain any and all documentation from the Transferor or Insurer or otherwise as may aid the Transferee in gaining the full benefit of its purchase.

3.11.    Severability. In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby in such jurisdiction, and such provision or obligation shall not in any way be affected or impaired thereby in any other jurisdiction.

EXHIBIT 2 - PAGE 195

3.12.   ACKNOWLEDGEMENT OF THE SIGNATORIES REGARDING TAX MATTERS.

Each of the Insured and the Beneficiary acknowledges that the Loan Satisfaction and Transfer of the Policy may have U.S. federal income tax and other tax consequences and each of them represents that he or she has consulted with his or her tax advisors in respect thereof. Without limiting the generality of the foregoing, each of the Insured and the Beneficiary has reviewed the Internal Revenue Service's Revenue Ruling 2009-13 and its potential impact on Signatory with his or her tax advisor.

Neither of the Insured or the Beneficiary has received or relied on any advice with respect to US federal income tax or other tax matters from any of the Transferor, the Transferee, the Trustee, PFG Loans Funding LLC, or any other party involved in the Loan Satisfaction and Transfer of the Policy, or any of their respective directors, officers, employees or agents.

Each of them acknowledges that Lender will issue a Form 1099-A to the Transferor in respect of the Loan Satisfaction and Transfer of the Policy each of them represents that he or she has consulted with his or her tax advisors in respect of that fact.

IN WITNESS WHEREOF, each Signatory has caused this Acknowledgment to be duly executed as of the date first written above.



INSURED

BENEFICIARY

INSURED'S SPOUSE

EXHIBIT 2 - PAGE 196

STATE OF _New York_ )
                                      )  SS.:
COUNTY OF _Nassau_ )

On this _21_ day of _August_, 2009, before me, a Notary Public in and for the State and County aforesaid, personally appeared ▨ personally known to me to be the individual described in and who executed the foregoing instrument, and acknowledged to me that he executed the same.

_Debra J Sabella_
Notary Public

My commission expires: _6/2013_

DEBRA L SABELLA
Notary Public, State of New York
No. 01SA6207574
Qualified in Nassau County
Commission Expires 6/15 20 13

STATE OF _New York_ )
                                      )  SS.:
COUNTY OF _Nassau_ )

On this _21_ day of _August_, 2009, before me, a Notary Public in and for the State and County aforesaid, personally appeared ▨ personally known to me to be the individual described in and who executed the foregoing instrument, and acknowledged to me that he executed the same.

_Debra J Sabella_
Notary Public

My commission expires: _6/2013_

DEBRA L SABELLA
Notary Public, State of New York
No. 01SA6207574
Qualified in Nassau County
Commission Expires 6/15 20 13

STATE OF _New York_ )
                                      )  SS.:
COUNTY OF _Nassau_ )

On this _21_ day of _August_, 2009, before me, a Notary Public in and for the State and County aforesaid, personally appeared ▨ personally known to me to be the individual described in and who executed the foregoing instrument, and acknowledged to me that he executed the same.

_Debra L Sabella_
Notary Public

My commission expires: _6/2013_

DEBRA L SABELLA
Notary Public, State of New York
No. 01SA6207574
Qualified in Nassau County
Commission Expires 6/15 20 13

EXHIBIT 2 - PAGE 197

EXHIBIT A

Transfer Agreement

EXHIBIT 2 - PAGE 198

**EXHIBIT B**

<u>Disclosed Contracts</u>

I. Loans

NONE.

II. Other Contracts entered into that relate to the Policy or proceeds of the Policy or Transferor

NONE.

EXHIBIT 2 - PAGE 199



PHOENIX

Neal R Regels, FLMI, ACS, AIAA, AIRC, ARA, FLHC
Director
Claims, Title, Disbursements
PO Box 22012
Albany NY 12201-2012
518-479-8882
518-479-8412 fax
neal.regels@phoenixwm.com

March 1, 2012

Mr. Russell D. Mosley
Vice President
US Bank, NA as Securities Intermediary
EP-MN-WS3D
60 Livingston Ave.
St. Paul, MN 55107

Re:   Policy/Contract No. 97528505
      Insured: ▓▓▓▓▓
      Claim No. 111109CD1144

Dear Mr. Mosley:

I write in response to your February 16, 2012 letter. In my January 27, 2012 letter, I requested several categories of documents. The purpose of obtaining these documents is to assist Phoenix in processing the claim US Bank, NA submitted for the death benefits on the above referenced policy and evaluating the assertions made by ▓▓▓▓▓ relating to the circumstances surrounding the issuance of the Policy. Rather than submitting all of the requested documentation, you included with your letter only a document that purports to be an "Acknowledgment and Consent by Insured, Insured's Spouse and Beneficiary." This document refers to a "Delayed Transfer Agreement", which is among the categories of documents requested in my January 27, 2012 letter. You have not provided us with the Delayed Transfer Agreement or any of the other requested documents.

I once again ask you to reconsider the position expressed in your January 20, 2012 and February 16, 2012 letters and provide Phoenix with the "Delayed Transfer Agreement" and any other documents in your possession or control that were requested in my January 27, 2012 letter.

Sincerely,

Neal R. Regels

EXHIBIT __7__

EXHIBIT 2 - PAGE 200



All of **us** serving you

EP-MN-WS3D
60 Livingston Avenue
St. Paul, MN 55107

March 9, 2012

Neal R. Regels
Director
Claims, Title, Disbursements
Phoenix Life Insurance Company
PO Box 22012
Albany, New York 12201-2012

> Re:   Policy/Contract No.: 97528505
>       Insured: ▮▮▮▮▮▮
>       Claim No.: 11109CD1144

Dear Mr. Regels:

I write in response to your letter dated March 1, 2012, in which you seek documents purportedly "to assist Phoenix in processing the claim . . . and evaluating the assertions made by Mrs. Lins relating to the circumstances surrounding the issuance of the policy." First, we have already provided Phoenix with all of the documents it needs to process the claim, in accordance with the terms of the policy itself. Those documents were provided to Phoenix several months ago on December 23, 2011. Second, in response to your purported concern that Mr. ▮▮▮may not have consented to the insurance, we provided you with the Acknowledgment and Consent by Insured, Insured's Spouse and Beneficiary, in which Mr. and Mrs. ▮▮▮make numerous representations and warranties regarding their participation in the application process for the policy. We also advised you on January 20, 2012 that Mrs. ▮▮▮(who obviously had an insurable interest in Mr. ▮▮▮life) was the beneficiary of the trust that originally owned the ▮▮▮policy, and you have not disputed this fact, which I am sure is reflected in your own records, as well as the fact that the policy was obtained through premium financing with PFG Private Funding.

Phoenix has no good faith basis for any concern about a potential lack of insurable interest. If Phoenix continues to refuse to pay this claim, we will take appropriate legal action.

Sincerely,

Russell Mosley
US Bank National Association

**EXHIBIT** _8_

# Exhibit 3

ORIGINAL

I/S
21

1 | Nancy Sher Cohen (SBN 081706)
ncohen@proskauer.com
2 | Lary Alan Rappaport (SBN 087614)
lrappaport@proskauer.com
3 | Joshua J. Pollack (SBN 215922)
jpollack@proskauer.com
4 | PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
5 | Los Angeles, CA 90067-3206
Telephone: (310) 557-2900
6 | Facsimile: (310) 557-2193

7 | John Failla (applying for *pro hac vice* admission)
jfailla@proskauer.com
8 | Elise Yablonski (applying for *pro hac vice* admission)
eyablonski@proskauer.com
9 | Nathan Lander (applying for *pro hac vice* admission)
nlander@proskauer.com
10 | PROSKAUER ROSE LLP
Eleven Times Square
11 | New York, NY 10036
Telephone: (212) 969-3000
12 | Facsimile: (212) 969-2900

13 | Attorneys for Plaintiffs

FILED
CLERK, U.S. DISTRICT COURT

JUN - 5 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

14 | **UNITED STATES DISTRICT COURT**

15 | **CENTRAL DISTRICT OF CALIFORNIA**

16 | **CV12-04926** SVW(ATNx)

17 | WILMINGTON SAVINGS FUND | Case No.
SOCIETY, FSB, as successor in interest to
18 | CHRISTIANA BANK & TRUST | **COMPLAINT FOR**
COMPANY, as trustee for JOHN DOE
19 | TRUST 1, JANE DOE TRUST 2, JOHN | **1. VIOLATION OF 18 U.S.C.**
DOE TRUST 3, JANE DOE TRUST 4, | **§ 1962 (c) (RICO);**
20 | JOHN DOE TRUST 5, JOHN DOE
TRUST 6, JANE DOE TRUST 7, JOHN | **2. VIOLATION OF 18 U.S.C.**
21 | DOE TRUST 8, JOHN DOE TRUST 9, | **§ 1962 (d) (RICO);**
JOHN DOE TRUST 10, JOHN DOE
22 | TRUST 11, JOHN DOE TRUST 12, | **3. FRAUD;**
JOHN DOE TRUST 13, JOHN DOE
23 | TRUST 14, JOHN DOE TRUST 15, JOHN | **4. DECLARATORY JUDGMENT;**
DOE TRUST 16, JOHN DOE TRUST 17,
24 | JOHN DOE TRUST 18, JOHN DOE | **5. BREACH OF CONTRACT;**
TRUST 19, JOHN DOE TRUST 20, JOHN
25 | DOE TRUST 21, JANE DOE TRUST 22, | **6. BREACH OF THE IMPLIED**
JOHN DOE TRUST 23, JOHN DOE | **COVENANT OF GOOD FAITH**
26 | TRUST 24, JOHN DOE TRUST 25, JOHN | **AND FAIR DEALING;**
DOE TRUST 26, JANE DOE TRUST 27,
27 | JOHN DOE TRUST 28, JOHN DOE | **7. PROMISSORY ESTOPPEL;**
TRUST 29, JOHN DOE TRUST 30, JOHN
28 | DOE TRUST 31, JOHN DOE TRUST 32, | **8. VIOLATION OF THE**
JOHN DOE TRUST 33, JOHN DOE | **CONNECTICUT UNFAIR TRADE**

EXHIBIT 3 - PAGE 202

TRUST 34, JOHN DOE TRUST 35, JOHN
DOE TRUST 36, JANE DOE TRUST 37,
JOHN DOE TRUST 38, JOHN DOE
TRUST 39, JANE DOE TRUST 40, JOHN
DOE TRUST 41, JANE DOE TRUST 42,
JANE DOE TRUST 43, JOHN DOE
TRUST 44, JOHN DOE TRUST 45, JOHN
DOE TRUST, 46 JANE DOE TRUST 47,
JOHN DOE TRUST 48, JOHN DOE
TRUST 49, JOHN DOE TRUST 50, JOHN
DOE TRUST 51, JANE DOE TRUST 52,
JANE DOE TRUST 53, JOHN DOE
TRUST 54, JOHN DOE TRUST 55, JOHN
DOE TRUST 56, JANE DOE TRUST 57,
JOHN DOE TRUST 58, JANE DOE
TRUST 59, JOHN DOE TRUST 60

**PRACTICES ACT; AND**

**9. VIOLATION OF
CALIFORNIA'S UNFAIR
COMPETITION LAW**

**JURY TRIAL DEMANDED**

Plaintiffs,

vs.

PHL VARIABLE INSURANCE
COMPANY, PHOENIX LIFE
INSURANCE COMPANY, and THE
PHOENIX COMPANIES, INC.

Defendants.

Plaintiffs John Doe Trust 1, Jane Doe Trust 2, John Doe Trust 3, Jane Doe Trust 4, John Doe Trust 5, John Doe Trust 6, Jane Doe Trust 7, John Doe Trust 8, John Doe Trust 9, John Doe Trust 10, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 16, John Doe Trust 17, John Doe Trust 18, John Doe Trust 19, John Doe Trust 20, John Doe Trust 21, Jane Doe Trust 22, John Doe Trust 23, John Doe Trust 24, John Doe Trust 25, John Doe Trust 26, Jane Doe Trust 27, John Doe Trust 28, John Doe Trust 29, John Doe Trust 30, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 34, John Doe Trust 35, John Doe Trust 36, Jane Doe Trust 37, John Doe Trust 38, John Doe Trust 39, Jane Doe Trust 40, John Doe Trust 41, Jane Doe Trust 42, Jane Doe Trust 43, John Doe Trust 44, John Doe Trust 45, John Doe Trust 46, Jane Doe Trust 47, John Doe Trust 48, John Doe Trust 49, John Doe Trust 50, John Doe Trust 51, Jane Doe Trust 52, Jane Doe Trust 53, John Doe Trust 54, John Doe Trust

1

EXHIBIT 3 - PAGE 203

55, John Doe Trust 56, Jane Doe Trust 57, John Doe Trust 58, Jane Doe Trust 59, and John Doe Trust 60, by and through Wilmington Savings Fund Society, FSB, as successor-in-interest to Christiana Bank & Trust Company, as trustee ("Plaintiffs" or the "Trusts") [1] allege as follows:

## NATURE OF THE ACTION

1.    PHL Variable Insurance Company ("PHL"), Phoenix Life Insurance Company ("Phoenix Life"), and their parent the Phoenix Companies, Inc. ("PNX") (collectively "Defendants") boast on their website that they have a "History of keeping our promises since 1851."    Contrary to this self-serving assurance Defendants provide to California residents and the general public, since in or about 2009 when Defendants' financial position was devastated by the global financial crisis and Defendants' own grossly incompetent management of their financial affairs, Defendants have broken their promises to policyholders at every opportunity and perpetrated a widespread and massive fraud upon their policyholders. Defendants have conspired together and engaged in this fraudulent scheme in an effort to ensure their own survival, thus placing their own interests above those of their policyholders.    By this action, Plaintiffs seek to recover damages from Defendants for the financial harm caused by Defendants' wrongful conduct and enjoin Defendants from engaging in such conduct in the future.

2.    As detailed below, Defendants have conspired together and secretly instituted a scheme in which they will ultimately deny coverage under many *billions* of dollars of life insurance policies issued by PHL and Phoenix Life, including the $466.9 million in life insurance policies issued to Plaintiffs by PHL that is the subject of this action.    Defendants' conduct presents an extreme and egregious example of insurer bad faith. But Defendants have not stopped there. Desperate to

---

[1] The Trusts are suing by fictitious names to protect the privacy of the individual insureds who formed them and whose names the Trusts bear. The true names of each Trust is known to the parties. Identifying information for the life insurance policies issued to the Trusts (the policy number, issue date and face amount) is alleged below.

2

EXHIBIT 3 - PAGE 204

continue profiting from policies they have no intention of ever honoring, Defendants have engaged in a fraudulent and illegal pattern of racketeering activity in which they have defrauded Plaintiffs and other policyholders into paying hundreds of millions of dollars in premium revenue under policies that Defendants secretly plan to later reject as being invalid. At all relevant times herein, Defendants have conducted the affairs of PNX's Life and Annuity segment (the "Enterprise") through a pattern of racketeering activity that has systematically defrauded and continues to defraud Plaintiffs and other policyholders.

3. Plaintiffs are life insurance trusts. Each Trust owns a life insurance policy issued by PHL (the "Policies"). The total face amount of the Policies is $466.9 million. Each Trust was formed by the individual whose life is insured by the Policy owned by that Trust for the purpose of owning an insurance policy on his or her life. As was their right under the Policies and applicable law, the beneficiary of each Trust (a family member of the insured) later sold his or her beneficial interest in the Trust to a third party for consideration. Although such transactions were permitted by the terms of the Policies and applicable law, and were actively encouraged by Defendants when the transactions occurred, PHL, as part of a fraudulent scheme and concerted effort with Phoenix Life and PNX, has: (i) implemented a practice of denying benefits under similar policies, thus destroying the Policies' value; (ii) engaged in a widespread and successful practice of defrauding its policyholders into paying premiums on policies PHL does not intend to honor; and (iii) breached the Policies and the duty of good faith and fair dealing implied therein in a concerted effort to intimidate Plaintiffs into allowing their Policies to lapse for no consideration, so that Defendants can use the resulting windfall profit to try to rescue themselves from their own financial mismanagement.

4. Plaintiffs own the Policies and continue to be billed by and pay substantial premiums to PHL. To date, PHL has collected more than $44,000,000 in premiums from Plaintiffs for the Policies. Despite continuing to charge and collect

3

EXHIBIT 3 - PAGE 205

premiums for the Policies, PHL's conduct, in concert with PNX and Phoenix Life, has made clear that PHL has no intention of willingly paying claims under the Policies when the insureds ultimately die and benefits become due. Instead, PHL, as part of a plan and scheme with Phoenix Life and PNX, has engaged in a course of conduct of systematically denying claims for benefits under policies owned by trusts when, as here, the beneficial interest in the trust has been transferred to a third party for consideration. Specifically, when a large death claim is submitted for payment by a trust, PHL refuses to promptly pay the claim after receiving due proof of death – which is all that is required by the terms of the policy for the death benefit to be paid. Disregarding its contractual and legal obligations, PHL improperly and without any basis requires that the trust complete a form requesting various information about any transfer of the beneficial interest in the trust and the identity of any new beneficiary. In classic "Catch-22" fashion: (i) if the trust refuses to complete the form, PHL denies the claim; and (ii) if the trust completes the form, and indicates a transfer has occurred, PHL denies the claim. In short, if a transfer of the beneficial interest in the trust owning the policy has occurred, PHL denies the claim on the purported (and erroneous) basis that, if a transfer has occurred, the policy is what PHL considers to be a so-called investor-originated life insurance ("IOLI") policy and therefore, according to PHL, lacks a valid insurable interest.

5.     This practice of denying claims when a beneficial interest transfer has occurred is part of Defendants' practice of denying claims whenever an "investor" has acquired either a policy issued by PHL or Phoenix Life or an interest in the entity owning such policy. Indeed, Defendants' practice extends to denying claims under policies transferred to investors even when: (i) PHL or Phoenix Life explicitly approved the transactions in advance; and/or (ii) PHL or Phoenix Life had knowledge of the relevant transfer for years, yet continued to bill and accept premiums.

6.     PHL's intention to not honor the Policies also is apparent from PHL's

4

EXHIBIT 3 - PAGE 206

attempts to rescind five different life insurance policies owned by trusts for which Wilmington Savings Fund Society, FSB ("Wilmington Savings"), as successor-in-interest to Christiana Bank & Trust Company ("Christiana Bank"), serves as trustee (including three of the Policies at issue here) on the ground that those five policies purportedly lack an insurable interest due to transfers of the beneficial interest in the trusts. PHL's position is contrary to applicable law, which explicitly provides that an insurable interest need only exist at policy inception and policies (and interests in trusts that own policies) are freely transferable after inception. Moreover, Plaintiffs are informed and believe that Defendants have identified the Policies as ones which they later intend to have PHL challenge when a death claim is submitted.

7. As a further demonstration of PHL's bad faith, when PHL denies claims for benefits based on the transfer of a policy or beneficial interest, PHL not only seeks to rescind the policy, but also attempts to confiscate and retain all of the premiums collected for that policy. PHL's practice is contrary to law as well as the terms of PHL's policies, which expressly state that PHL will return premiums in the event that it successfully contests the policy's validity. PHL's practice also gives Defendants an incentive to conceal PHL's true intentions from Plaintiffs and other policyholders and bill and collect as much in premiums as possible before challenging a policy's validity.

8. PHL's purported concern about IOLI not only is factually and legally incorrect, particularly where, as here, the transactions complied with the Policies' terms and applicable law, but it also is contradicted by Defendants' conduct. For years, Defendants embraced the sale of their policies to investors on the same "secondary market" that they now cite as a pretext for attempting to rescind policies. Defendants knowingly issued policies for "resale" in the secondary market, and encouraged their sales force to seek out such business, to boost Defendants' short term profits, provide dividends for PNX's shareholders, and enrich Defendants' management and sales force. Defendants' management encouraged employees to

5

EXHIBIT 3 - PAGE 207

"crank out" this type of business and "bring it on," stating "the more the merrier."

9. One former employee has candidly admitted that: (i) as much as 80% of Defendants' life insurance business was what Defendants now denounce as IOLI; (ii) Defendants' managers encouraged the solicitation of such business and taught employees how to find such business; and (iii) PNX's CEO would have had to have had a "learning disability" to not know that IOLI had become Defendants' core business. Another former employee has admitted that: (i) his compensation rose from $75,000 in 2004 to $1.8 million in 2006 as a result of the sale of policies Defendants now denounce as IOLI; (ii) he generated as much premium revenue as some entire life insurance companies due to the sale of such policies; (iii) Defendants implemented sales quotas which were impossible to meet without selling such policies; and (iv) it "doesn't take a rocket scientist to figure out what was happening" in Defendants' life insurance operations. Defendants succeeded in becoming a primary seller in the lucrative and burgeoning secondary market. Defendants also became an active buyer of policies on the secondary market, forming a subsidiary, Phoenix Life Solutions, dedicated to the purchase and origination of policies on the secondary market.

10. Now, however, because of Defendants' dire financial situation and concern that they will be unable to meet contractual obligations as they become due, Defendants no longer embrace the secondary market, and instead routinely deny coverage and seek to rescind policies their policyholders sold to investors on the pretext that such policies lack an insurable interest. Defendants' changed financial circumstance, rather than any good faith concern about the legitimacy of the policies Defendants eagerly marketed and knowingly issued, is the motivation for Defendants' improper attempts to avoid their contractual obligations.

11. Defendants have wrongfully decided they will not honor the Policies and other similar policies and conspired to commit a brazen fraud upon Plaintiffs and other policyholders. The purpose of this scheme is to defraud Plaintiffs and

6

EXHIBIT 3 - PAGE 208

other policyholders into continuing to pay premiums for policies that PHL has no intent of honoring. By doing so, PHL continues to generate substantial premium revenue which, in turn, gives the investing public the false impression that Defendants' financial position is more sound than it is in fact. Defendants' scheme also is designed to maximum the premiums collected before PHL denies a claim, attempts to rescind the Policy and seeks to retain premiums.

12. In furtherance of Defendants' fraudulent scheme, PHL has represented to Plaintiffs and other policyholders that their policies are in force and in good standing while concealing PHL's true intention to deny coverage and attempt to confiscate premiums. Despite secretly planning to deny coverage under the Policies, Defendants have conspired to defraud Plaintiffs into continuing to pay premiums by having PHL mail and/or fax Plaintiffs fraudulent communications indicating that the Policies are valid and in force while concealing PHL's true intentions. PHL has sent Plaintiffs hundreds of such fraudulent communications, including premium notices, annual summaries, policy illustrations, verifications of coverage, and responses to Policy audit requests. Defendants' illegal scheme has reaped hundreds of millions of dollars from policyholders, including tens of millions of dollars from Plaintiffs.

13. After fraudulently inducing Plaintiffs and other policyholders into paying hundreds of millions of dollars in premiums for policies that Defendants do not intend to honor, Defendants have engaged in a concerted effort to force the same policyholders to lapse their policies, so that Defendants can retain the ill-gotten premiums without having to deny coverage and try to defend their actions in court. PHL has taken several actions directly breaching the terms of the policies and violating its duty of good faith to Plaintiffs and other policyholders.

14. PHL has breached the Policies by impermissibly raising the cost of insurance ("COI") charges for the Policies. PHL also has breached the Policies by impermissibly attempting to restrict Plaintiffs' contractual right to transfer the

7

EXHIBIT 3 - PAGE 209

Policies and the right to transfer the beneficial interests in the Plaintiff Trusts. PHL has taken these actions as part of a plan by Defendants to intimidate Plaintiffs and other policyholders into allowing their policies to lapse.

15. Each of the Policies is a premium-adjustable, universal life insurance policy. The principal benefit of such policies is that, unlike whole life insurance, universal life insurance allows the policyholder to pay the minimum amount of premiums necessary to keep the policy in-force; the premiums paid need only be sufficient to cover the COI charges and certain other specified expense charges. Any premiums paid in excess of the COI charges and expense components are applied to a policy's "accumulated value" or "policy value," which earns interest. Defendants promoted these flexible-premium policies as "appropriate for those looking to minimize long term insurance costs" because they "present the opportunity to pay lower premiums, as well as adjust the amount and timing of premium payments."

16. Having marketed such policies as enabling policyholders to minimize their premium payments and keep policy values as low as possible, Defendants now are trying to punish Plaintiffs and other policyholders for doing so. PHL and Phoenix Life have drastically increased their COI rates where policyholders have exercised their contractual right to keep accumulated policy values low. This behavior by PHL and Phoenix Life is a breach of the express terms of the insurance contracts, as wells as bad faith conduct in furtherance of Defendants' overall scheme and campaign to destroy the value of policies and intimidate policyholders into lapsing their policies.

17. As California courts have recognized, it is illegal for an insurer to base COI increases on anything other than the factors specified in the policies. *See, e.g., Yue v. Conseco Life Ins. Co.*, No. CV 08-1506, 2011 (C.D. Cal. Jan. 19, 2011*); In re Conseco Life Ins. Co. Cost of Ins. Litigation*, No. ML 04-1610, 2005 WL 5678842 (C.D. Cal. 2005). By raising COI rates based on accumulated policy values, PHL

8

EXHIBIT 3 - PAGE 210

has breached the Policies. Additionally, the Policies expressly prohibit PHL from discriminating unfairly within any class of policyholders with respect to COI rates. Yet, PHL has publicly admitted that its COI increases are directed only at a certain subset of policies within the same class.

18. PHL's COI increases were done in bad faith and for a prohibited purpose. By increasing COI rates based on accumulated policy value, PHL is attempting to force Plaintiffs and other policyholders to either pay excessive premiums which will not justify the death benefit or lapse their policies and forfeit the premiums to PHL. This is a quintessential example of insurer bad faith.

19. PHL has also unlawfully, and in violation of the Policies' terms, sought to restrict Plaintiffs' ability to transfer the Policies or interests in the Trusts. The Policies expressly state that the Trusts have the right to transfer or assign the Policy. This is an important and valuable feature of the Policies which was marketed by PHL and its agents. The Policies do not restrict or dictate the circumstances in which beneficial interests in the entities owning the Policies can be transferred.

20. Nevertheless, and contrary to the terms of the Policies, PHL has demanded that it be advised of, and approve, any transfers of beneficial interests in the Trusts and threatened to deny coverage if transfers are made without its approval. PHL's conduct is a breach of both the express terms of the Policies and the covenant of good faith and fair dealing implied therein.

21. PHL and Phoenix Life routinely deny requests to change the ownership of policies even though the policies expressly permit ownership to be changed at any time. Plaintiffs are informed and believe, and upon such information and belief allege, that PHL and Phoenix Life have done so in a deliberate and wrongful attempt to destroy the value of PHL and Phoenix Life policies on the secondary market. Numerous policyholders have sued PHL and Phoenix Life over such conduct.

22. Defendants have, in effect, declared "war" against PHL's and Phoenix Life's policyholders. Defendants engage in a self-serving strategy in which they

9

EXHIBIT 3 - PAGE 211

attempt to cast PHL and Phoenix Life policyholders as villains and themselves as victims who innocently issued policies they do not intend to honor. Among other things, PHL files objectively baseless separate actions on individual policies in the hope that PHL can persuade the court that it was tricked into issuing the policy. In truth, the policies Defendants now label "IOLI" were Defendants' *core business* for several years. PHL and Phoenix Life issued *billions* of dollars of the policies which Defendants now claim are illegal. These policies enriched Defendants' executives and sales force, and comprised the core of Defendants' life insurance business. Defendants cannot in good faith contend that they did not intentionally market and issue policies which Defendants knew would be sold to investors on the secondary market, or owned by trusts in which the beneficial interest would be sold to investors.

## **THE PARTIES**

23. Wilmington Savings, as successor-in-interest to Christiana Bank, as trustee for Plaintiffs, is a Delaware citizen which has its principal place of business at 500 Delaware Ave., Wilmington, DE 19801.

24. Upon information and belief, PHL is a corporation organized under the laws of the State of Connecticut, with its principal place of business located in Hartford, Connecticut. At all relevant times herein, PHL was and is licensed to transact, and was transacting, insurance business in the State of California and this judicial district. PHL is an indirect wholly owned subsidiary of Phoenix Life.

25. Upon information and belief, Phoenix Life is a corporation organized and existing under the laws of New York, having its principal place of business in East Greenbush, New York. At all relevant times herein, Phoenix Life was and is licensed to transact, and was transacting, insurance business in the State of California and this judicial district. Phoenix Life is a wholly owned subsidiary of PNX.

26. Upon information and belief, PNX is a publicly traded Delaware corporation and a holding company. PNX's principal operating subsidiaries, Phoenix Life and its indirect subsidiary PHL, provide life insurance and annuity products in California and this judicial district. PHL and Phoenix Life are part of the PNX operational business segment known as the "Life and Annuity segment."

## JURISDICTION AND VENUE

27. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this Complaint alleges claims for relief arising under the Racketeer Influenced and Corrupt Organizations ("RICO") law, 18 U.S.C. §§ 1962 (c) and (d).

28. This Court has personal jurisdiction over defendants PHL and Phoenix Life, as among other reasons, they are licensed to issue insurance coverage in California and have made continuous and systematic contacts with California. This Court has personal jurisdiction over defendant PNX because, among other reasons, its principle operating subsidiaries, Phoenix Life and its indirect subsidiary PHL, are licensed to issue insurance coverage in California and because PNX has made continuous and systematic contacts with California. PHL issued many of the Policies: (i) to trusts formed in California within this judicial district; (ii) on the lives of California citizens who reside within this judicial district; and/or (iii) through licensed and appointed California agents of PHL and Phoenix Life doing business within this judicial district.

29. Venue is proper is this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District. PHL issued many of the Policies: (i) to trusts formed in California within this judicial district; (ii) on the lives of California citizens who reside within this judicial district; and/or (iii) through licensed and appointed California agents of PHL and Phoenix Life doing business within this judicial district. Plaintiffs are informed and believe, and upon such information and belief allege, that those insurance agents also prepared or assisted in many of the fraudulent communications alleged herein.

11

EXHIBIT 3 - PAGE 213

## FACTUAL ALLEGATIONS

### Defendants

30.     PNX is a holding company whose subsidiaries sell life insurance, annuities, and other products. PNX's 2011 Annual Report describes two distinct operational business segments: a "Life and Annuity segment" and a "Saybrus segment." The two principal life insurance company subsidiaries of PNX, which sell products for the "Life and Annuity segment," are PHL and Phoenix Life.

31.     Because PNX is a holding company, its ability to meet its obligations and to pay shareholder dividends is dependent upon dividends and other payments received from PHL, Phoenix Life and other operating subsidiaries. Based upon public filings, Phoenix Life pays dividends directly to PNX, and PHL pays hundreds of millions in fees to Phoenix Life annually which, in turn, are used to fund Phoenix Life's dividend payments to PNX. Thus, the financial success of PNX, and its ability to pay shareholder dividends, is directly tied to and dependent on the financial success of PHL and Phoenix Life.

32.     Plaintiffs are informed and believe, and upon such information and belief allege, that Defendants' life insurance business declined during the years prior to 2004. In order to grow their business, gain profit for their shareholders, and earn bonuses for their sales force, Defendants needed to find a way to compete with larger, more established insurers in the most profitable market segments. Defendants' primary target market was selling high face value policies to wealthy, elderly insureds because such policies generated premiums that were significantly larger than the premiums generated by the policies sold in the markets Defendants had traditionally serviced. The burgeoning "secondary market" for life insurance, and the increased demand for large life insurance policies among the senior population, provided the opportunity Defendants needed to enter and compete in the market they coveted.

12

EXHIBIT 3 - PAGE 214

## The Secondary Market For Life Insurance

33.     For decades, the life insurance industry paid relatively few death claims because the majority of life insurance policies lapsed (*i.e.*, the policy owner ceased paying premiums) before the insured's death. The primary reason for a policy owner to let a policy lapse was that, after owning a policy for some amount of time, the owner no longer was able to, or no longer wanted to, continue paying premiums. Before the development of a "secondary market" for life insurance policies, an insured's only alternative to paying premiums or letting a policy lapse was to surrender the insurance policy to the insurer for a modest cash value, thus relinquishing a potentially valuable asset for little or nothing. Insurers received a tremendous windfall as they collected premiums yet infrequently paid death benefits. This state of affairs resulted in a tremendous windfall to insurers, as they were able to retain premiums paid by all policyowners while only infrequently paying out death benefits.

34.     The secondary market developed as a direct response to this imbalance of power between insurers and policyholders. Investors who purchase policies from insureds in the secondary market provide insureds with an option to sell their policies to investors rather than simply surrendering their policies to the insurer or letting the policies lapse. According to a recent GAO report, policy owners who sold their policies on the secondary market received approximately eight times the cash surrender value that they would have received from their insurers.

35.     Additionally, insureds often form insurance trusts for the purpose of owning insurance policies on their lives and name themselves or family members as the beneficiaries of such insurance trusts. When a policy is owned by an insurance trust, the insured and his or her family have the option of later selling their interests in the trust (as opposed to the policy) on the secondary market.

36.     Although some insurers, as a scare tactic, have characterized the secondary market for life insurance policies as "wagering on human life," the

13

EXHIBIT 3 - PAGE 215

secondary market provides an important service to insureds: a means by which to sell a valuable asset (an insurance policy or an interest in an insurance trust) and thus monetize their policy or interest in a way that best serves their needs and benefits their families. Insurers who object to the secondary market are motivated solely by their own bottom line, not any professed concern regarding "wagering." An investor who buys a policy on the secondary market or an interest in the trust that owns such policy is unlikely to let the policy lapse. Thus, when a policy or interest in an insurance trust is sold to an investor, the insurer is more likely to have to pay the death benefit. Insurers who dislike the secondary market do so because it ensures they will have to honor their promise in the insurance policies they issue – pay death benefits for which they have received premiums.

37. Plaintiffs are informed and believe, and upon such information and belief allege, that, in or around 2004-2005, the life insurance industry began to experience significant growth in the marketing and sale of high face amount policies on the lives of wealthy seniors. These policies were significantly more expensive than most policies and, correspondingly, generated significantly more premium revenue for the insurer. Plaintiffs are further informed and believe, and upon such information and belief allege, that, this growth was primarily attributable to the expansion in the secondary market. The knowledge that a policy could potentially be sold for a profit, rather than lapsed or surrendered to the insurance company, led many seniors to purchase policies as an investment that could potentially be sold for a profit and benefit their family. The fact that the growth in the secondary market was driving increased demand for high face amount policies insuring the lives of seniors was commented upon frequently within the insurance industry and was well known to all major life insurers. Similarly, the fact that insureds were forming trusts to own insurance policies on their lives, with the possibility that the beneficial interest in the trusts would later be sold, also was well known and frequently discussed in the insurance industry.

14

EXHIBIT 3 - PAGE 216

38.   This increased demand by seniors for large face amount policies which could be sold to a third party on the secondary market provided insurers with an opportunity for significant revenue. However, because such policies were unlikely to lapse or be surrendered, certain insurers believed the policies ultimately would not be profitable and decided not to sell them. As early as 2005, certain life insurers had developed pejorative terms, such as IOLI, to describe life insurance policies which they believed were being procured for the purpose of resale to investors.

39.   By contrast, other insurers, including PHL and Phoenix Life, were eager to obtain a share of the premium revenue from the increased demand for high face amount policies insuring the lives of seniors. These insurers actively embraced the secondary market and the underlying transactions. Defendants were among the insurers who most eagerly embraced the new potential revenue available as a result of the secondary market.

40.   In order to increase their sales in the affluent senior market and fully capitalize on the potential new sales the secondary market offered, certain insurers like PHL and Phoenix Life, and their agents, promoted and marketed several types of transactions which made it easier for insureds to procure policies with the possibility of resale, thus increasing sales and premium revenue for the insurer. For instance, many of the policies sold by PHL, Phoenix Life and other insurers were financed through an arrangement called non-recourse premium financing. Under such an arrangement, a lender would loan the insured funds to pay premiums in exchange for the insured pledging the policy as the sole collateral for the loan. When the loan expired, usually 24 to 27 months after policy issuance, many insureds would elect to transfer ownership of the policy to the lender. These arrangements were known in the insurance industry and heavily marketed by insurers like PHL and Phoenix Life because they: (i) allowed insureds to purchase large policies without any cash outlay; and, (ii) in turn, allowed the insurers to sell more and larger policies.

15

EXHIBIT 3 - PAGE 217

41.     Another option that arose was for an insured to establish a life insurance trust to own a policy on his or her life and name a family member as the beneficiary of the trust, thereby giving the beneficiary the option of selling his or her beneficial interest to an investor. Such transactions could lawfully be accomplished in many states, like California, and were encouraged and promoted by insurers, like PHL, Phoenix Life and their agents.

42.     Still another option that insurers like PHL and Phoenix Life gave to insureds was the utilization of an annuity purchased with loaned funds to finance the premiums for a life insurance policy. Under this type of arrangement, the annuity would be sufficient to pay the premiums and interest to the lender, and the death benefit would later be divided by the insured and the lender.

43.     Due to these various arrangements, in which investors were likely to obtain an interest in the policy proceeds, insurance companies like PHL and Phoenix Life were able to sell a larger number of high face value polices and thus significantly increase their premium revenue and PNX's revenue. Defendants were fully aware of these various transactions and actively promoted them through their agents and sales force.

### Defendants Embrace And Profit From The Secondary Market

44.     During the time period from 2005 to 2007, Defendants engaged in an aggressive campaign to sell high face amount policies to elderly insureds in order to generate high premium revenue. Upon information and belief, Defendants even encouraged their agents to ask elderly insureds to purchase even larger policies than they had initially applied for so as to increase the premium revenue paid to Defendants. Upon information and belief, Defendants' products were priced such, and issued in such large face amounts (often at Defendants' urging), that resale of the policies was virtually inevitable.

45.     Defendants were not, as they now claim, actually concerned whether the policies they would issue were likely to be sold into the secondary market after

EXHIBIT 3 - PAGE 218

issuance. To the contrary, because Defendants wanted to increase their premium revenue, Defendants actively solicited insurance agents and other producers to offer life insurance products that were likely to be sold into the secondary market.

46. One former employee of Defendants, James Michael Max Labar, testified that although PNX's CEO sometimes made self-serving statements to shareholders that Defendants were not selling so-called IOLI, "privately it was a different matter" as employees were told to "bring it on" and "crank it out." Defendants' regional sales managers encouraged employees to seek out so-called IOLI business from insurance agents, explaining "that's where you're going to make the money." Employees who refused to participate in seeking out this business would either "fail," "leave" or "be fired." Mr. Labar admitted under oath that approximately 80% of Defendants' life insurance sales during the relevant time period were likely what Defendants now calls IOLI and that this practice was so "blatant" that PNX's CEO and Defendants' upper management would have had to have had a "learning disability" to not know that Defendants' life insurance business was largely IOLI.

47. Defendants were concerned only with generating as much premium revenue as possible through the sale of expensive life insurance policies on the lives of elderly individuals. As part of their plan to capture market share in the burgeoning market, Defendants solicited producers to offer products that many other insurers would have considered IOLI. Defendants' goal was to maximize premium revenue, which in turn would generate bonuses for their agents, sales force and personnel. On information and belief, the increased premium revenue also was intended to create an appearance to the investing public, rating agencies, and prospective policyholders, including Plaintiffs, that Defendants were growing and keeping pace with their competitors. In reality, such premium revenue was attributable to the sale of policies like the ones sold to Plaintiffs, which Defendants now disavow.

17

EXHIBIT 3 - PAGE 219

48.     As a result of Defendants' embracement of the secondary market, PHL's and Phoenix Life's life insurance sales increased dramatically in 2005, which Defendants acknowledged was a direct result of their having accepted significant amounts of one form of business which they now characterize as IOLI: namely, non-recourse premium financing.    The head of Defendants' life insurance sales told employees that Defendants' business philosophy with respect to policies sold pursuant to non-recourse premium financing was "the more the merrier." Defendants even created a "user guide" related to non-recourse premium financing, which detailed different programs available so that their employees could best take advantage of this market.

49.     Even after many of their competitors denounced non-recourse premium financing as IOLI, Defendants continued accepting such business and, even after deciding to stop accepting future non-recourse business, Defendants "grandfathered" significant amounts of pending non-recourse business so as to be able to gain the significant premiums from the pending business and boost Defendants' own financial position.    Although Defendants ultimately ceased accepting non-recourse premium financing business, they continued to actively seek and accept other applications for policies which they believed were likely to be sold to investors.

50.     Defendants' life insurance sales continued to increase dramatically in 2006 and 2007.  This increased business was directly tied to Defendants' and their agents' heavy marketing and solicitation of business which they now claim was impermissible IOLI.  Upon information and belief, the majority of new premium revenue that Defendants earned in 2005-2007 came from policies later sold to investors or owned by entities in which investors later purchased interests.    In several instances, Defendants sold hundreds of millions of dollars of such policies through individual agents.  Defendants sold many billions of dollars worth of policies they now characterize as being IOLI.

18

EXHIBIT 3 - PAGE 220

51. One of Defendants' former employees, Ed Humphrey, testified regarding this explosion in sales created by Defendants actively and aggressively selling policies destined to be sold on the secondary market. Mr. Humphrey testified that he was required to meet a $2 million quota for premiums generated in 2005. Due to Defendants' marketing and solicitation of policies sold using non-recourse premium financing, Mr. Humphrey was able to generate $7.5 million in premiums, nearly four times his $2 million quota. According to Mr. Humphrey's testimony, policies sold using non-recourse premium financing accounted for at least 90 percent of his business. Defendants raised Mr. Humphrey's quota to $8 million in premiums for 2006. By continuing to bring in business which had all of the "earmarks" of policies which were likely to be sold into the secondary market, Mr. Humphrey alone generated *$36 million* in premium in 2006. Mr. Humphry's $36 million in premium was more than the total premium generated by several top 100 life insurance companies. Defendants raised Mr. Humphrey's premium quota to $20 million in 2007, which he met again. As Mr. Humphrey explained, the quotas set by Defendants for their employees were impossible to meet without selling policies intended to be sold in the secondary market (*i.e.*, policies Defendants now denounce as IOLI). As Mr. Humphrey aptly put it, it "doesn't take a rocket scientist to figure out what was happening" at PNX and its subsidiaries PHL and Phoenix Life.

52. Plaintiffs are informed and believe, and upon such information and belief allege, that, in order to support its sales efforts in the senior market and maximize the issuance of high face value policies to seniors, PHL deliberately relaxed and disregarded its underwriting standards and requirements, and pressured its underwriters to approve policies, so that PHL could generate as much premium revenue as possible. Plaintiffs are further informed and believe, and upon such information and belief allege, that, PHL did not care about the accuracy of application information submitted by its agents, or about obtaining additional

19

EXHIBIT 3 - PAGE 221

information or follow-up, because it was entirely indifferent to such information. Rather, PHL cared only about receiving premiums by having policies approved and issued. This "anything goes" underwriting philosophy by PHL extended not only to issues regarding the potential future sale of the policy (which PHL encouraged), but also to issues related to potential insureds' financial and medical status. Indeed, Defendants' "aggressive underwriting" was even commented on by financial analysts, who noted that Defendants were likely approving policies their competitors would not in order to compensate for Defendants' comparably low financial ratings.

53. This consciously lax underwriting by PHL went hand-in-hand with its aggressive sales approach in the lucrative senior market. An insurer who performs rigorous underwriting must reject a high percentage of applications and thus sacrifice short term profits for long term stability. PHL had no interest in such an approach, as it cared only about generating significant premium revenue so that it could boost its short term profits, improve its financial ratings, and enrich its executives and sales force. Its goal was to sell as many large policies as possible and its deliberately relaxed, permissive, and inattentive underwriting was an essential part of that strategy.

54. PHL's underwriters either did not care about whether or not the policies being issued by PHL would later be sold on the secondary market, or they succumbed to Defendants' marketing pressure and disregarded such information. PHL's underwriters disregarded potential "red flags" that might have caused other insurers, who did not wish to participate in the market, to decline policies. Plaintiffs are further informed and believe, and upon such information and belief allege, that PHL's underwriters were under tremendous internal pressure to approve large policies and risked reprimand and possible dismissal if they rejected a policy and thus cost PHL business or jeopardized their colleagues' bonuses and compensation. The guiding philosophy and goal was to earn as much premium revenue as possible. PHL's underwriters performed their jobs according to Defendants' mission and

EXHIBIT 3 - PAGE 222

strategy, approving policies regardless of any questions, concerns or red flags raised in the application file.

55. Whether due to their indifference or Defendants' marketing pressure, PHL's underwriters were lax in investigating the financial status and medical history of elderly applicants for large face value life insurance policies. PHL did little, if any, due diligence to verify the accuracy of the financial and medical information submitted by its agents. By way of example, former PHL employee, Mr. Labar, testified that PHL made no effort to verify financial information submitted regarding insureds. According to Mr. Labar, PHL only cared about having any financial information at all so that it could claim, contrary to the facts, that it had performed "due diligence." Mr. Labar also testified that PHL underwriters routinely provided better ratings to insureds based on their medicals than did other insurers and that PHL's underwriters did this because of internal pressure at PHL to approve policies.

56. At least one example of PHL's deliberate disregard of any underwriting standards is available in the public record in *PHL Variable Insurance Company v. Faye Keith Jolly*, Case No. 08-cv-3220, United States District Court for the Northern District of Georgia (the "Jolly case").

57. According to publicly filed documents in the Jolly case, PHL issued a $10 million insurance policy on a man named Keith Jolly, based on information submitted by PHL' agents claiming that Mr. Jolly was a billionaire who had amassed his fortune by discovering emeralds in a sunken Spanish armada. Medical records PHL received, however, indicated that the supposed billionaire actually worked at a cemetery

58. If the story told by PHL's agents had been true, PHL's underwriters could, of course, have confirmed the story with even the most cursory internet search. Had they done such a search, however, rather than seeing any confirmation of sunken treasure, they would have discovered that the insured was instead a repeat felon with little or no assets.

21

EXHIBIT 3 - PAGE 223

59. PHL's shockingly poor underwriting in the Jolly case has, much to PHL's embarrassment, received significant media attention. One media outlet, the *Hartford Courant*, astutely noted: "But at the heart of the story, as pieced together through court records, is the question of how Phoenix could have approved the policy in the first place. Jolly's application contained wild discrepancies and claims, many easily debunked." PHL refused to comment to its hometown newspaper as to "why the company accepted Jolly's application despite such glaring discrepancies."

60. The answer to the question raised by PHL's hometown paper lies in PHL's unrelenting push to sell as many large policies as possible so as to boost its premium revenue. In pursuit of this goal, PHL was willing to issue policies regardless of the fact that they would be sold on the secondary market, regardless of the insureds' financial information, and regardless of any inaccurate information submitted by PHL's agents, even glaringly obvious inaccuracies such as outlandish stories about sunken treasure.

61. Largely due to Defendants' success in selling policies which they now deride as IOLI, PNX was able to pay significant dividends to its shareholders during the relevant timeframe. Indeed, in each of the years from 2005-2007, it paid substantial dividends to its shareholders.

62. Defendants' success in this market also enabled them to pay substantial bonuses to their executives and their sales force, and large commissions to their agents. For example, Ed Humphrey testified that, due to the sale of policies which were likely to be sold into the secondary market, his compensation rose from $75,000 in 2004 to $1.8 million in 2006. According to Mr. Humphrey, several other employees of Defendants received annual compensation in excess of $1 million during the relevant period due to the sale of policies likely to be sold into the secondary market.

63. California is one of the states in which Defendants were most successful in their efforts to sell policies which they now condemn as IOLI.

22

EXHIBIT 3 - PAGE 224

Although most of Defendants' key employees fully embraced aggressive marketing and selling of policies that Defendants' now label as IOLI, one employee, Mr. Labar, complained to the California Insurance Commissioner about Defendants' practices. The Insurance Commissioner correctly advised Mr. Labar that California's laws during the relevant period permitted so-called IOLI. California law only required an insurable interest to exist at inception and policyholders were free to transfer their policies to investors after issuance.

64. Defendants' participation in the secondary market for life insurance extended beyond actively promoting and soliciting life insurance policies which they knew were likely to be sold to third parties on the secondary market. PNX became an active buyer and originator of policies on the secondary market. On or about April 1, 2008, PNX issued a press release stating in relevant part:

> HARTFORD, Conn. – (BUSINESS Wire) – April 1, 2008
> – The Phoenix Companies, Inc. (NYSE: PNX) today announced that through its subsidiary, Phoenix Life Solutions, it will enter the life insurance settlements business with a focus on customer value and full transparency on commissions and fees.
>
> Phoenix Life Solutions will work with four prominent brokerage general agencies (BGAs) across the country to originate life settlements, or purchase unwanted or unneeded life insurance policies from policy owners in exchange for an immediate cash settlement...

65. Defendants even included a "right of first refusal" in their policies to facilitate Defendants buying their own policies on the secondary market. Defendants' assertions regarding "wagering," in the various rescission lawsuits they file, are hypocritical. PNX itself has been a purchaser and originator of policies on the secondary market. Defendants significantly and knowingly profited from the

23

EXHIBIT 3 - PAGE 225

secondary market during the years in which the sale of policies likely to be resold made up the core of Defendants' life insurance business.

### PHL Sells The Policies At Issue As Part Of Defendants' Plan To Profit From The Secondary Market

66.     PHL issued Plaintiffs the Policies during the 2006-2008 time period.

67.     Each Policy insures the life of the individual insured who established the Trust to which the Policy was issued. Each Policy complied with applicable insurable interest laws because the beneficiary of the Policy at issuance was an insurance trust established by the individual whose life was insured and, further, the beneficiary of the Trust owning Policy was a family member of the person whose life was insured by the Policy.

68.     Many of the insureds were residents of this judicial district and many of the Trusts originally had a trustee residing in this judicial district. Many of the Policies were solicited by PHL (and Phoenix Life) agents residing in this judicial district. The Trusts were and are the owners and beneficiaries of the Policies. An index of the Policies at issue – including the Policy number and face amount – is listed below:

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 1 | 97520071 | 12/26/06 | $10 Million |
| Jane Doe Trust 2 | 97520888 | 3/1/07 | $18 Million |
| John Doe Trust 3 | 97522408 | 6/11/07 | $15 Million |
| Jane Doe Trust 4 | 97521696 | 4/25/07 | $10 Million |
| John Doe Trust 5 | 97520284 | 1/8/07 | $4 Million |
| John Doe Trust 6 | 97520812 | 3/9/07 | $3.8 Million |

24

EXHIBIT 3 - PAGE 226

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| Jane Doe Trust 7 | 97521031 | 3/26/07 | $10 Million |
| John Doe Trust 8 | 97521294 | 3/27/07 | $10 Million |
| John Doe Trust 9 | 97521048 | 8/20/06 | $10 Million |
| John Doe Trust 10 | 97521378 | 8/20/06 | $10 Million |
| John Doe Trust 11 | 97520506 | 1/30/07 | $8 Million |
| John Doe Trust 12 | 97522397 | 6/15/07 | $8 Million |
| John Doe Trust 13 | 97521320 | 3/28/07 | $8 Million |
| John Doe Trust 14 | 97521321 | 3/28/07 | $8 Million |
| John Doe Trust 15 | 97521809 | 5/3/07 | $7 Million |
| John Doe Trust 16 | 97521539 | 4/11/07 | $7 Million |
| John Doe Trust 17 | 97521403 | 4/11/07 | $10 Million |
| John Doe Trust 18 | 97521770 | 5/2/07 | $5 Million |
| John Doe Trust 19 | 97519179 | 2/6/07 | $5 Million |
| John Doe Trust 20 | 97521195 | 3/21/07 | $10 Million |
| John Doe Trust 21 | 97520861 | 3/1/07 | $7 Million |
| Jane Doe Trust 22 | 97521514 | 4/11/07 | $10 Million |
| John Doe Trust 23 | 97521012 | 3/14/07 | $10 Million |

EXHIBIT 3 - PAGE 227

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 24 | 97520777 | 4/19/07 | $5 Million |
| John Doe Trust 25 | 97521700 | 5/2/07 | $10 Million |
| John Doe Trust 26 | 97521172 | 3/21/07 | $7 Million |
| Jane Doe Trust 27 | 97525531 | 12/10/07 | $10 Million |
| John Doe Trust 28 | 97522142 | 6/20/07 | $2.5 Million |
| John Doe Trust 29 | 97524232 | 8/5/07 | $10 Million |
| John Doe Trust 30 | 97526378 | 2/5/08 | $3 Million |
| John Doe Trust 31 | 97522530 | 6/25/07 | $6 Million |
| John Doe Trust 32 | 97526094 | 12/11/07 | $10 Million |
| John Doe Trust 33 | 97523537 | 8/21/07 | $8.5 Million |
| John Doe Trust 34 | 97522647 | 7/19/07 | $11 Million |
| John Doe Trust 35 | 97522876 | 8/10/07 | $3 Million |
| John Doe Trust 36 | 97526077 | 1/25/08 | $4 Million |
| Jane Doe Trust 37 | 97523627 | 9/25/07 | $5 Million |
| John Doe Trust 38 | 97523991 | 9/6/07 | $6 Million |
| John Doe Trust 39 | 97526006 | 12/5/07 | $5 Million |
| Jane Doe Trust 40 | 97530500 | 5/16/08 | $7.25 Million |

26

EXHIBIT 3 - PAGE 228

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 41 | 97524710 | 10/26/07 | $10 Million |
| Jane Doe Trust 42 | 97522793 | 5/9/07 | $10 Million |
| Jane Doe Trust 43 | 97524804 | 10/20/07 | $12 Million |
| John Doe Trust 44 | 97524390 | 11/9/07 | $5 Million |
| John Doe Trust 45 | 97525135 | 11/27/07 | $7 Million |
| John Doe Trust 46 | 97526705 | 1/29/08 | $3 Million |
| Jane Doe Trust 47 | 97526661 | 1/24/08 | $6 Million |
| John Doe Trust 48 | 97524674 | 12/20/07 | $5 Million |
| John Doe Trust 49 | 97523945 | 9/13/07 | $10 Million |
| John Doe Trust 50 | 97524197 | 9/13/07 | $10 Million |
| John Doe Trust 51 | 97522969 | 8/12/07 | $4 Million |
| Jane Doe Trust 52 | 97524684 | 12/23/07 | $10 Million |
| Jane Doe Trust 53 | 97527013 | 12/23/07 | $10 Million |
| John Doe Trust 54 | 97523960 | 9/13/07 | $7.5 Million |
| John Doe Trust 55 | 97524122 | 9/13/07 | $7.5 Million |
| John Doe Trust 56 | 97523018 | 4/18/07 | $3.85 Million |
| Jane Doe Trust 57 | 97523622 | 8/24/07 | $9 Million |

27

EXHIBIT 3 - PAGE 229

| Owner/Beneficiary | Policy Number | Issue Date | Face Amount |
|---|---|---|---|
| John Doe Trust 58 | 97524002 | 10/11/07 | $3 Million |
| Jane Doe Trust 59 | 97523154 | 8/3/07 | $10 Million |
| John Doe Trust 60 | 97523517 | 8/22/07 | $7 Million |

69.     Many of the Plaintiff Trusts were established by individual insureds who reside in this judicial district. As such, many of the Policies issued by PHL to the Trusts were issued on the lives of insureds residing in this judicial district. Specifically, the following Trusts were formed by insureds residing in this judicial district: Jane Doe Trust 2, John Doe Trust 8, John Doe Trust 9, John Doe Trust 10, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 18, John Doe Trust 20, John Doe Trust 21, John Doe Trust 23, John Doe Trust 26, John Doe Trust 29, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 39, and John Doe Trust 60. And, PHL issued Policies to each of the Trusts listed above on the life of an individual residing in this judicial district.

70.     With respect to each of the Policies identified in paragraph 69 as having been issued on the lives of insureds residing in this judicial district, Plaintiffs are informed and believe, and upon such information and belief allege, that each insured signed the policy application and other related documents in this judicial district and were solicited by PHL to buy insurance within this judicial district.

71.     Many of the Trusts had a trustee who resided in this judicial district at the time that the Trust was formed, when the Trust applied for a Policy and when the Policy was issued. Many of the Policies therefore were issued by PHL to Trusts whose trustee resided in this judicial district. The following Trusts had a trustee residing in this judicial district when they were first formed and when the Policies

28

EXHIBIT 3 - PAGE 230

were applied for and issued by PHL: Jane Doe Trust 4, John Doe Trust 9, John Doe Trust 10, John Doe Trust 12, John Doe Trust 15, John Doe Trust 18, John Doe Trust 19, John Doe Trust 29, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 39, John Doe Trust 41, John Doe Trust 45, and John Doe Trust 60.

72.     With respect to each of the Policies identified in paragraph 71 as having been issued by PHL to Trusts whose trustee resided in this judicial district, Plaintiffs are informed and believe, and upon such information and belief allege, that the Trustee signed the insurance application and other related documents in this judicial district and were solicited by PHL to buy insurance within this judicial district. Plaintiffs are further informed and believe, and upon such information and belief allege, that, for each of these Policies, PHL sent premium notices, annual policy summaries, illustrations and other documents to these Trusts, through their trustees, in this judicial district.

73.     Many of the Policies were solicited on PHL's behalf by PHL agents residing in this judicial district. For example, PHL agent Kevin Burke, who resides in this judicial district, solicited the Policies issued to the following Trusts: Jane Doe Trust 2, Jane Doe Trust 4, John Doe Trust 8, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 18, John Doe Trust 20, John Doe Trust 21, John Doe Trust 23, John Doe Trust 25, John Doe Trust 26, John Doe Trust 29, and John Doe Trust 41. PHL agent Richard Son, who resides in this judicial district, solicited the Policies issued to the following Trusts: John Doe Trust 32, John Doe Trust 38, and John Doe Trust 39. PHL agent Rosslyn Muriu, who resides in this judicial district, solicited the Policies issued to the following Trusts: John Doe Trust 16, John Doe Trust 17, John Doe Trust 54, and John Doe Trust 55.

74.     For each of the Policies identified in paragraph 73, the PHL agent solicited and communicated with the relevant insureds and Trusts, on PHL's behalf, in or from this judicial district. Additionally, PHL and Phoenix Life paid substantial

29

EXHIBIT 3 - PAGE 231

commissions to its agents residing in this judicial district as a result of the sale of the Policies.

75. All of the Policies, including those discussed in paragraphs 69-74, have substantially similar policy language and were issued during the same time period as a part of Defendants' aggressive campaign to capture market share in the lucrative market for high face value policies likely to be sold into the secondary market. As discussed throughout this Complaint, all of the Plaintiffs Trusts, including those discussed in paragraphs 69-72, have been targets of Defendants' fraudulent scheme to defraud policyholders and Defendants' wrongful actions towards and misrepresentations to Plaintiffs have all, as discussed herein, been nearly identical.

76. Consistent with Defendants' marketing of their policies so as to take advantage of the burgeoning secondary market, the Policies issued by PHL provided Plaintiffs with significant transfer rights and flexibility.

77. Each of the Policies expressly provided the policy owner with broad rights to change ownership of the policy, change the beneficiary of the policy, and assign rights under the policy. With respect to sales of the policy (as opposed to a beneficial interest in the policy owner), PHL provided itself with a right of first refusal to purchase the policy as part of Defendants' own life settlement operations.

78. Section 17 of the Policies provides, among other things, as follows:
> You may change the beneficiary by written notice filed with us at our main Administrative Office. When we receive it, the change will take affect as of the date it was signed by you. However, the change will be subject to any payments made or actions taken by us before we received the notice at our Main Administrative Office.

79. Section 18 of the Policies provides, among other things, as follows:
> You may, by written notice, assign any interest in this policy without the consent of any person other than an

30

EXHIBIT 3 - PAGE 232

irrevocable Beneficiary…When filed, it will bind us as of

the date of the assignment…

80. After the Policies were issued, the beneficiaries of the Trusts transferred their beneficial interests in the Trusts, as was permitted by the Policies and applicable law.

81. Wilmington Savings, as successor-in-interest to Christiana Bank, is the current trustee of each of the Trusts. Christiana Bank was not the initial trustee of any of the Trusts.

82. The Trusts have complied with all terms of the Policies, including the timely payment of all premiums due under the Policies. To date, PHL has collected more than $44 million in premiums for the Policies, which has benefited all of the Defendants.

**Defendants Financially Collapse Due To Their Reckless Management**

83. Since issuing the Policies, Defendants have found themselves in substantially different economic conditions as they suffered significant financial losses during the 2008-09 economic crisis.

84. PNX suffered a reported net loss of approximately $726 million in 2008. PNX reported an additional loss of $319 million in 2009, bringing to well over $1 billion its reported total losses in 2008-2009. Plaintiffs are informed and believe, and upon such information and belief allege, that PNX's reported losses were primarily attributable to poor investment and management decision by Defendants' executives, as opposed to losses from the sale of life insurance products.

85. As a result of these enormous losses, Defendants were downgraded by the ratings agencies to "junk" bond range and were forced to fire a substantial portion of their workforce.

86. Defendants lost their biggest distributors in early 2009, because they were no longer able to sell Defendants' products due to the ratings downgrades.

31

EXHIBIT 3 - PAGE 233

This caused Defendants to exit the market for large face value life insurance policies.

87.     PNX's stock, which had traded at over $15 a share during much of 2007 plummeted to as low as 21 cents a share in 2009.

88.     Upon information and belief, the executives who were responsible for Defendants' collapse were rewarded with generous severance packages worth tens of millions of dollars.     This further weakened Defendants' tenuous financial position.

89.     Because Defendants are no longer attempting to sell large face value policies in the high net worth market, they apparently are no longer concerned with their reputation among distributors and consumers.     Instead, fighting for their own survival, Defendants have desperately avoided having to pay any large claims which would further weaken their final position.     The *Wall Street Journal* recently reported that Defendants now deny death claims (of all types) at a rate more than *seven* times higher than other life insurers.     As a result of these efforts, PNX only lost $12.6 million in 2010 and turned a modest profit in 2011.     Had Defendants honored their contractual obligations and paid death benefits when due, their financial slide undoubtedly would have continued.

**Defendants Begin Breaching Their Obligations To And Defrauding Their Policyholders In An Effort To Escape Their Dire Financial Situation**

90.     In order to address their own financial troubles, Defendants have made a concerted effort to avoid having to honor policies PHL and Phoenix Life issued where either the policy or a beneficial interest in a trust owning the policy was later sold to investors on the secondary market.     Although PHL and Phoenix Life willingly issued such policies when it served Defendants' interests to increase premium revenue, Defendants now view such policies as unprofitable because the policies are not likely to lapse.     Upon information and belief, Defendants have concluded that if the policies PHL and Phoenix Life issued do not lapse, and

32

EXHIBIT 3 - PAGE 234

Defendants were to pay death benefits when due, Defendants' financial well-being would be threatened and Defendants might become insolvent. Defendants have implemented a wide scale effort to avoid paying claims on the many billions of dollars worth of policies they issued which have since been sold on the secondary market and to defraud policyholders into continuing to pay premiums on these policies Defendants have no intention of honoring, so that Defendants can later attempt to confiscate these premiums and thus reap a financial windfall.

91. As discussed below, PHL has acted unlawfully and in bad faith and breached its contractual obligations to Plaintiffs as part of a fraudulent scheme with the other Defendants. Among other things, PHL has: (i) implemented a practice of denying all claims, and instituting rescission actions, with respect to any policy which has been transferred to an investor, or where the beneficial interest in the trust that owns the policy has been transferred to an investor; (ii) unlawfully increased its COI rates for the Policies and other policies which it believes were likely to have been sold to investors; and (iii) attempted to restrict its policyholders' rights to transfer their policies, in direct violation of the terms of their policies. Defendants have conspired to defraud Plaintiffs and other policyholders by engaging in a pattern and practice of misrepresenting and fraudulently concealing their true intentions to their policyholders, so that Plaintiffs and other policyholders will continue to pay premiums on policies Defendants have no intention of honoring.

A. **PHL Engages In A Systematic Practice Of Denying Death Claims And Attempting To Rescind Policies And Keeping Its Policyholders' Premiums**

92. In an effort to address the financial problems of Defendants' own making, over the past few years, PHL persistently has denied claims submitted under policies similar to those at issue here. Indeed, upon information and belief, PHL has implemented a policy of denying claims under all policies like those at issue here.

33

EXHIBIT 3 - PAGE 235

93.     PHL has implemented a practice in which it denies coverage where an investor has acquired an interest in the policy or in a trust which owns the policy. PHL has implemented this policy even though, as described above, PHL knowingly sold billions of dollars of policies it knew would be sold on the secondary market. PHL has denied claims under policies transferred to investors even though PHL specifically approved the transaction and recorded the policies' change of ownership without objection.

94.     The Policies provide that PHL will pay the death benefit due under the policy upon "due proof of death of the Insured." The Policies do not contain any further requirement that the policy owner must comply with to receive the death benefit after the insured's death.

95.     In violation of the Policies' express terms, PHL has instituted a practice in which it requires that, for any death claim submitted by a trust policyholder, the trust must complete a form providing information not required by the policy. This practice is admitted at Defendants' website. Under "Life Insurance Claims," the website has a section "What to Do if a Beneficiary is a Trust" stating: "In addition to the Beneficiary Statement of Benefits, a certified death certificate, original insurance contract and Certification and Acknowledgement of Trust Agreement are required." https://www.phoenixwm.phl.com/public/customerservice/claims.jsp.

96.     Although not required by the Policy's express terms, the Certification and Acknowledgement of Trust Agreement form demands that, in order to seek death benefits, a trust must state whether it has transferred any beneficial interest and, if so, to whom. Among the questions contained on the form are:

> Please identify all Trust Beneficiaries and any and all persons or entities with any right, title, or interest in the beneficial interest of the Trust and describe the relationship between the Insured and any person or entity named.

34

EXHIBIT 3 - PAGE 236

Has there been any change in Trust beneficiaries since the Date of Trust? If yes, please identify the changes.

Has any Trust Beneficiary sold, assigned, or otherwise transferred his/her interest in the Trust to anyone? If Yes, please identify the date of sale and the person or entity to which the interest was transferred.

Did any party other then the Insured fund any contributions to the Trust's capital/principal? If yes, please identify the source of all capital/principal contributions to the Trust.

97. If a trust does not provide PHL with all of the information requested on the Certification and Acknowledgement of Trust Agreement form, PHL denies the claim and refuses to pay benefits because, even though the policy does not require such information, the policyholder trust did not provide it. If the trust completes the form, and indicates that a beneficial interest transfer occurred, PHL denies the trust's claim because, although not prohibited by the policy or applicable law, a beneficial interest in the policyholder trust was transferred.

98. As evidence of this widespread and systematic practice by PHL to deny claims when a policy or beneficial interest in a trust owning a policy has been sold on the secondary market: (i) PHL has filed numerous lawsuits seeking to rescind policies and deny death claims; and (ii) several lawsuits have been filed against PHL seeking to enforce policies and recover death claims. PHL also has filed numerous lawsuits in which, prior to the insured's death, it has sought to rescind the applicable policy based on the fact that the policy or the beneficial interest in the trust policy owner was transferred. PHL even seeks to deny claims and rescind policies after collecting premiums for five or six years. In these various lawsuits, PHL has claimed that the fact that the beneficial interest in the trust, or the policy itself, has

EXHIBIT 3 - PAGE 237

been transferred means that the policy lacks a valid insurable interest. By way of example, a partial list of lawsuits includes: *PHL Variable Insurance Company v. U.S. Bank Nat'l Ass'n, et al.*, Case No. 10-cv-00197 (D. Minn. Apr. 8, 2010), Complaint; *PHL Variable Insurance Company v. 2008 Christa Joseph Irrevocable Trust*, Case No. 10-cv-03001 (D. Minn. Jul. 14, 2010), Complaint; *PHL Variable Insurance Company v. Jay Doss Irrevocable Life Insurance Trust*, Case No. HHD-CV-10-6017099-S (Conn. Superior Court, Hartford, November 23, 2010), Complaint; *PHL Variable Insurance Company v. Dolores C. Painter Irrevocable NJ Trust, et al.,* Case No. 10-cv-03603 (D.N.J. Jul. 16, 2010), Complaint; *PHL Variable Insurance Company v. LaSalle Bank N.A., et al,* Case No. 08-cv-11562 (E.D. Mich. Apr. 11, 2008), Complaint; *PHL Variable Insurance Company v. Clifton Wright Family Insurance Trust,* Case No. 09-C-2344 (S.D. Cal. Nov. 12, 2009), Complaint; *PHL Variable Insurance Company v. Kenneth Green Family Insurance Trust,* Case No. 09-cv-02606 (S.D. Cal. Nov. 18, 2009), Complaint; *PHL Variable Insurance Company v. The James Evans Family Insurance Trust,* Case No. 10-cv-00240 (S.D. Cal. Jan. 29, 2010), Complaint; *PHL Variable Insurance Company v. The Abrams Family Irrevocable Life Insurance Trust,* Case No. 10-CV-521 (S.D. Cal. March 11, 2010); *PHL Variable Insurance Company v. Kristian Giordano, et al.,* Case No. 10-cv-00661 (S.D. Cal. Mar. 26, 2010), Complaint; *PHL Variable Insurance Company v. Gabriel Giordano, et al.,* Case No. 10-cv-0071 (S.D. Cal. Apr. 13, 2010), Complaint; *PHL Variable Insurance Company v. The Hyman Davidson 2008 Irrevocable Life Insurance Trust,* Case No. 10-CV-1219 (S.D. Cal. June 8, 2010); Complaint; *PHL Variable Insurance Company v. The Patricia Sanford Family Insurance Trust, et al.,* Case No. 10-cv-00784 (S.D. Cal. Apr. 14, 2010), Complaint; *PHL Variable Insurance Company v. Alberto Rubio Family Insurance Trust, et al.,* Case No. 09-CV-4652 (C.D. Cal. June 26, 2009), Complaint; *U.S. Bank National Association v. PHL Variable Insurance Company,* Case No. 12-CV-0347, (C.D. Cal. Apr. 6, 2012); *U.S. Bank National Association v.*

36

EXHIBIT 3 - PAGE 238

*PHL Variable Insurance Company*, Case No. 12-CV-00877, (D. Minn. Apr. 6, 2012).

99. As a result of this widespread and systematic practice by Defendants, thirteen PHL policyholders recently brought claims against PHL for breach of contract, fraud, and declaratory relief related to the validity of their policies. *See* Counterclaims in *PHL Variable Insurance Company v. ESF QIF Trust*, Case No. 12-CV-00319, (D. Del. Mar. 15, 2012) [D.I. 8].

100. PHL's intention to not honor the Policies also is evident from other actions by PHL. For example, PHL has challenged the validity of five large face amount policies owned by trusts for which Wilmington Savings, as successor-in-interest to Christiana Bank, serves as trustee, including three of the Policies. *See PHL Variable Insurance Company v. Price Dawe 2006 Insurance Trust*, Case No. 10-CV-964, (D. Del. Nov. 12, 2010), Complaint; *PHL Variable Insurance Company v. The Helene Small Insurance Trust*, Case No. 12-CV-00312, (D. Del. Mar. 15, 2012), Complaint; *PHL Variable Insurance Company v. The Edwin Fuld Life Insurance Trust*, Case No. 12-CV-00313, (D. Del. Mar. 15, 2012), Complaint; *PHL Variable Insurance Company v. The Chong Son Pak Life Insurance Trust*, Case No. 12-CV-00314, (D. Del. Mar. 15, 2012), Complaint; *PHL Variable Insurance Company v. The Virginia L. Lankow Life Insurance Trust*, Case No. 12-CV-315, (D. Del. Mar. 15, 2012), Complaint. PHL uses template "cookie cutter" complaints alleging that the policies are "IOLI" and violate applicable insurable interest laws.

101. PHL also has denied claims and/or brought rescission actions regarding several policies in which PHL's agent Robert Fink, who was PHL's agent for many of the Policies, was the agent. *See, e.g., PHL Variable Insurance Company v. The Edwin Fuld Life Insurance Trust*, Case No. 12-CV-00313, (D. Del. Mar. 15, 2012); *PHL Variable Insurance Company v. The Virginia L. Lankow Life Insurance Trust*, Case No. 12-CV-315, (D. Del. Mar. 15, 2012). Further, on information and belief, PHL has long considered Kevin Burke, who was PHL's agent for approximately 15

37

EXHIBIT 3 - PAGE 239

of the Policies, a so-called IOLI producer whose policies it intends to challenge. Indeed, during a 2010 deposition of Mr. Labar, Mr. Labar singled out Mr. Burke as one of the PHL and Phoenix Life agents who produced the largest volume of what Defendants now condemn as IOLI.

102. Additionally, PHL maintains tracking spreadsheets of policies it considers IOLI. Upon information and belief, each of the Policies at issue have long been included on PHL's IOLI tracking spreadsheets, indicating that PHL will ultimately deny any claim submitted under the Policies.

103. Moreover, when attempting to rescind policies, PHL, as a matter of practice, has taken the position that it not only is entitled to deny claims and rescind coverage, but also that PHL is entitled to retain all premiums paid for the policies. By taking that position, PHL is directly breaching the terms of its policies.

104. Section 21 of the Policies expressly provides: "If we contest the validity of all or a portion of the face amount provided under this policy, the amount we pay with respect to the contested amount will be limited to the higher of a return of any paid premium required by us for the contested face amount or the sum of any Monthly Deductions made under this policy for the contested face amount."

105. In other words, PHL contractually agreed, as an inducement to buying policies, that if it successfully contested a policy it would pay the policyholder back no less than all premiums paid for the policy. PHL's consistent failure to honor the terms of its policies is willful and done in bad faith.

106. Through its pattern of denying claims, challenging policies, and attempting to retain premiums, on similarly-situated policies, PHL has caused the Plaintiffs harm by significantly diminishing the value of their Policies

107. The marketability of the Policies owned by Plaintiffs depends on investors' confidence that the issuing insurer will pay a claim upon the death of the insured. In the absence of certainty that the carrier will honor the Policy, the Policy is rendered unmarketable and Plaintiffs are deprived of the economic benefit of

EXHIBIT 3 - PAGE 240

owning the Policies.

108. PHL's systematic refusal to pay death benefits contractually due under policies similar to these Policies, and its stance that it can retain premiums paid under the Policies, have destroyed the market's confidence in the Policies and significantly diminished the value of the Policies, thus depriving Plaintiffs of their economic interests in the Policies. As a result of PHL's continuous and systematic challenge of such policies and the uncertainty it has engendered, the value and marketability of the Policies has been and will continue to be impaired. In addition, PHL continues to collect premiums on the Policies at the same time that it is claiming that it owes no benefits on similarly situated policies.

109. Based on Defendants actions described above, the market has no confidence that: (i) PHL will honor any policy which has been transferred or any policy owned by a trust whose beneficial interest has been transferred; and (ii) PHL will willingly return premiums if a policy is rescinded. Plaintiffs have thus been forced into a position where they must continue paying premiums without any assurance their Policies will be honored by PHL or even that their premiums will be returned if PHL does not honor the Policies.

110. As one Judge aptly described the present harm caused by PHL's parent, Phoenix Life's, similar pattern of challenging policies:

> The marketability of the plaintiff's property, the subject life insurance policy, has been destroyed by [Phoenix Life's] refusal to honor similar policies involving [an agent] or that involve an alleged stranger-originated policy scheme with a trust structure similar to that used herein. As interest in a life insurance policy is a recognized property right, Phoenix's prior actions and express statements regarding trust schemes involving [an agent] create a cloud over the marketability of the subject policy.

39

EXHIBIT 3 - PAGE 241

> The likelihood that Phoenix will contest the policy upon the insured's death substantially diminishes the value of the policy, if it does not destroy it completely. July 5, 2001 Order in *CSSEL Bare Trust, Dated As Of April 21, 2006 v. Phoenix Life Insurance Company*, Index No. 601002/2009, Supreme Court of the State of New York, New York County.

111. Plaintiffs believe that their Policies are valid and are continuing to pay substantial premiums to PHL for such Policies. PHL's actions make clear not only that it will ultimately challenge the Policies but also that it will attempt to confiscate the premiums Plaintiffs are paying and will continue to pay. To redress a real and present economic injury to them, Plaintiffs are entitled to a declaratory judgment by this Court establishing PHL's obligation to pay an eventual claim for death benefits under the Policies or, in the alternative, to require PHL to refund all premiums on any policy that is rescinded or voided.

**B.  PHL, As Part Of A Conspiracy With Phoenix Life And PNX, Fraudulently Misrepresents And Conceals Its True Intentions So As To Obtain Additional Revenue**

112. Having determined that it will not honor the Policies and will deny death claims submitted under the Policies, and other similar policies, PHL has implemented a widespread practice of defrauding Plaintiffs and other policyholders into paying additional premiums which PHL will later attempt to confiscate. PHL has concealed from Plaintiffs and other policyholders PHL's intention to ultimately deny their claims for benefits. PHL's failure to disclose its intention to deny Plaintiffs' and other policyholders' claims for benefits when submitted is material because, among other things, PHL has continued to bill Plaintiffs and other policyholders for premiums and to send them other communications intended to assure Plaintiffs and other policyholders that their policies are valid and in good

40

EXHIBIT 3 - PAGE 242

standing, lull them into believing that PHL intends to pay death benefits when due and induce them to continue to pay PHL premiums. PHL's communications both affirmatively misrepresent and fraudulently conceal PHL's true intentions, which are to ultimately deny Plaintiffs' claims for coverage and seek to retain the premiums that PHL continues to bill and receive.

113. PHL has engaged in this widespread fraud in concert with, and as part of a conspiracy with, Phoenix Life and PNX in an effort to improve Defendants' dire financial situation. Plaintiffs are informed and believe that Defendants have several improper motivations for this dishonest and fraudulent conduct. First, Plaintiffs are informed and believe that Defendants hope that, by concealing their true intentions while PHL continues to charge and receive premiums, Plaintiffs will allow some of the Policies to lapse due to PHL's other improper conduct with respect to the Policies. Every Policy that lapses would give Defendants a windfall and allow them to avoid the cost of litigation. Further, as described above, when PHL denies coverage and attempts to rescind policies, it takes the position that it is entitled to retain premiums. Thus, by continuing to charge premiums on policies it has no intention of honoring, PHL increases the amount of premiums it can later attempt to confiscate when it ultimately denies coverage and attempts to rescind. As part of this conspiracy among Defendants, PHL has collected millions of dollars in premiums under false pretenses, with no intention of either honoring the Policies or returning the premiums.

114. One egregious example of this fraudulent practice by Defendants relates to the Policy owned by the John Doe Trust 1. On December 11, 2009 PHL filed a federal lawsuit in Florida accusing the insured who created the John Doe Trust 1 of lying on an insurance application for a different policy and alleged that policy was an unlawful IOLI policy. PHL's agent for the policy, Robert Fink, was later added as a third-party defendant in that case. PHL, however, delayed and continued collecting premiums for an additional two years before suing to rescind

EXHIBIT 3 - PAGE 243

the Policy owned by the John Doe Trust 1 on the very same grounds it previously sought to rescind another policy issued on the life of the same insured and solicited by the same agent.

115. PHL's practice of failing to disclose and concealing the intent to deny benefits, challenge the policies and attempt to keep the premiums it continues to bill and collect was adopted by Defendants in bad faith and is a fraud on Plaintiffs and other policyholders. In furtherance of this fraudulent scheme, PHL has made repeated misrepresentations and concealed material information with a fraudulent intent.

116. For each of the Policies, PHL has continued to send premium notices by the United States Postal Service, charging premiums to Plaintiffs that they must pay to avoid having their Policies lapse. Defendants have caused PHL to mail Plaintiffs these notices, and collect the premiums billed therein, without disclosing to Plaintiffs that Defendants secretly intend to have PHL deny benefits when claims are made and seek to retain all of the premiums being billed and collected. PHL has also provided Defendants with wiring instructions for the payment of premiums and accepted the premium payments by interstate wire transfer. PHL mailed the notices as part of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which it does not intend to return.

117. Premiums are only due under policies which are valid and enforceable. If an insurer knows or believes that a policy is invalid or unenforceable, the insurer has an obligation to inform the policyholder of that fact and cease charging premiums for the policy in question. PHL has determined that it will not honor the Policies, yet has continued to use the United States Postal Service to bill Plaintiffs for premiums PHL claims are due under the Policies. Each time PHL mails a premium notice to Plaintiffs, PHL is affirmatively representing that, to its knowledge, the Policy in question is valid and enforceable and that it has no plan to

42

EXHIBIT 3 - PAGE 244

challenge the Policy or deny benefits under the Policy. Each time that PHL has used the United States Postal Service to bill Plaintiffs for premiums, PHL has fraudulently concealed its intention to deny benefits under the Policy when the insured dies and attempt to rescind the Policy and confiscate all of the premiums being billed and collected.

118. For each Policy, PHL has used the United States Postal Service to mail Plaintiffs annual statements (called an "Annual Policy Summary") advising Plaintiffs of their Policies' current death benefits and policy values. Each Annual Policy Summary thanks the Plaintiff to whom it is mailed "for choosing Phoenix to meet your insurance and investment needs." Each Annual Policy Summary also states that "Phoenix is committed to providing you with the highest level of service now, and in the future." Each Annual Policy Summary further states that the Plaintiff policyholder "should consider requesting more detailed information about your policy to understand how it may perform in the future." Plaintiffs are informed and believe, and upon such information and belief allege, that PHL mailed these statements with the intent to ultimately deny Plaintiffs' claims for benefits. PHL mailed Plaintiffs these Annual Policy Summaries in furtherance of Defendants' scheme to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and earn additional premium revenue which PHL intends to keep.

119. The Annual Policy Summaries affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented to Plaintiffs the amount of the current death benefit and policy value, PHL knew and intended that Plaintiffs would believe that PHL intended to honor the Policy and pay the amounts stated and that the Plaintiffs would be induced to continue to pay premiums based on those representations and assurances. These Annual Policy Summaries mailed to Plaintiffs each falsely represented that PHL considered the Policy in question valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In mailing this information to Plaintiffs, PHL fraudulently

43

EXHIBIT 3 - PAGE 245

concealed that it had no intention of paying the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

120. As invited to do by the Annual Policy Summaries, Plaintiffs requested policy illustrations from PHL. PHL responded to Plaintiffs' requests by either faxing Plaintiffs policy illustrations by interstate wires or mailing Plaintiffs the policy illustrations by the United States Postal Service. Among other things, the policy illustrations faxed or mailed to Plaintiffs advised Plaintiffs of the current death benefits and policy values for their respective Policies. The policy illustrations also contained projections of these figures based on premium outlays. When PHL faxed and mailed these illustrations to Plaintiffs, PHL did not disclose to Plaintiffs that PHL did not intend to honor the Policies and pay benefits. PHL faxed and mailed Plaintiffs the illustrations in furtherance of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which PHL does not intend to return.

121. The policy illustrations faxed and mailed to Plaintiffs by PHL affirmatively misrepresented and fraudulently concealed material facts. For example, when PHL represented to a Plaintiff the amount of the Policy's current death benefit and policy value, PHL knew and intended that the Plaintiff would: (i) believe that PHL intended to honor the Policy and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. The policy illustrations faxed and mailed to each Plaintiff by PHL falsely represented that PHL considered the Policy to be valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits. PHL fraudulently concealed, and failed to disclose, that it did not intend to pay the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

122. PHL also has sent each Plaintiff documents entitled Verification of Coverage for Life Insurance Policy ("VOC") either by fax using interstate wires or

44

EXHIBIT 3 - PAGE 246

mail using the United States Postal Service. The VOCs verified to Plaintiffs that they had coverage from PHL and gave details about the coverage. For example, in response to the VOC's question "Is the above referenced policy in force," PHL answered and represented "YES." The VOCs confirmed for each Plaintiff the current death benefit and policy value for that Plaintiff's Policy. The VOCs faxed and mailed to each Plaintiff fraudulently concealed, and failed to disclose, that PHL did not intend to pay the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid. PHL faxed and mailed Plaintiffs the VOCs in furtherance of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which PHL does not intend to return.

123. The VOCs that PHL faxed and mailed Plaintiffs affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented "YES" in response to the question whether a Policy was "in force," PHL knew and intended that Plaintiffs would: (i) believe that PHL intended to honor their respective Policy and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. When PHL represented to Plaintiffs the current death benefit and policy value for their respective Policies, PHL knew and intended that Plaintiffs would: (i) believe that PHL intended to honor their respective Policy and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. Each VOC that PHL faxed or mailed to a Plaintiff falsely represented that PHL considered the Policy "in force," valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In providing this information to Plaintiffs, PHL fraudulently concealed, and failed to disclose, that it had no intention of paying the amounts stated and intended to deny any claim for benefits and confiscate all premiums paid.

124. As described above, many of the Policies were solicited by PHL agents

EXHIBIT 3 - PAGE 247

residing in this judicial district. For the Policies noted in paragraph 73 above, the illustrations mailed or faxed to Plaintiffs by PHL each represented that they were prepared by the applicable agent residing in this judicial district. For example, (a) the illustrations mailed or faxed by PHL to the Jane Doe Trust 4 represent that they were "Prepared by: KEVIN BURKE"; (b) the illustrations mailed or faxed by PHL to the John Doe Trust 32 represent that they were "Prepared by: RICHARD SON"; and (c) the illustrations mailed or faxed by PHL to the John Doe Trust 55 represent that they were "Prepared by: ROSSYLN MURIU". The premium notices mailed to the Trusts noted in paragraph 73 above also refer to the applicable agent residing in this judicial district.

125. Plaintiffs are informed and believe, and on such information and belief allege, that PHL and Phoenix Life continue to pay renewal commissions to the agents residing in this judicial district as new premiums are paid on these Policies. Thus, both PHL and its agents residing in this district are benefiting and profiting from Defendants' fraud.

126. Set forth below are representative examples of communications faxed or mailed to Plaintiffs by PHL as part of Defendants' plan to fraudulently induce Plaintiffs and other policyholders to continue to pay premiums on policies that Defendants secretly intend will not be honored by PHL when death benefits become due. Each of these communications affirmatively misrepresented and fraudulently concealed material facts from Plaintiffs:

- PHL sent fraudulent communications to the John Doe Trust 1, through its trustee, including but not limited to, communications dated as follows: premium notices of December 6, 2009, December 6, 2010, and December 6, 2011; annual policy summaries of December 29, 2009, December 28, 2010, and December 27, 2011; policy illustrations of February 9, 2009, November 16, 2009, December 28, 2009, January 10, 2011, and February 8, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 2, through its

trustee, including but not limited to, communications dated as follows: premium notices of February 10, 2009, February 10, 2010 and February 10, 2011; annual policy summaries of March 3, 2009, March 2, 2010 and March 1, 2011; policy illustrations of November 18, 2009, March 3, 2010 and March 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 3, through its trustee, including but not limited to, communications dated as follows: premium notice of May 22, 2010; annual policy summaries of June 11, 2009 and June 11, 2010; policy illustrations of November 16, 2009, June 17, 2010, June 16, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 4, through its trustee, including but not limited to, communications dated as follows: premium notices of April 6, 2010, April 6, 2011 and April 6, 2012; annual policy summaries of April 28, 2009, April 27, 2010, April 26, 2011, and April 26, 2012; policy illustrations of November 16, 2009, April 30, 2010, May 4, 2011, January 17, 2012, and May 9, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 5, through its trustee, including but not limited to, communications dated as follows: premium notices of December 19, 2009, December 19, 2010, and December 19, 2011; annual policy summaries of January 8, 2009, January 9, 2010, January 11, 2011, and January 10, 2012; policy illustrations of November 23, 2009, January 20, 2010, January 18, 2011, November 23, 2011, and February 19, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 6, through its trustee, including but not limited to, communications dated as follows: premium notices of February 18, 2010, February 18, 2011, and February 18, 2012; annual policy summaries of November 24, 2009, April 9, 2010, April 9, 2011, and March 9, 2012; policy illustrations of November 23, 2009, March 16, 2010, March 14, 2011, and April 9, 2012; and VOC of September 21, 2011.

47

EXHIBIT 3 - PAGE 249

- PHL sent fraudulent communications to the Jane Doe Trust 7, through its trustee, including but not limited to, communications dated as follows: premium notices of March 6, 2009, March 6, 2010, March 6, 2011, and March 6, 2012; annual policy summaries of March 26, 2009, March 26, 2010, March 28, 2011, and March 26, 2012; policy illustrations of December 1, 2009, April 6, 2010, March 31, 2011, January 4, 2012, and March 27, 2012; and VOC of September 20, 2011.

- PHL sent fraudulent communications to the John Doe Trust 8, through its trustee, including but not limited to, communications dated as follows: premium notices of March 7, 2009, March 7, 2010, March 7, 2011, and March 7, 2012; annual policy summaries of March 27, 2009, March 30, 2010, March 28, 2011, and March 27, 2012; policy illustrations of December 8, 2009, April 5, 2010, March 31, 2011, and January 4, 2012; and VOC of September 19, 2011.

- PHL sent fraudulent communications to the John Doe Trust 9, through its trustee, including but not limited to, communications dated as follows: premium notices of July 31, 2009, July 31, 2010, and July 31, 2011; annual policy summaries of August 26, 2009, August 21, 2010, and August 22, 2011; policy illustrations of August 26, 2009, September 10, 2010, August 29, 2011, and January, 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 10, through its trustee, including but not limited to, communications dated as follows: premium notices of July 31, 2010 and July 31, 2011; annual policy summaries of August 20, 2009, August 21, 2010, and August 22, 2011; policy illustrations of September 20, 2010, August 15, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 11, through its trustee, including but not limited to, communications dated as follows: premium notices of January 10, 2010, January 10, 2011, and January 10, 2012; annual policy summaries of November 24, 2009, February 2, 2010, February 1, 2011, and January, 2012; policy illustrations of February 23, 2009, February 2, 2010, February 17,

48

EXHIBIT 3 - PAGE 250

2011, November 10, 2011, and January 5, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 12, through its trustee, including but not limited to, communications dated as follows: premium notice of May 26, 2010; annual policy summaries of June 16, 2010 and June 16, 2011; policy illustrations of December 22, 2009, June 23, 2010, June 23, 2011, and February 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 13, through its trustee, including but not limited to, communications dated as follows: premium notices of March 8, 2009, March 8, 2010, March 8, 2011, and March 8, 2012; annual policy summaries of March 31, 2009, March 30, 2010, March 28, 2011, and March 28, 2012; policy illustrations of December 22, 2009, April 5, 2010, March 31, 2011, January 4, 2012, and April 5, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 14, through its trustee, including but not limited to, communications dated as follows: premium notices of March 8, 2009, March 8, 2010, March 8, 2011, and March 8, 2012; annual policy summaries of March 31, 2009, March 30, 2010, March 28, 2011, and March 28, 2012; policy illustrations of December 8, 2009, April 5, 2010, March 31, 2011, and January 4, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 15, through its trustee, including but not limited to, communications dated as follows: premium notices of April 13, 2010 and April 13, 2011; annual policy summaries of May 4, 2010 and May 3, 2012; policy illustrations of December 14, 2009, May 4, 2010, May 19, 2011, and January 17, 2012; and VOC of November 9, 2011.

- PHL sent fraudulent communications to the John Doe Trust 16, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of April 14, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of September 29, 2009, May 6, 2010, May 18, 2011, January 17,

49

EXHIBIT 3 - PAGE 251

2012, and May 8, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 17, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of April 14, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of December 14, 2009, April 19, 2010, April 14, 2011, January 17, 2012 and May 8, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 18, through its trustee, including but not limited to, communications dated as follows: premium notices of April 12, 2010, April 12, 2011, and April 12, 2012; annual policy summaries of December 11, 2009, May 4, 2010, August 1, 2011, and May 8, 2012; policy illustrations of December 10, 2009, May 4, 2010, January 7, 2012, and May 4, 2012; and VOCs of November 17, 2011 and December 5, 2011.

- PHL sent fraudulent communications to the John Doe Trust 19, through its trustee, including but not limited to, communications dated as follows: premium notices of January 17, 2010, January 17, 2011, and January 17, 2012; annual policy summaries of February 6, 2009, February 9, 2010, February 7, 2011, and February 6, 2012; policy illustrations of May 13, 2009, November 30, 2009, February 12, 2010, February 9, 2011, January 4, 2012, and February 8, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 20, through its trustee, including but not limited to, communications dated as follows: premium notices of March 1, 2009, March 1, 2010, March 1, 2011, and March 1, 2012; annual policy summaries of March 24, 2009, April 14, 2010, March 22, 2011, and March 21, 2012; policy illustrations of December 14, 2009, March 23, 2010, April 27, 2011, January 4, 2012 and March 23, 2012; and VOC of September 20, 2011.

- PHL sent fraudulent communications to the John Doe Trust 21, through its trustee, including but not limited to, communications dated as follows: premium

50

EXHIBIT 3 - PAGE 252

notices of February 10, 2009, February 10, 2010, February 10, 2011, and February 10, 2012; annual policy summaries of March 3, 2009, March 2, 2010, March 1, 2011, and March 1, 2012; policy illustrations of November 30, 2009, March 17, 2010, March 14, 2011, January 4, 2012, and March 8, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 22, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of November 10, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of December 10, 2009, April 19, 2010, January 17, 2012 and April 13, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 23, through its trustee, including but not limited to, communications dated as follows: premium notices of February 23, 2009, February 23, 2010, February 23, 2011, and February 23, 2012; annual policy summaries of March 17, 2009, March 16, 2010, March 15, 2011, and March 16, 2012; policy illustrations of December 10, 2009, March 16, 2010, March 18, 2011, January 14, 2012 and March 19, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 24, through its trustee, including but not limited to, communications dated as follows: premium notices of March 30, 2010, March 30, 2011, and March 30, 2012; annual policy summaries of April 20, 2009, April 20, 2010, April 20, 2011, and April 19, 2012; policy illustrations of December 10, 2009, April 20, 2010, April 27, 2011, and May 9, 2012; and VOC of September 22, 2011.

- PHL sent fraudulent communications to the John Doe Trust 25, through its trustee, including but not limited to, communications dated as follows: premium notices of April 12, 2009, April 12, 2010, April 12, 2011, and April 12, 2012; annual policy summaries of May 5, 2009, May 4, 2010, and May 8, 2012; policy

51

EXHIBIT 3 - PAGE 253

illustrations of December 10, 2009, May 4, 2010, January 17, 2012 and May 4, 2012; and VOC of November 9, 2011.

- PHL sent fraudulent communications to the John Doe Trust 26, through its trustee, including but not limited to, communications dated as follows: premium notices of March 1, 2010, March 1, 2011, and March 1, 2012; annual policy summaries of March 24, 2009, March 22, 2010, March 22, 2011, and March 21, 2012; policy illustrations of December 1, 2009, March 23, 2010, March 23, 2010, January 4, 2012 and March 23, 2012; and VOC of September 20, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 27, through its trustee, including but not limited to, communications dated as follows: premium notice of November 20, 2010; annual policy summaries of December 10, 2009, December 11, 2009, and December 13, 2011; policy illustrations of January 5, 2010, December 15, 2010, December 15, 2011 and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 28, through its trustee, including but not limited to, communications dated as follows: premium notice of May 31, 2008; annual policy summaries of June 23, 2009, September 28, 2010, and June 20, 2011; policy illustrations of December 29, 2009, June 23, 2010, June 27, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 29, through its trustee, including but not limited to, communications dated as follows: premium notices of July 16, 2010 and July 16, 2011; annual policy summaries of August 5, 2010 and August 5, 2011; policy illustrations of December 15, 2009, September 1, 2010, August 15, 2011 and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 30, through its trustee, including but not limited to, communications dated as follows: premium notices of January 16, 2011 and January 16, 2012; annual policy summaries of February 5, 2010, February 7, 2011, and February 6, 2012; policy illustrations of

52

EXHIBIT 3 - PAGE 254

March 2, 1010, February 16, 2011, January 4, 2012 and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 31, through its trustee, including but not limited to, communications dated as follows: premium notice of June 5, 2010; annual policy summaries of June 26, 2010 and June 28, 2011; policy illustrations of December 14, 2009, June 28, 2010, July 12, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 32, through its trustee, including but not limited to, communications dated as follows: premium notices of November 21, 2010 and November 21, 2011; annual policy summaries of December 11, 2009, December 14, 2010, and December 13, 2011; policy illustrations of March 4, 2010, December 21, 2010, December 15, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 33, through its trustee, including but not limited to, communications dated as follows: premium notices of August 1, 2010 and August 1, 2011; annual policy summaries of August 23, 2010 and August 22, 2011; policy illustrations of December 15, 2009, August 24, 2010, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 34, through its trustee, including but not limited to, communications dated as follows: premium notices of June 29, 2009 and June 29, 2010; annual policy summaries of July 19, 2010 and July 19, 2011; policy illustrations of December 15, 2009, July 22, 2010, July 20, 2011 and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 35, through its trustee, including but not limited to, communications dated as follows: premium notices of July 21, 2009, July 21, 2010, and July 21, 2011; annual policy summaries of August 11, 2009 and August 10, 2010; policy illustrations of December 15, 2009, September 10, 2010, August 11, 2011, August 15, 2011 and January 19, 2012; and

53

EXHIBIT 3 - PAGE 255

VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 36, through its trustee, including but not limited to, communications dated as follows: premium notices of January 5, 2011 and January 5, 2012; annual policy summaries of January 26, 2010, January 25, 2011, and January 25, 2012; policy illustrations of March 2, 2010, February 9, 2011, November 29, 2011, and January 31, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 37, through its trustee, including but not limited to, communications dated as follows: premium notices of September 5, 2009, September 5, 2010, and September 5, 2011; annual policy summaries of September 26, 2009, September 28, 2010, and September 30, 2011; policy illustrations of December 22, 2009, March 30, 2010, August 29, 2011, September 29, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 38, through its trustee, including but not limited to, communications dated as follows: premium notice of August 17, 2011; annual policy summaries of September 8, 2010 and September 7, 2011; policy illustrations of December 22, 2009, October 5, 2010, August 9, 2011, August 22, 2011, September 12, 2011, and January 24, 2012; and VOCs of June 13, 2011 and July 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 39, through its trustee, including but not limited to, communications dated as follows: premium notices of November 15, 2010 and November 15, 2011; annual policy summaries of December 8, 2009, December 7, 2010, and December 5, 2011; policy illustrations of December 22, 2009, December 5, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 40, through its trustee, including but not limited to, communications dated as follows: premium notices of April 26, 2011 and April 26, 2012; annual policy summary of June 3,

54

EXHIBIT 3 - PAGE 256

2010; policy illustrations of June 3, 2010, May 20, 2011, and January 17, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 41, through its trustee, including but not limited to, communications dated as follows: premium notice of October 6, 2010; annual policy summaries of October 27, 2009, October 26, 2010, and October 26, 2011; policy illustrations of January 5, 2010, November 3, 2010, November 1, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 42, through its trustee, including but not limited to, communications dated as follows: premium notices of April 19, 2010, April 19, 2011 and April 19, 2012; annual policy summaries of May 11, 2010 and May 9, 2012; policy illustrations of December 14, 2009, May 11, 2010, May 19, 2011, January 17, 2011, and May 16, 2012.

- PHL sent fraudulent communications to the Jane Doe Trust 43, through its trustee, including but not limited to, communications dated as follows: premium notices of September 30. 2009, September 30, 2010, and September 30, 2011; annual policy summaries of October 20, 2009, October 20, 2010, and October 20, 2011; policy illustrations of January 2, 2010, November 3, 2010, November 16, 2011, December 19, 2011, and March 1, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 44, through its trustee, including but not limited to, communications dated as follows: premium notices of October 20, 2010 and October 20, 2011; annual policy summaries of November 10, 2009, November 9, 2010, and November 9, 2011; policy illustrations of January 5, 2010, November 16, 2010, November 17, 2011, and February 6, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 45, through its trustee, including but not limited to, communications dated as follows:  premium notices of November 7, 2010 and November 7, 2011; annual policy summaries of November 27, 2009, November 30, 2010, and December 2, 2011; policy

55

EXHIBIT 3 - PAGE 257

illustrations of December 15, 2009, December 1, 2010, November 30, 2011, and February 8, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 46, through its trustee, including but not limited to, communications dated as follows: premium notices of January 9, 2011 and January 9, 2012; annual policy summaries of January 29, 2010, February 1, 2011, and February 1, 2012; policy illustrations of March 2, 2010, February 1, 2011, November 29, 2011, and February 1, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the Jane Doe Trust 47, through its trustee, including but not limited to, communications dated as follows: premium notices of January 4, 2009 and January 4, 2012; annual policy summaries of January 26, 2010, January 27, 2011, and January 24, 2012; policy illustrations of March 2, 2010, January 27, 2011, November 29, 2011, January 25, 2012, and January 31, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 48, through its trustee, including but not limited to, communications dated as follows: premium notices of November 20, 2010 and November 20, 2011; annual policy summaries of December 10, 2009, December 11, 2010, and December 13, 2011; policy illustrations of January 5, 2010, December 15, 2010, December 15, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 49, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 17, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 50, through its trustee, including but not limited to, communications dated as follows: premium

56

EXHIBIT 3 - PAGE 258

notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, September 13, 2011; and policy illustrations of December 17, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 14, 2011.

- PHL sent fraudulent communications to the John Doe Trust 51, through its trustee, including but not limited to, communications dated as follows: premium notices of July 23, 2009, July 23, 2010, and July 23, 2011; annual policy summaries of August 12, 2009, August 12, 2010, and August 17, 2011; policy illustrations of November 16, 2009, September 10, 2010, August 8, 2011, August 15, 2011, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 52, through its trustee, including but not limited to, communications dated as follows: premium notices of December 3, 2010 and December 3, 2011; annual policy summaries of January 13, 2010, December 23, 2010, and December 23, 2011; policy illustrations of January 13, 2010, January 6, 2011, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 53, through its trustee, including but not limited to, communications dated as follows: premium notices of December 3, 2010 and December 3, 2011; annual policy summaries of January 13, 2010, December 23, 2010, and December 23, 2011; policy illustrations of January 13, 2010, December 29, 2010, and February 8, 2012; and VOC of September 15, 2011.

- PHL sent fraudulent communications to the John Doe Trust 54, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 15, 2010, and September 13, 2011; policy illustrations of December 22, 2009, September 20, 2010, August 22, 2011, September 21, 2011, January 24, 2011, and March 1, 2011; and VOC of July 14,

57

EXHIBIT 3 - PAGE 259

2011.

- PHL sent fraudulent communications to the John Doe Trust 55, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 22, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 56, through its trustee, including but not limited to, communications dated as follows: premium notices of March 19, 2009, March 19, 2010, March 19, 2011, and March 19, 2012; annual policy summaries of April 8, 2009, April 8, 2010, April 8, 2011, and April 9, 2012; policy illustrations of June 9, 2009, December 10, 2009, April 19, 2010, and January 17, 2012; and VOC of September 21, 2011.

- PHL sent fraudulent communications to the John Doe Trust 57, through its trustee, including but not limited to, communications dated as follows: premium notices of August 4, 2010 and August 4, 2011; annual policy summaries of August 24, 2010 and August 24, 2011; policy illustrations of December 17, 2009, August 27, 2010, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 58, through its trustee, including but not limited to, communications dated as follows: premium notices of September 21, 2009, September 21, 2010, and September 21, 2011; annual policy summaries of October 13, 2009, October 12, 2010, and October 11, 2011; policy illustrations of January 5, 2010, October 12, 2010, October 31, 2011, and January 24, 2012; and VOC of July 12, 2011.

- PHL sent fraudulent communications to the John Doe Trust 59, through its trustee, including but not limited to, communications dated as follows: premium notices of July 14, 2009, July 14, 2010, and July 14, 2011; annual policy summaries of October 13, 2009, August 3, 2010, and August 3, 2011; policy illustrations of

58

EXHIBIT 3 - PAGE 260

October 13, 2009, August 12, 2010, August 8, 2011, August 15, 2011, and January 19, 2012; and VOC of June 13, 2011.

- PHL sent fraudulent communications to the John Doe Trust 60, through its trustee, including but not limited to, communications dated as follows: premium notices of August 2, 2010 and August 2, 2011; annual policy summaries of August 23, 2010 and August 22, 2011; policy illustrations of December 17, 2009, August 24, 2010, August 8, 2011, August 15, 2011, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

127. In furtherance of Defendants' fraudulent scheme, PHL (specifically, Phoenix Life representatives acting on behalf of PHL), faxed or mailed each Plaintiff a document entitled "Policy Audit Request for Life Insurance Policy" ("Policy Audit") which again misrepresented and concealed material facts about each Plaintiff's Policy.

128. On or about January 5, 2012, Wilmington Savings, as successor in interest to Christiana Bank in its capacity as trustee for Plaintiffs, provided PHL/Phoenix Life with a "schedule of policies" and asked that a "Policy Audit request form" be completed to update the records for the Policies. The letter requested that PHL/Phoenix Life provide this information to Pricewaterhouse Coopers LLP and the trustee.

129. In response to the trustee's request, PHL (by Phoenix Life) sent a Policy Audit for each Policy by mail using the United States Postal Service and/or by fax using interstate wires. In response to the Policy Audit question "Is the above referenced policy in force," PHL answered and represented "YES" for each Policy. The Policy Audit also confirmed the current death benefit for that Policy. The Policy Audits faxed and mailed to each Plaintiff fraudulently concealed, and failed to disclose, that PHL did not intend to pay the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid. PHL faxed and mailed Plaintiffs the Policy Audits in furtherance of Defendants' plan to defraud

EXHIBIT 3 - PAGE 261

Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which PHL does not intend to return.

130. The Policy Audits faxed and/or mailed to Plaintiffs each affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL answered and represented "YES" in response to the question "Is the above referenced policy in force," PHL knew and intended that the Plaintiffs would: (i) believe that PHL intended to honor the Policy issued to it and pay the amounts stated; and (ii) in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. When PHL represented to a Plaintiff the amounts of the current death benefit for that Plaintiff's Policy, PHL knew and intended that the Plaintiff would: (i) believe that PHL intended to honor the Policy; and (ii) pay the amounts stated and, in reasonable and justifiable reliance on PHL's representations and assurances, continue to pay premiums. The Policy Audits faxed and mailed to Plaintiffs by PHL each falsely represented that PHL considered the Policy in question "in force," valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. PHL fraudulently concealed that it has no intention of paying the amounts stated, and instead intended to deny any claim for benefits and to confiscate all premiums paid.

131. Notably, and in an egregious example of Defendants' fraudulent practices, PHL sent such fraudulent Policy Audits to the John Doe Trust 1, John Doe Trust 22, and Jane Doe Trust 43 and then sued to rescind the Policies owned by these Trusts – which PHL had just represented were "in force" – less than two months later.

C. **PHL Unlawfully Increases Its Cost Of Insurance Charges As Part Of Defendants' Plan To Destroy The Value Of Their Policyholders' Policies And Force Policyholders To Lapse Their Policies**

132. PHL has also willfully breached the Policies and numerous other

60

EXHIBIT 3 - PAGE 262

policies in an attempt to intimidate Plaintiffs and other policyholders into lapsing their policies. Phoenix Life has engaged in the same conduct with respect to policies it issued. Such conduct is in furtherance of Defendants' scheme to evade its contractual obligations to Plaintiffs and other policyholders and gain a windfall by retaining many years worth of premiums paid for lapsed policies.

133. The first way in which PHL has breached the Policies and other policies is by unlawfully raising the COI charges for the Policies, in direct violation of the terms of the Policies. These breaches were done willfully and in bad faith, as their sole purpose was to attempt to force Plaintiffs, and other policyholders, into letting their Policies lapse and thus earning PHL an undeserved windfall. These actions by PHL are identical to actions Phoenix Life has impermissibly taken with respect to policies it issued to certain of its policyholders. Defendants are thus engaged in a concerted effort to breach their policies and improperly attempt to force their policyholders into letting their policies lapse to the policyholders' detriment and Defendants' benefit.

134. The Policies each provide that they will remain in force as long as there are sufficient funds in the policy account to cover specific monthly deductions set forth in the Policies. The most significant of these deductions is the COI charge, which reflects the price charged by PHL to cover the risk of paying the death benefit. The COI charge is determined by multiplying the COI rate times the net amount at risk.

135. The Policies allow PHL to change the COI rate, but only under very specific circumstances set forth therein. Specifically, the Policies provide that changes in cost of insurance rates: (i) will be based on PHL's expectations of "future mortality, persistency, investment earnings, expense experience, capital reserve requirements and tax assumptions"; (ii) will "not discriminate unfairly within any class of insureds"; and (iii) "will not distribute past gains or recoup prior losses."

136. Therefore, under the express terms of the Policies, PHL may only

EXHIBIT 3 - PAGE 263

change COI rates based on a change in PHL's expectation of mortality, persistency and other specified factors. Additionally, any change in the COI rates must be made on a uniform basis for all insureds in the same class and cannot be used to recoup PHL's prior losses.

137. The Policies' strict limitation on when COI rates may be increased is a material provision. The Policies are flexible-premium, universal life policies. This type of policy provides significant flexibility to the policyholder. A policyholder may choose to pay more into the account in premiums and accumulate tax-deferred interest. Or, if a policyholder wants to invest funds elsewhere, the policyholder may choose to pay only enough to cover monthly policy charges. If the COI rates could simply be increased whenever the insurer wished, the flexibility in premium payments which is the selling point of such policies would be wholly illusory.

138. Defendants marketed and sold their policies, including the Policies, as "flexible premium" policies, knowing that this flexibility would appeal to investors wishing to seek a competitive return on their investments and to avoid paying more premiums than needed to keep their policies in force. Among other things, Defendants represented that these policies: (i) give policyholders the "opportunity to lower premiums, as well as adjust the amount and timing of premium payments" (Press Release dated April 3, 2006); (ii) are "designed to balance protection and cash accumulation with features suited to meet policyholders' evolving personal or business needs" (Press Release dated April 3, 2006); and (iii) are "appropriate to those looking to minimize long term insurance costs while seeking competitive returns" (Press Release dated June 19, 2003).

139. Despite the explicit language in the Policies limiting the circumstances under which the COI rates may be increased, and the fact that Defendants heavily marketed such policies as permitting policyholders to pay the minimum premiums needed to keep their policies in force, PHL and Phoenix Life have twice unlawfully raised their COI rates, targeting the very policyholders who used their policies in the

62

EXHIBIT 3 - PAGE 264

way Defendants designed and marketed them. Both increases were part of Defendants' overall scheme to force policyholders into allowing their policies to lapse; the second unlawful increase breached the Policies. PHL and Phoenix Life have raised their COI rates in a targeted effort against policies they believe have become owned by investors, as investors frequently choose to pay only the minimum premiums required to keep a policy in force rather than attempting to build up the accumulated policy value.

140. In March 2010, PHL and Phoenix Life began sending letters to a subset, but not all, of their universal life policyholders, announcing that a COI rate increase would affect their policies if their accumulated policy value was not high enough. The letters stated in pertinent part:

> We are sending you this letter to inform you that on April 1, 2010, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies. Your policy referenced above will be subject to this rate increase on your next policy anniversary beginning 11/1/2010 unless your accumulated policy value is maintained at a sufficient level....The amount of the increase will vary based on the accumulated amount of your policy value. In general, maintaining higher levels of policy value in relation to the face amount will reduce or even eliminate the increase.

141. This first COI rate increase by PHL and Phoenix Life was unlawful in several respects.

142. First, there is nothing in PHL's and Phoenix Life's policies that allows them to increase COI rates based on the accumulated policy value. Indeed, the policies were marketed and purchased for the purpose of keeping the accumulated policy value low.

63

EXHIBIT 3 - PAGE 265

143.   Second, the COI rate increase was unlawful because it did not apply to an entire class of insureds, but only to those who maintain lower accumulated policy values.

144.   Third, the rate increase was unlawful because the life expectancies of insureds have increased, not decreased.   COI rates are the rates that PHL and Phoenix Life charge to cover death benefits, and thus should properly be driven primarily by expectations of future mortality.   Given that insureds are now living longer, PHL and Phoenix Life have no legitimate justification for raising costs intended to cover the risk of insureds' earlier death

145.   Fourth, the COI rate increases were unlawful because they were, on information and belief, intended to recoup prior losses by Defendants.

146.   Defendants' conduct with respect to the COI increases makes clear that they know they are acting improperly.   Shrouding its actions in secrecy, PHL has refused to disclose the precise methodology used to calculate the COI rates, or even what those rates are.   Phoenix Life has done the same.   Rather, in order to estimate the impact of the rate increases, policyholders have been forced to request illustrations for their respective policies.   Further recognizing that their behavior was improper, Defendants warned their shareholders that Defendants' actions would likely result in litigation.   Phoenix 2010 Form 10-K at 12 ("Effective April 1, 2010 we implemented an increase in the cost of insurance rates for certain universal life policies [which] may adversely affect our relationships with distributors, future sales and surrenders, and may result in claims against us by our policyholders.")

147.   Defendants' goal in increasing COI rates was clearly to force policyholders into the unpalatable choice of either paying premiums which would no longer justify the death benefit under the policy or to lapse their policy and surrender all premiums to Defendants.   These unlawful efforts appear to have been successful.  Defendants announced during their second quarter 2010 conference call that they had seen an increase in policy lapses due to a number of factors, including

64

EXHIBIT 3 - PAGE 266

the "cost of insurance rate increase we announced for a subset of policies in our product line."

148. In October 2011, PHL and Phoenix Life announced a second unlawful COI increase, which impacted and breached the Policies. The letters sent to Plaintiffs and other policyholders did not explain the basis for the increase, instead stating cryptically that:

> We are sending you this letter to inform you that on November 1, 2011, we are increasing cost of insurance rates on certain Phoenix Accumulator Universal Life policies, including your policy referenced above...This change will go into effect on your next policy anniversary on or after November 1, 2011. As background, we review our cost of insurance rates periodically to determine whether they should be changed and take action only when the rates are too low or too high relative to our current actuarial and financial expectations related to the policies. This change is in accordance with the terms of your policy, and all currently payable rates for the cost of insurance remain below the maximum guaranteed rate contained in your policy contract.

149. PHL cannot raise COI rates based on "actuarial and financial expectations" as they are not listed in the Policies as permissible reasons for raising COI rates. Moreover, on information and belief, the second COI increase was again based largely on the level of accumulated policy value. PHL has simply avoided stating what the increases were based on in an effort to make the increases appear legitimate.

150. Further, the second COI increase, like the first, discriminates unfairly within the same class of insureds and was an improper effort to recoup prior losses

65

EXHIBIT 3 - PAGE 267

by Defendants. Both increases are targeted at certain owners (namely policies which Defendants believe have become investor-owned). The COI rate increase does not affect thousands of other similar universal life policies, and PHL has not announced COI rate increases for other policies. If PHL had in fact revised its actuarial or investment expectations, as it claims, the COI rate increases would have affected a broad range of policies, not an unspecified subset of universal policies.

151. The COI rate increase was a breach of the Policies. Plaintiffs have been damaged by such breaches in two distinct ways. First, Plaintiffs have been damaged because they are being forced to pay larger premiums than required under the Policies. Second, PHL's raising of the COI rates has significantly impaired the value of the Policies on the secondary market, as PHL has attempted to destroy one of the most valuable features of the Policies, which was the ability to only pay premiums necessary to keep the Policies in force.

152. Plaintiffs are not the first policyholders who have been forced to sue PHL or Phoenix Life regarding their improper COI increases. Rather, at least two other lawsuits have been filed against Defendants regarding their unlawful increases. *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 11-CV-09517, United States District Court for the Central District of California, Western Division; *Martin Fleisher, as trustee of the Michael Moss Irrevocable Life Insurance Trust II, et al., v. Phoenix Life Insurance Company*, Case No. 11-CV-8405, United States District Court for the Southern District of New York. Further, on information and belief, at least one state Insurance Department (New York) has already ordered Phoenix Life to reverse the first of the unlawful COI increases.

153. Rather than admitting their wrongful actions when confronted, and abiding by the terms of their policies with respect to COI rates, on information and belief, Defendants have made a business decision to retaliate against those who have challenged their COI rate increases and who Defendants believe reported their

EXHIBIT 3 - PAGE 268

unlawful actions to regulatory authorities, by denying all claims submitted by any policyholders who have bravely stood up against Defendants' unlawful actions. Indeed, two policyholders have already been forced to sue PHL for the death benefits under their policies, after PHL denied their claims in retaliation for having stood up against the COI rate increases. *See U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-0347, United States District Court for the Central District of California, Western Division; *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 12-CV-00877, United States District Court for the District of Minnesota.

154. Contrary to Defendants' plan, Plaintiffs will not be intimidated into accepting PHL's unlawful COI rate increases or into lapsing their Policies for no consideration. Plaintiffs therefore seek a judicial declaration that the increases were improper and damages for PHL's breach of the Policies.

**D. PHL Unlawfully Attempts To Restrict Plaintiffs' Rights To Transfer The Policies Or Beneficial Interests In The Trusts, As Part Of Defendants' Plan To Destroy The Value Of Their Policyholders' Policies And Force Lapses**

155. As another aspect of Defendants' efforts to deprive Plaintiffs, and other policyholders, of their contractual rights, PHL has engaged in improper and unlawful conduct aimed at preventing Plaintiffs from exercising their contractual rights to transfer their Policies or interests in the entities that own the Policies. PHL and Phoenix Life have both engaged in similar conduct with respect to other policyholders as part of a systematic effort by Defendants to deprive their policyholders of valuable rights, destroy or impair the value of their policies, and intimidate policyholders into lapsing their policies.

156. The Policies are form PHL policies and, like other PHL policies, expressly provide that Plaintiffs may: (i) change ownership of the Policy; (ii) change the Policy beneficiary; and (iii) assign Policy rights to a third party. Further, the

67

EXHIBIT 3 - PAGE 269

Policies do not limit the rights or ability to transfer ownership or beneficial interests in trusts or other entities which own PHL's policies. Upon information and belief, Phoenix Life's policies contain substantially similar provisions. These are important and valuable policyholder rights, and were a significant inducement to Plaintiffs' purchase of the Policies.

157. Despite explicitly promising Plaintiffs and other policyholders that their Policies were freely transferable, and placing no contractual limitation on the ability to change or transfer beneficial interests in trusts which own PHL and Phoenix Life policies, PHL and Phoenix Life have attempted to deprive Plaintiffs and other policyholders of these valuable policy rights.

158. With respect to each of the Policies, when Christiana Bank became the new trustee of the Plaintiff Trusts, PHL retroactively demanded in a "Certificate and Acknowledgment of Trust Agreement" that it be advised within 30 days of any future transfer of the beneficial interest in any of the Plaintiff Trusts. Based on PHL's conduct and pattern and practice, it is clear that if it is advised of any such transfer, PHL will attempt to rescind the subject Policy based on a purported lack of insurable interest. PHL had no right under the Policies to make this demand as a condition for acknowledging Christiana Bank as the new trustee. By insisting that Plaintiffs comply with such extracontractual conditions, PHL has further breached the Policies.

159. PHL's conduct in attempting to restrict the Plaintiff Trusts' contractual rights to transfer their Policies or interests in the Plaintiff Trusts is part of a larger pattern of conduct by Defendants aimed at destroying their policyholders' transfer rights and thus diminishing the value of their policies.

160. Although Defendants' policies all provide that they are freely transferable, when policyholders actually attempt to exercise their contractual right to transfer the policy or assign the policy, Defendants routinely deny their requests (which Defendants have no right to do under the policies) and seek to rescind the

policy and confiscate the premiums paid for the policy on the grounds that the policies purportedly lack an insurable interest.

161. By refusing to process and acknowledge policy transfers, and seeking to rescind policies when policyholders attempt to exercise their transfer rights, Defendants attempt to intimidate policyholders into lapsing their policies for no consideration and to destroy the value of the policies on the secondary market.

162. Plaintiffs are not the first policyholders who have been forced to take action to prevent Defendants from breaching their policies by unlawfully restricting their transfer rights. Indeed, PHL and Phoenix Life have both already been sued in California state court by approximately thirty different policyholders for improperly refusing to acknowledge and process changes of ownership and changes of the beneficiary with respect to their policies. *See, e.g., Alan H. Fenton, as Trustee for the Dan Tana Irrevocable Life Insurance Trust II, et al. v. PHL Variable Insurance Company*, Case No. BC416600, Superior Court for California, County of Los Angeles and *Alan H. Fenton, as Trustee for William Harville Irrevocable Life Insurance Trust, et al. v. Phoenix Life Insurance Company*, Case No. 1340238, Superior Court of California, County of Santa Barbara.

163. The ability to transfer a policy for consideration, or to transfer the beneficial interest in a policy-owning trust for consideration, is a significant right which increases the market value for a policy. PHL's attempt to restrict Plaintiffs' transfer rights with respect to their Policies has damaged the value of the Policies and harmed Plaintiffs.

## **FIRST CLAIM FOR RELIEF**

**(Against PHL, Phoenix Life and PNX For Violation of 18 U.S.C. § 1962 (c))**

164. Plaintiffs refer to above paragraphs 1 through 163, inclusive, and by this reference incorporate the same herein as though fully set forth.

165. According to the 2011 Annual Report for PNX dated March 15, 2012, PNX is a holding company incorporated in Delaware whose principal operating

EXHIBIT 3 - PAGE 271

subsidiaries, Phoenix Life and its indirect subsidiary PHL, provide life insurance and annuity products. The 2011 Annual Report represents that, as of December 31, 2011, PNX's operating subsidiaries had $43.5 billion of net life insurance in force and $4.5 billion of annuity assets under management. PNX reports that it also has expanded sales of other insurance companies' policies through a distribution subsidiary, Saybrus Partners, Inc. PNX's 2011 Annual Report describes two distinct operational business segments: a "Life and Annuity segment" and a "Saybrus segment." Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, the Life and Annuity segment (the "Enterprise") was and is an association in fact comprised of PNX and its operating subsidiaries, including PHL and Phoenix Life, which provide life insurance and annuity products.

166. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, the Enterprise has had structure, a hierarchy and a legitimate purpose (*i.e.*, providing life insurance and annuity products throughout the United States). These elements are apparent in Defendants' filings with the Securities and Exchange Commission and publications.

167. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, PNX's role in the Enterprise has included strategic planning and policy making for the Enterprise and management of the Enterprise.

168. Among other things, Plaintiffs are informed and believe, and upon such information and belief allege, that PNX determines which life insurance and annuity products are to be sold by the Enterprise and the Enterprise's strategies and policies for marketing, underwriting and claims handling. By way of example, at page 3 of PHL's Form 10-K for the period ending December 31, 2011, PHL described PNX's role in determining the Enterprise's business lines as follows:

> Since 2009, our ultimate parent company, The Phoenix

70

EXHIBIT 3 - PAGE 272

Companies, Inc. ("PNX"), has focused on selling products and services that are less capital intensive and less sensitive to its ratings. In 2011, PNX product sales were primarily in annuities and 94% of those sales were fixed indexed annuities. In addition, PNX expanded sales of other insurance companies' policies through its distribution subsidiary, Saybrus Partners, Inc. ("Saybrus").

169. At pages 30 - 32 of PHL's Form 10-K for the period ending December 31, 2011, PHL described PNX's "Enterprise Risk Management" for the Enterprise:

**Enterprise Risk Management**

Our ultimate parent company, PNX, has a comprehensive, enterprise-wide risk management program under which PHL Variable operations are covered. The Chief Risk Officer reports to the Chief Financial Officer and monitors our risk management activities. During 2009, as part of our strategic repositioning and overall expense reduction effort, we refined our approach to risk management across the enterprise. We have an Enterprise Risk Management Committee, chaired by our ultimate parent company's Chief Executive Officer, whose functions are to establish risk management principles, monitor key risks and oversee our risk-management practices. Several management committees oversee and address issues pertaining to all our major risks—operational, market and product—as well as capital management.

170. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, PNX also has provided underwriting for the Enterprise's life insurance and annuity products through other PNX

71

EXHIBIT 3 - PAGE 273

subsidiaries. This arrangement is described at page F-37 of PHL's Form 10-K for the period ending December 31, 2011:

> Effective September 20, 2010, 1851 Securities, Inc., a wholly-owned subsidiary of PM Holdings, Inc., became the principal underwriter of the Company's variable life insurance policies and variable annuity contracts. . . . Prior to September 20, 2010, Phoenix Equity Planning Corporation ("PEPCO"), an indirect wholly-owned subsidiary of PNX, was the principal underwriter.

Plaintiffs are informed and believe, and upon such information and belief allege, that at all relevant times herein, PM Holdings, Inc. is a holding company that is the sole shareholder of PHL and, in turn, is a wholly owned subsidiary of Phoenix Life. Thus, Plaintiffs are informed and believe, and upon such information and belief allege, that at all relevant times herein, the underwriter for the Enterprise, 1851 Securities, is a sister company of PHL and an indirect wholly owned subsidiary of Phoenix Life which, in turn, is a wholly owned subsidiary of PNX.

171. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, Phoenix Life's role in the Enterprise has included paying commissions for the Enterprise's life insurance and annuity products, providing key business services for the Enterprise, and selling life insurance products for the Enterprise.

172. By way of example, as described above, at page F-37 of PHL's Form 10-K for the period ending December 31, 2011, PHL states that:

> Phoenix Life reimburses 1851 [Securities, Inc., a wholly-owned subsidiary of PM Holdings, Inc.] for commissions incurred on our behalf and we in turn reimburse Phoenix Life through a cost allocation process. Commissions incurred were $6,920 thousand and 15,736 thousand for

72

EXHIBIT 3 - PAGE 274

the years ended December 31, 2011 and 2010, respectively. There were no amounts payable to Phoenix Life related to commissions as of December 31, 2011 and 2010, respectively. . . . Phoenix Life reimbursed PEPCO for commissions incurred on our behalf and we in turn reimbursed Phoenix Life through a cost allocation process. Commissions incurred were $0, $9,029 thousand and $16,271 thousand for the years ended December 31, 2011, 2010 and 2009, respectively.

173. Also by way of example, PHL's 2011 Annual Report to Insurance Departments states that:

The Company [PHL] has entered into service agreements with its affiliates, including the Parent Company, Phoenix Life Insurance Company, related to cost reimbursement for services. The agreement covers a variety of services including, but not limited to, management fees for business services, information technology services, office space, investment advisory services, commission paying services, and administrative services.

174. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, PHL's role in the Enterprise has included premium processing services for the Enterprise's life insurance and annuity products and selling life insurance products for the Enterprise.

175. For example, at pages F-37 and F-38 of PHL's Form 10-K for the period ending December 31, 2011, PHL states that:

We provide payment processing services for Phoenix Life, wherein we receive deposits on Phoenix Life annuity contracts and forward those payments to Phoenix Life.

73

EXHIBIT 3 - PAGE 275

During 2006, we began including life insurance premiums in this service. In connection with this service, we had amounts due to Phoenix Life of $4,226 thousand and $2,793 thousand as of December 31, 2011 and 2010, respectively. We do not charge any fees for this service.

We also provide payment processing services for Phoenix Life and Annuity Company ("Phoenix Life and Annuity"), a wholly-owned indirect subsidiary of Phoenix Life, wherein we receive deposits on certain Phoenix Life and Annuity annuity contracts and forward those payments to Phoenix Life and Annuity. During 2006, we began including life insurance premiums in this service. In connection with this service, we had amounts due from Phoenix Life and Annuity of $29 thousand as of December 31, 2011 and amounts due to Phoenix Life and Annuity of $47 thousand as of December 31, 2010.

We do not charge any fees for this service.

176. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, Defendants, and each of them, have operated, managed, conducted and participated in the conduct of the affairs of the Enterprise through common officers and directors at headquarters with a common address, One American Row, Hartford, Connecticut.

177. By way of example, at page 47 of PHL's Form 10-K for the period ending December 31, 2011, PHL identifies James D. Wehr as President (Principal Executive Officer), Peter A. Hoffman as Senior Executive Vice President and Chief Financial Officer (Principal Financial Officer) and Michael E. Hanrahan as Vice President and Chief Accounting Officer (Principal Accounting Officer). Plaintiffs are informed and believe, and upon such information and belief allege, that Mr.

74

EXHIBIT 3 - PAGE 276

Wehr is a member of the PNX Board of Directors, has been PNX's President and Chief Executive Officer since in or about April 2009 and also has served as the Senior Vice President and Chief Investment Officer for Phoenix Life since approximately January 2004. Plaintiffs are further informed and believe, and upon such information and belief allege, that Mr. Hoffman has been the Chief Financial Officer and Senior Executive Vice President for PNX since approximately November 2007 and also serves as the Chief Financial Officer and Senior Executive Vice President of Phoenix Life.

178. At page 47 of PHL's Form 10-K for the period ending December 31, 2011, PHL identifies Edward W. Cassidy, Christopher M. Wilkos and Philip K. Polkinghorn as Directors. According to PNX's April 3, 2012 Proxy Statement, Mr. Wilkos is the PNX Executive Vice President and Chief Investment Officer and Mr. Polkinghorn is the Senior Executive Vice President, Business Development for PNX. Plaintiffs are informed and believe, and upon such information and belief allege, that Mr. Cassidy has been the Executive Vice President, Distribution, for PNX since in or about May 2007.

179. PNX's April 3, 2012 Proxy Statement also identifies Sanford Cloud, Jr., Gordon J. Davis, Esq., Augustus K. Oliver, II, Martin N. Bailey, John H. Forsgren and Thomas S. Johnson as members of the Board of Directors of both PNX and Phoenix Life. Indeed, at page 11 of the Proxy Statement, PNX states that "Each director of the Company [PNX] also serves, without additional compensation, as a member of the board of directors of the Company's subsidiary, Phoenix Life."

180. The April 3, 2012 PNX Proxy Statement identifies John H. Forsgren, Martin N. Baily, Gordon J. Davis, Esq. and Augustus K. Oliver, II as members of the PNX Finance Committee whose responsibilities include "[e]xercising the authority of the Board with respect to our financial and investment policies," "[e]xercising general supervision over the disposition of our subsidiaries and of material assets," and "[r]eviewing policies and positions, and those of our major

75

EXHIBIT 3 - PAGE 277

subsidiaries, regarding interest rate risk, liquidity, management, counterparty risk, derivative usage and foreign exchange risk."

181. At all relevant times herein, each Defendant was and is a "person" within the meaning of 18 U.S.C. § 1961 (3) because each Defendant was and is an entity capable of holding a legal or beneficial interest in property.

182. At all relevant times herein, the Enterprise was and is an "enterprise" within the meaning of 18 U.S.C. § 1961 (4).

183. At all relevant times herein, each Defendant was and is a person employed by or associated with the Enterprise within the meaning of 18 U.S.C. § 1962 (c).

184. At all relevant times herein, Defendants and the Enterprise have been involved in interstate commerce and their activities, as well as the predicate acts of racketeering activity described below, have affected interstate commerce. Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, the Enterprise has provided life insurance and annuity products to individuals throughout the United States. PNX transacts business in all 50 states. PHL has been licensed to transact and has transacted insurance business in every state except New York and Maine. Phoenix Life has been licensed to transact and has transacted insurance business in all 50 states. The predicate acts of racketeering activity described below involved the interstate use of the United States Postal Service and commercial interstate carriers and the use of interstate wire communications in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

185. Plaintiffs are informed and believe, and upon such information and belief allege, that, within the past ten years, Defendants, and each of them, have conducted and/or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961 (5).

76

EXHIBIT 3 - PAGE 278

186. As discussed above, Defendants have secretly decided and agreed not to willingly pay claims for death benefits when the insureds ultimately die if the life insurance policy is owned by an insurance trust and there has been a transfer of the policy or the beneficial interest in a trust owning the policy. Defendants' undisclosed plan is to lull Plaintiffs and other policyholders into a false sense of security, and induce Plaintiffs and other policyholders to continue to pay premiums, so that Defendants will maximize the amount of premiums billed and collected prior to the death of the insureds and before PHL or Phoenix Life (depending upon which company issued the policy) deny death benefits and seek to retain the premiums by asserting that the policy was a IOLI policy that purportedly is void *ab initio*.

187. In perpetrating their fraudulent scheme, Defendants have conducted and/or participated, directly or indirectly, in the conduct of the Enterprise's affairs to make material misrepresentations to Plaintiffs, and fail to disclose material facts to Plaintiffs, through the use of the United States Postal Service and commercial interstate carriers and the use of interstate wire communications in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343.

188. Among other things, for each of the Policies at issue, after Defendants decided that death benefits would not be paid, PHL continued to use the United States Postal Service to mail Plaintiffs premium notices, charging premiums to the Plaintiff policyholders, without disclosing to Plaintiffs that PHL did not intend to pay death benefits willingly and was trying to maximize the amount of premiums it collected from Plaintiffs and ultimately would assert could be retained.

189. Premiums are only due under policies which are valid and enforceable. If a policy is invalid or unenforceable, no premiums are due. If an insurer knows or believes that a policy is invalid or unenforceable, the insurer has an obligation to inform the policyholder of that fact and, more importantly, to cease charging premiums for the policy in question. PHL has determined that it will not honor the Policies, yet has continued to bill Plaintiffs by mail for the substantial premiums due

EXHIBIT 3 - PAGE 279

under the Policies. Each time PHL mails a premium notice to Plaintiffs, PHL is affirmatively representing to the Plaintiff receiving the premium notice that, to PHL's knowledge, the Policy in question is valid and enforceable and that it has no plan to challenge the Policy or deny benefits under the Policy. Each time that PHL has used the United States Postal Service to bill Plaintiffs for premiums, PHL has fraudulently concealed that it does not view the Policy as valid and enforceable and its true intentions with respect to the Policy, which is to deny the claim for benefits under the Policy, to attempt to rescind it, and to attempt to confiscate all premiums (including the ones being billed in the fraudulent premium notice).

190. PHL also used the United States Postal Service to mail Plaintiffs Annual Policy Summaries representing to Plaintiffs the current amount of the death benefits and policy values that PHL would pay to Plaintiffs. The Annual Policy Summaries thanked Plaintiffs for choosing PHL to meet their insurance and investment needs and promised Plaintiffs that PHL remained committed to providing Plaintiffs with "the highest level of service now, and in the future." PHL mailed Plaintiffs these Annual Policy Summaries containing these representations even though Defendants already had decided that they would not pay death benefit claims willingly and also would attempt to retain the premiums that had been, and would continue to be, paid by Plaintiffs. Defendants caused these Annual Policy Summaries to be mailed to Plaintiffs without disclosing to Plaintiffs that they did not intend to pay death benefits willingly and were trying to maximize the amount of premiums PHL collected from Plaintiffs and ultimately would assert could be retained.

191. The Annual Policy Summaries each affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented to Plaintiffs the amount of the current death benefit and policy value, PHL knew and intended that Plaintiffs would believe that PHL intended to honor the Policy and pay the amounts stated and that the Plaintiffs would be induced to continue to pay premiums based

EXHIBIT 3 - PAGE 280

on those representations and assurances. These Annual Policy Summaries mailed to Plaintiffs each falsely represented that PHL considered the Policy in question valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In mailing this information to Plaintiffs, PHL fraudulently concealed that it had no intention of paying the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

192. In response to Plaintiffs' requests, Defendants caused PHL to send Plaintiffs policy illustrations, either by mail through the United States Postal Service or by interstate facsimile through the use of interstate wires. These policy illustrations included representations to Plaintiffs regarding the death benefits and policy values that PHL purportedly would pay as of the date of the illustration and projections of the policy values based on additional premium outlays by Plaintiffs. Here, too, PHL mailed and faxed Plaintiffs the policy illustrations containing these representations even though Defendants already had decided that they would not pay death benefit claims willingly and also would attempt to retain the premiums that had been, and would continue to be, paid by Plaintiffs. Defendants caused these policy illustrations to be mailed and faxed to Plaintiffs without disclosing to Plaintiffs that Defendants did not intend to pay death benefits willingly and were trying to maximize the amount of premiums PHL collected from Plaintiffs and ultimately would assert could be retained.

193. The policy illustrations that Defendants caused to be mailed and faxed to Plaintiffs each affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented to a policyholder the amounts of the policyholder's current death benefit and policy value, PHL knew and intended that the policyholder would believe that PHL intended to honor the policy and pay the amounts stated and, in reasonable and justifiable reliance on PHL's representations and assurances, the policyholder would continue to pay premiums. The policy illustrations faxed and mailed to Plaintiffs by PHL each falsely represented that PHL

79

EXHIBIT 3 - PAGE 281

considered the Policy in question valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In providing this information to Plaintiffs by fax and by mail, PHL fraudulently concealed that it has no intention of paying the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

194. PHL also has used the interstate wires to fax to the Plaintiff policyholders and/or else used the United States Postal Service to mail to the Plaintiff Policyholders documents entitled Verification of Coverage for Life Insurance Policy ("VOC"). As the name of the documents suggests, these documents verify to the policyholder that it has coverage from PHL and other details about the coverage. Each VOC asks "Is the above referenced policy in force?" In response to this question, PHL answered and represented "YES." The VOCs also contain confirmation of the current death benefit and current policy value for the respective Policy. PHL faxed and mailed these VOCs to Plaintiffs despite having no intention of ultimately honoring the Policies. PHL faxed and mailed Plaintiffs the VOCs in furtherance of Defendants' plan to defraud Plaintiffs into paying premiums for Policies PHL intends to challenge and to earn additional premium revenue for PHL which it does not intend to return.

195. The VOCs that were faxed and mailed to Plaintiffs each affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented "YES" in response to the question of whether the Policies were "in force," PHL knew and intended that the policyholder would believe that PHL intended to honor the policy and pay the amounts stated and, in reasonable and justifiable reliance on PHL's representations and assurances, the policyholder would continue to pay premiums. Further, when PHL represented to a policyholder the amounts of the policyholder's current death benefit and policy value, PHL knew and intended that the policyholder would believe that PHL intended to honor the policy and pay the amounts stated and, in reasonable and justifiable reliance on PHL's

80

EXHIBIT 3 - PAGE 282

representations and assurances, the policyholder would continue to pay premiums. The VOCs faxed and mailed to Plaintiffs by PHL each falsely represented that PHL considered the Policy in question "in force," valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In providing this information to Plaintiffs by fax and by mail, PHL fraudulently concealed that it has no intention of paying the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

196. Plaintiffs are informed and believe, and upon such information and belief allege, that, within the past ten years, Defendants, and each of them, conducted and/or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity. The following are representative examples of communications faxed and mailed to Plaintiffs by PHL as part of Defendants' plan to fraudulently induce Plaintiffs and other policyholders to continue to pay premiums on the policies that Defendants secretly intended to have PHL not honor when benefits became due. Each of the below communications that Defendants caused PHL to fax or mail to Plaintiffs both affirmatively misrepresented and fraudulently concealed facts from Plaintiffs as described above:

A.     PHL sent fraudulent communications to the John Doe Trust 1, through its trustee, including but not limited to, communications dated as follows: premium notices of December 6, 2009, December 6, 2010, and December 6, 2011; annual policy summaries of December 29, 2009, December 28, 2010, and December 27, 2011; policy illustrations of February 9, 2009, November 16, 2009, December 28, 2009, January 10, 2011, and February 8, 2012; and September 21, 2011.

B.     PHL sent fraudulent communications to the Jane Doe Trust 2, through its trustee, including but not limited to, communications dated as follows: premium notices of February 10, 2009, February 10, 2010 and February 10, 2011; annual policy summaries of March 3, 2009, March 2,

81

EXHIBIT 3 - PAGE 283

2010 and March 1, 2011; policy illustrations of November 18, 2009, March 3, 2010 and March 14, 2011.

C.   PHL sent fraudulent communications to the John Doe Trust 3, through its trustee, including but not limited to, communications dated as follows: premium notice of May 22, 2010; annual policy summaries of June 11, 2009 and June 11, 2010; policy illustrations of November 16, 2009, June 17, 2010, June 16, 2011, and January 19, 2012; and VOC of June 13, 2011.

D.   PHL sent fraudulent communications to the Jane Doe Trust 4, through its trustee, including but not limited to, communications dated as follows: premium notices of April 6, 2010, April 6, 2011 and April 6, 2012; annual policy summaries of April 28, 2009, April 27, 2010, April 26, 2011, and April 26, 2012; policy illustrations of November 16, 2009, April 30, 2010, May 4, 2011, January 17, 2012, and May 9, 2012; and VOC of September 15, 2011.

E.   PHL sent fraudulent communications to the John Doe Trust 5, through its trustee, including but not limited to, communications dated as follows: premium notices of December 19, 2009, December 19, 2010, and December 19, 2011; annual policy summaries of January 8, 2009, January 9, 2010, January 11, 2011, and January 10, 2012; policy illustrations of November 23, 2009, January 20, 2010, January 18, 2011, November 23, 2011, and February 19, 2012; and VOC of September 21, 2011.

F.   PHL sent fraudulent communications to the John Doe Trust 6, through its trustee, including but not limited to, communications dated as follows: premium notices of February 18, 2010, February 18, 2011, and February 18, 2012; annual policy summaries of November 24, 2009, April 9, 2010, April 9, 2011, and March 9, 2012; policy illustrations of November 23, 2009, March 16, 2010, March 14, 2011, and April 9, 2012; and VOC of September 21, 2011.

82

EXHIBIT 3 - PAGE 284

G.  PHL sent fraudulent communications to the Jane Doe Trust 7, through its trustee, including but not limited to, communications dated as follows: premium notices of March 6, 2009, March 6, 2010, March 6, 2011, and March 6, 2012; annual policy summaries of March 26, 2009, March 26, 2010, March 28, 2011, and March 26, 2012; policy illustrations of December 1, 2009, April 6, 2010, March 31, 2011, January 4, 2012, and March 27, 2012; and VOC of September 20, 2011.

H.  PHL sent fraudulent communications to the John Doe Trust 8, through its trustee, including but not limited to, communications dated as follows: premium notices of March 7, 2009, March 7, 2010, March 7, 2011, and March 7, 2012; annual policy summaries of March 27, 2009, March 30, 2010, March 28, 2011, and March 27, 2012; policy illustrations of December 8, 2009, April 5, 2010, March 31, 2011, and January 4, 2012; and VOC of September 19, 2011.

I.  PHL sent fraudulent communications to the John Doe Trust 9, through its trustee, including but not limited to, communications dated as follows: premium notices of July 31, 2009, July 31, 2010, and July 31, 2011; annual policy summaries of August 26, 2009, August 21, 2010, and August 22, 2011; policy illustrations of August 26, 2009, September 10, 2010, August 29, 2011, and January, 19, 2012; and VOC of June 13, 2011.

J.  PHL sent fraudulent communications to the John Doe Trust 10, through its trustee, including but not limited to, communications dated as follows: premium notices of July 31, 2010 and July 31, 2011; annual policy summaries of August 20, 2009, August 21, 2010, and August 22, 2011; policy illustrations of September 20, 2010, August 15, 2011, and January 19, 2012; and VOC of June 13, 2011.

K.  PHL sent fraudulent communications to the John Doe Trust 11, through its trustee, including but not limited to, communications dated as

EXHIBIT 3 - PAGE 285

follows: premium notices of January 10, 2010, January 10, 2011, and January 10, 2012; annual policy summaries of November 24, 2009, February 2, 2010, February 1, 2011, and January 30, 2012; policy illustrations of February 23, 2009, February 2, 2010, February 17, 2011, November 10, 2011, and January 5, 2012; and VOC of September 22, 2011.

L.     PHL sent fraudulent communications to the John Doe Trust 12, through its trustee, including but not limited to, communications dated as follows: premium notice of May 26, 2010; annual policy summaries of June 16, 2010 and June 16, 2011; policy illustrations of December 22, 2009, June 23, 2010, June 23, 2011, and February 19, 2012; and VOC of June 13, 2011.

M.     PHL sent fraudulent communications to the John Doe Trust 13, through its trustee, including but not limited to, communications dated as follows: premium notices of March 8, 2009, March 8, 2010, March 8, 2011, and March 8, 2012; annual policy summaries of March 31, 2009, March 30, 2010, March 28, 2011, and March 28, 2012; policy illustrations of December 22, 2009, April 5, 2010, March 31, 2011, January 4, 2012, and April 5, 2012; and VOC of September 22, 2011.

N.     PHL sent fraudulent communications to the John Doe Trust 14, through its trustee, including but not limited to, communications dated as follows: premium notices of March 8, 2009, March 8, 2010, March 8, 2011, and March 8, 2012; annual policy summaries of March 31, 2009, March 30, 2010, March 28, 2011, and March 28, 2012; policy illustrations of December 8, 2009, April 5, 2010, March 31, 2011, and January 4, 2012; and VOC of September 22, 2011.

O.     PHL sent fraudulent communications to the John Doe Trust 15, through its trustee, including but not limited to, communications dated as follows: premium notices of April 13, 2010 and April 13, 2011; annual policy summaries of May 4, 2010 and May 3, 2012; policy illustrations of December

EXHIBIT 3 - PAGE 286

14, 2009, May 4, 2010, May 19, 2011, and January 17, 2012; and VOC of November 9, 2011.

P.    PHL sent fraudulent communications to the John Doe Trust 16, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of April 14, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of September 29, 2009, May 6, 2010, May 18, 2011, January 17, 2012, and May 8, 2012; and VOC of September 22, 2011.

Q.    PHL sent fraudulent communications to the John Doe Trust 17, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of April 14, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of December 14, 2009, April 19, 2010, April 14, 2011, January 17, 2012 and May 8, 2012; and VOC of September 22, 2011.

R.    PHL sent fraudulent communications to the John Doe Trust 18, through its trustee, including but not limited to, communications dated as follows: premium notices of April 12, 2010, April 12, 2011, and April 12, 2012; annual policy summaries of December 11, 2009, May 4, 2010, August 1, 2011, and May 8, 2012; policy illustrations of December 10, 2009, May 4, 2010, January 7, 2012, and May 4, 2012; and VOCs of November 17, 2011 and December 5, 2011.

S.    PHL sent fraudulent communications to the John Doe Trust 19, through its trustee, including but not limited to, communications dated as follows: premium notices of January 17, 2010, January 17, 2011, and January 17, 2012; annual policy summaries of February 6, 2009, February 9, 2010, February 7, 2011, and February 6, 2012; policy illustrations of May 13, 2009,

EXHIBIT 3 - PAGE 287

November 30, 2009, February 12, 2010, February 9, 2011, January 4, 2012, and February 8, 2012; and VOC of September 21, 2011.

T.     PHL sent fraudulent communications to the John Doe Trust 20, through its trustee, including but not limited to, communications dated as follows: premium notices of March 1, 2009, March 1, 2010, March 1, 2011, and March 1, 2012; annual policy summaries of March 24, 2009, April 14, 2010, March 22, 2011, and March 21, 2012; policy illustrations of December 14, 2009, March 23, 2010, April 27, 2011, January 4, 2012 and March 23, 2012; and VOC of September 20, 2011.

U.     PHL sent fraudulent communications to the John Doe Trust 21, through its trustee, including but not limited to, communications dated as follows: premium notices of February 10, 2009, February 10, 2010, February 10, 2011, and February 10, 2012; annual policy summaries of March 3, 2009, March 2, 2010, March 1, 2011, and March 1, 2012; policy illustrations of November 30, 2009, March 17, 2010, March 14, 2011, January 4, 2012, and March 8, 2012; and VOC of September 21, 2011.

V.     PHL sent fraudulent communications to the Jane Doe Trust 22, through its trustee, including but not limited to, communications dated as follows: premium notices of March 22, 2010, March 22, 2011, and March 22, 2012; annual policy summaries of November 10, 2009, April 13, 2010, April 12, 2011, and April 11, 2012; policy illustrations of December 10, 2009, April 19, 2010, January 17, 2012 and April 13, 2012; and VOC of September 22, 2011.

W.     PHL sent fraudulent communications to the John Doe Trust 23, through its trustee, including but not limited to, communications dated as follows: premium notices of February 23, 2009, February 23, 2010, February 23, 2011, and February 23, 2012; annual policy summaries of March 17, 2009, March 16, 2010, March 15, 2011, and March 16, 2012; policy

86

EXHIBIT 3 - PAGE 288

illustrations of December 10, 2009, March 16, 2010, March 18, 2011, January 14, 2012 and March 19, 2012; and VOC of September 21, 2011.

X.    PHL sent fraudulent communications to the John Doe Trust 24, through its trustee, including but not limited to, communications dated as follows: premium notices of March 30, 2010, March 30, 2011, and March 30, 2012; annual policy summaries of April 20, 2009, April 20, 2010, April 20, 2011, and April 19, 2012; policy illustrations of December 10, 2009, April 20, 2010, April 27, 2011, and May 9, 2012; and VOC of September 22, 2011.

Y.    PHL sent fraudulent communications to the John Doe Trust 25, through its trustee, including but not limited to, communications dated as follows: premium notices of April 12, 2009, April 12, 2010, April 12, 2011, and April 12, 2012; annual policy summaries of May 5, 2009, May 4, 2010, and May 8, 2012; policy illustrations of December 10, 2009, May 4, 2010, January 17, 2012 and May 4, 2012; and VOC of November 9, 2011.

Z.    PHL sent fraudulent communications to the John Doe Trust 26, through its trustee, including but not limited to, communications dated as follows: premium notices of March 1, 2010, March 1, 2011, and March 1, 2012; annual policy summaries of March 24, 2009, March 22, 2010, March 22, 2011, and March 21, 2012; policy illustrations of December 1, 2009, March 23, 2010, March 23, 2010, January 4, 2012 and March 23, 2012; and VOC of September 20, 2011.

AA.    PHL sent fraudulent communications to the Jane Doe Trust 27, through its trustee, including but not limited to, communications dated as follows: premium notice of November 20, 2010; annual policy summaries of December 10, 2009, December 11, 2009, and December 13, 2011; policy illustrations of January 5, 2010, December 15, 2010, December 15, 2011 and February 8, 2012; and VOC of September 15, 2011.

BB.    PHL sent fraudulent communications to the John Doe Trust 28,

87

EXHIBIT 3 - PAGE 289

through its trustee, including but not limited to, communications dated as follows: premium notice of May 31, 2011; annual policy summaries of June 23, 2009, September 28, 2010, and June 20, 2011; policy illustrations of December 29, 2009, June 23, 2010, June 27, 2011, and January 19, 2012; and VOC of June 13, 2011.

CC.   PHL sent fraudulent communications to the John Doe Trust 29, through its trustee, including but not limited to, communications dated as follows: premium notices of July 16, 2010 and July 16, 2011; annual policy summary of August 5, 2010 and August 5, 2011; policy illustrations of December 15, 2009, September 1, 2010, August 15, 2011 and January 19, 2012; and VOC of June 13, 2011.

DD.   PHL sent fraudulent communications to the John Doe Trust 30, through its trustee, including but not limited to, communications dated as follows: premium notices of January 16, 2011 and January 16, 2012; annual policy summaries of February 5, 2010, February 7, 2011, and February 6, 2012; policy illustrations of March 2, 1010, February 16, 2011, January 4, 2012 and February 8, 2012; and VOC of September 15, 2011.

EE.   PHL sent fraudulent communications to the John Doe Trust 31, through its trustee, including but not limited to, communications dated as follows: premium notice of June 5, 2010; annual policy summaries of June 26, 2010 and June 28, 2011; policy illustrations of December 14, 2009, June 28, 2010, July 12, 2011, and January 19, 2012; and VOC of June 13, 2011.

FF.   PHL sent fraudulent communications to the John Doe Trust 32, through its trustee, including but not limited to, communications dated as follows: premium notices of November 21, 2010 and November 21, 2011; annual policy summaries of December 11, 2009, December 14, 2010, and December 13, 2011; policy illustrations of March 4, 2010, December 21, 2010, December 15, 2011, and February 8, 2012; and VOC of September 15,

88

EXHIBIT 3 - PAGE 290

2011.

GG. PHL sent fraudulent communications to the John Doe Trust 33, through its trustee, including but not limited to, communications dated as follows: premium notices of August 1, 2010 and August 1, 2011; annual policy summaries of August 23, 2010 and August 22, 2011; policy illustrations of December 15, 2009, August 24, 2010, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

HH. PHL sent fraudulent communications to the John Doe Trust 34, through its trustee, including but not limited to, communications dated as follows: premium notices of June 29, 2009 and June 29, 2010; annual policy summaries of July 19, 2010 and July 19, 2011; policy illustrations of December 15, 2009, July 22, 2010, July 20, 2011 and January 19, 2012; and VOC of June 13, 2011.

II. PHL sent fraudulent communications to the John Doe Trust 35, through its trustee, including but not limited to, communications dated as follows: premium notices of July 21, 2009, July 21, 2010, and July 21, 2011; annual policy summaries of August 11, 2009 and August 10, 2010; policy illustrations of December 15, 2009, September 10, 2010, August 11, 2011, August 15, 2011 and January 19, 2012; and VOC of June 13, 2011.

JJ. PHL sent fraudulent communications to the John Doe Trust 36, through its trustee, including but not limited to, communications dated as follows: premium notices of January 5, 2011 and January 5, 2012; annual policy summaries of January 26, 2010, January 25, 2011, and January 25, 2012; policy illustrations of March 2, 2010, February 9, 2011, November 29, 2011, and January 31, 2012; and VOC of September 15, 2011.

KK. PHL sent fraudulent communications to the Jane Doe Trust 37, through its trustee, including but not limited to, communications dated as follows: premium notices of September 5, 2009, September 5, 2010, and

89

EXHIBIT 3 - PAGE 291

September 5, 2011; annual policy summaries of September 26, 2009, September 28, 2010, and September 30, 2011; policy illustrations of December 22, 2009, March 30, 2010, August 29, 2011, September 29, 2011, and January 24, 2012; and VOC of July 12, 2011.

LL.    PHL sent fraudulent communications to the John Doe Trust 38, through its trustee, including but not limited to, communications dated as follows: premium notice of August 17, 2011; annual policy summaries of September 8, 2010 and September 7, 2011; policy illustrations of December 22, 2009, October 5, 2010, August 9, 2011, August 22, 2011, September 12, 2011, and January 24, 2012; and VOCs of June 13, 2011 and July 14, 2011.

MM. PHL sent fraudulent communications to the John Doe Trust 39, through its trustee, including but not limited to, communications dated as follows: premium notices of November 15, 2010 and November 15, 2011; annual policy summaries of December 8, 2009, December 7, 2010, and December 5, 2011; policy illustrations of December 22, 2009, December 5, 2011, and February 8, 2012; and VOC of September 15, 2011.

NN.    PHL sent fraudulent communications to the Jane Doe Trust 40, through its trustee, including but not limited to, communications dated as follows: premium notices of April 26, 2011 and April 26, 2012; annual policy summary of June 3, 2010; policy illustrations of June 3, 2010, May 20, 2011, and January 17, 2012; and VOC of June 13, 2011.

OO.    PHL sent fraudulent communications to the John Doe Trust 41, through its trustee, including but not limited to, communications dated as follows: premium notice of October 6, 2010; annual policy summaries of October 27, 2009, October 26, 2010, and October 26, 2011; policy illustrations of January 5, 2010, November 3, 2010, November 1, 2011, and January 24, 2012; and VOC of July 12, 2011.

PP.    PHL sent fraudulent communications to the Jane Doe Trust 42,

90

EXHIBIT 3 - PAGE 292

through its trustee, including but not limited to, communications dated as follows: premium notices of April 19, 2010, April 19, 2011 and April 19, 2012; annual policy summaries of May 11, 2010 and May 9, 2012; policy illustrations of December 14, 2009, May 11, 2010, May 19, 2011, January 17, 2011, and May 16, 2012.

QQ. PHL sent fraudulent communications to the Jane Doe Trust 43, through its trustee, including but not limited to, communications dated as follows: premium notices of September 30, 2009, September 30, 2010, and September 30, 2011; annual policy summaries of October 20, 2009, October 20, 2010, and October 20, 2011; policy illustrations of January 2, 2010, November 3, 2010, November 16, 2011, December 19, 2011, and March 1, 2012; and VOC of July 12, 2011.

RR. PHL sent fraudulent communications to the John Doe Trust 44, through its trustee, including but not limited to, communications dated as follows: premium notices of October 20, 2010 and October 20, 2011; annual policy summaries of November 10, 2009, November 9, 2010, and November 9, 2011; policy illustrations of January 5, 2010, November 16, 2010, November 17, 2011, and February 6, 2012; and VOC of July 12, 2011.

SS. PHL sent fraudulent communications to the John Doe Trust 45, through its trustee, including but not limited to, communications dated as follows: premium notices of November 7, 2010 and November 7, 2011; annual policy summaries of November 27, 2009, November 30, 2010, and December 2, 2011; policy illustrations of December 15, 2009, December 1, 2010, November 30, 2011, and February 8, 2012; and VOC of July 12, 2011.

TT. PHL sent fraudulent communications to the John Doe Trust 46, through its trustee, including but not limited to, communications dated as follows: premium notices of January 9, 2011 and January 9, 2012; annual policy summaries of January 29, 2010, February 1, 2011, and February 1,

91

EXHIBIT 3 - PAGE 293

2012; policy illustrations of March 2, 2010, February 1, 2011, November 29, 2011, and February 1, 2012; and VOC of September 15, 2011.

UU. PHL sent fraudulent communications to the Jane Doe Trust 47, through its trustee, including but not limited to, communications dated as follows: premium notices of January 4, 2009 and January 4, 2012; annual policy summaries of January 26, 2010, January 27, 2011, and January 24, 2012; policy illustrations of March 2, 2010, January 27, 2011, November 29, 2011, January 25, 2012, and January 31, 2012; and VOC of September 15, 2011.

VV. PHL sent fraudulent communications to the John Doe Trust 48, through its trustee, including but not limited to, communications dated as follows: premium notices of November 20, 2010 and November 20, 2011; annual policy summaries of December 10, 2009, December 11, 2010, and December 13, 2011; policy illustrations of January 5, 2010, December 15, 2010, December 15, 2011, and February 8, 2012; and VOC of September 15, 2011.

WW. PHL sent fraudulent communications to the John Doe Trust 49, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 17, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 14, 2011.

XX. PHL sent fraudulent communications to the John Doe Trust 50, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 17, 2009, September

92

EXHIBIT 3 - PAGE 294

20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 14, 2011.

YY.    PHL sent fraudulent communications to the John Doe Trust 51, through its trustee, including but not limited to, communications dated as follows: premium notices of July 23, 2009, July 23, 2010, and July 23, 2011; annual policy summaries of August 12, 2009, August 12, 2010, and August 17, 2011; policy illustrations of November 16, 2009, September 10, 2010, August 8, 2011, August 15, 2011, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

ZZ.    PHL sent fraudulent communications to the John Doe Trust 52, through its trustee, including but not limited to, communications dated as follows: premium notices of December 3, 2010 and December 3, 2011; annual policy summaries of January 13, 2010, December 23, 2010, and December 23, 2011; policy illustrations of January 13, 2010, January 6, 2011, and February 8, 2012; and VOC of September 15, 2011.

AAA.    PHL sent fraudulent communications to the John Doe Trust 53, through its trustee, including but not limited to, communications dated as follows: premium notices of December 3, 2010 and December 3, 2011; annual policy summaries of January 13, 2010, December 23, 2010, and December 23, 2011; policy illustrations of January 13, 2010, December 29, 2010, and February 8, 2012; and VOC of September 15, 2011.

BBB.    PHL sent fraudulent communications to the John Doe Trust 54, through its trustee, including but not limited to, communications dated as follows: premium notices of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 15, 2010, and September 13, 2011; policy illustrations of December 22, 2009, September 20, 2010, August 22, 2011, September 21, 2011, January 24, 2011, and March 1, 2011; and VOC of July 14, 2011.

93

EXHIBIT 3 - PAGE 295

CCC. PHL sent fraudulent communications to the John Doe Trust 55, through its trustee, including but not limited to, communications dated as follows: premium notice of August 24, 2010 and August 24, 2011; annual policy summaries of September 15, 2009, September 14, 2010, and September 13, 2011; policy illustrations of December 22, 2009, September 20, 2010, August 22, 2011, September 21, 2011, and January 24, 2012; and VOC of July 12, 2011.

DDD. PHL sent fraudulent communications to the John Doe Trust 56, through its trustee, including but not limited to, communications dated as follows: premium notices of March 19, 2009, March 19, 2010, March 19, 2011, and March 19, 2012; annual policy summaries of April 8, 2009, April 8, 2010, April 8, 2011, and April 9, 2012; policy illustrations of June 9, 2009, December 10, 2009, April 19, 2010, and January 17, 2012; and VOC of September 21, 2011.

EEE. PHL sent fraudulent communications to the John Doe Trust 57, through its trustee, including but not limited to, communications dated as follows: premium notices of August 4, 2010 and August 4, 2011; annual policy summaries of August 24, 2010 and August 24, 2011; policy illustrations of December 17, 2009, August 27, 2010, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

FFF. PHL sent fraudulent communications to the John Doe Trust 58, through its trustee, including but not limited to, communications dated as follows: premium notices of September 21, 2009, September 21, 2010, and September 21, 2011; annual policy summaries of October 13, 2009, October 12, 2010, and October 11, 2011; policy illustrations of January 5, 2010, October 12, 2010, October 31, 2011, and January 24, 2012; and VOC of July 12, 2011.

GGG. PHL sent fraudulent communications to the John Doe Trust 59,

94

EXHIBIT 3 - PAGE 296

through its trustee, including but not limited to, communications dated as follows: premium notices of July 14, 2009, July 14, 2010, and July 14, 2011; annual policy summaries of October 13, 2009, August 3, 2010, and August 3, 2011; policy illustrations of October 13, 2009, August 12, 2010, August 8, 2011, August 15, 2011, and January 19, 2012; and VOC of June 13, 2011.

HHH. PHL sent fraudulent communications to the John Doe Trust 60, through its trustee, including but not limited to, communications dated as follows: premium notices of August 2, 2010 and August 2, 2011; annual policy summaries of August 23, 2010 and August 22, 2011; policy illustrations of December 17, 2009, August 24, 2010, August 8, 2011, August 15, 2011, August 29, 2011, and January 19, 2012; and VOC of June 13, 2011.

197. PHL (specifically, Phoenix Life representatives acting on behalf of PHL), also, as part of Defendants' scheme, recently used the interstate wires and/or else used the United States Postal Service to mail all Plaintiffs documents regarding each of the Policies, entitled "Policy Audit Request for Life Insurance Policy" ("Policy Audit"), in which Defendants once again misrepresented and fraudulently concealed facts regarding the Policies from Plaintiffs.

198. The Policy Audits that were faxed and mailed to Plaintiffs each affirmatively misrepresented and fraudulently concealed facts from Plaintiffs. When PHL represented "YES" in response to the question of whether the Policies were "in force," PHL knew and intended that the policyholder would believe that PHL intended to honor the policy and pay the amounts stated and, in reasonable and justifiable reliance on PHL's representations and assurances, the policyholder would continue to pay premiums. Further, when PHL represented to a policyholder the amounts of the policyholder's current death benefit, PHL knew and intended that the policyholder would believe that PHL intended to honor the policy and pay the amounts stated and, in reasonable and justifiable reliance on PHL's representations and assurances, the policyholder would continue to pay premiums. The Policy

95

EXHIBIT 3 - PAGE 297

Audits faxed and mailed to Plaintiffs by PHL each falsely represented that PHL considered the Policy in question "in force," valid and enforceable and that PHL had no plan to challenge the Policy or deny benefits under the Policy. In providing this information to Plaintiffs by fax and by mail, PHL fraudulently concealed that it has no intention of paying the amounts stated, but instead intended to deny any claim for benefits and to confiscate all premiums paid.

199. The above-described fraudulent scheme and predicate acts of racketeering activity by Defendants in furtherance of that scheme constitutes an ongoing and continuous pattern of racketeering activity. Plaintiffs are informed and believe, and upon such information and belief allege, that there is a continuing threat that Defendants will engage in future similar predicate acts of racketeering activity in furtherance of their fraudulent scheme and in the conduct and/or participation, directly or indirectly, in the conduct of the Enterprise's affairs.

200. As a direct and proximate result of Defendants' conduct and/or participation, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity described above, Plaintiffs have been injured in their business and property in an amount in excess of Forty-Four Million Dollars ($44,000,000) to be determined at trial which, pursuant to 18 U.S.C. § 1964(c), shall be trebled. Among other things, Plaintiffs have been fraudulently induced to pay Plaintiffs premiums for Policies for which Defendants will not willingly pay death benefits.

201. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs also are entitled to recover from Defendants Plaintiffs' reasonable attorneys' fees and costs of suit herein.

## SECOND CLAIM FOR RELIEF

**(Against PHL, Phoenix Life and PNX For Violation of 18 U.S.C. § 1962 (d))**

202. Plaintiffs refer to above paragraphs 1 through 163, inclusive, and 165 through 200, inclusive, and by this reference incorporate the same herein as though fully set forth.

96

EXHIBIT 3 - PAGE 298

203. As described in the preceding paragraphs, Defendants agreed and conspired with each other to violate 18 U.S.C. § 1961 (c) in violation of 18 U.S.C. § 1961 (d).

204. The above-described fraudulent scheme and predicate acts of racketeering activity by Defendants in furtherance of that scheme constitutes an ongoing and continuous pattern of racketeering activity. Plaintiffs are informed and believe, and upon such information and belief allege, that there is a continuing threat that Defendants will engage in future similar predicate acts of racketeering activity in furtherance of their fraudulent scheme and in the conduct and/or participation, directly or indirectly, in the conduct of the Enterprise's affairs.

205. As a direct and proximate result of Defendants' conduct and/or participation, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity described above, Plaintiffs have been injured in their business and property in an amount in excess of Forty-Four Million Dollars ($44,000,000) to be determined at trial which, pursuant to 18 U.S.C. § 1964(c), shall be trebled. Among other things, Plaintiffs have been fraudulently induced to pay Plaintiffs premiums for Policies for which Defendants will not willingly pay death benefits.

206. Pursuant to 18 U.S.C. § 1964(c), Plaintiffs also are entitled to recover from Defendants Plaintiffs' reasonable attorneys' fees and costs of suit herein.

### THIRD CLAIM FOR RELIEF

**(Against PHL, Phoenix Life and PNX For Fraud And Conspiracy)**

207. Plaintiffs refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, and 205, and by this reference incorporate the same herein as though fully set forth.

208. As detailed in paragraphs 112-130 above, from 2009 to 2012, PHL made representations of fact to Plaintiffs that were false. Specifically, on the dates identified in paragraphs 112-130 above, PHL sent premiums notices, Annual Policy

97

EXHIBIT 3 - PAGE 299

Summaries, policy illustrations, VOCs, and Policy Audits to Plaintiffs (care of each Plaintiff's trustee) that were intended to, and did, assure Plaintiffs of the Policies' validity and good standing. When PHL represented to Plaintiffs that it considered the Policies to be valid and in good standing, PHL knew these representations to be false. PHL made these representations with the intention to deceive and defraud Plaintiffs and to induce Plaintiffs to act in reliance on these representations.

209. Plaintiffs, at the time the representations were made by PHL and at the time Plaintiffs took the actions herein alleged, were ignorant of the falsity of PHL's representations and believed them to be true.

210. As detailed in paragraphs 112-130 above, PHL also knowingly or intentionally concealed from Plaintiffs the material facts that it intended to attempt to induce a lapse and challenge each of the Policies as void *ab initio* and retain all premiums paid under each of the Policies.

211. PHL accepted premium payments from Plaintiffs under false pretenses, while concealing the material facts that it had adopted an internal policy or practice whereby PHL continued to collect premium payments on policies that it intended to challenge as being void *ab initio* after the insureds' deaths or after earning sufficient profits after collecting as much in premiums as PHL deemed adequate, and intended to retain all premiums paid on those policies. PHL had sole knowledge or access to these facts and knew that such facts were not known to or reasonably discoverable by Plaintiffs. PHL thus had a duty to disclose such facts to Plaintiffs. PHL nonetheless intentionally concealed these facts with the intent to defraud Plaintiffs.

212. Plaintiffs did not discover, and could not have discovered with reasonable diligence, the true facts related to their fraud claim until 2012.

213. In reasonable and justifiable reliance on PHL's representations and omissions, Plaintiffs were induced to, and did pay premiums to PHL in the total sum of more than $44,000,000 as of the date of this Complaint. Had Plaintiffs known the true facts, which PHL concealed, they would not have paid such amounts.

EXHIBIT 3 - PAGE 300

214. As described in paragraphs 165 through 200 and 203 through 205 above, PHL also formed and operated a conspiracy with Phoenix Life and PNX to defraud owners of PHL policies, including Plaintiffs. Each defendant knowingly and willfully participated in the conspiracy and knowingly and willfully committed wrongful acts pursuant to, and in furtherance of, the conspiracy in the manner described in paragraph 165 through 200 and 203 through 205 above. Each defendant knew that their conduct, and that of the conspiracy, was wrongful and had an unlawful purpose.

215. As a direct and proximate result of PHL's fraudulent misrepresentations and omissions, and as a direct and proximate result of Defendants' conspiracy and the wrongful acts committed pursuant to and in furtherance thereof, Plaintiffs have been damaged in an amount to be proven at trial but not less than the jurisdictional limit of this court.

216. The aforementioned conduct was an intentional misrepresentation, deceit and/or concealment of material facts known to defendants, with the intention on the part of defendants of thereby depriving Plaintiffs of property, legal rights or otherwise causing injury; was despicable conduct that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights; was intended by Defendants to cause injury to Plaintiffs; and was despicable conduct which was carried on by Defendants with a willful and conscious disregard of Plaintiffs' rights, so as to justify an award of exemplary and punitive damages.

## FOURTH CLAIM FOR RELIEF

### (Against PHL For Declaratory Judgment)

217. Plaintiffs refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, 205, and 208 through 215, inclusive, and by this reference incorporate the same herein as though fully set forth.

218. The Policies constitute valid and enforceable written contracts between each of the Plaintiffs, on the one hand, and PHL, on the other. By way of example,

EXHIBIT 3 - PAGE 301

the policy of life insurance issued to John Doe Trust 1 by PHL constitutes a valid and enforceable written contract between John Doe Trust 1 and PHL.

219. Each Plaintiff is the sole owner and beneficiary of the Policy issued to it by PHL. By way of example, John Doe Trust 1 is the sole owner and beneficiary of the life insurance policy issued to John Doe Trust 1.

220. Plaintiffs, and each of them, have complied with all applicable terms and conditions of the Policies including the timely payment of premiums due under the Policies to date.

221. PHL has implemented a practice in which it routinely and consistently denies claims made under policies similar to the Policies at issue (*i.e.*, where the policy or trust interest has been sold on the secondary market). When PHL receives a death claim from a trust policy owner, PHL refuses to pay the claim unless the trust completes forms and supplies information not required by the terms of PHL's policies, which provide that PHL will promptly pay claims upon receipt of due proof of death. And, if the beneficial interest in the trust has been transferred to a third party, PHL denies the claim on the basis that the policy purportedly lacks an insurable interest. In such instances, PHL further takes the position, contrary to the explicit language in its policies requiring the return of premiums when PHL contests a policy, that it is entitled not only to avoid coverage but also to retain all premiums paid for the policy in question. Further, PHL already has attempted to rescind five other policies owned by trusts for which Wilmington Savings, as successor-in-interest to Christiana Bank, serves as trustee and several policies involving the same agents as many of the Policies at issue here. On information and belief, PHL has also internally identified the Policies as ones which it plans to later challenge.

222. PHL's systematic refusal to pay claims due under similar policies, and refusal to return premiums when it contests a policy, has impaired the economic value of the Policies.

223. Accordingly, an actual case or controversy exists among the parties.

100

EXHIBIT 3 - PAGE 302

224. Plaintiffs seek a declaration that there is no basis for rescission or voiding of the Policies and seek to have them declared in full force and effect to provide insurance coverage on the lives of the insureds.

225. Plaintiffs also seeks a declaration that PHL has improperly raised the cost of insurance charges for the Policies, in violation of the Policies' terms, and must reduce the charges and pay Plaintiffs all damages incurred as a result of the improper charges.

226. Plaintiffs also, in the alternative, seek a declaration that if PHL is successful in rescinding or voiding any of the Policies, it must return all premiums paid for any Policy which is voided or rescinded to the applicable Plaintiff Trust which owns the relevant Policy, plus interest.

227. A declaration that PHL is barred from rescinding or voiding the Policies, that the Policies are enforceable, that the increases in the cost of insurance charges made by PHL were improper, and that PHL must return all premiums in the event that any Policy is rescinded or declared void, is necessary and proper at this time so that all parties may determine their rights and obligations among themselves.

## FIFTH CLAIM FOR RELIEF

### (Against PHL For Breach of Contract)

228. Plaintiffs refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, 205, 208 through 215, inclusive, and 218 through 227, inclusive, and by this reference incorporate the same herein as though fully set forth.

229. The Policies constitute valid and enforceable written contracts between each of the Plaintiffs, on the one hand, and PHL, on the other. By way of example, the policy of life insurance issued to John Doe Trust 1 by PHL constitutes a valid and enforceable written contract between John Doe Trust 1 and PHL.

101

EXHIBIT 3 - PAGE 303

230. Each Plaintiff is the sole owner and beneficiary of the Policy issued to it by PHL. By way of example, John Doe Trust 1 is the sole owner and beneficiary of the life insurance policy issued to John Doe Trust 1.

231. Plaintiffs, and each of them, have complied with all applicable terms and conditions of the Policies including the timely payment of premiums due under the Policies to date.

232. PHL's cost of insurance increases have materially breached the Policies in several respects. First, PHL breached the Policies by increasing the cost of insurance rates based on a policy's accumulated value because accumulated value is not one of the permissible and enumerated bases for increasing the cost of insurance rates. Second, PHL breached the Policies by increasing the cost of insurance rates based on a policy's accumulated value because such an increase does not apply uniformly to a class of insureds. Third, PHL breached the Policies because its cost of insurance increases were not, on information and belief, based on the permissible factors stated in the Policies, such as expectations of future mortality and persistency. Fourth, PHL breached the Policies because, on information and belief, the cost of insurance increases were impermissibly designed to recoup past losses.

233. As a result of PHL's material breaches of the Policies by improperly raising the cost of insurance rates, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial which is greater than the jurisdictional minimum of $75,000.

234. PHL has further breached the Policies by attempting to restrict Plaintiffs' transfer rights, in direct contradiction to the terms of the Policies.

235. The Policies expressly provide that the policy owner has the right to change ownership of the policy, change the beneficiary of the policy, and assign rights to the policy. Further, the Policies place no restriction on the ability to transfer a beneficial interest in or ownership of the entity that owns the policy.

102

EXHIBIT 3 - PAGE 304

236. Contrary to the terms of the Policies, PHL has improperly attempted to place retroactive restrictions on Plaintiffs' transfer rights. PHL has demanded that it be advised of any future transfers of beneficial interests in the trusts that own the Policies and stated that it will deny coverage under the Policies if such changes are made without its permission, which, under the Policies, Plaintiffs are not required to seek. This unequivocal refusal to abide by the terms of the Policies is a breach of contract by PHL.

237. As a result of PHL's material breaches of the Policies by improperly restricting Plaintiffs' transfer rights, Plaintiffs have been damaged as alleged herein, including the market value of the Policies having been diminished in value, in an amount to be proven at trial which is greater than the jurisdictional minimum of $75,000.

## SIXTH CLAIM FOR RELIEF

**(Against PHL For Breach of the Implied Covenant of Good Faith and Fair Dealing)**

238. Plaintiffs refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, 205, 208 through 215, inclusive, 218 through 227, inclusive, and 229-237, inclusive, and by this reference incorporate the same herein as though fully set forth.

239. The Policies constitute valid and enforceable written contracts between each of the Plaintiffs, on the one hand, and PHL, on the other. By way of example, the policy of life insurance issued to John Doe Trust 1 by PHL constitutes a valid and enforceable written contract between John Doe Trust 1 and PHL.

240. Each Plaintiff is the sole owner and beneficiary of the Policy issued to it by PHL. By way of example, John Doe Trust 1 is the sole owner and beneficiary of the life insurance policy issued to John Doe Trust 1.

103

EXHIBIT 3 - PAGE 305

241. Plaintiffs, and each of them, have complied with all applicable terms and conditions of the Policies including the timely payment of premiums due under the Policies to date.

242. Each of the Policies includes an implied covenant that PHL will act in good faith and deal fairly with Plaintiffs.

243. PHL breached the implied covenant of good faith and fair dealing by undermining Plaintiffs' right to pay premiums as needed to cover their monthly deductions, including the cost of insurance. By increasing the cost of insurance based on the policy's accumulated value, PHL is, among other things, penalizing and deterring Plaintiffs from exercising their contractual right to maintain a minimal accumulated policy value, which PHL has no right to do.

244. PHL also breached the implied covenant of good faith and fair dealing by using the cost of insurance rates to make the Policies prohibitively expensive and trying to cause Plaintiffs and other policyholders to lapse or surrender their policies so that PHL can keep the premiums and never have to pay the death benefits.

245. PHL has also breached the implied covenant of good faith and fair dealing by attempting to restrict Plaintiffs' transfer rights, in direct contradiction to the terms of the Policies.

246. The Policies expressly provide that the policy owner has the right to change ownership of the policy, change the beneficiary of the policy, and assign rights to the policy. Further, the Policies place no restriction on the ability to transfer a beneficial interest in or ownership of the entity that owns the policy.

247. Contrary to the terms of the Policies, PHL has improperly attempted to place retroactive restrictions on Plaintiffs' transfer rights. PHL has demanded that it be advised of any future transfers of beneficial interests in the trusts that own the policies and stated that it will deny coverage under the Policies if such changes are made without its permission, which, under the Policies, Plaintiffs are not required to seek. This unequivocal refusal to abide by the terms of the Policies was done in bad

EXHIBIT 3 - PAGE 306

faith and with the intention of depriving Plaintiffs of their rights under the Policies and is a breach of the implied covenant of good faith.

248. PHL has further breached the implied covenant of good faith by internally determining that it will deny benefits due under the Policies, yet continuing to charge premiums under the Policies and otherwise representing to Plaintiffs that the Policies continue to be in good standing. These actions by PHL were taken in bad faith and with the intention of depriving Plaintiffs of the benefit of the Policies.

249. As a direct and proximate cause of PHL's breaches of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged as alleged herein in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (Against PHL for Promissory Estoppel)

250. Plaintiffs refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, 205, 208 through 215, inclusive, 218 through 227, inclusive, 229 through 237, inclusive, and 239 through 249, inclusive, and by this reference incorporate the same herein as though fully set forth.

251. PHL entered into the Policies in exchange for Plaintiffs' agreement to pay millions of dollars in premiums in return for PHL insuring the lives of the insureds.

252. PHL reasonably expected to induce Plaintiffs to pay millions of dollars in premiums in return for PHL insuring the lives of the insureds.

253. Plaintiffs entered into the Policies in good faith, reasonably relied on PHL's promise to comply with its obligations under the Policies, and understood (and continue to understand) that a valid insurable interest existed at the inception of the Policies such that the Policies were (and are) legal and enforceable.

105

EXHIBIT 3 - PAGE 307

254. At the time it issued the Policies, PHL knew or should have reasonably known all of the relevant facts relating to whether an insurable interest existed at the inception of the Policies.

255. If the trier of fact determines that no insurable interest existed at the inception of the Policies (which Plaintiffs deny), the Policies nonetheless are binding because injustice can be avoided only by enforcement of the obligations set forth therein. PHL defrauded Plaintiffs into paying millions of dollars of premiums for the Policies based on (i) PHL's false representations to Plaintiffs that PHL considered the Policies to be valid and in good standing; and (ii) PHL's fraudulent concealment of its intent to attempt to induce a lapse and challenge each of the Policies as void *ab initio* and retain all premiums paid under each of the Policies. PHL will be unjustly enriched by millions of dollars if the terms of the Policies are not enforced.

## EIGHTH CLAIM FOR RELIEF

**(Against PHL for Violation of The Connecticut Unfair Trade Practices Act)**

256. Plaintiffs refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, 205, 208 through 215, inclusive, 218 through 227, inclusive, 229 through 237, inclusive, and 239 through 249, inclusive, and by this reference incorporate the same herein as though fully set forth.

257. As described above, Plaintiffs are informed and believe, and upon such information and belief allege, that PHL is a Connecticut insurance company organized under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut. According to various complaints filed by PHL, PHL's "high level officers direct, control and coordinate the corporation's activities from Hartford, Connecticut."

258. As a Connecticut insurance company, PHL is governed by and subject to the provisions of the Connecticut Unfair Insurance Practices Act, Connecticut General Statutes §§ 38a-815, *et seq*. ("CUIPA").

106

EXHIBIT 3 - PAGE 308

259. Section 38a-815 provides that no individual, corporation, limited liability company or other person shall engage in Connecticut in "any trade practice which is defined in section 38a-816 as, or determined pursuant to sections 38a-817 and 38a-818 to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance, *nor shall any domestic insurance company engage outside of this state in any act or practice defined in subsections (1) to (12), inclusive, of section 38a-816.* (Emphasis added.)

260. Connecticut General Statutes § 38a-816 defines unfair methods of competition and unfair and deceptive acts or practices in the business of insurance.

261. Under Section 38a-816(1), unfair methods of competition and unfair and deceptive acts or practices in the business of insurance include: "[m]aking, issuing or circulating, or causing to be made, issued or circulated, any estimate, illustration, circular or statement, sales presentation, omission or comparison which: (a) Misrepresents the benefits, advantages, conditions or terms of any insurance policy; . . . [and] (f) is a misrepresentation, including, but not limited to, an intentional misquote of a premium rate, for the purpose of inducing or tending to induce to the purchase, lapse, forfeiture, exchange, conversion or surrender of any insurance policy."

262. Under Section 38a-816(6), unfair methods of competition and unfair and deceptive acts or practices in the business of insurance include: "[c]ommitting or performing with such frequency as to indicate a general business practice any of the following: (a) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue."

263. As a Connecticut corporation, PHL also is governed by and subject to the provisions of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes §§ 42-110a, *et seq.* ("CUTPA").

264. Connecticut General Statutes § 42-110b provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or

107

EXHIBIT 3 - PAGE 309

practices in the conduct of any trade or commerce." Violation of the CUIPA may be predicate acts or practices within the meaning of Connecticut General Statutes § 42-110 (b) in violation of the CUTPA.

265. Plaintiffs are informed and believe, and upon such information and belief allege, that the wrongful conduct by PHL described above constituted unfair methods of competition and unfair and deceptive acts or practices in the business of insurance in violation of Connecticut General Statutes §§ 38a-816(1) and (6), and each of them.

266. Plaintiffs are informed and believe, and upon such information and belief allege, that the wrongful conduct by PHL in violation of Connecticut General Statutes §§ 38a-816(1) and (6) described above also constituted unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of Connecticut General Statutes § 42-110b.

267. Plaintiffs are informed and believe, and upon such information and belief allege, that the wrongful conduct by PHL described above offends public policy as it has been established by the CUIPA and CUTPA and the common law, is immoral, unethical, oppressive or unscrupulous and has caused substantial injury to Plaintiffs and other consumers and business persons.

268. Plaintiffs, and each of them have suffered an ascertainable loss of money and personal property as a result of PHL's use or employment of a method, act or practice prohibited by Connecticut General Statutes § 42-110b. Pursuant to Connecticut General Statutes § 42-110g (a) and (g), Plaintiffs, and each of them, are entitled to an award of damages in an amount not less than $44,000,000 according to proof, punitive damages and Plaintiffs' reasonable attorneys' fees and costs of suit herein.

EXHIBIT 3 - PAGE 310

## NINTH CLAIM FOR RELIEF

### (Against PHL For Violation Of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *Et Seq.*)

269. Plaintiffs Jane Doe Trust 2, Jane Doe Trust 4, John Doe Trust 8, John Doe Trust 9, John Doe Trust 10, John Doe Trust 11, John Doe Trust 12, John Doe Trust 13, John Doe Trust 14, John Doe Trust 15, John Doe Trust 18, John Doe Trust 19, John Doe Trust 20, John Doe Trust 21, John Doe Trust 23, John Doe Trust 25, John Doe Trust 26, John Doe Trust 29, John Doe Trust 31, John Doe Trust 32, John Doe Trust 33, John Doe Trust 39, John Doe Trust 41, John Doe Trust 45, Jane Doe Trust 57, and John Doe Trust 60 (the "UCL Plaintiffs") refer to above paragraphs 1 through 163, inclusive, 165 through 200, inclusive, 203, 204, 205, 208 through 215, inclusive, 218 through 227, inclusive, 229 through 237, inclusive, and 239 through 249, inclusive, and by this reference incorporate the same herein as though fully set forth.

270. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, prohibits any unlawful, unfair or fraudulent business act or practice.

271. At all relevant times herein, PHL engaged in unlawful conduct in violation of the UCL in that its aforesdecribed conduct violates the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, RICO law, 18 U.S.C. §§ 1962(c) and 1962(d), and California Insurance Code § 790.03.

272. At all relevant times herein, PHL engaged in fraudulent conduct in violation of the UCL by making the misrepresentations of material facts, concealing material facts and failing to disclose material facts as described in paragraphs 112-130 above.

273. At all relevant times herein, PHL engaged in unfair conduct in violation of the UCL by engaging in the deceptive and sharp business practices described above, including but not limited to defrauding PHL policyholders and systematically

EXHIBIT 3 - PAGE 311

breaching policies that are owned by trusts. PHL's business practices offend established public policy, and are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

274. The UCL Plaintiffs have been injured as a direct and proximate result of PHL's above-described violations of the UCL.

275. By reason of the above-described violations of the UCL, the UCL Plaintiffs are entitled to a preliminary and permanent injunction enjoining PHL from engaging in its unfair, unlawful and fraudulent acts and practices. The UCL Plaintiffs are entitled to ancillary relief in the form of restitution for monies paid to PHL, and the disgorgement of profits obtained from the UCL Plaintiffs by reason of PHL's unfair, unlawful and deceptive acts and practices.

276. This action will confer a significant benefit upon the general public, insureds, and trusts by stopping PHL from continuing to engage in unfair, unlawful and deceptive acts and practices. The UCL Plaintiffs therefore are entitled to recover their attorneys' fees and costs incurred herein pursuant to California Code of Civil Procedure § 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment ordering as follows:

On the First Claim for Relief:

1. For damages in an amount no less than $44,000,000 to be determined at trial and trebled, together with prejudgment and post-judgment interest thereon as allowed by law; and

2. For Plaintiffs' reasonable attorneys' fees incurred herein.

On the Second Claim for Relief:

1. For damages in an amount no less than $44,000,000 to be determined at trial and trebled, together with prejudgment and post-judgment interest thereon as allowed by law; and

110

EXHIBIT 3 - PAGE 312

2. For Plaintiffs' reasonable attorneys' fees incurred herein.

On the Third Claim for Relief:

1. For damages in an amount no less than $44,000,000 to be determined at trial, together with prejudgment and post-judgment interest thereon as allowed by law; and

2. For punitive damages in an amount to be determined at trial.

On the Fourth Claim for Relief:

1. For a judicial declaration that: (a) the Policies, and each of them, are in full force and effect; (b) there is no basis for rescinding or voiding the Policies, or any of them; (c) PHL has improperly raised the cost of insurance charges for the Policies, and each of them, in violation of the Policies' terms, and must reduce the charges and reimburse each Plaintiff for all amounts received from that Plaintiff as a result of improperly increased cost of insurance charges; and (d) if the Court determines that any Policy is rescinded or void, PHL must return to the Plaintiff owning that Policy all premiums paid for the Policy together with prejudgment interest thereon from the date the Policy is rescinded or voided.

On the Fifth Claim for Relief:

1. For damages in an amount in excess of $75,000 to be determined at trial, together with prejudgment and post-judgment interest thereon as allowed by law.

On the Sixth Claim for Relief:

1. For damages in an amount in excess of $75,000 to be determined at trial, together with prejudgment and post-judgment interest thereon as allowed by law.

On the Seventh Claim for Relief:

1. For damages in an amount in excess of $75,000 to be determined at trial, together with prejudgment and post-judgment interest thereon as allowed by law.

111

EXHIBIT 3 - PAGE 313

On the Eighth Claim for Relief:

1. For damages in an amount no less than $44,000,000 to be determined at trial, together with prejudgment and post-judgment interest thereon as allowed by law;

2. For punitive damages in an amount to be determined at trial; and

3. For Plaintiffs' reasonable attorneys' fees incurred herein.

On the Ninth Claim for Relief:

1. For a preliminary and permanent injunction enjoining PHL from engaging in its unfair, unlawful and fraudulent acts and practices;

2. For an order requiring PHL to account to Plaintiffs for all money and property obtained by PHL from Plaintiffs;

3. For an order requiring PHL to make restitution to Plaintiffs for all monies received from Plaintiffs and disgorge all profits obtained from Plaintiffs, together with prejudgment and post-judgment interest thereon as allowed by law; and

4. For Plaintiffs' reasonable attorneys' fees incurred herein.

On all Claims for Relief:

1. For Plaintiffs' costs of suit herein incurred; and

2. For such other and further relief as the Court may deem just.

DATED: June 5, 2012

NANCY SHER COHEN
LARY ALAN RAPPAPORT
JOSHUA POLLACK
PROSKAUER ROSE LLP

JOHN FAILLA (applying for *pro hac vice* admission)
ELISE YABLONSKI (applying for *pro hac vice* admission)
NATHAN LANDER (applying for *pro hac vice* admission)

Attorneys for Plaintiffs

Nancy Sher Cohen

Attorneys for Plaintiffs

112

EXHIBIT 3 - PAGE 314

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the above-entitled action on all claims for relief for which plaintiffs are entitled to a trial by jury.

DATED: June 5, 2012

NANCY SHER COHEN
LARY ALAN RAPPAPORT
JOSHUA POLLACK
PROSKAUER ROSE LLP

JOHN FAILLA (applying for *pro hac vice* admission)
ELISE YABLONSKI (applying for *pro hac vice* admission)
NATHAN LANDER (applying for *pro hac vice* admission)

Nancy Sher Cohen

Attorneys for Plaintiffs

113

EXHIBIT 3 - PAGE 315

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐ ) | **DEFENDANTS** |
|---|---|
| WILMINGTON SAVINGS FUND SOCIETY, FSB, etc., et al. | PHL VARIABLE INSURANCE COMPANY, et al. |

| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Nancy Sher Cohen (SBN 081706)<br>Proskauer Rose LLP<br>2049 Century Park East<br>Suite 3200<br>Los Angeles, California 90067-3206<br>Telephone: (310) 557-2900 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff     ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant     ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No     ☒ **MONEY DEMANDED IN COMPLAINT: $** 466,900,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

18 U.S.C. § 1962(C); 18 U.S.C. § 1962(d) - RICO

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER<br>PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☒ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: _____ **CV12-04926**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

ORIGINAL   EXHIBIT 3 - PAGE 316

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No ☐ Yes

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply) ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Please see attached sheet |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | PHL Variable Insurance Company - CT; Phoenix Life Insurance Company - DE; The Phoenix Companies, Inc. - NY |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Nancy Sher Cohen / jp_  Date June 5, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

EXHIBIT 3 - PAGE 317

## ATTACHMENT

| PLAINTIFFS | STATE |
| --- | --- |
| John Doe Trust 1 | Delaware |
| Jane Doe Trust 2 | Delaware |
| John Doe Trust 3 | Delaware |
| Jane Doe Trust 4 | Delaware |
| John Doe Trust 5 | Delaware |
| John Doe Trust 6 | Delaware |
| Jane Doe Trust 7 | Delaware |
| John Doe Trust 8 | Delaware |
| John Doe Trust 9 | Delaware |
| John Doe Trust 10 | Delaware |
| John Doe Trust 11 | Delaware |
| John Doe Trust 12 | Delaware |
| John Doe Trust 13 | Delaware |
| John Doe Trust 14 | Delaware |
| John Doe Trust 15 | Delaware |
| John Doe Trust 16 | Delaware |
| John Doe Trust 17 | Delaware |
| John Doe Trust 18 | Delaware |
| John Doe Trust 19 | Delaware |
| John Doe Trust 20 | Delaware |
| John Doe Trust 21 | Delaware |
| Jane Doe Trust 22 | Delaware |
| John Doe Trust 23 | Delaware |

EXHIBIT 3 - PAGE 318

| | |
|---|---|
| John Doe Trust 24 | Delaware |
| John Doe Trust 25 | Delaware |
| John Doe Trust 26 | Delaware |
| Jane Doe Trust 27 | Delaware |
| John Doe Trust 28 | Delaware |
| John Doe Trust 29 | Delaware |
| John Doe Trust 30 | Delaware |
| John Doe Trust 31 | Delaware |
| John Doe Trust 32 | Delaware |
| John Doe Trust 33 | Delaware |
| John Doe Trust 34 | Delaware |
| John Doe Trust 35 | Delaware |
| John Doe Trust 36 | Delaware |
| Jane Doe Trust 37 | Delaware |
| John Doe Trust 38 | Delaware |
| John Doe Trust 39 | Delaware |
| Jane Doe Trust 40 | Delaware |
| John Doe Trust 41 | Delaware |
| Jane Doe Trust 42 | Delaware |
| Jane Doe Trust 43 | Delaware |
| John Doe Trust 44 | Delaware |
| John Doe Trust 45 | Delaware |
| John Doe Trust 46 | Delaware |
| Jane Doe Trust 47 | Delaware |
| John Doe Trust 48 | Delaware |
| John Doe Trust 49 | Delaware |
| John Doe Trust 50 | Delaware |

EXHIBIT 3 - PAGE 319

| | |
|---|---|
| John Doe Trust 51 | Delaware |
| Jane Doe Trust 52 | Delaware |
| Jane Doe Trust 53 | Delaware |
| John Doe Trust 54 | Delaware |
| John Doe Trust 55 | Delaware |
| John Doe Trust 56 | Delaware |
| Jane Doe Trust 57 | Delaware |
| John Doe Trust 58 | Delaware |
| Jane Doe Trust 59 | Delaware |
| John Doe Trust 60 | Delaware |

EXHIBIT 3 - PAGE 320